UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA

    - against -

ERIC ADAMS,

      Defendant.

No. 24-CR-556 (DEH)

**DEFENDANT ERIC ADAMS'S MEMORANDUM OF LAW IN SUPPORT OF
<u>HIS MOTION FOR AN EVIDENTIARY HEARING AND FOR SANCTIONS</u>**

**TABLE OF CONTENTS**

Page

BACKGROUND ................................................................................................................... 3

ARGUMENT ....................................................................................................................... 9

I.     APPLICABLE LEGAL PRINCIPLES ................................................................... 9

II.     MAYOR ADAMS HAS ESTABLISHED A *PRIMA FACIE* SHOWING OF
VIOLATIONS OF GRAND JURY SECRECY ................................................... 11

      A.     There Have Been Repeated Leaks Of Protected Grand Jury Information ............ 12

      B.     The Leaks Came From The Government ................................................. 14

III.    THE LEAKS HAVE PREJUDICED MAYOR ADAMS .................................. 16

IV.    MAYOR ADAMS IS ENTITLED TO AN EVIDENTIARY HEARING ........................ 18

CONCLUSION .................................................................................................................. 22

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*In re Archuleta*,
  432 F. Supp. 583 (S.D.N.Y. 1977) .......................................................................19, 21

*Barry v. United States*,
  865 F.2d 1317 (D.C. Cir. 1989)............................................................... *passim*

*Campbell v. Bradshaw*,
  674 F.3d 578 (6th Cir. 2012) ........................................................................22

*Douglas Oil Co. of Cal. v. Petrol Stops Nw.*,
  441 U.S. 211 (1979) ...........................................................................9

*Ganek v. Leibowitz*,
  No. 15-cv-01446 (S.D.N.Y. filed Feb. 26, 2015) (Dkt. No. 1) ...........................................19, 20

*In re Grand Jury Investigation*,
  No. 87-cv-00163, 1987 WL 8073 (E.D.N.Y. Feb. 23, 1987) ...................................................14

*In re Grand Jury Investigation (90-3-2)*,
  748 F. Supp. 1188 (E.D. Mich. 1990) ........................................................................22

*In re Grand Jury Investigation (Lance)*,
  610 F.2d 202 (5th Cir. 1980) ........................................................................10, 18

*In re Grand Jury Matter (Catania)*,
  682 F.2d 61 (3d Cir. 1982)...........................................................................14

*In re Motions of Dow Jones & Co.*,
  142 F.3d 496 (D.C. Cir. 1998)....................................................... 12, 13, 14

*In re Sealed Case No. 98-3077*,
  151 F.3d 1059 (D.C. Cir. 1998)............................................................ *passim*

*United States v. Bonanno*,
  177 F. Supp. 106 (S.D.N.Y. 1959) ........................................................................22

*United States v. Coughlan*,
  842 F.2d 737 (4th Cir. 1988) ........................................................ 2, 10, 21

*United States v. Cuervelo*,
  949 F.2d 559 (2d Cir. 1991) ........................................................ 11, 19, 21

*United States v. Friedman*,
    854 F.2d 535 (2d Cir. 1988) ................................................................................ 9

*United States v. Jacobs*,
    547 F.2d 772 (2d Cir. 1976) .............................................................................. 11

*United States v. Leeper*,
    No. 06-cr-00058, 2006 WL 1455485 (W.D.N.Y. May 22, 2006)............................ 11

*United States v. Omni Intl Corp.*,
    634 F. Supp. 1414 (D. Md. 1986)........................................................................ 21

*United States v. Rioux*,
    97 F.3d 648 (2d Cir. 1996)........................................................................ 9, 10, 15

*United States v. Ross*,
    372 F.3d 1097 (9th Cir. 2004) ............................................................................ 21

*United States v. Silver*,
    103 F. Supp. 3d 370 (S.D.N.Y. 2015) ................................................................. 20

*United States v. Silver*,
    No. 15-cr-00093 (S.D.N.Y. filed Feb. 24, 2015) (Dkt. No. 12) ............................ 19

*United States v. Skelos*,
    No. 15-cr-00317, 2015 WL 6159326 (S.D.N.Y. Oct. 20, 2015) .......... 11, 12, 19, 20

*United States v. Walters*,
    910 F.3d 11 (2d Cir. 2018)................................................................. 2, 17, 20, 21

## Rules

Fed. R. Crim. P. 6(e) ............................................................................................ *passim*

S.D.N.Y. Local R. 23.1 ............................................................................................. 18

## Other Authorities

James Burnham & Yaakov Roth, Opinion, <u>Prosecutors Overreach in the Case
    Against Eric Adams</u>, *Wall St. J.* (Sept. 29, 2024),
    https://www.wsj.com/opinion/prosecutors-overreach-in-the-case-against-eric-
    adams-evidence-bribery-claims-mayor-new-york-d7775822 ................................ 17

Rich Calder et al., <u>If de Blasio Won't Talk, His Staff Will</u>, *N.Y. Post* (Apr. 28,
    2016, at 11:29 a.m.), https://nypost.com/2016/04/27/de-blasio-staffers-
    slapped-with-subpoenas-as-scandal-deepens/ ..................................................... 20

Nicholas Fandos, Ocasio-Cortez Says Adams Should Resign 'for the Good of the
    City,' *N.Y. Times* (Sept. 25, 2024),
    https://www.nytimes.com/2024/09/25/nyregion/aoc-eric-adams-resign.html .........................17

John Miller, Investigation into NYC Mayor Adams Focused on Campaign Money
    and Possible Foreign Influence, CNN (Nov. 14, 2023),
    https://www.cnn.com/2023/11/14/politics/mayor-eric-adams-investigation-
    campaign-money-foreign-influence/index.html...................................................................5, 12

Gloria Pazmino et al., FBI Investigation of NYC Mayor Eric Adams Fundraiser
    Centers on Illegal Contributions from Foreign Nationals, CNN (Nov. 4, 2023),
    https://www.cnn.com/2023/11/02/politics/fbi-search-fundraiser-adams-
    campaign-new-york/index.html...........................................................................................4, 14

*Grand Jury Secrecy*, 1 FED. PRAC. & PROC. CRIM. § 107 (5th ed. 2024) .......................................21

William K. Rashbaum et al., City Hall Aide Is Cooperating with Corruption
    Investigation into Adams, *N.Y. Times* (May 20, 2024),
    https://www.nytimes.com/2024/05/20/nyregion/adams-fbi-corruption-
    investigation-aide.html................................................................................................ 6, 13, 16

