UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>- against -<br><br>ERIC ADAMS,<br><br>          Defendant. | No. 24-CR-556 (DEH) |

**REPLY MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT ERIC ADAMS'S
MOTION FOR AN EVIDENTIARY HEARING AND FOR SANCTIONS**

**TABLE OF CONTENTS**

**Page**

ARGUMENT ............................................................................................................................... 2
I. THE GOVERNMENT LEAKED CONFIDENTIAL INFORMATION ............................. 2
II. THE LEAKS VIOLATED THE GRAND JURY SECRECY RULE .................................. 8
III. MAYOR ADAMS DOES NOT NEED TO SHOW PREJUDICE NOW .......................... 10
CONCLUSION ............................................................................................................................ 11

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Barry v. United States*,
   865 F.2d 1317 (D.C. Cir. 1989) ............................................................................................ 4, 5, 10

*In re Grand Jury Investigation (Lance)*,
   610 F.2d 202 (5th Cir. 1980) ............................................................................................................ 9

*Kamakana v. City & Cnty. of Honolulu*,
   447 F.3d 1172 (9th Cir. 2006) .......................................................................................................... 8

*United States v. Blaszczak*,
   2018 WL 1322192 (S.D.N.Y. Mar. 12, 2018) ........................................................................ 5, 7, 10

*United States v. Eisen*,
   974 F.2d 246 (2d Cir. 1992) ........................................................................................................... 10

*United States v. Flemmi*,
   233 F. Supp. 2d 75 (D. Mass. 2000) ................................................................................................ 5

*United States v. Gangi*,
   1 F. Supp. 2d 256 (S.D.N.Y. 1998) .................................................................................................. 4

*United States v. Nordlicht*,
   2018 WL 6106707 (E.D.N.Y. Nov. 21, 2018) ................................................................................. 5

*United States v. Rioux*,
   97 F.3d 648 (2d Cir. 1996) ............................................................................................................. 10

*United States v. Rosenthal*,
   142 F.R.D. 389 (S.D.N.Y. 1992) ..................................................................................................... 4

*United States v. Skelos*,
   2015 WL 6159326 8 (S.D.N.Y. Oct. 20, 2015) ..................................................................... 5, 7, 9, 10

*United States v. Walters*,
   910 F.3d 11 (2d Cir. 2018) .......................................................................................................... 8, 10

## Statutes / Rules

Fed. R. Crim. P. 6(e) .................................................................................................................... *passim*

S.D.N.Y. L. Crim. R. 23.1 ..................................................................................................................... 8

**Other Authorities**

Justice Manual §§ 1-7.100 & 1-7.610 – General Need for Confidentiality &
    Concerns of Prejudice ........................................................................................................ 8

**Articles**

| Short Citation | Article |
|---|---|
| 11/2/23 NYT | William K. Rashbaum et al., U.S. Investigating Whether Adams Received Illegal Donations from Turkey, *N.Y. Times* (Nov. 2, 2023), https://www.nytimes.com/2023/11/02/nyregion/eric-adams-brianna-suggs-fbi-raid.html |
| 11/2/23 Fox News | Greg Norman et al., FBI raids home of NYC Mayor Eric Adams' chief fundraiser Brianna Suggs, source says, Fox News (Nov. 2, 2023), https://www.FoxNews.com/politics/fbi-raids-home-nyc-mayor-eric-adams-chief-fundraiser-brianna-suggs-source.amp |
| 11/4/23 CNN | Gloria Pazmino et al., FBI Investigation of NYC Mayor Eric Adams Fundraiser Centers on Illegal Contributions from Foreign Nationals, CNN (Nov. 4, 2023), https://www.cnn.com/2023/11/02/politics/fbi-search-fundraiser-adams-campaign-new-york/index.html |
| 11/12/23 NYT | William K. Rashbaum et al., F.B.I. Examining Whether Adams Cleared Red Tape for Turkish Government, *N.Y. Times* (Nov. 12, 2023), https://www.nytimes.com/2023/11/12/nyregion/eric-adams-investigation-turkey-consulate.html |
| 4/5/24 NYT | William K. Rashbaum et al., F.B.I. Examining Free Airfare Upgrades Received by Adams, *N.Y. Times* (Apr. 5, 2024), https://www.nytimes.com/2024/04/05/nyregion/eric-adams-turkish-airlines-upgrades.html |
| 5/20/24 NYT | William K. Rashbaum et al., City Hall Aide Is Cooperating with Corruption Investigation into Adams, *N.Y. Times* (May 20, 2024), https://www.nytimes.com/2024/05/20/nyregion/adams-fbi-corruption-investigation-aide.html |
| 8/15/24 NYT | William K. Rashbaum et al., Eric Adams and His Campaign Receive Subpoenas in Federal Investigation, *N.Y. Times* (Aug. 15, 2024), https://www.nytimes.com/2024/08/15/nyregion/eric-adams-fbi-investigation.html |
| 8/15/24 NYP | Craig McCarthy et al., "NYC Mayor Eric Adams hit with first subpoena over 2021 campaign," *N.Y. Post* (Aug. 15, 2024), https://nypost.com/2024/08/15/us-news/nyc-mayor-eric-adams-hit-with-first-subpoena-over-2021-mayoral-campaign/ |
| 9/25/24 NYT | William K. Rashbaum et al., Eric Adams Is Indicted After Federal Corruption Investigation, *N.Y. Times* (Sept. 25, 2024), https://www.nytimes.com/2024/09/25/nyregion/eric-adams-indicted.html |

