OB1DAdaC

1  UNITED STATES DISTRICT COURT
   SOUTHERN DISTRICT OF NEW YORK
2  ------------------------------x

3  UNITED STATES OF AMERICA,

4          v.                              24 Cr. 00556 (DEH)

5  ERIC ADAMS,

6                                          Motion Hearing
              Defendant.
7  ------------------------------x

8
                                          New York, N.Y.
9                                         November 1, 2024
                                          2:00 p.m.
10

11  Before:

12                      HON. DALE E. HO,

13                                        U.S. District Judge

14                          APPEARANCES

15  DAMIAN WILLIAMS
        United States Attorney for the
16      Southern District of New York
    ANDREW ROHRBACH
17  DEREK WIKSTROM
    CELIA V. COHEN
18  HAGAN CORDELL SCOTTEN
        Assistant United States Attorneys
19
    ALEX SPIRO
20  MICHAEL BLOOM
    JOHN BASH
21  NEIL PHILLIPS
        Attorneys for Defendant
22

23

24

25

OB1DAdaC

```
 1                    (Case called)
 2                    THE DEPUTY CLERK:  Counsel, please state your names
 3          for the record.
 4                    MR. SCOTTEN:  Good afternoon, your Honor.  Hagan
 5          Scotten, Derek Wikstrom, Andrew Rohrbach, and Celia Cohen for
 6          the government.
 7                    THE COURT:  Good afternoon.
 8                    MR. SPIRO:  Good afternoon, your Honor.  Alex Spiro,
 9          myself, joined by John Bash, on behalf of Mayor Adams.
10                    THE COURT:  Good afternoon.
11                    Everyone please have a seat.
12                    We're here today for oral argument on Mayor Adams'
13          motion to dismiss count five of the indictment.  I issued an
14          order on Wednesday to set out the parameters of how I see
15          argument proceeding, although we may take more time, depending
16          on how things go.  Then, after that, I'd like to discuss the
17          case management schedule and a potential trial date.
18                    Any questions before we proceed?
19                    MR. SCOTTEN:  None from the government, your Honor.
20          Thank you.
21                    MR. SPIRO:  No, your Honor.  Thank you.
22                    THE COURT:  So I'll hear from Mayor Adams' counsel.  I
23          don't know if it will be Mr. Bash or Mr. Spiro.
24                    MR. BASH:  It will be me, your Honor.
25                    THE COURT:  If you want some different time allotment
```

OB1DAdaC

| 1 | out of the total 20, if you'd rather reserve something other
| 2 | than five minutes for rebuttal, that's fine.  Just let me know.

3              MR. BASH:  I'll stick with five, your Honor.

4              Can you hear me okay?

5              THE COURT:  I can.

6              We don't have fancy lights like the Court of Appeals

7  do, so my courtroom deputy, Ms. Morales, will be keeping track

8  of time.

9              MR. BASH:  Great.  We have a PowerPoint, but it's not

10 really a presentation.  I think you've already seen it, but it

11 just has some excerpts from the indictment that we may use,

12 depending on how it goes.

13             THE COURT:  Thank you.

14             I'm going to be trying to keep time here as well.  So

15 whenever you're ready, Mr. Bash.

16             MR. BASH:  Thank you, your Honor.

17             In the indictment in this case, count five of the

18 indictment does not state a federal offense, and, therefore,

19 should be dismissed.  That is true for two basic reasons.  The

20 first reason is that the quo alleged for the quid pro quo

21 bribery -- and this is in paragraph 36 and in the statutory

22 allegations in 63 -- is insufficiently specific to state a

23 claim for bribery.  That's true whether this Court agrees with

24 us that *McDonnell*, by its own force, applies in the wake of

25 *Snyder*, because it is not a specific matter or question akin to

OB1DAdaC

1    a judicial proceeding or an agency proceeding.  That's also

2    true if the Court just applies the plain text of section 666

3    without regard to *McDonnell*, which speaks of "a transaction, a

4    series of transactions, or business," which, as we've argued,

5    should be interpreted not to render the other two very specific

6    items superfluous.  So, for that first reason, the quo alleged

7    in this case, which, again, is the regulation of a consulate

8    building or the operation of a consulate building, the

9    indictment varies in how it describes it, that is

10   insufficiently specific to support a claim for bribery.

11        The alternative reason for why count five should be

12   dismissed is even if you could somehow read this indictment to

13   allege a quid pro quo about the September 2021 permit matter

14   specifically, it doesn't actually allege an agreement to take

15   official action.  It is agreed that Mayor Adams had no

16   regulatory authority on that matter.

17        They have alleged a pressure theory, but they have

18   shown their cards.  They have shown the three messages that

19   supposedly amounted to pressure and they don't satisfy that.

20   So I wanted to take those two arguments in turn.

21        THE COURT:  Just to understand the difference between

22   the two points that you're making, it seems to me that the

23   first point that you're making is one that, in theory, if the

24   facts could bear it out, the government, if the allegations had

25   been more specific, maybe could have addressed, but the second

OB1DAdaC

1  point that you're making seems to be one that, regardless of

2  what the government alleged, because Mayor Adams had no

3  regulatory authority at the time and was not, in fact, mayor at

4  that point, just as a matter of law, it was impossible for him

5  to have violated 666.

6          Am I understanding you correctly?

7          MR. BASH:  You are correct on the first, but I'd

8  modify what you said on the second.  We think there are at

9  least two requirements under 666 -- and that is whether

10  *McDonnell* applies of its own force or not -- the agreement has

11  to relate to something specific and it has to relate to the

12  exercise of government powers.

13          So your characterization of our argument on the first

14  one is -- in that they have not alleged a specific quo, you

15  know, I don't think that was a drafting error by the very

16  capable attorneys on the other side.  I think it was because

17  they had no evidence of an agreement of a specific action.

18          On the second one, we don't claim that an official can

19  never exercise governmental power if he or she does not address

20  regulatory authority, not even *McDonnell* holds that.  *McDonnell*

21  allows for the idea that an official could either exert

22  pressure or advise with the intent that his or her advice be

23  taken by another official to exercise governmental power, and

24  that's, in fact, the theory that the government has proceeded

25  on, that Mayor Adams pressured the FDNY, that led to a letter,

1    that led to the permit.

2              Our contention is, as a matter of law -- this is all

3    found in the different subparagraphs of 38 of the indictment --

4    they have not alleged anything more than what *McDonnell* said

5    was fine, which is setting up meetings, phone calls, flagging

6    issues for other officials, and if it amounts to pressure, then

7    anything does.  They can always circumvent the *McDonnell*

8    requirement, at least as a matter of pleading, and we don't

9    think that's consistent with the way the Supreme Court defined

10   the crime.  We also, Judge Ho, don't think it's consistent with

11   section 666, apart from *McDonnell*.

12             THE COURT:  Just so I understand your argument, it was

13   not then merely because Mayor Adams was the Brooklyn Borough

14   president at the time he could not have been liable under 666

15   for pressuring the FDNY, it's that the allegations in the

16   indictment here -- and you wouldn't say the underlying facts --

17   don't show that kind of pressure that could subject him to 666

18   liability.

19             Is that right?

20             MR. BASH:  Correct, your Honor.  And I would add one

21   thing on that.  It's not a caveat, because I think what you

22   said is correct, but although courts haven't elaborated on

23   this, in the wake of *McDonnell*, I think it's inherent in

24   *McDonnell* the pressure must arise from the official's

25   governmental authority.

OB1DAdaC

1        That doesn't mean the official has to be a supervisory

2   official over the pressure, of the other official, but, for

3   example, if a City Council person was bribed to pressure a

4   Congressperson but the mechanism of pressure was a threat to

5   disclose an affair between the two of them, I don't think that

6   would be bribery, because the mechanism of pressure had

7   absolutely nothing to do with the official position.

8        So I think there's a line there that at some point you

9   have to say, this has nothing to do with governmental position,

10  and we would contend we don't think the Court needs to reach

11  that.  But we sort of read the indictment to suggest it was

12  then Brooklyn Borough President Adams' prospects that were the

13  pressure, and we said that wouldn't be sufficient.  The

14  government did not oppose that in their brief.  I don't think

15  they're relying on this.  We made that point preemptively.

16  They did not push that theory.

17       I want to clarify a few legal points before we get

18  into the particulars of the indictment.  First, the government

19  hangs its hat largely in its opposition brief on the principle

20  that, hey, we just have to essentially track the elements of

21  the crime, give a date and time, and that's all we have to do.

22  So what I want to impress upon the Court is that's both

23  incorrect and, ultimately, irrelevant for the thrust of our

24  objection here.

25       So let me briefly say why that's incorrect.  In *United*

OB1DAdaC

*States v. Stringer*, which is a Second Circuit decision that
they rely on, the Court said, yeah, for a lot of elements -- I
think they were thinking of relatively simple offenses -- it's
enough to say the -- to track the language of the statute.  So,
imagine, for the kind of bread and butter offenses that federal
courts see every day, like a 924(c) or a felon in possession,
if you say he was a felon, he possessed a firearm, that's
pretty much sufficient to state the crime.  But what *Stringer*
also said, going off of the *Russell* decision, which certainly
hasn't been overruled, and the Second Circuit cannot overrule
that decision, is for certain sorts of offenses, where the
facts are the chief dividing line between lawful and unlawful
conduct, you do need to state the facts.

          So, for example, false statement offenses, you have to
say what the false statement was and why it was false, even
though that's going pretty far beyond the language of the false
statement statute.  I don't see how the government could
contend bribery is not in that category given the Supreme Court
has taken great pains to say these sorts of quos count and
these don't, and these quos are otherwise unlawful activity
and, in fact, raise serious concerns.  So the quo, the nature
of it, sort of the facts, under *Stringer*, you have to state.

          But the reason I said, Judge Ho, why it's irrelevant,
it's -- the thrust of our argument is a different sort of
argument.  In the indictment, even if you don't have to say

OB1DAdaC

specific facts to pass the minimum threshold of sufficiency,

when the government does say the facts, it's not only the power

but the obligation of the Court to determine if the facts the

government or the indictment asserts to satisfy the offense

actually do.

So to give just one hypothetical example, in examples

from case law, *Stringer* said, you don't have to say the name of

the victim of identity theft under 1028(a). Fine. But if the

government's indictment was a speaking indictment, like this

one, and said the name of the person was Don Draper, a

fictional character you impersonated, or it was an alias of the

defendant -- and I'm assuming neither of those things would

violate the statute -- the Court would not have to throw up his

hands and say, well, you track the elements of the offense, you

don't have to say the name of the victim. So I can't

scrutinize the facts, you say the elements is enough.