William K. Rashbaum et al., Eric Adams and His Campaign Receive Subpoenas
    in Federal Investigation, *N.Y. Times* (Aug. 15, 2024),
    https://www.nytimes.com/2024/08/15/nyregion/eric-adams-fbi-
    investigation.html ............................................................................................................7, 13

William K. Rashbaum et al., Eric Adams Is Indicted After Federal Corruption
    Investigation, *N.Y. Times* (Sept. 25, 2024),
    https://www.nytimes.com/2024/09/25/nyregion/eric-adams-indicted.html ....................1, 7, 15

William K. Rashbaum et al., F.B.I. Examining Free Airfare Upgrades Received
    by Adams, *N.Y. Times* (Apr. 5, 2024),
    https://www.nytimes.com/2024/04/05/nyregion/eric-adams-turkish-airlines-
    upgrades.html.................................................................................................................6, 13

William K. Rashbaum et al., F.B.I. Examining Whether Adams Cleared Red Tape
    for Turkish Government, *N.Y. Times* (Nov. 12, 2023),
    https://www.nytimes.com/2023/11/12/nyregion/eric-adams-investigation-
    turkey-consulate.html.....................................................................................................5, 12

William K. Rashbaum et al., F.B.I. Raided Homes of Second Adams Aide and
    Ex-Turkish Airline Official, *N.Y. Times* (Nov. 16, 2023),
    https://www.nytimes.com/2023/11/16/nyregion/nyc-adams-turkey-raid-
    aide.html.......................................................................................................................5, 17

William K. Rashbaum et al., <u>F.B.I. Seizes Eric Adams's Phones as Campaign Investigation Intensifies</u>, *N.Y. Times* (Nov. 10, 2023), https://www.nytimes.com/2023/11/10/nyregion/adams-fbi-investigation-phones.html ..................................................................................................................... 4

William K. Rashbaum et al., <u>Firm Run by Brother of Top N.Y.C. Officials Is Focus of Bribery Inquiry</u>, *N.Y. Times* (September 10, 2024), https://www.nytimes.com/2024/09/10/nyregions/adams-banks-consultant-investigation.html ................................................................................................................... 8

William K. Rashbaum et al., <u>Mayor Eric Adams Faces Crisis as U.S. Investigations Reach Inner Circle</u>, *N.Y. Times* (Sept. 5, 2024), https://www.nytimes.com/2024/09/05/nyregion/banks-sheena-fbi-search-nyc.html ................................................................................................................................. 8

William K. Rashbaum et al., <u>U.S. Inquiry into N.Y. Mayor's Foreign Ties Said to Include 6 Countries</u>, *N.Y. Times* (Sept. 23, 2024), https://www.nytimes.com/2024/09/23/nyregion/fbi-adams-qatar-israel-china-uzbekistan-korea.html ...................................................................................................... 7

William K. Rashbaum et al., <u>U.S. Investigating Whether Adams Received Illegal Donations from Turkey</u>, *N.Y. Times* (Nov. 2, 2023), https://www.nytimes.com/2023/11/02/nyregion/eric-adams-brianna-suggs-fbi-raid.html ......................................................................................................... 3, 12, 13

Daniel C. Richman, *Grand Jury Secrecy: Plugging the Leaks in an Empty Bucket*, 36 AM. CRIM. L. REV. 339, 346 (1999) ................................................................. 16

UNITED STATES DEP'T OF JUSTICE, JUSTICE MANUAL, §§ 1-7.100 & 1-7.610 – General Need for Confidentiality & Concerns of Prejudice (last updated Apr. 2018) ................................................................................................ 18

Damian Williams, U.S. Att'y for the S. Dist. of N.Y., Press Conference on the Unsealing of the Indictment (Sept. 26, 2024) , *available at* https://www.youtube.com/watch?v=34j75z5X0ZM ........................................... 2, 21

## PRELIMINARY STATEMENT

For nearly a year, the government has leaked grand jury material and other sensitive information to the media to aggrandize itself, further its investigation, and unfairly prejudice the defendant, Mayor Eric Adams.  These leaks have disclosed the targets of the government's investigation, the nature of evidence being sought and seized in furtherance of the investigation, the identities of witnesses subpoenaed to testify before the grand jury, the government's operative prosecution theory, the specific strategies and direction of the investigation as it progressed, and characterizations of the status of key witnesses.  The net effect of the government's leaks was that, by the time that charges against Mayor Adams were unsealed on September 26, 2024, most of the details of the indictment and the evidence underpinning the government's case (weak as it is) had already been widely reported in the national and local press.  In fact, the day before the indictment was unsealed—and even before the Mayor's counsel was notified of the indictment—*The New York Times* reported that the Mayor "has been indicted in a federal corruption investigation, people with knowledge of the matter said," and that "[f]ederal prosecutors were expected to announce more details on Thursday."  *See* William K. Rashbaum et al., <u>Eric Adams Is Indicted After Federal Corruption Investigation</u>, *N.Y. Times* (Sept. 25, 2024).[1]  Only three groups of people could have known the indictment had been returned at the time it was leaked to *The Times*:  the prosecution team, the grand jurors, and court staff who processed the then-sealed indictment.  But of those, only the prosecution team would have been privy to the government's plan to announce additional details the next day (as it did in a self-laudatory press conference).  It is therefore clear that the prosecution team is responsible for the leak.

---

[1]  *Available at* https://www.nytimes.com/2024/09/25/nyregion/eric-adams-indicted.html.

The government has shown an appalling disregard for Mayor Adams's rights and the grand jury secrecy provisions of Rule 6(e).  *See* Fed. R. Crim. P. 6(e)(2).  The Mayor's counsel has repeatedly pleaded with the government to plug the leaks and launch an internal investigation.  *See* Perry Decl. Exs. 1-3.  The government has ignored these requests, not even bothering to respond to written submissions documenting the pattern of leaks.

This Court should remedy the government's brazen violations of the rules governing grand jury secrecy.  "The leaking of confidential grand jury information to members of the press, whether to satisfy public interest in high-profile criminal prosecutions or to generate evidentiary leads, is serious misconduct and, indeed, likely criminal."  *United States v. Walters*, 910 F.3d 11, 23 (2d Cir. 2018).  Given the government's refusal to police its own misconduct, the Court must intervene to protect the Mayor's pretrial and trial rights, preserve the integrity of the judicial process, and ensure ongoing compliance with Rule 6(e) in a case where the government admits it is still looking for evidence to support its theories.  Damian Williams, U.S. Att'y for the S. Dist. of N.Y., Press Conference on the Unsealing of the Indictment (Sept. 26, 2024) [hereinafter "Williams Press Conference"].[2]  As described below, Mayor Adams has met his *prima facie* burden of establishing a Rule 6(e) violation, and thus the Court should hold an evidentiary hearing to develop the record as to the scope of the prosecution team's misconduct and the appropriate remedy, including dismissal of the indictment, *Walters*, 910 F.3d at 23, suppression of evidence, *United States v. Coughlan*, 842 F.2d 737, 740 (4th Cir. 1988), contempt, Fed. R. Crim. P. 6(e)(7), and other equitable relief, *Barry v. United States*, 865 F.2d 1317, 1321 (D.C. Cir. 1989).