## PRELIMINARY STATEMENT

One of two things happened here. *Either* the government leaked grand jury information in violation of Rule 6(e), *or* multiple subjects of a criminal investigation independently leaked self-derogating information, contrary to their own self-interest and, coincidentally, principally to a single reporter at *The New York Times*. The first possibility is supported by facts—*The Times* journalist knew when the government's "secret" investigation began and when the government planned to unseal the indictment and hold a press conference, and at least three other news organizations attributed leaked information to "law enforcement sources." The second possibility, which the government asks the Court to accept, is based on conjecture and makes no sense.

The government apparently agrees that some of the leaked information "was likely known only to law enforcement and certain subjects of [the] investigation." Opp. 8. Mayor Adams has made a *prima facie* showing that the source was, in fact, the government. At this stage, he is not required to disprove every other conceivable source. And there is no logic behind the government's far-fetched claim that various people with no motive to leak and every incentive to maintain confidentiality instead might be behind the leaks. The simpler explanation is far more likely: the government leaked to manufacture public perception that Mayor Adams is a criminal before it asked the grand jury to return what ultimately was an underwhelming indictment.

Nor can the government rebut that the leaks violated Rule 6(e). Multiple articles refer to grand jury subpoenas. The existence of a sealed indictment is covered by Rule 6(e), and that information, too, was leaked alongside news of the government's planned press conference—which strongly implicates the government as the source. The government has no answer except to accuse *court personnel* of leaking the indictment news and to speculate that a reporter might have "surmised" that a press conference would follow. Opp. 15 n.5. That rings hollow.

On these facts, Mayor Adams has met his "relatively light" *prima facie* burden. *Sealed Case No. 98-3077*, 151 F.3d 1059, 1068 n.7 (D.C. Cir. 1998). He is entitled to an evidentiary hearing to determine the truth, assess the extent of prejudice, and fashion appropriate remedies. The government is wrong, moreover, that Mayor Adams must establish prejudice *before* the hearing. That is the standard for relief, not a prerequisite to a hearing in the first place.

## ARGUMENT

### I. THE GOVERNMENT LEAKED CONFIDENTIAL INFORMATION

The leaks in this case point overwhelmingly to the government. Bookending the investigation were leaks about when the investigation began and the return of an indictment. *The Times* reported that "[t]he investigation . . . began in 2021, . . . and continued in secret until this past fall, two people with knowledge of its origin said." 8/15/24 NYT. The government *must* be the source for when a "secret" investigation began, and the government is the only source with "knowledge of its origin." *See id.* *The Times* also reported that a sealed indictment had been returned and "[f]ederal prosecutors were expected to announce more details on Thursday." 9/25/24 NYT. To counter the obvious inference that it leaked information about the indictment and a planned press conference, the government posits that court personnel and "officials in three different law enforcement agencies" (presumably, the DOJ, FBI, and New York City Department of Investigation ("DOI")) might have been responsible for the leak, and a reporter might have "surmised" that a press conference would occur. Opp. 15 n.5. That is speculation built on speculation. And obviously, if an official in one of the agencies that jointly investigated this case *was* responsible for the leak, that is imputable to the government. That is because Rule 6(e) applies to *any* attorney for the government or law enforcement personnel, *see* Fed. R. Crim. P. 6(e)(2)(B)(vi)-(vii), 6(e)(3)(A)(ii), not only the assigned line prosecutors and case agents.