Look at a case like *Pacione*, the Second Circuit case

in our brief. The Second Circuit looked at the alleged scheme,

which related to the loan sharking statute and said, the facts

here don't satisfy the elements. Or you can go much more

recently from just four months ago, maybe six months ago, when

the Supreme Court clarified the meaning of the obstruction

statute, 1512(c)(2), in the *Fischer* case, and adopted a

narrower construction of that statute than the D.C. Circuit had

adopted. The Court then remanded for the lower court to

OB1DAdaC

```
1   determine whether the factual allegations in the indictment
2   were sufficient.
3         That would have been a pointless request if all you
4   had to do was track the language of the statute.  So when the
5   statute actually does --
6         THE COURT:  Mr. Bash, I want you to be mindful of
7   time.  We can go a little over.
8         I'm not too concerned about the standard, candidly, or
9   the pleading standard I should say, but let's just talk a
10  minute about whether or not 666 incorporates the 201 official
11  act standard.  Now, am I right that your argument really relies
12  on Snyder here?  Because up until Snyder was decided, there
13  would be, I think you would say, no question that in the Second
14  Circuit, anyway, the two standards are distinct under Ng Lap
15  Seng.
16        Is that right?
17        MR. BASH:  Well, we have two alternative paths, Judge
18  Ho.  We think that's the right answer, that Snyder not only
19  construed the quo language of 666 to refer to an official act
20  25 times, but that was integral to its reasoning.  If you refer
21  to Snyder, it has six kinds of points that Justice Kavanaugh,
22  for the court, makes, and the first two are about text and
23  history.  And the point in Snyder was, the purpose in Congress
24  enacting 666 was to extend 201(b) to state and local officials.
25  That's directly contrary to the rulings of Ng Lap Seng and
```

OB1DAdaC

1    *Boyland*.  And, moreover --

2            THE COURT:  I understand that, but it is a little --

3    in the Second Circuit, the law as of 2023, or just pre-*Snyder*,

4    any district court in the Second Circuit would have been, I

5    think you would agree, obliged to follow *Ng Lap Seng* at that

6    point.

7            MR. BASH:  Correct.

8            THE COURT:  So, your position is that *Snyder* changes

9    that.  I guess the hard time that I'm having -- *Ng Lap Seng* is

10   very, very specific about the question, right, that you're

11   putting before me right here:  Whether or not the standard

12   under the statutes is the same.  I understand what you're

13   saying about *Snyder's* reasoning and, obviously, the use of the

14   term "official act," but don't I need something clearer from

15   the Supreme Court here to depart from very clear direction from

16   the Second Circuit?

17           MR. BASH:  Judge Ho, I don't think you do, not when

18   the court construes the language to mean "official act."  And

19   *Ng Lap Seng* says, the language is broader than "official act,"

20   because it doesn't say "official act," not when the history of

21   extending it to state and local officials was integral to the

22   Supreme Court case.  But I obviously note the skepticism in

23   your voice.

24           We said on page ten of the motion, and elaborated more

25   in reply because of the way the government argued the

OB1DAdaC

1     opposition brief, *Ng Lap Seng* and *Boyland* just said it's not

2     the same standard as 201(b).  They did not push for the -- to

3     define the contours of "transaction, series of transactions, or

4     business" and determine whether that language also picks up a

5     specificity requirement, just like 201(b).

6          So all it says is rejected the argument that you have

7     to have a *McDonnell* standard, and that language clearly refers

8     "transaction and series of transactions" is specific -- it

9     would not be natural to say the operation or regulation of a

10    building is a transaction or series of transactions.  We don't

11    think it can fall within "business," because if it's

12    "business," that broad, it renders those two categories

13    superfluous.

14         THE COURT:  If "business" is as broad as you're

15    saying, wouldn't it render those two superfluous?

16         MR. BASH:  I don't think so.  I don't think so.  You

17    can have specifics to the organization but not naturally

18    characterize it as a transaction, maybe in an exchange with

19    some other entity.  So Congress wanted to make sure it was

20    covering the waterfront of specific actions.

21         And remember one thing, the Supreme Court does say and

22    bind, I think, all lower courts now, as Congress intends this

23    to extend 201(b), so I think you'd at least construe it, to

24    the extent you could with Second Circuit precedent, with

25    201(b).  But the other thing that is important is this is what

OB1DAdaC

```
 1    the Solicitor General of the United States told -- in Snyder,
 2    she said that language is not only parallel but connotes a
 3    specific activity.  I don't see how you can say the operation
 4    or regulation of a building is a specific activity in that
 5    sense.
 6              THE COURT:  So setting aside this, it sounds like
 7    you're saying, regardless of what I think of Snyder and its
 8    effect on Ng Lap Seng, that just as a matter of statutory
 9    interpretation, the two statutes themselves have roughly the
10    same requirement as far as the specificity of the -- I'm not
11    going to say official act, since that term is loaded, but the
12    action taken by the official in question.
13              MR. BASH:  Correct.
14              THE COURT:  Let me give you a hypothetical then.
15    Let's say we have the operator of, I don't know, a casino
16    business making a lot of campaign contributions to a city or
17    state official, and he says, I'm giving you these contributions
18    so that you can help me out with the operation and regulation
19    of my business.  There's a process right now in which different
20    companies are vying to open a new casino in New York City, and
21    let's say that when the time for that decision comes, the state
22    or government -- state or city official calls up the board
23    that's responsible and says, hey, look, it's really important
24    to me that you get this done for my friend over here, and
25    exerts what let's say we would all agree is some form of
```

OB1DAdaC

1    pressure.

2           666 liability?

3           MR. BASH:  No, your Honor.  And you get there, if I'm

4    understanding the hypothetical correctly -- and I'll restate

5    it, so tell me if I'm misunderstanding.  I think the answer is

6    no, whether you apply *McDonnell* or 666, so let me do each of

7    those.

8           Under *McDonnell*, the specificity has to be the

9    specificity of a specific proceeding that could come before an

10   agency or official judicial proceeding.  If the agreement in

11   this case says, I want you to generally help me out with a

12   casino, that other matter has arisen of the -- just like in

13   this case, no, that is not a thing -- what would come before an

14   agency is, there's a casino, he wants help generally, what

15   would come before the agency is specific permitting matters

16   before a cause of action.  So I think it fails under *McDonnell*

17   and under 666, especially in light of the *Snyder* statutory

18   history analysis.

19          That's not a transaction.  That's not a series of

20   transactions.  Generally, help me with this casino.  And I know

21   the next thought may be, well, that doesn't seem right; how can

22   that be; the campaign contributions; you agreed to help.  One

23   thing to keep in mind, and the Supreme Court has said over and

24   over again is federal criminal law is not the only law on the

25   ethics of government officials.  There's state law, ethics

OB1DAdaC

```
1    code, the ballot box, a lot of ways state officials are

2    regulated.  But federal bribery is punishable by ten to fifteen

3    years in prison.  It is not satisfied by a general agreement to

4    help somebody out or some business out.

5          And let me give you one specific example of that,

6    Silver.  So the scheme that Senator Silver was convicted of but

7    was vacated by the Second Circuit was to help a doctor who was

8    referring Senator Silver cases, and just helping the doctor

9    with whatever comes up was insufficient the Second Circuit

10   held.  Now, I think a lot of people would look at that and say

11   it's wrong, this guy's referring you cases, and you agreed to

12   help him, but that's not covered by the federal bribery laws.

13         And obviously we think all the factual allegations are

14   wrong on the facts.  That's not why we're here today.  But

15   assuming the facts here, the sort of thing they've alleged,

16   operation or regulation, is not enough under any of the

17   statutes we're talking about.

18         THE COURT:  Circling back to I think it was maybe the

19   first question I asked you, Mr. Bash, and let me come at what I

20   was getting at in a different direction, with respect to the

21   two flaws that you see here, which it sounds like you're saying

22   they're not problems of a matter of law, they are problems with

23   the allegations that obviously you think are -- they exist

24   because the facts don't bear out what's missing here, but

25   leaving that aside for a second, what additional allegations
```

OB1DAdaC

1    could address the two problems that you're identifying here?

2            MR. BASH:  Well, I of course hate to write the

3    government's superseding indictment for them in case -- if

4    that's the direction they're going to go, but just to make this

5    a little bit more abstract, if the allegation was that a

6    political or a government official took money in exchange for

7    agreeing to help on a specific permit matter -- for example, in

8    *Boyland*, it was a carnival permit somebody needed for a

9    carnival in some location -- that is sufficient on the quid pro

10   quo allegations.  It's a specific matter and -- I'm sorry.  I

11   guess I should modify it.  I'm trying to do a hypothetical in

12   realtime.

13           There has to be some sort of necessary implication

14   that what is agreed to is governmental powers.  So both *Silver*

15   and *Percoco*, another more recent Second Circuit case, say that.

16   So if it's so broad, easily you include -- non-official

17   governmental acts, things exercising government power, and

18   things that are then -- that is not sufficient, but if the

19   official sits on the board that grants the permit and says

20   "I'll vote to grant your permit in exchange for money," that's

21   specific enough.  If the individual has ability to exert

22   pressure over somebody on the board and that arises from

23   governmental power --

24           THE COURT:  But the pressure has to arise from the

25   person's official position.  It can't arise out of whatever

OB1DAdaC

```
 1   official governmental role they have, they're chair of the
 2   county party or something like that.
 3            MR. BASH:  I think that has to be true, your Honor,
 4   and, candidly, I'm not really aware of a case that addresses
 5   that fact scenario.  I think the government is correct, that
 6   many -- there are cases that say you don't have to have direct
 7   supervisory authority.
 8            THE COURT:  County official, city official, many --
 9            MR. BASH:  An official is threatening to expose
10   personal details, I don't think that's bribery.  I don't think
11   the government is arguing something like that qualifies as
12   bribery where it has nothing to do with the official position
13   at all.
14            THE COURT:  Thank you, Mr. Bash.  I will give you time
15   for rebuttal of course.
16            MR. BASH:  Thank you, Judge.
17            MR. SCOTTEN:  Good afternoon, your Honor.  Hagan
18   Scotten.
19            THE COURT:  Good afternoon, Mr. Hagan.
20            MR. SCOTTEN:  Mr. Scotten, sir.
21            THE COURT:  Oh, Scotten. I'm sorry.
22            MR. SCOTTEN:  That's all right.  It's my parents'
23   fault.  It happens all the time.
24            So I'd like to go through the three reasons, same as
25   in our briefing, as to why the motion fails.  And in light of
```

OB1DAdaC

my friend's argument, I suppose I should start by saying I'm

working backwards in the sense that even if your Honor agreed

with everything that he said about the applicable law,

substantive law, he still wouldn't be entitled to a motion to

dismiss.  What he would be entitled to is a narrow jury

instruction that might or might not be hard for us to satisfy.