---

[2] *Available at* https://www.youtube.com/watch?v=34j75z5X0ZM.

## BACKGROUND

Since at least November 2023, *The New York Times* and other prominent news outlets have published a series of articles detailing the grand jury investigation that ultimately led to Mayor Adams's indictment on September 26, 2024.[3]  Citing unidentified sources "familiar with aspects of the probe," "familiar with the federal investigation," or "with knowledge of the matter"—and sometimes *expressly citing* anonymous law-enforcement sources—these articles disclosed non-public information relating to investigative theories and strategies, as well as specific evidence being sought by and presented to the grand jury.

The nature of these leaks leaves no doubt as to their provenance.  A non-exhaustive chronology proves the point:  On November 2, 2023, *The New York Times* reported that it had obtained a copy of a search warrant for the residence of Brianna Suggs (an employee of Mayor Adams's 2021 campaign) and that the warrant sought information relating to a potential "straw donor scheme" and connections to Turkish officials, among other things.  *See* William K. Rashbaum et al., U.S. Investigating Whether Adams Received Illegal Donations from Turkey, *N.Y. Times* (Nov. 2, 2023).[4]  The article also set out a detailed description of materials seized by the FBI during the search ("three iPhones and two laptop computers, along with papers and other evidence, including something agents identified as 'manila folder labeled Eric Adams,' seven 'contribution card binders' and other materials, according to the documents"), which had occurred that same day.  *Id.*  It also disclosed that agents had served Ms. Suggs with a subpoena to testify before the grand jury.  *Id.  The Times* relied on "[a] person with knowledge of the raid" in reporting

---

[3]  In each instance, after the initial reporting, the stories were picked up and disseminated widely by other news outlets.

[4]  *Available at* https://www.nytimes.com/2023/11/02/nyregion/eric-adams-brianna-suggs-fbi-raid.html.

these details.  Given the specificity of the article, and because the search warrant obtained by *The Times* remains under seal today, the source very likely was a member of the prosecution team.

Two days later, on November 4, 2023, CNN confirmed the sourcing, reporting that, according to "*law enforcement officials* who are familiar with the search warrants," the ongoing investigation sought to "determine whether Adams's 2021 mayoral campaign conspired with a Brooklyn-based construction company to funnel foreign money into the campaign coffers." Gloria Pazmino et al., FBI Investigation of NYC Mayor Eric Adams Fundraiser Centers on Illegal Contributions from Foreign Nationals, CNN (Nov. 4, 2023) (emphasis added).[5]  The article explicitly reported that "multiple law enforcement officials told CNN" the details of the investigation.  The article also identified the construction company that was under investigation and noted that the investigation was focused on potential "straw" donations by individuals affiliated with Turkey. *Id.*

The following week, on November 10, 2023, *The Times* reported in detail how the government had obtained a warrant for Mayor Adams's devices, how the FBI had gone about executing the warrant and seizing the devices, and how the devices were returned to the Mayor a few days later. *See* William K. Rashbaum et al., F.B.I. Seizes Eric Adams's Phones as Campaign Investigation Intensifies, *N.Y. Times* (Nov. 10, 2023).[6]  *The Times* sourced its reporting to "a person with knowledge of the matter" and "another person familiar with the situation," *id.*—commonplace anonyms for government insiders.

---

[5]  *Available at* https://www.cnn.com/2023/11/02/politics/fbi-search-fundraiser-adams-campaign-new-york/index.html.

[6]  *Available at* https://www.nytimes.com/2023/11/10/nyregion/adams-fbi-investigation-phones.html.

Two days later, *The Times* reported that, according to "three people with knowledge of the matter," the grand jury investigation was also focused on whether the Mayor had pressured the FDNY on behalf of the Turkish embassy.  *See* William K. Rashbaum et al., <u>F.B.I. Examining Whether Adams Cleared Red Tape for Turkish Government</u>, *N.Y. Times* (Nov. 12, 2023).[7] According to these sources, the FBI had been interviewing top FDNY officials since the spring, and those interviews included two FBI agents assigned to the same squad that searched Ms. Suggs's residence.  *Id.*  The knowledgeable sources also disclosed that agents had asked "detailed questions" about "safety issues, the approval process and whether pressure had been brought to bear and by whom."  *Id.*  Among other telling details, only the government would have known which specific agents were assigned to two separate investigative actions (*i.e.*, the search of Ms. Suggs's home and the FDNY interviews months earlier).

On November 14, 2023, CNN disclosed that, according to a source "familiar with the aspects of the probe involving the fire department," FDNY Commissioner Daniel Nigro had received a grand jury subpoena seeking his testimony and had agreed to a voluntary FBI interview. John Miller, <u>Investigation into NYC Mayor Adams Focused on Campaign Money and Possible Foreign Influence</u>, CNN (Nov. 14, 2023).[8]

On November 16, 2023, *The Times*, after consulting "several people with knowledge of the matter," wrote that the FBI had "searched the New Jersey houses of Rana Abbasova, an aide in Mr. Adams's international affairs office . . . and Cenk Öcal, a former Turkish Airlines executive who served on his transition team."  William K. Rashbaum et al., <u>F.B.I. Raided Homes of Second</u>

---

[7] *Available at* https://www.nytimes.com/2023/11/12/nyregion/eric-adams-investigation-turkey-consulate.html.

[8] *Available at* https://www.cnn.com/2023/11/14/politics/mayor-eric-adams-investigation-campaign-money-foreign-influence/index.html.

Adams Aide and Ex-Turkish Airline Official, *N.Y. Times* (Nov. 16, 2023).[9]  The article reported that the searches were conducted by "separate teams" of agents, *id.*—a fact no one outside the government would have known.