2

During the investigation, three news outlets expressly sourced leaked information to "law enforcement"—not investigative subjects, defense attorneys, or court personnel. While the government argues that the "paradigmatic" leak case "involves far more express law enforcement sourcing," Opp. 12-13, there is a clear pattern here, across multiple news organizations and many months, of explicit sourcing to law enforcement.

On November 2, 2023—just hours after a law enforcement search of Brianna Suggs's home—*Fox News* reported that "[t]he FBI on Thursday raided the home of Brianna Suggs, . . . a law enforcement source tells Fox News." 11/2/23 Fox News. *The Times* reported the same search, along with a description of the warrant and the additional details that "agents also served Ms. Suggs with a subpoena directing her to testify before a federal grand jury hearing evidence in Manhattan" and "[a] person with knowledge of the raid said agents from one of the public corruption squads in the F.B.I.'s New York office questioned Ms. Suggs during the search." 11/2/23 NYT. These details point to a government source—likely the same "law enforcement source" as *Fox News*—and the disclosure of the subpoena plainly is covered by Rule 6(e).

Two days later, *CNN* also reported that, according to "law enforcement officials who are familiar with the search warrants," the investigation sought to "determine whether Adams's 2021 mayoral campaign conspired with a Brooklyn-based construction company to funnel foreign money into the campaign coffers." 11/4/23 CNN. The article explicitly reported that "multiple law enforcement officials told CNN" the details of the ongoing investigation. *Id.*

And on August 15, 2024, the *New York Post* reported that "Mayor Eric Adams was slapped with a grand jury subpoena by federal prosecutors digging into his 2021 campaign fundraising, law enforcement sources confirmed." 8/15/24 NYP. While the government suggests, again with no apparent basis, that many people associated with the Mayor would have known about, and

3

might have leaked, these subpoenas, *see* Opp. 5, that is not what the article *says*. It *says* the source was law enforcement. And while the government shamefully casts doubt on the news media, *see id.* at 6 ("These reporters . . . may or may not have had actual 'law enforcement' sources"), it is sufficient for Mayor Adams's *prima facie* case that he can point to an article that both describes the issuance of a grand jury subpoena and expressly credits a law enforcement source. *See Barry v. United States*, 865 F.2d 1317, 1325-26 (D.C. Cir. 1989) (ordering hearing because "a *prima facie* case had been made out as to one of the articles, and we find that at least one other suggests the same"). This article *alone* warrants a hearing.

The government's "paradigmatic" case also makes clear—and the government concedes, *see* Opp. 14—that "[i]t is not necessary for [] article[s] to expressly implicate the Justice Department . . . if the nature of the information disclosed furnishes the connection," *Barry*, 865 F.2d at 1325. That holds true here. While the government posits that law enforcement sources may have been police officers or others outside the core prosecution team, *see* Opp. 3, 13, that view is inconsistent with the government's own internal assessment in its November 10, 2023 email to the case agents, *see id.* at 8.[1] The possibility that a police officer assisting with a one-off warrant may have been the source also is refuted by the months-long pattern of leaking case developments, the evolving focus of the grand jury investigation, the issuance of subpoenas, and the identities of witnesses. Only someone positioned inside the DOJ, FBI, or DOI could have

---

[1] In providing and affirmatively relying on an internal email, the government has effected a subject-matter privilege waiver. *See United States v. Gangi*, 1 F. Supp. 2d 256, 268 (S.D.N.Y. 1998) (finding waiver of government memorandum "contain[ing] privileged work product"); *United States v. Rosenthal*, 142 F.R.D. 389, 392 (S.D.N.Y. 1992) (disclosure of "attorney-client privileged communication result[ed] in 'subject matter waiver'"). The Court should order the government to produce other relevant emails from its files, including any responses to the November 10, 2023 email and any emails among the line prosecutors or supervisors about the leaks. The government cannot selectively disclose an internal email it believes (wrongly) supports its position while shielding others.