But you don't get there on a motion to dismiss.

And I suppose, taking it in his terms, the defendant

says, well, there are some cases where you have to be very

specific about the facts, and there's many cases you don't.

That's all the circuit says in *Stringer*, the same the Supreme

Court says in *Resendiz-Ponce*.  The way your Honor knows, not

one of these cases is -- there are a litany of cases refusing

to dismiss an indictment under *McDonnell*.  *Snyder* is obviously

a more recent opinion, but we cited the *Madigan* case, refusing

to dismiss under *Snyder*, and just a few hours after we filed

our opposition in this case, Judge Rochon, in this district,

denied a motion to dismiss under *Snyder* in *Starks*, a case

called *Starks*, as we argue here.

So *McDonnell*, and really the facts behind *McDonnell*,

the core of defendant's argument is it's a significant case,

around for a decade.  The fact he can't find any case

dismissing under *McDonnell* is a problem.  Also, bribery charges

are not unheard of.  So there are cases that say false

statements, as in *Russell*, maybe there's a need for specificity

OB1DAdaC

1    there.  You'd think he'd have a case saying you need

2    specificity in bribery, because those are not new charges.

3         THE COURT:  So what you're telling me is if I grant

4    the motion, I'd be the first Court in the country to grant a

5    motion to dismiss under *McDonnell*?

6         MR. SCOTTEN:  That's correct, your Honor.

7         THE COURT:  Okay.

8         MR. SCOTTEN:  The first case is called *Williams*, in

9    Georgia, which stands for the proposition you can look for

10   discovery, *McDonnell* elements discovery even if the indictment

11   is found sufficient, that's just wrong.  I'm going to read from

12   the case.

13        For one, the decision in *McDonnell* still did not

14   concern the sufficiency of charges in an indictment.  Instead,

15   it dealt with an error in jury instructions as to bribery

16   charges.  The full relevance of *McDonnell* will be debated and

17   addressed at trial.  Now, it goes on to discuss whether

18   allegations in *McDonnell* were proven, and we're happy to prove

19   that here, but he's wrong it's a similar case --

20        THE COURT:  Why don't we turn to the standard of --

21        MR. SCOTTEN:  Substantive law, your Honor?

22        THE COURT:  Sure, 666.

23        MR. SCOTTEN:  Oh, I am going to spend less time on the

24   *Snyder* argument, as to -- they cite it changes circuit law.

25   One, I think your Honor's questions got a lot of the points I

OB1DAdaC

1    want to make, but it is true we're not arguing the quo in 666

2    is broad or ill-defined, so we think we're going to satisfy

3    whatever the standard is, the *Snyder* standard, the *McDonnell*

4    standard.  And I suppose I should point out, not to jump too

5    far ahead, but there are a lot of 666 trials going on or cases

6    going on in the district right now, principally as a result of

7    a large take-down of corruption in the New York City Housing

8    Authority.

9            In those cases, the government is recommending a jury

10   instruction that incorporates a lot of concerns in *McDonnell*,

11   saying meetings alone are not enough, currying favor is not

12   enough in cases that have so far gone to trial.  In Judge

13   Kaplan's case, that instruction was given.  So I think a lot of

14   the concerns are better addressed in jury instructions.  It may

15   not turn out to be concerns --

16           THE COURT:  I guess a question I had, I may as well

17   ask it now, is let's say I agreed with you 666 is more

18   capacious in terms of what it covers than 201, but I'm not the

19   last word on that --

20           MR. SCOTTEN:  Right.

21           THE COURT:  -- so if we were to instruct the jury on

22   the language of 666 in connection with "business," and the

23   Second Circuit comes back saying, wait a minute, didn't you

24   read *Snyder* and *Ng Lap Seng*, it's no longer the law of the

25   circuit, where does it leave us?

OB1DAdaC

1          MR. SCOTTEN:  I take your Honor's point, and it's a

2     tough spot, because *Ng Lap Seng* doesn't say the instruction's

3     not necessary.  It says it was wrong, and it says, here's what

4     the Court should have been charging.  And, essentially, many

5     have, not just this case, but cases we have mentioned.  So I

6     think what we're going to ask your Honor to do is a jury

7     instruction that gets to a lot of the constitutional concerns

8     that I think you can find in *McDonnell*, such that even if

9     there's eventually a Supreme Court opinion, for example,

10    suggesting that the official act requirement in *McDonnell* is

11    similar to or the same as the lengthier language in 666, the

12    jury would still be affirmed, the instructions would still be

13    substantively correct.  So I think maybe for that reason I'll

14    pass largely by *Snyder*.

15          Now, we do agree with everything your Honor said.  You

16    would need much more clarity right now to tell the Circuit, I'm

17    disregarding what you said just a few years ago was clearly

18    erroneous -- I guess I will belabor the point for a second.

19    The defendant cites two cases for this decision flowing out of

20    *Ng Lap Seng*.  One he cites, the footnote is theoretically

21    possible, *1-800-Flowers*, but the text of the case criticizes

22    the district court and says "courts are obliged to follow our

23    precedent, even though it believes it will be overturned in the

24    near future."  And it says, "don't read the tea leaves --"

25          THE COURT:  Let's say I were to try to read the tea

OB1DAdaC

1    leaves here or look at the statutes with fresh eyes after

2    *Snyder*, what am I to make of a legislative history that says

3    666 really is meant to make sure that 201 extends to local and

4    state officials?

5        I mean, the interpretation of 666, which, again, I

6    know what the Second Circuit said in *Ng Lap Seng*, but it would

7    kind of sweep in more conduct than 201 does.

8        What case is there that Congress thought to make

9    federal program bribery easier to prove or cast a wider net

10   with respect to federal program bribery as opposed to public

11   officials?

12       MR. SCOTTEN:  So I don't think there is a case that

13   it's an attempt to be broader.  That's why I'm going to try to

14   not belabor this point.  I think our part really is there are

15   precedents in this circuit which tell the Court what to do, and

16   it should follow them and not precedents for another statute

17   that the circuit has said is erroneous.

18       But I will say that the Court's reading of *Snyder* --

19   I'm sorry, the defendant's reading of *Snyder* is just wrong.

20   The Court was not at all ambiguous when it said what it meant,

21   statutes are similar, 201 and 666, and that they tracked each

22   other.  If I can, I'm going to read point one in *Snyder*, in the

23   textual analysis, 666(a)(1)(B) makes it a crime for state and

24   local officials to "corruptly" accept a payment "intending to

25   be influenced or rewarded" for an official act.  Section 201(b)

OB1DAdaC

1     similarly makes it a crime for federal officials to accept a

2     payment in return for "being influenced."  And then it goes on

3     to the gratuity statute that does not contain an express mens

4     rea requirement.

5              The Court is crystal clear about what the similar

6     elements in the statutes are.  It quoted them.  It quoted them

7     side by side.  It wasn't the official act element.  It was the

8     mens rea.  And I know your Honor has read *Snyder*.  That was

9     clearly the heart of the *Snyder* decision, corruptly, mens rea,

10    use of influence is what makes the two statutes similar.  And

11    so I don't think there's room for a court to say that it also

12    reached "official act" when it very clearly did not, when the

13    dissent criticized it for that.

14             And I suppose I should briefly address what that sort

15    of leaves the defendant with, which is quoting the losing brief

16    in *Snyder*.  Generally, we have great respect for -- I should

17    say we are as confident as one can be that the Solicitor's

18    Office is on board with this indictment.  That said, the reason

19    I think I can advocate the *McDonnell* point is we don't

20    fundamentally disagree with this idea 666 is going to require a

21    business or transaction as some content, not vague or

22    amorphous, so if I could go to that point now --

23             THE COURT:  Why don't we go to that, and tell me what

24    precisely it is, as alleged in the indictment.

25             MR. SCOTTEN:  Sure.  And that's I think one of the

OB1DAdaC

1    things that's a bit off about the defense's approach to reading

2    the indictment.  There are at least two alleged quid pro quos

3    in the indictment, and they are nested within each other.

4          We focused in our opposition on the very specific

5    exchange of the TCO for travel benefits, because that seems

6    just clear as day to be as specific and focused as you can get,

7    and the defense's arguments about that are extraordinarily, of

8    course, fact specific.  They're the kind of things you just

9    can't do at this stage and, frankly, we can't respond to,

10   because we don't have an evidentiary record yet.  Something the

11   defendant said offhandedly that is dead wrong is the idea the

12   government has shown its cards, so the Court can now assess

13   factual sufficiency.  That's wrong.  In *Alfonso*, which we cite

14   for a different proposition, the Court is as clear as day, the

15   courts only look at all of the facts if the government

16   expressly says, I've given you all the government's facts, your

17   Honor, I have nothing further to prove at trial.

18         THE COURT:  If I may, the TCO for travel benefits --

19         MR. SCOTTEN:  Another one I think defendant addressed

20   here, a slightly broader agreement, exchange for travel

21   benefits for -- being influenced in the regulation of the

22   Turkish House.

23         THE COURT:  Let's talk about the first one, because --

24   well, does the indictment tell me when that quid pro quo was

25   agreed upon?

OB1DAdaC

1          MR. SCOTTEN:  It does, your Honor.  It says "no later

2     than 2021."  It certainly doesn't state a precise date.  It

3     certainly doesn't have to.

4          THE COURT:  I'm sorry.  My hearing isn't the best in

5     the world.  You said it was when?

6          MR. SCOTTEN:  No later than 2021.  And, really, I

7     could be more confident, it is clearly at some point before

8     September of 2021, because when the defendant is asked to

9     intervene and told he has to because of the port, he says, I

10    know, he acknowledges a prior agreement.  And I want to be

11    clear about this, because agreements like this are implicit.

12    They evolve in the minds of the defendant and his

13    co-conspirators.  There's not going to be a precise date.

14          And I refer the Court, for example, to the *Walsh*

15    indictment, which the defendant actually cites, where there was

16    great uncertainty as to dates essentially in that case, because

17    of the recollection of the witnesses.  But the circuit is clear

18    that was not a problem in the indictment.  Indictments only

19    have to identify what happened with enough specificity that you

20    know what's charged, but you don't have to give the date and

21    month.