On April 5, 2024, *The Times* reported that the investigation was now focused on commercial flight upgrades, writing that "[f]ederal prosecutors in Manhattan and F.B.I. agents conducting the inquiry have developed evidence that Mr. [Cenk] Öcal," the Turkish Airlines employee, "helped arrange at least some of the upgrades in coordination with Ms. Abbasova." William K. Rashbaum et al., F.B.I. Examining Free Airfare Upgrades Received by Adams, *N.Y. Times* (Apr. 5, 2024).[10]  These details were attributed to two people "familiar with the federal investigation" who agreed to speak on the condition of anonymity.  *Id.*[11]

On May 20, 2024, *The Times* reported that Ms. Abbasova had "turned against" the Mayor and was cooperating with the investigation, according to "three people with knowledge of the matter."  *See* William K. Rashbaum et al., City Hall Aide Is Cooperating with Corruption Investigation into Adams, *N.Y. Times* (May 20, 2024).[12]  The article reported that Ms. Abbasova "began talking with the team of F.B.I. agents and federal prosecutors conducting the corruption investigation in the weeks after the F.B.I. searched her home on Nov. 2."  *Id.*

---

[9]  *Available at* https://www.nytimes.com/2023/11/16/nyregion/nyc-adams-turkey-raid-aide.html.

[10]  *Available at* https://www.nytimes.com/2024/04/05/nyregion/eric-adams-turkish-airlines-upgrades.html.

[11]  The article referred to flight upgrades where Mayor Adams purportedly received "the highest class" seats available on Turkish airlines, an odd turn-of-phrase that also appears in the indictment itself.  *See* Indictment (ECF No. 1) at ¶ 12a.

[12]  *Available at* https://www.nytimes.com/2024/05/20/nyregion/adams-fbi-corruption-investigation-aide.html.

On August 15, 2024, *The Times* reported on the issuance of "a new round of grand jury subpoenas" to "Mr. Adams himself, to City Hall and to his election committee, according to four people with knowledge of the matter," adding that "[t]he subpoenas contain similar language and seek information in a number of areas, including travel by the mayor, his aides and others, as well as fund-raising."  *See* William K. Rashbaum et al., <u>Eric Adams and His Campaign Receive Subpoenas in Federal Investigation</u>, *N.Y. Times* (Aug. 15, 2024).[13]  It is self-evident that only members of the prosecution team had knowledge of all of these subpoenas, including the specific language used in the subpoenas.

On September 23, 2024, *The Times* reported that, according to "people with knowledge of the matter," prosecutors had expanded the scope of the investigation to encompass Mayor Adams's alleged interactions with countries other than Turkey, and the grand jury had issued subpoenas seeking information related to these additional countries.  *See* William K. Rashbaum et al., <u>U.S. Inquiry Into N.Y. Mayor's Foreign Ties Said to Include 6 Countries</u>, *N.Y. Times* (Sept. 23, 2024).[14]

And on September 25, 2024, before the indictment was unsealed and even before the Mayor's counsel was notified of the indictment, *The Times* reported that the Mayor "has been indicted in a federal corruption investigation, people with knowledge of the matter said," and that "[f]ederal prosecutors were expected to announce more details on Thursday."  *See* Rashbaum, <u>Eric Adams Is Indicted</u>, *supra* p. 1.  There can be little doubt that the source of this leaked information was the prosecution team, since neither a grand juror nor the court staff would have been privy to the government's plan to announce more details the next day.

---

[13]  *Available at* https://www.nytimes.com/2024/08/15/nyregion/eric-adams-fbi-investigation.html.

[14]  *Available at* https://www.nytimes.com/2024/09/23/nyregion/fbi-adams-qatar-israel-china-uzbekistan-korea.html.

The prejudice from these leaks has been severe.  A cascade of critical articles based on one-sided, misleading leaks by the government has eroded public support for the Mayor long before he was ever charged with a crime and able to defend himself in court.  Nor have the leaks been limited to investigative details relating to the allegations in the indictment; the government also has spoon-fed the media confidential information concerning other non-public, uncharged theories and avenues of investigation.  *See, e.g.*, William K. Rashbaum et al., Mayor Eric Adams Faces Crisis as U.S. Investigations Reach Inner Circle, *N.Y. Times* (Sept. 5, 2024);[15] William K. Rashbaum et al., Firm Run by Brother of Top N.Y.C. Officials Is Focus of Bribery Inquiry, *N.Y. Times* (September 10, 2024).[16]  The predictable effect has been to create a specter of broader misconduct—in contrast to the indictment's narrow allegations concerning receipt of matching campaign funds for approximately $18,000 of contributions, and a specious (and non-sensical) "bribery" theory that does not state a federal crime at all.  *See* Mot. to Dismiss Count V, ECF Nos. 13-14 (Sept. 30, 2024).  By design, the government's leaks have steadily created a facade of guilt, resulting in intense, negative scrutiny of Mayor Adams and his administration.  And by leaking information to the press, the government has infringed the Mayor's right to a taint-free grand jury process and impeded his ability to obtain a fair trial from an impartial jury.

To protect the Mayor's rights, his counsel has diligently flagged these concerns for the government.  On June 7, 2024, and again on August 13, 2024, the Mayor's counsel wrote to the government to document the recurrent leaks and to request that the government investigate the source of the leaks.  Perry Decl. Exs. 1-2.  The government flat-out ignored both letters.  In a phone

---

[15]  *Available at* https://www.nytimes.com/2024/09/05/nyregion/banks-sheena-fbi-search-nyc.html.

[16]  *Available at* https://www.nytimes.com/2024/09/10/nyregions/adams-banks-consultant-investigation.html.

call with prosecutors on August 20, 2024, Mayor Adams's counsel re-raised the issue of the grand jury leaks and noted that the government still had not responded to the letters and requests for an investigation.  The government again summarily dismissed the concerns.  *See* Perry Decl. Ex. 3.

The government has never disavowed its responsibility for the repeated leaks of grand jury information in violation of Rule 6(e) and in flagrant violation of the Mayor's rights.  Nor does the government appear to have taken any action whatsoever to try to turn off the spigot of confidential investigative information that began flowing to the media nearly a year before the Mayor was charged.  Accordingly, there is good reason to believe that the government will continue to leak information ahead of trial, notwithstanding Rule 6(e) and any protective order that the Court may enter.

## ARGUMENT

## I.    APPLICABLE LEGAL PRINCIPLES

Grand jury secrecy is a fundamental tenet of federal investigations, ensuring that witnesses testify fully and frankly, investigations are free from improper influence, and later-exonerated investigatory targets are not subjected to unnecessary exposure.  *See Douglas Oil Co. of Cal. v. Petrol Stops Nw.*, 441 U.S. 211, 218-19 (1979) ("[T]he proper functioning of our grand jury system depends upon the secrecy of grand jury proceedings.").  Violations of grand jury secrecy rules can be so prejudicial that they can "jeopardize[] the defendant's right to a fair trial before a petit jury." *United States v. Friedman*, 854 F.2d 535, 583 (2d Cir. 1988).