4

leaked all this information. *See United States v. Flemmi*, 233 F. Supp. 2d 75, 81 (D. Mass. 2000) (*prima facie* showing based on articles that were "susceptible to the interpretation that a government attorney and/or agent was at least one source of the [protected] information").

None of the government's cases, *see* Opp. 12-13, involved the pattern of substantive leaks present here. *United States v. Blaszczak* involved two articles published two years apart, one of which was released before the government even began investigating. 2018 WL 1322192, at *3 (S.D.N.Y. Mar. 12, 2018). *United States v. Skelos* involved three articles and a letter. 2015 WL 6159326, at *8 (S.D.N.Y. Oct. 20, 2015). And in *United States v. Nordlicht*, "none of [the articles] used the term 'grand jury' anywhere." 2018 WL 6106707, at *5 (E.D.N.Y. Nov. 21, 2018). This case is more like *Barry*, where there was "a whole spectrum of news articles," some with express reference to law enforcement sources and others with vaguer attributions, which the court found sufficient for a *prima facie* case. 865 F.2d at 1325-26. *Barry* explained that "[t]he precise attribution of a source in one [article] may give definition to a vague source reference in others because of their context in time or content." *Id.* Considered together, the articles in this case clearly define their source: the government and its agents.

The government's argument that others are "at least equally likely" to be the leakers, Opp. 13-15, asks the Court to jettison common sense. Investigative subjects and grand jury witnesses had no motive to leak their involvement in a public-corruption probe. The timing of the leaks further undermines the government's claim. *The Times* and *Fox News* knew in real time that Ms. Suggs's home was searched and that a grand jury subpoena was served. 11/2/23 NYT; 11/2/23 Fox News. The government would have the Court believe that, during or immediately after a law enforcement raid, "[Ms.] Suggs, her counsel, anyone in a joint defense agreement with Suggs, or someone else she or her counsel shared that information with spoke to the *Times*" about

5

circumstances that potentially inculpated Ms. Suggs in a crime. Opp. 14. The implausibility of that scenario is compounded by *Fox News*'s attribution to a "law enforcement source," 11/2/23 Fox News, and *The Times*'s reporting that "Ms. Suggs . . . could not be reached for comment," 11/2/23 NYT, which *The Times* would not have written if Ms. Suggs or a proxy was the source.

Equally implausible is the notion that KSK employees leaked that "the FBI has the records of checks and wire transfers from KSK, returning money to employees in the same amounts as the contributions." Opp. 14. Again, these facts would incriminate the leakers. Nor is it credible that Rana Abbasova, who still worked at City Hall at the time, leaked that her home was raided and she had "turned against" the Mayor. 5/20/24 NYT. The government's suggestion, Opp. 5, that the Mayor's own lawyer was the source is frivolous. The article makes clear that counsel was asked to comment because of the leak to *The Times* by unidentified "people with knowledge of the matter." *The Times* would not describe the Mayor's counsel both by name and pseudonymously.

Indeed, the government had a clear motive to use leaks to support its investigation, pressure current or prospective witnesses to inculpate the Mayor, and create widespread belief that the Mayor had committed crimes leading up to the grand jury's decision whether to indict. That motive is especially strong because years of investigation had failed to turn up convincing evidence of criminal conduct by Mayor Adams. *See* 8/15/24 NYT ("The investigation . . . began in 2021" and "may have been effectively dormant during some of that time").