22          THE COURT:  The reason I ask, and maybe it's

23    irrelevant, but part of what's motivating my thinking here is I

24    assume it's the case that you're not saying from the beginning

25    when -- I think it was 2016 is when the first allegations -- do

OB1DAdaC

1    I have that right?  2016 is when the first allegations of

2    travel benefits are?

3                MR. SCOTTEN:  That's correct, your Honor.

4                THE COURT:  The TCO for the Turkey House wasn't on the

5    table at that point, right?

6                MR. SCOTTEN:  That's correct.

7                THE COURT:  I know you have this broader quid pro quo

8    you're alleging, too, but assuming that for a moment, then what

9    is happening in 2016?  Because since it's not part of the quid

10   pro quo for the Turkish House, it would not be part of the

11   underlying conduct, right?

12               MR. SCOTTEN:  It would be evidence of the agreement

13   but not alone suffice to prove it.  So one of the things

14   significant about 2016 and 2017, is right from the getgo or

15   almost from the getgo, since we can't be precise about timing,

16   it is clear with the defendant he's entering a transactional

17   relationship.

18               You will recall when he first starts getting travel

19   benefits he agrees to stop meeting with his constituents at the

20   request of the Turkish government's quite explicit terms of

21   getting support.  It might not be a purely government function

22   as defined in *Silver*, but evidence of the agreement that is

23   transactional, at what point it becomes clear to the defendant.

24   He's also agreeing to use government power, and at what point

25   specific to the Turkish House, obviously we agree with your

OB1DAdaC

1    Honor that that is later on.

2            I want to discuss briefly the regulation of the

3    Turkish House, a quo, which is not separate from the TCO.

4    Obviously, the TCO is a subset of regulations of the Turkish

5    House, and I think the best way to say that that is a

6    sufficiently specific and focused government matter is to turn

7    to *Silver*, which I think is probably the most extensive

8    exploration of that subject by the Second Circuit.

9            Here is what *Silver* says, at 570 and 71.  "With

10   respect to the real estate scheme, the question is whether it's

11   clear beyond a reasonable doubt that a rational jury would have

12   found that Silver accepted referral fees with the belief that

13   he was expected to influence a particular matter," and that's

14   the Circuit's emphasis, "namely, the relevant tax abatement and

15   rent stabilization programs."

16           So a program, not a specific program, not something

17   generally like Bob's for jobs in *McDonnell*, but a specific

18   program is clearly specific enough.  My opponent's answer to

19   that is, well, if you look later in the opinion, the opinion

20   talks about specific votes on specific legislation.  That is

21   not the question of a particular matter.  Those are the

22   specific acts he took on the question or matter.  They're

23   evidence of the broader agreement.  And I'm not sure just

24   reading that into the opinion it is clear as day from the

25   opinion, because attached to what I just read your Honor is a

OB1DAdaC

footnote, footnote 22, which said the government's even broader

formation is no good.  But then it says and he says, that is

not the kind of thing that can be put on an agenda, tracked for

progress, and then checked as complete, quoting McDonnell.  A

narrower definition of focusing on particular programs, e.g.

tax abatement and rent stabilization programs, is, therefore,

required.  However, the question or matter need not specify how

the public official would support programs, for example,

sponsoring a bill, lobbying colleagues to gather votes for the

bill, or funding a study on the program's efficacy.

So our somewhat broader quote, very much like what you

see at *Silver*, TCO, a narrower example, same kind of

examination seen in *Boyland* -- and I don't think my opponent

has cited any case saying it has to be so granular as a permit.

THE COURT:  The regulation and operation, you think

those are equivalent to the kind of programs that -- the tax

abatement program that you just described from *Silver*?

MR. SCOTTEN:  I think regulation is -- regulation is a

broader agreement also alleged in the indictment, and the

indictment alleged as a whole, which means all those

allegations there don't cancel each other out.  But I'm focused

on regulation, because regulation does by its nature convey a

specific exercise of formal powers exactly what the circuit

said.  You need something -- not specific, not a formal

exercise of power, and not so broad as in -- I think my

OB1DAdaC

```
 1    opponent is right in this example, the quid pro quo in that

 2    case was found to be keeping Dr. Taub happy -- he was the bribe

 3    payer.  The defendant also did a lot of things in this quid pro

 4    quo to keep Turkish officials happy.  That doesn't constitute

 5    bribery, just evidence of the overall relationship.

 6              I still have three and a half minutes left.  I suppose

 7    what I should address briefly is the idea of pressure, which

 8    matters -- for your Honor, come backs to the more specific TCO

 9    thing.  Two points on that.  I think, one, he said it very

10    clearly is not an element.  Right.  Pressure is one of the

11    particular ways to satisfy an official act, which is also here

12    not an element.  It is something that has to be proven at

13    trial, but is not one of the five elements enumerated in the

14    indictment.  So to the extent the defendant says we're not

15    going to be able to prove pressure, that really is something

16    that has to wait for trial.

17              It is also true, I do want to be clear, that it's not

18    an area where we have a lot of concern.  If you look at cases,

19    likely, there is pressure.  If you look at the circumstantial

20    evidence in *Silver* of how this came to pass, the circumstantial

21    evidence in *Silver* was, frankly -- are more specific than you

22    see here -- really pieced together from nothing more than the

23    bribe payer saying, we don't want to anger Silver, you don't

24    want to anger him, and showing Silver acting on certain

25    programs important to them and programs they care about.  Each,
```

OB1DAdaC

1    here, much more direct.  And I know I already said this, it's

2    not just three messages, but that's the kind of thing the Court

3    has to see at trial.

4        THE COURT:  One place where I'm getting confused a

5    little bit, it seems like both of you, both sides are arguing

6    that, in the alternative, you're arguing that there are

7    different standards here, but that regardless of which standard

8    applies -- it seems like Mayor Adams' side is saying even if

9    it's 666, that is, a version of 666 that is like the Second

10   Circuit said in *Ng Lap Seng*, and not 201's official act

11   standard, we still need something more concrete than what you

12   have here.

13       It sounds like you're saying, well, even if it's 201

14   and it's very concrete, we have something really concrete here,

15   but it seems like there's still some differences between the

16   standards that aren't just how concrete the action taken by the

17   defendant is.  666, just looking at the section's actual

18   language, just says, whatever thing of value is given the

19   defendant, it has to be in connection with some business, but

20   201 seems to suggest that he needs to have taken some action as

21   a part of their official capacity.

22       Am I not understanding the differences between the

23   statutes?

24       MR. SCOTTEN:  I think your Honor is describing the

25   text right, and this is an area where there's a lot of overlaid

OB1DAdaC

```
 1    case law, the kind of thing, really, as you set out in jury
 2    instructions.  So, for example, 666 does not actually contain a
 3    quid pro quo requirement.  Courts are ready to do so, and
 4    Snyder makes it certain -- so I think your Honor is right about
 5    really attention about the agreement of influence.  It does
 6    have to be an agreement of influence, even if the text of the
 7    statute is looser.
 8              THE COURT:  I guess what I'm getting at, and sorry for
 9    my long-winded question, is if the standard is the 201 official
10    act --
11              MR. SCOTTEN:  Right.
12              THE COURT:  -- then whatever action Mayor Adams took
13    seems like it has to come out of whatever official capacity he
14    had at the time that the action was taken.
15              Is that not right?
16              MR. SCOTTEN:  I don't think that's right, your Honor,
17    for a couple of reasons.
18              THE COURT:  Okay.
19              MR. SCOTTEN:  One, as I read the statute, it is by
20    itself simply a status requirement.  He has to be an agent.
21    And there are cases like Rooney that closely tie that to having
22    a duty.  So he's acting as an agent.  I agree the more extreme
23    examples my opponent came up with -- the one I've heard is if
24    the defendant also happened to be the basketball coach of a
25    fire commissioner's kid and he threatened to bench the fire
```

OB1DAdaC

commissioner's kid if he didn't do this, that's completely

divorced from his official capacity.  What I wouldn't apply,

what I totally disagree with, and cases like *Boyland* I think

dispute, is this notion that the power has to come exclusively

from the position.

        So just to give your Honor a hypothetical, if a few

prosecutors were both paid to influence a fellow prosecutor to

drop a case, similar to what the Court saw in *Lee*, it wouldn't

matter that, you know, before them is a jovial, persuasive guy,

guy one, and the other is the unpopular, disliked person and

couldn't influence anybody, because nobody paid attention to

him.  In both cases it's their position that -- it's access to

the federal prosecutor.  And I think we are going to prove that

at trial, the contention here.

        I don't think the defendant is saying the fire

commissioner would have taken anybody's call, and if Margot

Robbie gave a call and was really persuasive, he might have

then done this.  It is definitely tied to the defendant's

official position.

        THE COURT:  He probably would have taken that call.

        MR. SCOTTEN:  He would have taken that call, but it

wouldn't have been 666.

        THE COURT:  But as I understand the theory of this

case, right, it's not so much that Mayor Adams was Brooklyn

Borough president at the time, that he was able to, as the

OB1DAdaC

1    facts you're putting forth in the indictment, pressure the fire

2    department.  It is that he had secured the democratic

3    nomination for mayor.  And it seems a little weird when the

4    jurisdictional connection here is that he was the Brooklyn

5    Borough president but the source of his ability to exercise

6    pressure appears to stem from something else.

7         Maybe that's just the way the statute operates, or

8    maybe I'm misunderstanding your theory of the case, but there

9    is something about that that does seem a little strange.

10        MR. SCOTTEN:  I take your Honor's point.  I suppose

11   there's three answers for purposes of today's proceedings:

12        First, the allegations do stretch into 2022.  The quid

13   pro quo does continue into 2022 when he's the mayor.  So for

14   purposes of these proceedings and the broader quo --

15        THE COURT:  For the TCO --

16        MR. SCOTTEN:  The TCO granted in September, the

17   regulatory agreement at large, which we certainly think is

18   sufficient.

19        I think the second point is, this is what I was trying

20   to get at -- maybe it wasn't a good example with my

21   prosecutor's example -- we think the defendant has to use his

22   official position, official position, the thing that gets him

23   in the room, as it were, with the fire commissioner.  Why that

24   pressure is effective, I don't think there's any rule that

25   says, well, it has to be solely for official position reasons,

OB1DAdaC

1   otherwise that would contradict the relevant case law, which I

2   don't see the defendant to be fighting anymore, that you don't

3   have to have supervisory authority to pressure.