Rule 6(e) safeguards these interests by prohibiting government personnel from disclosing matters occurring before a grand jury.  *See* Fed. R. Crim. P. 6(e)(2)(B).  And courts, in turn, permit criminal defendants and targets of grand jury investigations to enforce Rule 6(e)(2).  *See In re Sealed Case No. 98-3077*, 151 F.3d 1059, 1067-77 (D.C. Cir. 1998); *Barry*, 865 F.2d at 1321; *see also United States v. Rioux*, 97 F.3d 648, 662 (2d Cir. 1996).  If the victim of a grand jury leak sets

forth "a *prima facie* case of a violation of Rule 6(e)(2)," the presiding court "must conduct a 'show cause' hearing to determine whether" the violation occurred. *Barry*, 865 F.2d at 1321.

The movant's burden to make out a *prima facie* case and obtain an evidentiary hearing "is relatively light." *Sealed Case No. 98-3077*, 151 F.3d at 1068 n.7. In the context of leaks to the media, the Second Circuit has identified several non-exhaustive factors that courts should consider: "(1) whether the media reports disclose matters occurring before the grand jury; (2) whether the media report discloses the source as one prohibited under Rule 6(e); and (3) evidence presented by the government to rebut allegations of a violation of Rule 6(e)." *Rioux*, 97 F.3d at 662. But the media reports need not "expressly implicate the Justice Department as the source of [a] disclosure[] if the nature of the information disclosed furnishes the connection." *Barry*, 865 F.2d at 1325 (quoting *In re Grand Jury Investigation (Lance)*, 610 F.2d 202, 218 (5th Cir. 1980)). And even if the connection is not evident from the nature of the disclosure, "the seriousness of a disclosure may militate in favor of a further investigation of its source in the form of an evidentiary hearing." *Lance*, 610 F.2d at 219.

Once a "*prima facie* case has been established, the burden shifts to the government to 'attempt to explain its actions' in a show cause hearing. If the government fails to rebut the *prima facie* case, a violation of Rule 6(e)(2) is deemed to have occurred." *Sealed Case No. 98-3077*, 151 F.3d at 1068 (quoting *Barry*, 865 F.2d at 1326). The court has numerous remedies available to it, including, for example, dismissal of indictment, *id.*; *see also Rioux*, 97 F.3d at 662; suppression of grand jury material, *Coughlan*, 842 F.2d at 740; contempt, Fed. R. Crim. P. 6(e)(7); and other equitable relief, *Barry*, 865 F.3d at 1321.

Moreover, even apart from Rule 6(e), a district court may invoke its inherent supervisory authority to hold an evidentiary hearing about misconduct involving the grand jury. *See, e.g.*,

*United States v. Jacobs*, 547 F.2d 772, 778 (2d Cir. 1976) (affirming suppression of testimony and dismissal of a charged count for misconduct before a grand jury); *United States v. Leeper*, No. 06-cr-00058, 2006 WL 1455485, at *4-5 (W.D.N.Y. May 22, 2006) ("To let [an] indictment stand" after "prosecutorial misconduct has undermined the grand jury's ability to make an informed and objective evaluation of the evidence presented to it" would serve no interest of justice, "would make a mockery out of the entire grand jury process[,] and would render the Grand Jury Clause a nullity." (citations and quotations marks omitted)).  "A hearing allows for a searching inquiry into the particulars of the investigative process employed by the government," which "permits factual determinations to be made by the district judge" about that process.  *United States v. Cuervelo*, 949 F.2d 559, 567 (2d Cir. 1991).  Thus, when faced with evidence of government misconduct that potentially affected grand jury proceedings, "conducting a hearing is the preferred course of action in cases where disputed factual issues exist."  *Id.*

## II.    MAYOR ADAMS HAS ESTABLISHED A *PRIMA FACIE* SHOWING OF VIOLATIONS OF GRAND JURY SECRECY

The record establishes that the government has systematically leaked secret grand jury material throughout the investigation in violation of Rule 6(e).  The leaks have disclosed the use of grand jury subpoenas to seek specific evidence and testimony, the specific areas of investigative inquiry, identification of purportedly cooperating witnesses, and even the fact that a still-sealed indictment was returned.  That the leaks have specifically involved grand jury information, as opposed to investigative information independent of the grand jury, is also apparent because much of the leaked information mirrors the allegations in the indictment.  *See United States v. Skelos*, No. 15-cr-00317, 2015 WL 6159326, at *9 (S.D.N.Y. Oct. 20, 2015) (Rule 6(e)(2) "[p]rotection also extends beyond the literal evidence that is presented to include anything that may tend to

reveal what transpired before [the grand jury]").  These facts dispel any doubt that the leaks came from government agents subject to Rule 6(e)(2)(B).

### A.    There Have Been Repeated Leaks Of Protected Grand Jury Information

For nearly a year, *The New York Times* and other media outlets have published articles detailing leaks of various categories of information covered by the grand jury secrecy rule.  Those leaks included the identities of witnesses called to testify before the grand jury and characterizations of witness testimony.  *See In re Motions of Dow Jones & Co.*, 142 F.3d 496, 500 (D.C. Cir. 1998) ("identities of witnesses or jurors" are "[e]ncompassed within the rule of secrecy"); *Skelos*, 2015 WL 6159326, at *9 ("summaries of grand jury testimony" are protected).  In November 2023, for instance, *The Times* reported that Ms. Suggs's residence was searched and she was subpoenaed to testify before the grand jury.  Rashbaum, U.S. Investigating Whether Adams Received Illegal Donations from Turkey, *supra* p. 3.  The leaked information also primed the grand jury for Ms. Suggs's testimony by revealing that numerous items of "evidence" were seized from her residence, including multiple devices, binders, and a "manila folder labeled Eric Adams."  *Id.*  Later that month, a "source familiar with aspects of the probe" leaked that FDNY Commissioner Daniel Nigro also had been subpoenaed to testify before the grand jury.  Miller, Investigation into NYC Mayor Adams Focused on Campaign Money, *supra* p. 5.  The report of Mr. Nigro's prospective grand jury testimony came just days after *The Times* reported that the investigation was focused on whether Mayor Adams had pressured FDNY officials, and that the FBI had been interviewing such officials for months.  Rashbaum, F.B.I. Examining Whether Adams Cleared Red Tape for Turkish Government, *supra* p. 5.  And in May 2024, *The Times* reported that Ms. Abbasova—another grand jury witness—had "turned against" Mayor Adams

and was providing allegedly inculpatory information to the government.  Rashbaum, <u>City Hall Aide Is Cooperating with Corruption Investigation into Adams</u>, *supra* p. 6.