The government argues that some articles contained errors "that anyone participating in the investigation would not have made." Opp. 15-16. Yet the highlighted "errors" are nitpicky— for instance, the precise number of subpoenas served or whether a business received a warrant or subpoena. *Id.* A government source easily could have made such minor errors, or they could have resulted from a reporter taking down details incorrectly. They also could have been made by an

6

agent who was not directly "participating in the investigation." That still would be a Rule 6(e) violation. Fed. R. Crim. P. 6(e)(2)(B)(vi)-(vii). The government's reliance on *Blaszczak* is misplaced because the "obvious flaw" there was inaccurate reporting that a witness was cooperating. 2018 WL 1322192, at *5. Misrepresenting a key witness's status is fundamentally different than mistaking the exact number of subpoenas served on a particular day.[2]

Finally, the government's self-serving declaration, *see* ECF No. 38-2, does not rebut Mayor Adams's showing. Most obviously, the declaration (which has not been tested through cross-examination) says only that the assigned line prosecutors and case agents "have not disclosed information they learned in the course of the Investigation to any member of the press." *Id.* ¶ 3. That does not refute that other DOJ, FBI, or DOI officials, attorneys, public-relations officers, or agents leaked, or that prosecutors and agents leaked to non-press middlemen. Moreover, the line prosecutors and agents did not even sign the declaration themselves. *Compare Skelos*, 2015 WL 6159326, at *11 (affidavit was "signed by all government attorneys . . . investigating agents and investigators"). If an untested declaration is all the government needs to stave off a hearing in a case where *CNN*, *Fox News*, and *The Post* all expressly credited law enforcement sources and *The Times* clearly also had a government source, then the "relatively light" *prima facie* standard actually is impossible to meet.

The government concluded as early as November 2023 that "the media appears to have acquired information about our investigation that was likely known only to law enforcement and certain subjects," ECF No. 38-1 ¶ 6, and twice looked into leaks in this case, *id.* ¶ 4. The

---

[2] The government is wrong that reporting on prosecutors "zeroing in" on text messages must have come from the Mayor's team. Opp. 14. While the government claims it had not reviewed the Mayor's phone, the other person in possession of those messages was a top FDNY official, and the government had already interviewed "top [FDNY] officials." *See* 11/12/23 NYT.

7

government has not disclosed the results of those investigations (it should), but if the government decided there was sufficient evidence of leaks to warrant fact-finding, this Court should too.

## II.     THE LEAKS VIOLATED THE GRAND JURY SECRECY RULE

The government cannot seriously contest that reporting about the issuance of grand jury subpoenas, *see, e.g.*, 11/2/23 NYT; 8/15/24 NYP, and the leak of the still-sealed indictment, *see* 9/25/24 NYT, involved matters "occurring before the grand jury" in violation of Rule 6(e).[3] The government itself appears to have concluded that Rule 6(e) information was leaked. *See* Opp. 8 (government email noting leaks were "entirely at odds with our shared duty to maintain confidential information, and quite possibly criminal acts"); *cf. United States v. Walters*, 910 F.3d 11, 28 (2d Cir. 2018) (noting leaks by FBI were "deeply disturbing and perhaps even criminal"). While the government points out that some articles also discussed non-grand jury material, like search warrants, *see* Opp. 17-20, it is no defense that the leaks extended beyond grand jury information.[4] Indeed, the additional leaks of non-grand jury material are relevant to establish the government's motive, intent, and plan.

The government also faults Mayor Adams for "speculating" about who testified before the grand jury. Opp. 19-20. Unfortunately, the Mayor has no alternative, because the government has rejected defense counsel's request to produce grand jury witness transcripts. The government is trying to have it both ways—arguing that Mayor Adams cannot make out a *prima facie* case

---

[3] The government's claim that the leak of the indictment is "not a basis for a finding of a grand jury secrecy violation," Opp. 19 n.9, is wrong. Rule 6(e)(4) states "no person may disclose [a sealed] indictment's existence."

[4] Even if all leaked information was truly independent of the grand jury process (it was not), it still would be sanctionable government misconduct. *See Kamakana v. City & Cnty. of Honolulu*, 447 F.3d 1172, 1185 (9th Cir. 2006) ("warrant materials during the pre-indictment phase of an investigation . . . warrant the highest protection"); Justice Manual §§ 1-7.100 & 1-7.610 – General Need for Confidentiality & Concerns of Prejudice; S.D.N.Y. L. Crim. R. 23.1.

8

without transcripts of witness testimony, while at the same refusing to provide the transcripts until closer to trial. The Court should order the transcripts produced now. Otherwise, the government's gamesmanship will necessitate reopening this matter after the transcripts are produced on or before December 4, as ordered. *See* Oct. 2, 2024 Hr'g Tr. 26.