4          So in a lot of cases I might listen to a fellow

5   prosecutor, and they're talking to me about a case because

6   they're a federal prosecutor, but whether I'm persuaded by them

7   and take their advice would seriously depend on the facts.

8   Totally unrelated.  So here, for example, if the jury were to

9   conclude, well, the defendant was using his official position

10  as Brooklyn Borough president to let him reach out the fire

11  commissioner on city business with the mayor, that's what got

12  him a room and in the position, but is that enough -- the fire

13  commissioner -- the reason I care about this guy and not the

14  Bronx Bureau president is because I know what he will be in six

15  months.  That wouldn't defeat it, because he still needs an

16  official decision -- nobody's disputing, if Andrew Yang won the

17  primary, he calls the fire commissioner -- I think the fire

18  commissioner would have said, why are you calling me about a

19  permit; I can't talk to you about that.

20         THE COURT:  Well, if he had secured the democratic

21  nomination, maybe he would have put the call through and not

22  had liability, because he's still not a public official, right?

23         MR. SCOTTEN:  The second point is the report

24  transforms the other first half the jury will have to figure

25  out, but the other point -- the actus rea is he must agree to

OB1DAdaC

be influenced.  The question is not how does he carry out that

influence.  It's not why is influence effective, why is he able

to pressure, if he is an agent at this time, and in that

position he's asked to do something.  And he was clearly asked

as Brooklyn Borough president, the Turkish official, not acting

as a friend, a buddy, as a social connection, he is interacting

as an agent after the -- you know, he is important for the

Turkish official, because he's a prominent public official, at

least in the Turkish official's eyes.  That's why agreeing to

be influenced -- how he is able to get done what he agrees to

do is not legally relevant, even if factually helpful.

THE COURT:  One more question.  When I asked you what

the quid pro quo was, the first thing you said was TCO for

travel, and just precisely which actions by Mayor Adams are you

alleging are part of the quo here, the TCO?

MR. SCOTTEN:  I think what we are alleging as part of

the TCO is causing the fire commissioner to in turn -- it's

really causing the FDNY to issue the letter of no objection.

That is really the action.

The specific things he does, phone calls, text

messages, those aren't actions.  Those are the kind of

things -- *McDonnell* says those are, meetings, a phone call,

calling, not anything themselves.  They're how you get things

done.  But the action is the FDNY allowing of the building to

open, and the way to accomplish that is by leaning on the fire

OB1DAdaC

 1    commissioner, who leans on the subordinates.  It's ultimately a

 2    subordinate who issues the letter.

 3            THE COURT:  I want to turn back to Mr. Bash, but I

 4    will give you an opportunity to make any last point you wanted

 5    to make.

 6            MR. SCOTTEN:  Sure.  The last point is about reading

 7    the indictment as a whole.  I've discussed two things

 8    separately, and I want to make sure they're not -- they're

 9    nested within each other.  And the last, my opponent's citation

10    to *Mostafa*, which he seems to suggest reading the indictment as

11    a whole let's the defendant look at certain allegations and

12    cancel other allegations, and *Mostafa* stands for exactly the

13    opposite.  The allegation in *Mostafa* is material support for

14    terrorism camps.  The defendant says, there's an allegation

15    that I support a training camp; that's not itself a crime, so,

16    therefore, the indictment should be dismissed.  And the

17    district court said, no, right, the indictment as a whole,

18    reading the whole indictment I can tell the training camp here

19    was an al-Qaeda training camp, and that demonstrates a crime.

20    And, more importantly, on appeal in the Second Circuit, when

21    the defendant argued letting the government prove that thing

22    broader than the allegation is a constructive amendment of the

23    indictment, the circuit said, no, the government needs to --

24    gets to prove every allegation of the indictment, not to cancel

25    out -- and, in particular, the clause here, the part of

OB1DAdaC

 1  paragraph 63 that says, the allegations in no way limits all

 2  the other allegations.  So the defendant would literally have

 3  to show every single allegations separately and, taken as a

 4  whole, are inadequate at this stage.

 5          THE COURT:  Thank you, Mr. Scotten.

 6          Mr. Bash.

 7          MR. BASH:  Thank you, Judge Ho.

 8          There's a lot there.  I'd like to respond to as much

 9  as I can.  But the first thing is what happened near the end of

10  the argument, the prosecutor for the United States had trouble

11  stating what the quo is alleged here, and, in fact, started

12  adding words to the indictment, like, his access, using his

13  position to gain access.  None of that is in the indictment.

14  That's not what he was indicted on, and, in a moment, I'd like

15  to show why their central theory that they have alleged, this

16  other quo, this specific permit matter is not what the

17  indictment says.

18          But two or three points before that.  First, I think

19  you're essentially right.  Essentially, what they seem to be

20  suggesting, at least from the podium, is he used his potential

21  future political position, in other words, his future

22  prospects, to pressure.  We pointed out in our motion that's

23  insufficient.  They did not respond, and your Honor has pointed

24  out exactly the incongruity that would produce, which is a

25  private sector candidate who does the exact same thing, not

OB1DADaC

bribery, but a public office, just by being in the government

would be -- it's hard to imagine Congress intended that scheme.

Two points before turning to the indictment. I don't

follow my friend's interpretation of *Silver*. On page 563, the

Court very clearly says what the quo is. It's particular

provisions of the Rent Act of 2011. That's obviously specific.

They don't dispute that specific.

The other point is this kind of theme of, don't worry

if this indictment has some issues, we can handle it in jury

instructions, your Honor, jury instructions have a

fundamentally different purpose. Jury instructions don't set

out the facts of a crime. Jury instructions can, with some

level of generality, state elements of the crime, and then the

jury finds the facts, and then there's a sufficiency challenge

later.

But under *Russell* and a number of Second Circuit cases

we've cited, and under the text of Rule Seven, the indictment

has to state essential facts of the offense. As the Supreme

Court said in *Russell*, part of the reason for that is to enable

the district court to determine whether it actually states an

offense. So the fact something might be okay in jury

instructions, it's actually totally reversed from comparison

with the government's comment. The indictment needs to set

forth facts.

I don't want to get too involved in the PowerPoint,

OB1DAdaC

```
 1    but I want to refute the essential claim, which is in addition
 2    to this quo, which is the only quo articulated in general
 3    allegations in paragraph 63, either regulation or operation --
 4    I don't know why it says two things, but it does.  But that
 5    there's other quo knowledge specific to the permit matter -- I
 6    don't want to talk too fast, but these are the two paragraphs,
 7    36 and 63, that actually set out the quo.  These are the
 8    operation and regulations paragraphs.

 9            And what does 36 say?  It says, in exchange for the
10    benefits described in 34 and 35.  If you go to 34 and 35, there
11    is that canceled upgrade from June 2021.  So it must be saying
12    the agreement was reached in 2021.  Remember, it's when the
13    bribed party agrees to accept benefits.  That's when the
14    agreement happens.  So it's June 2021.

15            Same thing with paragraph 35.  This is the hotel
16    lounge for the fund-raiser.  That's also June 2021, as you can
17    see on the slide.  Okay?

18            Now we go to the allegations about the permit issue
19    specifically.  That is not until September 2021.  In fact, if
20    you look at paragraph F here, it's not even an issue in the
21    world, according to the indictment, at least as far as the
22    indictment says, in August, far after this purported agreement
23    to accept benefits in exchange for action was consummated in
24    the government's allegations.  We, of course, dispute it's a
25    matter of the facts.  Again, September, now we go to this
```

OB1DAdaC

paragraph 33, this is what they're hinging their interpretation

of the indictment on.

        And your Honor, look, pointed this out, 2021, they

don't get specific on the month now, because they're vagueing

this up to try to make it seems like an exchange of the

specific matter.  "In 2021, he agreed to intervene in exchange

for luxury travel benefits," but this is the overview

paragraph.  In light of the other paragraphs I just showed you,

which kind of explain this part, it's clear what they're saying

an agreement was reached in June of 2021 to assist on an

operation generally, then this was an action in furtherance of

that agreement.  And that's precisely why, your Honor, back at

the statutory allegations in paragraph 63, they don't say the

permit thing here, they don't say that's what the agreement

was.  They just generally say "regulation," because presumably

they didn't have any evidence that there was ever an exchange

for that specific matter.  And that's fatal under *McDonnell* and

it's fatal under the "transaction, series of transactions,

business" language.

        Last point -- I guess those are all the points I want

to make.  I guess I should do one quick one.  Your Honor, on

paragraph 43, that is what they cite, they said once he's

mayor, he agreed to -- I don't know if they're suggesting

another agreement or what they're saying at the podium but it's

clear from the umbrella paragraph here all they're alleging is

OB1DAdaC

1    this was a continuation of the earlier stuff in the June 2021

2    agreement.  That's why it says "continued the agreement."

3          And, by the way, the thing they're focused on, like

4    this language, it doesn't say he knew about the language.  It

5    doesn't say he directed the language.  It says nothing.  So

6    that can't be enough to say he entered into a quid pro quo,

7    what they're talking about here.  So this stuff only deals with

8    operation and regulation stuff.

9          Two points you raised, "in connection with"

10   language -- let me go to the statutory language here, which we

11   put at the end.  So it's possible, I guess, that "in connection

12   with" could be broader than this.  So this is 666.  You'll see

13   the highlighted part "in connection with."  That's I guess

14   you'd call it the nexus language.

15         Here's 201, "in return for being influenced in the

16   performance."  I mean, maybe there's some daylight there, but

17   that's not the focus of our argument.  We're not arguing that

18   there was an insufficient nexus between his action and the

19   alleged transaction.  We're arguing that the quo, the alleged

20   quo here, "operation and regulation," is simply too general and

21   vague to satisfy this statutory language, whether you

22   incorporate *McDonnell* or not.