These leaks regarding Ms. Suggs's, Mr. Nigro's, and Ms. Abbasova's status and testimony plainly breached the secrecy of the ongoing grand jury proceedings.  So did the reporting in August 2024 regarding the issuance of "a new round of grand jury subpoenas" to "Mr. Adams himself, to City Hall and to his election committee, according to four people with knowledge of the matter." Rashbaum, <u>Eric Adams and His Campaign Receive Subpoenas</u>, *supra* p. 7.

In addition to the identities and testimony of grand jury witnesses and the recipients of subpoenas, the unlawful leaks have resulted in disclosure of the evolving focus of the investigation and the evidence being gathered by or presented to the grand jury.  That information is also protected under Rule 6(e).  *Dow Jones*, 142 F.3d at 500 (rule of secrecy encompasses "the strategy or direction of the investigation").  For instance, in November 2023, leaks revealed that the investigation was focusing on potential "straw donors" and connections to individuals affiliated with Turkey.  Rashbaum, <u>U.S. Investigating Whether Adams Received Illegal Donations from Turkey</u>, *supra* p. 3.  That theory permeates the indictment that the grand jury ultimately returned. Similarly, *The Times* reported on a specific construction company under investigation for funneling money to Mayor Adams's campaign, and that the investigation sought to determine whether Mayor Adams had pressured FDNY officials about a building's inspection before he was even Mayor.  And in April 2024, *The Times* again reported on the focus and progress of the grand jury's investigation by disclosing that "[f]ederal prosecutors in Manhattan and F.B.I. agents conducting the inquiry ha[d] developed evidence" regarding flight upgrades—another allegation contained in the indictment.  <u>F.B.I. Examining Free Airfare Upgrades Received by Adams</u>, *supra* pp. 6.  Because all of these leaks mirror the eventual indictment, the government cannot possibly

argue that the leaks involved investigative information independent of what occurred before the grand jury. *See In re Grand Jury Matter (Catania)*, 682 F.2d 61, 63 (3d Cir. 1982) ("anything which may reveal what occurred before the grand jury" qualifies as a prohibited disclosure); *In re Grand Jury Investigation*, No. 87-cv-00163, 1987 WL 8073, at *5 (E.D.N.Y. Feb. 23, 1987) (same).

The reality is that the eventual contours of the grand jury's indictment, as well as the sources from which the grand jury obtained evidence, were available to the public and the prospective jury pool long before the indictment itself, and long before Mayor Adams had the opportunity to defend himself in court. *See Dow Jones*, 142 F.3d at 500 (prohibited disclosures "include[] not only what has occurred and what is occurring, but also what is likely to occur"). There can be no dispute that these leaks undermined Rule 6(e)'s intended protections and the sanctity of the grand jury proceedings.

### B.    The Leaks Came From The Government

The contents and circumstances of the leaks confirm that they stemmed from the government in violation of Rule 6(e)(2). The sources of the repeated leaks were reported as individuals "familiar with the federal investigation" who "spoke on condition of anonymity to discuss the ongoing federal investigation," individuals "familiar with aspects of the probe involving the fire department," individuals "with knowledge of the matter," or "a person with knowledge of the raid" (that included service of a grand jury subpoena)—among other euphemisms for government insiders. At least one article explicitly attributed leaked information to "law enforcement officials." Pazmino, FBI Investigation of NYC Mayor Eric Adams Fundraiser, *supra* p. 4. And the contents of the leaks—including the recipients of grand jury subpoenas, FBI staffing assignments the evolving focus of the investigation, and characterizations of evidence—betrays the source of the leaks as the government and its agents. *Barry*, 865 F.2d at

1325 (media articles need not expressly identify government as source, and "the nature of the information disclosed [can] furnish[] the connection").  As perhaps the most obvious example, the government clearly is responsible for the leaked information that an indictment had been returned before it was unsealed and that "[f]ederal prosecutors were expected to announce more details on Thursday."  Rashbaum, Eric Adams Is Indicted, *supra* p. 1.  As noted above, neither a grand juror nor the court staff would have been privy to the government's plan to announce additional details the next day.

There is no alternative source for the leaks.  The number of leaks, the degree of detail, the disclosure of multiple subpoenas and grand jury witnesses, the fact that *The Times* obtained and reviewed a sealed search warrant, the premature leak of the fact of the indictment itself, and the thinly veiled description of the media's sources all point to the government as the source of the leaks.  The notion that multiple, independent witnesses and court personnel—none of whom had any incentive to leak—were instead the sources is so far-fetched as to be absurd.  The simplest explanation is the correct one here:  The government leaked details of its investigation to tarnish Mayor Adams and serve its own purposes.

\*       \*       \*

On these facts, Mayor Adams easily satisfies his "relatively light" burden to establish a *prima facie* showing of Rule 6(e) violations.  *Sealed Case No. 98-3077*, 151 F.3d at 1068 n.7.  Both of the relevant factors outlined by the Second Circuit—"(1) whether the media reports disclose matters occurring before the grand jury," and "(2) whether the media report[s] disclose[] the source as one prohibited under Rule 6(e)"—point decidedly to Rule 6(e) violations by the government here.  *Rioux*, 97 F.3d at 662.

### III.    THE LEAKS HAVE PREJUDICED MAYOR ADAMS

The *prima facie* case laid out above is sufficient for the Court to hold an evidentiary hearing and force the government to attempt to rebut Mayor Adams's showing.  *See* Section IV, *infra*. Following a hearing where Mayor Adams has an opportunity to further develop the record, including as to the prejudice he has suffered from the leaks, the Court can assess the appropriate remedies.  *See Sealed Case 98-3077*, 151 F.3d at 1076, 1077 n.21 (if "the district court determines that a violation of Rule 6(e)(2) has occurred . . . [t]he movants may then participate in determining the appropriate remedy," at which point an "adversarial presentation may be appropriate, since what appears to be harmless to a district judge may be prejudicial if seen in light of a defense counsel's special familiarity with a given prosecution" (internal quotations and citations omitted)).