In any event, the indictment itself makes clear that Ms. Abbasova was a grand jury witness who, as reported, had "turned against" the Mayor. But for uncorroborated allegations that could have come *only* from Ms. Abbasova, the indictment would be devoid of allegations that Mayor Adams had knowledge of wrongdoing or criminal intent. *See, e.g.*, Indictment ¶ 20(a) (purporting to recount oral conversation between Ms. Abbasova and Mayor Adams). Ms. Abbasova's centrality to the indictment makes the leaks about her status and testimony even more concerning. *In re Grand Jury Investigation (Lance)*, 610 F.2d 202, 218 (5th Cir. 1980) ("the seriousness of a disclosure may militate in favor of a further investigation," even if connection to improper source is not immediately apparent).

Still more evidence confirms that leaks involved grand jury matters. *The Times* reported investigative angles mirroring the indictment, such as alleged straw donations connected to "Turkish officials" and "a Brooklyn construction company," alleged "pressure" on behalf of the Turkish government, and that prosecutors "ha[d] developed evidence" regarding flight upgrades. 11/2/23 NYT; 11/12/23 NYT; 4/5/24 NYT. Much, if not all, of that reporting appears to trace back to the grand jury process. "[T]ruly independent" information might include, for instance, "interviews with witnesses not expected to appear before the grand jury." *Skelos*, 2015 WL 6159326, at *10. Here, however, leaks revealed "the identity of . . . expected witnesses; information about expected testimony . . . ; [and] information that reveal[ed] the strategy or direction of a grand jury investigation," all of which Rule 6(e) protects. *Id.*

9

## III. MAYOR ADAMS DOES NOT NEED TO SHOW PREJUDICE NOW

The government invents another nonexistent burden by arguing that Mayor Adams must prove prejudice *before* a hearing. Opp. 20, 24. But that's wrong. All the Court should consider at this stage is "(1) whether the media reports disclose matters occurring before the grand jury; (2) whether the media report discloses the source as one prohibited under Rule 6(e); and (3) [rebuttal] evidence presented by the government." *United States v. Rioux*, 97 F.3d 648, 662 (2d Cir. 1996). The government's cases do not say otherwise. *Blaszczak* confirms that prejudice is a prerequisite to Rule 6(e) *relief*, not to an evidentiary hearing. 2018 WL 1322192, at *3-6. In *Skelos*, the court did not address prejudice at all. *See* 2015 WL 6159326, at *11-12. And in *Walters* and *United States v. Eisen*, the defendants made Rule 6(e) motions after trial, so the evidentiary record was already developed as to prejudice. 910 F.3d at 28-29; 974 F.2d 246, 261 (2d Cir. 1992). Nor should the Court decide this motion based on the government's *ex parte* effort to convince the Court that "the grand jury's decision was not influenced by the news coverage." Opp. 22. The government is already trying to hold the evidentiary hearing—just without Mayor Adams.

Yet there is already evidence of prejudice. *See* Mot. 16-18. Extensive pre-indictment leaks caused public figures and ordinary citizens to conclude that the Mayor had engaged in wrongdoing and call for him to step down. *Id.* at 17-18. That creates real concern that the grand jury similarly was influenced to charge the Mayor with wrongdoing. And the government's apparent use of leaks to pressure Ms. Abbasova to turn against the Mayor is the kind of prejudice that Rule 6(e) attempts to prevent, as the government concedes. Opp. 21. But at this stage, neither Mayor Adams nor the Court can know exactly how leaks impacted the grand jury, which is precisely why an evidentiary hearing is necessary. *Barry*, 865 F.2d at 1326.

10

## CONCLUSION

Because Mayor Adams has established a *prima facie* case, the Court should order an evidentiary hearing in connection with the government's leaks of grand jury material.

Dated: October 25, 2024

Respectfully submitted,

QUINN EMANUEL URQUHART
& SULLIVAN, LLP

By: */s/ Alex Spiro*

Alex Spiro
51 Madison Avenue, 22nd Floor
New York, NY 10010
(212) 849-7000

William A. Burck
John F. Bash (admitted *pro hac vice*)
Avi Perry
1300 I Street NW, 9th Floor
Washington, D.C. 20005
(202) 538-8000

*Attorneys for Mayor Eric Adams*

11