23         THE COURT:  The point of my question is, the 201

24   language, if you want to go back to it, it does suggest a very,

25   very kind of tight fit between -- well, it's not the right way

OB1DAdaC

```
 1    of describing it, but a very specific act by the defendant in

 2    the performance of any official act, whereas the 666 language,

 3    if we flip back to that, the influence or reward in connection

 4    with any business, transaction, or series of transactions, it

 5    does seem broader.

 6            I take your point that legislative history did not --

 7    Congress didn't intend to create something broader in terms of

 8    the acts that were being swept in just for the individuals who

 9    were going to be subject to liability.

10            MR. BASH:  I hear that point, Judge.  Here's the

11    one -- I don't know if you want to call it funny thing about

12    that.  McDonnell, the Supreme Court essentially departs a

13    little from the language of 201 and establishes something akin

14    to "in connection with" language, because, remember, the

15    official himself or herself does not have to perform the act.

16    They can pressure or advise someone else to perform the act.

17            Maybe there could have been an argument in --

18    actually, your broadening this actually requires the official

19    to perform it, but I think, as the language is construed in

20    McDonnell, I don't think it's that different.  And from the "in

21    connection with" language of 666, the last point I'll leave the

22    Court with, unless the Court has further questions, is just how

23    sweeping the government's theory is, and especially given that

24    my friend, Mr. Scotten, couldn't even exactly define what the

25    quo is here -- the government could go to I don't want to say
```

OB1DAdaC

any -- a lot of politicians, a lot of politicians around the

country and say, you know what, we can, under *Benjamin*, infer

an implicit agreement that when this big donor, who is also a

big state employer, gave you a donation, they expected and you

understood that you would be looking out for their factory,

let's say, that employs a lot of people.  They could at least

make that case, thousands over the country, and three months

later, or a year later, or two months later, when that official

calls up the environmental bureau and says, hey, we really want

to get this factory started, it's opening next week, a lot of

jobs are hinging on this, anything you can do, I just want to

let you know about this, but if you can't, I'll manage

expectations, they can indict that thousands of times around

the country.  That is a sweeping theory of 666, and it's

directly contrary to the federalism concerns and vagueness

concerns that the Supreme Court found so critical in *Snyder*.

So we'd urge the Court, whether you go the *McDonnell*

route, the *Snyder* route, or just as a matter of the plain text

of 666, we'd urge the Court to adopt an interpretation that at

least requires a modicum of specificity, and this is a point we

haven't discussed much from the podium, an allegation that the

bribee is going to use his or her official position.

So *Silver*, if you recall, says there's nothing to be a

necessary implication from the deal that the person will use

their official position -- and we think even apart from the

OB1DAdaC

 1    specificity problem, the alleged agreement here in paragraphs

 2    36 and 63 could encompass a host of the unofficial acts

 3    referring people to the right regulator, setting up meetings,

 4    calling people up and saying there are issues, referring to

 5    regulatory attorneys, and knowing what -- talking about it.

 6    That's the problem when you allege something vague, amorphous,

 7    a lack of regulation.  So it's not specificity.  It's that the

 8    purported deal could encompass a host of things that don't

 9    exert governmental power.

10        So on that ground and the grounds we've discussed

11    previously, we would urge the Court to dismiss count five of

12    indictment for failure to allege an offense and lack of

13    specificity.

14        THE COURT:  The motion is submitted, and I'll take it

15    under advisement and attempt to rule shortly.

16        I want to take up the issue of the schedule in this

17    case and potentially a trial date.  When we were last here, I

18    understood Mayor Adams to be seeking a trial date in March and

19    the government suggesting that a trial -- you'll be ready,

20    obviously, whenever is I think the language you used, but

21    suggesting that a trial date of late May was more realistic.

22        I just want to confirm it's still everyone's positions

23    here.

24        Mr. Scotten?

25        MR. SCOTTEN:  If we said late May, I'm not walking

OB1DAdaC

1    back on that, but I actually think May would be fine.  I don't

2    know that we have a view within May.

3            Just looking at the calendar, we think May is going to

4    give the Court time to rule on everything you need to rule on.

5            THE COURT:  Mr. Spiro?

6            MR. SPIRO:  And I think what I said was no later than

7    March, and we wanted the case to conclude in March or the very

8    beginning of April as a conclusion of the case.

9            THE COURT:  Okay.  Well, one of the things that -- in

10   setting a trial date, I want to set a date that's not just

11   aspirational, one where it's not likely, or there's a good

12   chance that we're not going to make that date.  I think it's a

13   date that is one that we can and will meet, absent some

14   unexpected circumstances that we can't anticipate today.

15           I want to try to take into account the known unknowns,

16   so to speak.  So, I guess the first question I have is what's

17   the status of the superseding indictment that the government

18   referred to as likely coming at the last conference?

19           MR. SCOTTEN:  I think the short answer, your Honor, is

20   that remains unchanged, what we said before, but I don't think

21   the Court should factor that into a trial date.  If the

22   superseding indictment comes too late, then the Court could

23   consider a motion to sever.  If the superseding indictment

24   contains charges that don't require a lot of new discovery,

25   that are not factually dissimilar, then it's not going to

OB1DAdaC

```
1    affect the trial date.

2              And, look, we never said it was certain.  We said it's

3    a possibility.  So I don't think the Court should be factoring

4    in one way or another whether there would be a superseding

5    indictment.  I think the Court should set a trial date on the

6    current indictment and, hopefully, that will hold.  That is one

7    area I don't think the Court should factor in unknowns.

8              THE COURT:  Okay.  Thank you for that.

9              You said it was likely we'd get a superseding

10   indictment that would add one or more defendants, and obviously

11   they're going to have views about -- if that happens, they may

12   have views about a trial date, and I would want to hear those.

13   I take your point about severing, but it sort of begs the

14   question about why there's one indictment if I'm going to end

15   up severing.

16             But, anyway, Mr. Spiro, I assume your position is

17   going to be the same, whether or not there's a superseding

18   indictment shouldn't change anything?

19             MR. SPIRO:  Correct.

20             THE COURT:  Okay.

21             MR. SPIRO:  I can elaborate on that, but I don't think

22   the Court's going to --

23             THE COURT:  Yes or no.  So everyone's in agreement.

24   If there's agreement, we don't need to belabor the point.

25             The other thing that I think I have to take into
```

OB1DAdaC

1    account that I'm aware of is the potential proceedings with

2    respect to classified information, and that's why I asked you

3    all -- to the extent we discuss it, I want everyone to be

4    mindful of the fact that we're in open court right now and

5    there are aspects of this perhaps -- to avoid getting into

6    aspects that shouldn't be discussed in open court.

7            But, obviously, we don't know what the extent of any

8    CIPA proceedings would be, if, in fact, there are any, but I

9    want to build in a schedule that accounts for the possibility

10   of full proceedings, and that's why I asked you all to confer

11   with each other.  And the competing proposals that I got

12   suggested from -- again, I know we might not need all of this,

13   but I want to build a schedule that accommodates it all.  The

14   government's proposal I think gets us to the end of late -- I

15   mean early May.  I'm still going to need some time to rule

16   after the last date proposed by the government, and that's got

17   to be between then and trial.  So that's why I said it seemed

18   to me that the government's proposal suggested like a late May

19   trial date.

20           Then, Mr. Spiro, your proposal I think gets us to the

21   end of the line, and, again, we may not need every aspect of

22   what's been laid out, but I think by March 11, and then I'm

23   going to need some time to rule between that and the start of

24   trial.  So that being the case, I don't see how we could get a

25   trial complete before April.

OB1DAdaC

1              Go ahead, Mr. Spiro.

2              MR. SPIRO:  This gets into the unknown question that I

3    would ask the Court to give less weight to, and there's a few

4    reasons why.  I made a reference to this at the last court

5    appearance, but I think it caught the Court here sort of by

6    surprise.  But from my perspective, again, we want an open,

7    public trial in March.

8              There's three possibilities here:

9              One, the CIPA process becomes unnecessary;

10             Two, we adopt my schedule, and the CIPA process is

11   completed, which is a perfectly easy thing for the Court to

12   order.  I mean, government attorneys say all the time, wow, we

13   really need more time, we need this, we need that, and courts

14   say every day, well, sorry, get your act together; you could

15   have declassified this before; you could have decided when to

16   bring the indictment.  It happens all the time.  The sky

17   doesn't fall.

18             So, again, it could become necessary.  I think we all

19   acknowledge that.

20             Two, you could order it faster;

21             Or, three, if I'm forced to choose, I will just waive,

22   as I said at the last court appearance.  Meaning, I'm not going

23   to want CIPA discovery to delay the trial.  That's how

24   significant the CIPA is to his defense, so under no -- we'd

25   continue with the process.  It's just not using the

OB1DAdaC

1    information.  And I see the Court scratching his head as it did

2    last time, but if I'm forced to make a choice, that's the

3    choice I'll make.

4        THE COURT:  You're telling me you'll waive *Brady*

5    material if you're forced to choose --

6        MR. SPIRO:  I'm saying in this particular case, the

7    sitting Mayor of New York, up for election, I -- when they

8    indicted him on that date, in light of -- the U.S. Attorney's

9    Office says, indict prior to this election, federal election.

10   They knew the CIPA issue.  They could have declassified.  They

11   knew it would run us up -- according to what they're telling

12   the Court, they knew it would run us up to the election.  So if

13   I'm put in a position to choose between a speedy and open

14   trial, so this man can clear his good name and serve the city,

15   then I'm going to take it, even if I don't get information.

16       Again, it's hypothetical.  It's a hypothetical.  There

17   is going to be the information, and you're talking about a

18   case -- I'm not going to belabor the merits of the case and

19   what I think about it, but we're not talking about a rock

20   crushing case here.  So if I have to give up this little bit of

21   information and that's the choice I'm in, I want the trial in

22   March.

23       A trial in May, effectively, what that would be, these

24   government lawyers, whether or not before you, your Honor, that

25   work at whatever three letter agency it is, they haven't come

OB1DAdaC

1    here and said they even need this much time, by the way.  This

2    schedule, we're going to impact the mayoral race in one of the

3    most important, if not the most important city in the world.

4    That's what we're going to do, because, again, some government

5    lawyer not in front of the Court says "I need more time."

6         So if that's the position, then the answer is yes, we

7    want the speedy and public trial.

8         THE COURT:  Just so I'm clear, the government's made

9    representations as to when it can move forward with the next

10   stage of a CIPA process if there is one.  I always want to make

11   sure I'm speaking in conditional terms here.  I don't take that

12   as sacrosanct, but I am looking at schedules in other cases to

13   try to get a sense of how these things typically go, and

14   there's certainly an outer limit to how fast the government can

15   move.

16        I just don't want to be in a position where I order

17   proceedings to happen a certain date and it just becomes

18   impossible to meet it.  But I do take your point, Mr. Spiro,

19   that I don't have to be stuck with whatever representation that

20   the government makes.

21        But let me just ask you this.  I understand the

22   interest in a speedy trial with any defendant, but particularly

23   in the context that we are faced with here.  So I'm very

24   focused on the election in June and when that voting period

25   begins.  What I'm trying to understand is, from your

OB1DAdaC

1    perspective, what precisely is the prejudice here if the trial

2    is completed before voting commences?