Yet even now it is clear that the government's leaks were intended to, and did, prejudice Mayor Adams by affecting the evidence available to the grand jury and its decision to indict.  The most obvious motivation for the government to leak details of its investigation is to strengthen its case (and the public perception of its case) by coalescing support among prospective government witnesses or motivating new potential witnesses to come forward with information.  *See* Daniel C. Richman, *Grand Jury Secrecy: Plugging the Leaks in an Empty Bucket*, 36 Am. Crim. L. Rev. 339, 346 (1999).  In particular, the targeted leaks about the identities of grand jury witnesses and the searches of Ms. Suggs's and Ms. Abbasova's residences seem to have been designed to signal progress and motivate cooperation.

At least in Ms. Abbasova's case, the government's ploy appears to have worked.  Based on reporting by *The Times*, Ms. Abbasova "turned against" Mayor Adams and began cooperating "in the weeks after" her home was searched on November 2, 2023.  *See* Rashbaum, <u>City Hall Aide Is Cooperating with Corruption Investigation</u>, *supra* p. 6.  It therefore appears that Ms. Abbasova did not make the decision to cooperate *immediately* after the search, and her hesitation likely

motivated the government to put additional pressure on her by leaking news of the search two weeks later, when *The Times* reported it on November 16, 2023.  *See* Rashbaum, <u>F.B.I. Raided Homes of Second Adams Aide</u>, *supra* p. 5.  This timeline strongly suggests that the leak was strategic and precipitated the cooperation of the government's central witness—on whose say-so the indictment's flimsy campaign-finance allegations are based.  *Contra Walters*, 910 F.3d at 24 (no prejudice shown where cooperating witness "did not decide to cooperate until approximately six months after the publication of the last article which [Walters] contends contained leaked information." (internal quotations omitted)).  Given Ms. Abbasova's centrality to the allegations, there is no doubt that her cooperation—apparently procured at least in part through a leak— affected the grand jury's decision to indict.

The leaks also likely put pressure on senior Justice Department officials to approve the indictment of the Mayor.  The allegations in the indictment are paper thin, *see* Mot. to Dismiss Count V (ECF Nos. 13-14) (Sept. 30, 2024); James Burnham & Yaakov Roth, Opinion, <u>Prosecutors Overreach in the Case Against Eric Adams</u>, *Wall St. J.* (Sept. 29, 2024),[17] but the prosecution team's leaks and the attendant news coverage boxed in the Department's leadership, which could not be seen to give a pass to a public official who already had been extensively tarnished by the press.

Moreover, since the leaks began, the Mayor has faced intense scrutiny from the media and the public.  More recently, the months-long series of leaks has culminated in calls for the Mayor's resignation by prominent political figures.  *See, e.g.*, Nicholas Fandos, <u>Ocasio-Cortez Says Adams</u>

---

[17] *Available at* https://www.wsj.com/opinion/prosecutors-overreach-in-the-case-against-eric-adams-evidence-bribery-claims-mayor-new-york-d7775822.

Should Resign 'for the Good of the City,' *N.Y. Times* (Sept. 25, 2024).[18]  The leaks also have distracted from, and made more difficult, Mayor Adams's commitment to serving New Yorkers on a daily basis.

There are numerous other ways in which the unlawful leaks have prejudiced Mayor Adams and impacted the grand jury proceedings.  The Department of Justice's own internal policies prohibit federal prosecutors from disseminating the kind of sensitive non-public information that has been leaked here precisely because doing so may "prejudice the rights of a defendant," "prejudice an adjudicative proceeding," and, more generally, "unfairly damage the reputation of a person."  UNITED STATES DEP'T OF JUSTICE, JUSTICE MANUAL, §§ 1-7.100 & 1-7.610 – General Need for Confidentiality & Concerns of Prejudice (last updated Apr. 2018);[19] *see also* S.D.N.Y. Local R. 23.1 (prohibiting lawyers and government agents from releasing non-public information "if there is a substantial likelihood that such dissemination will interfere with a fair trial or otherwise prejudice the due administration of justice").  With an evidentiary hearing, Mayor Adams will be able to substantiate the prejudice the government's leaks have caused and identify the sanctions and remedies necessary to cure the prejudice and deter misconduct in the future.

## IV.    MAYOR ADAMS IS ENTITLED TO AN EVIDENTIARY HEARING

Victims of government leaks rarely have access to information or evidence about the leaks beyond media publications.  *See Sealed Case No. 98-3077*, 151 F.3d at 1067-68.  The government, by contrast, possesses complete information about its agents' communications and the grand jury proceedings, but it also has an interest in disclaiming any violation.  *See id.*; *Lance*, 610 F.2d at 219.  In recognition of this asymmetry, the law requires only that a movant provide media reports

---

[18]  *Available at* https://www.nytimes.com/2024/09/25/nyregion/aoc-eric-adams-resign.html.

[19]  *Available at* https://www.justice.gov/jm/jm-1-7000-media-relations.

"susceptible to [the] interpretation" that a violation occurred to carry the initial burden and prove the necessity of a hearing. *Sealed Case No. 98-3077*, 151 F.3d at 1068 n.7. Here, Mayor Adams has more than satisfied his light burden.

As a result, "the district court must conduct a 'show cause' hearing to determine whether the Government was responsible for the preindictment publicity and whether any information disclosed by the Government concerned matters occurring before the grand jury." *Barry*, 865 F.2d at 1321; *Skelos*, 2015 WL 6159326, at *9 (S.D.N.Y. Oct. 20, 2015) ("Once the defendant has made a *prima facie* showing, the burden then shifts to the Government to rebut the defendant's case in a show cause hearing." (citing *Barry*, 865 F.2d at 1321)). Such a hearing "is the preferred course of action" when a district court is confronted with evidence of government misconduct that may justify dismissal of an indictment. *Cuervelo*, 949 F.2d at 567.