3              What difference does it make if it's completed one

4    month before voting commences, or two months, or three months?

5              MR. BASH:  Yes.

6              THE COURT:  Is there something other than the starting

7    of the voting period that is, from your perspective,

8    prejudicial?

9              MR. BASH:  Absolutely.

10             THE COURT:  Please.

11             MR. BASH:  So I think, you know, and I don't have a

12   degree in political science, but I think if you talk to people

13   who run political campaigns and understand the political

14   process, you can't leave him as an indicted man and start from

15   a standing start, where you're not able to participate in much

16   of this process, and then day one you come out and that's when

17   your political process begins.  It's just not realistic.  It

18   doesn't give him a realistic chance, and it doesn't give the

19   people of the State of New York and this city a realistic

20   chance of having him actually involved in the process.

21             It doesn't start the day voting begins, just like the

22   election now didn't start the day voting begins, and the answer

23   is --

24             THE COURT:  So your argument is it's not about whether

25   or not voters have complete information at the time ballots are

OB1DAdaC

 1    being cast.  It's about whether or not Mayor Adams can fully

 2    participate in the campaign process.

 3              MR. SPIRO:  Absolutely.  He will be dealing with

 4    trial.  He has to raise funds.  He has to raise awareness.  He

 5    has to battle political opponents.

 6              THE COURT:  I understand that, but I'm trying to -- I

 7    take your point, and I take your point that the closer we get

 8    to the election then the more of a burden there is on the

 9    mayor, but I'm trying to figure out where the cutoffs are.

10              Is it just every day is marginally worse, so every day

11    further out from the election is marginally better?

12              If that's it, then I can try my best to weigh that,

13    but what I'm trying to assess is whether or not there are sort

14    of dictates at which the marginal cost, I'll put it, kind of

15    jumps or the curve inflects at certain points.

16              So are there dates that are more problematic than

17    others, and not just kind of marginally getting worse the

18    closer we get to election?

19              You mentioned the signature gathering, and I will tell

20    you I've looked at the dates for that and I just can't see how

21    the trial can get done before the signature gathering period

22    starts, which I understand, based on my research, and you might

23    tell me I'm wrong, that's February 25.

24              MR. SPIRO:  And that's why when I was before the Court

25    the last time I said -- that's when it starts.  That's why I

OB1DAdaC

1      said March, because the first week of April approximately they

2      are then on the ballot and the contest begins, your Honor.  And

3      so every day -- I mean, we can get into the incremental days,

4      and it's a slippery slope, and it always is in these things,

5      but by the time they're on the ballot, if he still has this

6      hanging over his head, it impacts the election, it impacts the

7      City of New York to decide who its leader is.

8              THE COURT:  Do you have a certification date?  Because

9      my understanding of that is April 21st, that's when the board

10     of electors will certify who appears on the ballot.

11             MR. SPIRO:  That is the final certification date.  I

12     don't want to quibble when in mid April effectively the ballot

13     is understood to be what it is, right.  So at some point

14     between April 1st and April 15 everybody understands, because

15     as the Court pointed out last time, the certification is not

16     some huge threshold to break through once everybody knows what

17     the numbers are.

18             THE COURT:  Signature gathering isn't a really big

19     issue here.  4,000 names in a city of 8 million people, it

20     doesn't seem like that's going to be significantly -- as a

21     practical matter, I don't know how much I'm supposed to take

22     that into account, but as a practical matter, it doesn't really

23     seem like what happens in the courtroom is going to affect the

24     ability of anyone to collect 4,000 signatures.

25             MR. SPIRO:  Well, there may be some people running

OB1DAdaC

1    that may not get the 4,000.  But, in all seriousness, that's

2    why I did not say that the trial has to be completed in

3    February.

4            But, again, going back to my point, there is a point

5    in early April when people know who are the people in the

6    ballot who are actually up, who are realistically up to be the

7    mayor of the city.  At that point, he's running -- he's either

8    running with this hanging over his head, or he's running after

9    his case is over.

10           And so what are the competing considerations here?  I

11   would urge the Court to consider the government, you know, they

12   tip toe, but they're always ready.  The defense is urging the

13   Court for March, and I'm willing to waive the CIPA process

14   under the possibility that it continues on if that's an issue.

15           So if the defense is ready and the government is

16   ready, I don't know why -- I don't see a countervailing reason,

17   given the grave democratic concerns that I'm outlining, why we

18   wouldn't have the trial as expeditiously as possible.

19           And the final thing I would say to the Court on that

20   topic is, you know, you're supposed to come to the court an

21   innocent man, presumed innocent.  It's the hallmark of our

22   system of justice.  They decided to do the indictment.  They

23   decided to do the indictment with the color pictures -- in

24   cases like that, the truth always come out.  One day we'll find

25   out about the leaks and what happened.  You saw their little

OB1DAdaC

press conference.  So they decided to put this into a posture
where he's not sitting here presumed innocent anymore in the
city.  You look at the poles.  They have poles on this.  They
think he's guilty.  We are here arguing whether it's even a
crime at all, whether it's even a crime at all --

THE COURT:  That's with respect to one count, Mr.
Spiro.  The motion to dismiss, if I grant it, we're still going
to trial.

MR. SPIRO:  I understand that, on a straw donor, which
every serious election in this country has had straw donors
since the beginning.  Yes, we agree that if the count is
dismissed, what's left is the straw donor case, but that's not
the posture he finds himself in.  So when they decide to do
that and do the things they have done to prejudice the
presumption of his innocence, in this city, with an election
pending, I think the Court absolutely should take into account
that he is not just sitting here presumed innocent anymore.

THE COURT:  Thank you, Mr. Spiro.

I appreciate the interest in a speedy trial that the
public has, that any defendant has, but particularly that Mayor
Adams has in this case given the election cycle, but I also
have to be realistic about what I think can get done and the
timeframe in which it can get done.

I've looked at a lot of dockets in cases involving
public officials.  One of the ones that jumped out at me, and

OB1DAdaC

1    obviously this is not the schedule that's being asked for, so I

2    don't want to suggest that the situation's comparable, but in

3    the case involving Senator Ted Stevens in Alaska, there was

4    this effort to really just kind of hit the gas in a way that

5    got everything done before the election.  Then it turns out

6    some *Brady* material didn't get over to the defense in the mad

7    rush that everyone went into going to trial, and that obviously

8    created a lot of problems.

9        I hear what you're saying about potentially being

10    willing to waive it.  I'm not sure you can.  I don't know the

11    answer, but I'm not sure that you can do that before you've

12    seen it and still provide effective assistance of counsel.  But

13    I don't know one way or the other, so I'm not suggesting it one

14    way or the other.  It's just important to me that we hit all of

15    our marks and that we have enough time for review and

16    production.

17        I guess the one other question I should ask is where

18    are we with respect to the non-CIPA discovery right now?  I

19    ordered a cutoff about a month from now, and I want to see

20    where we are.

21        MR. SCOTTEN:  The very short answer, your Honor, is we

22    are on schedule, on the same schedule we were before.  If your

23    Honor would like a more detailed breakdown, Mr. Rohrbach can

24    really go by the numbers.  Whichever your Honor prefers.

25        THE COURT:  I don't know that we need to go item by

OB1DAdaC

1    item, but, Mr. Rohrbach, can you give me a sense of what

2    percentage of discovery has been produced, what's outstanding,

3    and when it will be complete?

4         MR. ROHRBACH:  Sure, your Honor.  So we have produced

5    -- we've made four productions, the most recent one today.

6    They total about 1.6 terabytes of data so far; more than

7    300,000 pages of subpoena returns, which is the bulk of

8    subpoena returns; another 4,000 records of City Hall; the case

9    file from department of investigation, which is one of the two

10   investigative agencies in this case; our 38 search warrants and

11   21 initial responsive sets from devices or accounts.  And there

12   are about between 60 and 70 devices and accounts so far, so

13   we're between a third and a quarter of the way through that

14   production.

15        We're continuing to roll out our productions, and so

16   we expect to be on track to produce the vast bulk of the

17   discovery by December 4th, with the caveat that Mr. Scotten

18   mentioned in our first conference, which I'd be happy to go

19   through for the Court again if you like.

20        THE COURT:  I think I remember what those are, but you

21   say 1.6 terabytes.  That's not the production today -- that's

22   the total so far?

23        MR. ROHRBACH:  Yes, your Honor.

24        THE COURT:  What percentage of the ultimate total are

25   we at this point?

OB1DAdaC

```
 1              MR. ROHRBACH:  Our data is stored a variety of places.

 2              THE COURT:  Mine, too, unfortunately.

 3              MR. ROHRBACH:  So, unfortunately, it's difficult to

 4     give an estimate.  I think of the categories of subpoena

 5     returns, the vast majority out of the electronic devices, a

 6     third to a quarter of the devices, but they of course vary in

 7     size, and then of the other records, those should be much

 8     smaller in terms of total data than devices and accounts, which

 9     should be the bulk of the actual data remaining.  But it's hard

10     to give a precise amount of that information.

11              THE COURT:  Okay.  Are you more than halfway home?

12              MR. ROHRBACH:  I think we are more than halfway of the

13     set of materials other than the devices and accounts, which, as

14     I said, we are about a third to a quarter of a way through

15     those.

16              THE COURT:  Okay.

17              MR. ROHRBACH:  But the bottom line from our

18     perspective is we expect to meet the December 4 deadline.

19              THE COURT:  With respect to devices and accounts, I

20     think those are the ones that are locked and you don't have

21     access to right now?

22              MR. ROHRBACH:  So we've produced 21 of the devices and

23     accounts we have access to.  There's the mayor's device, which

24     we don't have access to.  Some of the devices are in filter

25     review with the mayor's team that we haven't yet been able to
```

OB1DAdaC

1  review for responsive material.  And we're continuing to

2  investigate, so we're continuing to gather more devices and

3  accounts as we go to the December deadline.

4          THE COURT:  The device you don't have access to, do

5  you expect access by the discovery deadline?  If you can't

6  answer, I understand.

7          MR. ROHRBACH:  We can't answer that, your Honor.

8          THE COURT:  Anything the government would like to say

9  with respect to a potential trial date?

10         MR. SCOTTEN:  I think only that flag isn't just about

11 CIPA.  There are a lot of things that have to get done.  We

12 think what's proposed is very quick, as quick as we've seen,

13 but it's not going to lead to the kind of problems your Honor

14 flagged.