Grand jury leaks have been a fifty-year problem in this District. *See In re Archuleta*, 432 F. Supp. 583, 599 (S.D.N.Y. 1977) (Lasker, J.) (observing that "[b]reaches of grand jury secrecy have been occurring with disturbing frequency" and that "the mere gnashing of judicial teeth should not remain the sole response to such law enforcement behavior" (internal quotations and citation omitted)). In the prosecution of former New York Senate Majority Leader Dean Skelos, for example, government agents leaked a draft criminal complaint that was to be filed under seal in advance of Senator Skelos's arrest. *See Skelos*, 2015 WL 6159326, at *11. Similar leaks occurred during the investigation of former New York Assembly Speaker Sheldon Silver. *See* Def.'s Mot. to Dismiss at 3-4 & nn. 2-3, *United States v. Silver*, No. 15-cr-00093 (S.D.N.Y. filed Feb. 24, 2015) (Dkt. No. 12) (compiling examples of leaks during the investigation and on the day of the assemblyman's arrest). In the securities fraud context, one hedge fund manager has sued a number of government officials for a similar pattern of leaks. *See* Compl. ¶¶ 95-106, *Ganek v.*

*Leibowitz*, No. 15-cv-01446 (S.D.N.Y. filed Feb. 26, 2015) (Dkt. No. 1).  And the investigation of former Mayor Bill de Blasio featured a steady stream of articles reflecting inside information about the strategy and direction of the investigation, even though no charges were ever filed.  *See, e.g.*, Rich Calder et al., <u>If de Blasio Won't Talk, His Staff Will</u>, *N.Y. Post* (Apr. 28, 2016) (citing anonymous sources who described the contents, timing, and recipients of five separate grand jury subpoenas sent to different people, none of whom themselves confirmed the information).[20]

Numerous courts have denounced this improper use of the media by *this very prosecutorial office* to further the government's investigative agenda, yet the misconduct persists.  *See, e.g.*, *Walters*, 910 F.3d at 28 (describing case agent's leak to the press in SDNY prosecution as "deeply disturbing and perhaps even criminal"); *Skelos*, 2015 WL 6159326, at *11 (noting that, in SDNY prosecution, leaked "information should not have been made public, as the Government acknowledges"); *United States v. Silver*, 103 F. Supp. 3d 370, 373, 378 n.6 (S.D.N.Y. 2015) (criticizing government's contacts with the media in SDNY prosecution, including "the media blitz orchestrated by the U.S. Attorney's Office" and leaks of sealed information regarding the defendant's arrest).

A public hearing is imperative to investigate the leaks and impose meaningful consequences.  Although some courts have held that the "show cause" hearing should be conducted *ex parte* and *in camera*, *see, e.g.*, *Sealed Case No. 98-3077*, 151 F.3d at 1075-76, such measures are not required and would not be appropriate here, where charges have been filed publicly.  The egregious pattern of leaks in this case is merely a continuation of the government's years-long pattern of using the media to tarnish the reputation of criminal defendants outside of the courtroom, and it is exactly the kind of persistent governmental misconduct that is properly the subject of a

---

[20]  *Available at* https://nypost.com/2016/04/27/de-blasio-staffers-slapped-with-subpoenas-as-scandal-deepens/.

public evidentiary hearing.  *See Cuervelo*, 949 F.2d at 567 (reversing and remanding for evidentiary hearing regarding government misconduct).  In fact, the Mayor fully expects that the government will support a public hearing on the leaks.  After all, the government purports to make this case about the public's trust in its officials, the harms of concealing information from the public, and "bright red lines."  *See generally* Williams Press Conference.

The remedies imposed after an evidentiary hearing should be commensurate with the severity of the leaks, up to and including dismissal where prejudice is established.  *See Walters*, 910 F.3d at 22-23 ("A district court may exercise its supervisory authority to dismiss an indictment for Rule 6(e) violations.").  But even short of dismissal, the Court's supervisory power provides the flexibility to tailor an appropriate remedy.  *See United States v. Ross*, 372 F.3d 1097, 1107 (9th Cir. 2004) ("The supervisory powers provide a wider range of remedial options than would otherwise exist . . . ."); *United States v. Omni Int'l Corp.*, 634 F. Supp. 1414, 1438-39 (D. Md. 1986) ("A common thread underlying many decisions is that the magnitude of the misconduct affects the use of the supervisory power, whether or not actual prejudice is shown.  In determining the proper remedy pursuant to the supervisory power, the relief chosen should be directly related to the seriousness of the misconduct." (citations omitted)).

Even without a showing of prejudice, "[a] knowing violation of Rule 6. . . may be punished as a contempt of court."  Fed. R. Crim. P. 6(e)(7); *see In re Archuleta*, 432 F. Supp. at 599 (S.D.N.Y. 1977) ("The remedy for improper disclosure of grand jury evidence is to punish the offending party in a contempt proceeding.").  Other possible remedies include suppression of grand jury material or evidence improperly procured through leaks.  *See* Grand Jury Secrecy, 1 Fed. Prac. & Proc. Crim. § 107 (5th ed. 2024); *see also Coughlan*, 842 F.2d at 740 (suppression of grand jury material may be appropriate to remedy Rule 6(e) violation).  Recusal of government agents

complicit in the leaks (or their preclusion from serving as government witnesses) would also be appropriate, as would the replacement of current prosecution teams members who appear to have (at minimum) turned a blind eye to the leaks. *See, e.g.*, *In re Grand Jury Investigation (90-3-2)*, 748 F. Supp. 1188, 1206 (E.D. Mich. 1990) (district court may disqualify parties who violate grand jury secrecy "under its inherent and supervisory powers, if not [Rule 6(e)] itself"). Such alternatives to dismissal are not mutually exclusive and, if this case proceeds to trial, the remedies also should include extensive voir dire, detailed jury questionnaires, and additional peremptory strikes of jurors for Mayor Adams. *See Campbell v. Bradshaw*, 674 F.3d 578, 593-94 (6th Cir. 2012) (voir dire is "the primary tool to determine . . . the impact of the publicity"); *United States v. Bonanno*, 177 F. Supp. 106, 123 (S.D.N.Y. 1959) (granting defendant forty-two peremptory challenges and government only six because of pretrial publicity).

While an evidentiary hearing will help the Court assess the scope of the Rule 6(e) violation, identify the responsible parties, and determine the appropriate remedies, it is already clear that some sanctions are necessary to plug the leaks prospectively. Otherwise, the government will continue to use strategic disclosures in the media to gain a tactical advantage in this case, including by tainting the jury pool, and to tarnish Mayor Adams's reputation. The Court must intervene.

## CONCLUSION

For the foregoing reasons, Mayor Adams respectfully requests that the Court order an evidentiary hearing in connection with the government's persistent leaks of grand jury material and other confidential information.

Dated:  October 1, 2024              Respectfully submitted,

                                          QUINN EMANUEL URQUHART
                                        & SULLIVAN, LLP

                                        By: _/s/ Alex Spiro_        

                                        Alex Spiro
                                        51 Madison Avenue, 22nd Floor
                                        New York, NY 10010
                                        (212) 849-7000

                                        William A. Burck
                                        John F. Bash (_pro hac vice_ pending)
                                        Avi Perry
                                        1300 I Street NW, 9th Floor
                                        Washington, D.C. 20005
                                        (202) 538-8000

                                        _Attorneys for Mayor Eric Adams_