15         THE COURT:  Okay.  Mr. Spiro?

16         MR. SPIRO:  If I could just make one last comment?

17         THE COURT:  Yes.

18         MR. SPIRO:  Which is, the trial in March is five, six

19 months.  The reference to Senator Stevens, that trial I believe

20 happened about seven weeks after.

21         THE COURT:  Yes, and it's clear it's a different

22 situation.  It just, to me, speaks to the hazards of moving too

23 fast sometimes.  But I appreciate that it was a different order

24 of magnitude of speed than what you're proposing here.  I

25 didn't mean to suggest that you were proposing that schedule.

OB1DAdaC

```
 1          MR. SPIRO:  I just wanted the Court to know that's a
 2   large distinction.
 3          The final thing I would say to the Court is the Sixth
 4   Amendment and the Speedy Trial Act -- and I understand the
 5   Court said that you ruled that this was a complex case, but as
 6   far as complex cases go, especially if what we're left with is
 7   a straw donation case, this is not that -- right, I'm not
 8   trying to revisit the Court's ruling.  I'm just saying to the
 9   Court that Congress in its wisdom thought in cases like this
10   you could get there in 70 days.  It's a relatively simple case
11   in my judgment, so I would ask the Court to at least consider
12   that that happens all the time.  Now, it's 70 days, right, from
13   arraignment, and so given that, we think that our request is
14   infinitely reasonable.
15          And the final thing I'll say is we hear the government
16   say "we're ready to proceed anytime."  Even if they don't mean
17   it fully, they said it.
18          THE COURT:  Thank you, Mr. Spiro.
19          Look, I've carefully considered what has been put
20   before me with respect to a trial date.  I want everyone to be
21   comfortable with that.  I'm not just picking a number out of a
22   hat, but I am taking very seriously the public's interest in a
23   quick trial, a defendant's interest in a quick trial generally,
24   and Mayor Adams' interest in one here specifically in light of
25   the election calendar.  I do think it's important for the
```

OB1DAdaC

public to have an answer one way or another, assuming we get to a trial, but I also have to be mindful of the discovery process, which even if I were to grant the motion to dismiss and we were left with a simpler set of charges, the volume of discovery is quite significant here.

There are a lot of challenges with the particular nature of discovery that the government is producing I think, and then there's the whole CIPA process, which I appreciate what you're saying, Mr. Spiro, about potentially being willing to waive reliance on material that comes out of that before you've seen it. But I think I have to build a trial schedule that accommodates the possibility, anyway, of full CIPA proceedings.

When I look at other cases involving public officials that have come before this Court, seven and nine months from the time of indictment to trial seems to be the norm. It was over seven month in *Menendez*, more than eight months in *Silver*. The Brian Benjamin case never got to trial, but the schedule was to get there in over nine months. So when I look at that, it's hard for me to envision something substantially shorter than that.

Now, with respect to *Menendez*, my understanding, which I think is the most recent of these cases and the one that I'm really looking at when it comes to the docket, that was a multi-defendant case. My understanding was that the volume of

OB1DAdaC

1    classified material in that case was unusually large.  So it's

2    not clear to me that we need as much time, and I also

3    understand that the *Menendez* trial schedule, notwithstanding

4    the things that I said, was quite burdensome for everyone

5    involved.  I know it was burdensome for the parties.  I know it

6    was burdensome for the Court.  I'm not suggesting that was a

7    walk in the park where they were.  I'm very mindful of the

8    fact, as the government put it, Judge Stein moved heaven and

9    earth to get to that trial date in May.

10           So it's not that I think that's something easy to -- a

11   road that's easy to follow, let alone eclipse, but given that

12   we do have just one defendant in this case and that I

13   anticipate if there is classified material, it won't reach the

14   levels of the extremely large volume in *Menendez*, I think we

15   can shoot to get to trial faster.

16           I'm going to set a trial date, and, again, I'm setting

17   this date not just to have a control date, but a date that I

18   think we can meet, assuming nothing unexpected comes up.  But I

19   understand something may happen, so we may not, but I'm going

20   to set a trial date of April 21.

21           I'm not going to set a CIPA schedule right now.  We'll

22   kind of try to Tetras that into what we have.

23           Now, again, something may come up, but that's the date

24   that I think we can realistically -- that's the earliest date

25   that I think we can realistically shoot for.

OB1DAdaC

1    Is there anything that the parties want to raise with

2    me?

3    MR. SPIRO:  Not from the defense, your Honor.

4    Oh, one thing, actually.  This is just -- we had a

5    date in mid December for discovery, and if the Court recalls,

6    the last time I sort of said, well, if we did it the day after

7    the government produces --

8    THE COURT:  Yes.

9    MR. SPIRO:  It didn't make much -- I didn't think it

10   would work, and I thought it would waste the Court's time,

11   because I had to ingest the material.  Now that I have watched

12   what it takes to ingest the material, I don't think that date

13   works either.  Meaning, I would be coming to the Court and

14   telling the Court I can't answer the question because I haven't

15   seen the discovery yet.

16   So, again, I say these things, but they're based on --

17   I've thought them through, which it's hard to imagine that we

18   are going to have motions in this case beyond the motions

19   related to the things we've talked about to date, so this is

20   almost certainly a moot issue that I don't want to belabor, but

21   what I would suggest to the Court is, if it's okay with the

22   Court, is submit something to the Court once we have seen the

23   discovery, to ask for a schedule, or to tell the Court that

24   we're definitely not going to be filing motions based on the

25   discovery.

OB1DAdaC

1          That would be my suggested approach, because I can't

2    tell the Court when I'm going to know that, and I'm telling the

3    Court almost certainly the letter is going to say we do not

4    intend to file motions in this matter.

5          THE COURT:  You don't anticipate anything like a

6    suppression motion?

7          MR. SPIRO:  I don't.

8          THE COURT:  Okay.  That conference scheduled for

9    December 13, Mr. Spiro, you're telling me you think you need

10   more time before you're going to have an answer.

11          What would you propose?

12          MR. SPIRO:  Well, if the Court is okay with my

13   suggestion, which is we would alert --

14          THE COURT:  I'm not sure.

15          MR. SPIRO:  Okay.

16          THE COURT:  Let me think about the date first, and

17   then the form of having the conversation.

18          MR. SPIRO:  I hope to alert the Court earlier, but to

19   alert the Court by December 20, or be able to at least tell the

20   Court, because I can't know whether the government is

21   intentionally or not backloading, and I'm going to get a huge

22   production on the 4th.  It's hard to know.  And the ingestion

23   process is more complicated and cumbersome than you would

24   think, or you would know --

25          THE COURT:  It's a substantial volume.

OB1DAdaC

1          MR. SPIRO:  Yes.

2          THE COURT:  So the proposal on the table is to have a

3     discovery update either on paper or at a conference on the

4     20th, where the defendant will notify everyone as to whether or

5     not he seeks to -- intends to file any motions.

6          Does government have views on this?

7          MR. SCOTTEN:  I think our -- one concern we have is

8     that there was also a motions schedule set off that, and if

9     we're moving a little faster than perhaps we thought, I don't

10    want to see a motions schedule creep later, too.  But I don't

11    have any problem at all moving it from the 13th to the 20th, as

12    long as we keep the same due date for their motions.

13         THE COURT:  Mr. Spiro?

14         MR. SPIRO:  I see no reason that's going to be an

15    issue, and I will alert the Court if there is any issue.

16         THE COURT:  Okay.  Let's adjourn the December 13

17    conference to December 20th, set for 2:00 p.m.

18         I think it's best to keep it as a conference, Mr.

19    Spiro, just so we can check in on where we are.

20         Then there's the matter of the Speedy Trial Act.  I

21    had excluded time through December 13.  I assume that there is

22    not going to be any issue extending it to the 20th for the same

23    reasons I have --

24         MR. SPIRO:  I've made my record on the Speedy Trial

25    Act, and I have nothing further to add to that record.

OB1DAdaC

1           THE COURT:  Okay.  Noted.

2           Is there a motion?

3           MR. SCOTTEN:  Your Honor, yes, although we were going

4   to move to exclude time until April 21, as the Court has

5   already, just by its ruling, found to be necessary.

6           THE COURT:  I'll hear your motion on that.

7           MR. SCOTTEN:  I think explicit in some ways --

8   explicit in the Court's reasoning in finding earlier the

9   recent date to get to trial, given the volume of discovery

10  needs, for defendant to review discovery and make any necessary

11  motions, as well as the Court to rule on any disputes that come

12  out of that, so based on the Court's findings, trial is not

13  practicable earlier than April 21.  We ask the Court exclude

14  time until then in the interest of justice, which outweighs

15  defendant's desire for speedy trial and the defendant's --

16  because that is, in fact, the earliest trial date.

17          THE COURT:  Mr. Spiro?

18          MR. SPIRO:  I will rely mostly on my comments before.

19  Courts look to a number of components.  The complexity of the

20  charges, again, we think a straw donor case, nothing could be

21  simpler, yet the volume of the discovery defense said we can

22  get through it far faster and asked for an earlier trial date.

23  We do not think this is a complex case, and I'll rest on the

24  record I made earlier.

25          THE COURT:  Thank you, Mr. Spiro.

1          I will grant the government's motion and exclude time

2     through April 21 from the Speedy Trial Act calculation.  I find

3     the ends of justice served by excluding such time outweigh the

4     interest of the public and the defendant in a speedy trial for

5     all of the reasons that I cited at the last conference and that

6     I identified today.  The exclusion of such time will provide

7     time for the parties to finish the production of discovery, to

8     review it, consistent with the defendant's request to notify

9     the Court as to whether or not motions are necessary by

10    December 20, rather than the 13th, which I think speaks to the

11    volume and complexity of the discovery here.

12         The discovery also involves potentially proceedings

13    under CIPA, which take some time, and the schedule for trial

14    that I have proposed is consistent with other cases involving

15    public officials, like *United States v. Menendez*.  The

16    exclusion of time will provide not only an opportunity to

17    review that discovery but for the defendant to make any motions

18    as necessary and for counsel to provide effective assistance.

19         Is there anything further that the parties would like

20    to raise with me today?

21         Mr. Scotten?

22         MR. SCOTTEN:  Not from the government.  Thank you,

23    your Honor.

24         THE COURT:  Mr. Spiro?

25         MR. SPIRO:  Not from the defense.  Thank you, your

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

OB1DAdaC

1    Honor.

2         THE COURT:  Thank you very much for your time.  Thank

3    you for the excellent arguments on the motion to dismiss.  I

4    appreciate it.

5         We are adjourned for today.

6         (Adjourned)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25