# Exhibit A

quinn emanuel trial lawyers | new york

295 5th Avenue, New York, New York 10016-7103 | TEL (212) 849-7000 FAX (212) 849-7100

WRITER'S DIRECT DIAL NO.
**(212) 849-7364**

WRITER'S EMAIL ADDRESS
**alexspiro@quinnemanuel.com**

February 3, 2025

Emil Bove
Deputy Attorney General
United States Department of Justice
950 Pennsylvania Avenue NW
Washington, DC 20530

Re:   <u>U.S. v. Eric Adams</u>, Case No. 24-Cr-556-DEH (S.D.N.Y. 2024)

Dear Mr. Bove:

We write on behalf of Mayor Eric Adams and in follow-up to our meeting on Friday, January 31. In particular, we wanted to address questions you have raised with respect to the indictment's impact on Mayor Adams's ability to lead New York City, including by working with the federal government on important issues of immigration enforcement and national security.

At the outset, it warrants emphasis again that Mayor Adams is an innocent man who has been forced into a fight for his freedom and good name against the most formidable opponent imaginable—the United States Government. He finds himself in this unenviable position because of the political ambitions of the former U.S. Attorney for the Southern District, Damian Williams, and the weaponized Justice Department that rubber-stamped Mr. Williams's improper crusade. Under Mr. Williams's direction, federal prosecutors and law enforcement agents orchestrated nearly a year's worth of pre-indictment press leaks regarding their "investigation" of Mayor Adams, the design and effect of which was to cripple Mayor Adams politically and erode the presumption of innocence to which he is entitled. Indeed, since Mr. Williams's resignation, he has wasted no time publicly touting his prosecution of Mayor Adams in a thinly veiled op-ed and on his personal, made-for-the-campaign-circuit website.

While Mr. Williams may have moved on to the next stage of his political plans, Mayor Adams remains in the midst of an unwanted civil war with the federal government. This adversarial posture necessarily curtails Mayor Adams's ability to work hand-in-hand with his federal counterparts on the myriad issues that overlap New York City and the country as a whole. It is a daily challenge that manifests itself in numerous ways—both obvious and subtle—and it will only increase as Mayor Adams's trial draws nearer and he is increasingly required to devote

quinn emanuel urquhart & sullivan, llp

ABU DHABI | ATLANTA | AUSTIN | BEIJING | BERLIN | BOSTON | BRUSSELS | CHICAGO | DALLAS | DOHA | HAMBURG | HONG KONG | HOUSTON | LONDON | LOS ANGELES | MANNHEIM | MIAMI | MUNICH | NEUILLY-LA DEFENSE | NEW YORK | PARIS | PERTH | RIYADH | SALT LAKE CITY | SAN FRANCISCO | SEATTLE | SHANGHAI | SILICON VALLEY | SINGAPORE | STUTTGART | SYDNEY | TOKYO | WASHINGTON, DC | WILMINGTON | ZURICH

attention to his defense. The trial will begin on April 21, 2025, and is expected to last at least four weeks, excluding jury deliberations which are unpredictable in length and could extend the time to verdict considerably. As you know, the Mayor will be in court at least eight hours per day, five days per week until it is over. And in the weeks before the trial begins, he will have no choice but to spend most of his time preparing for the trial with his counsel. Conservatively, Mayor Adams will be spending 75% of his waking hours preparing for or on trial from now until it concludes in late May or early June. Mayor Adams has every right, and no choice, but to defend himself against these false charges. Nor will he resign from office and abandon the millions of New Yorkers who voted for him and leave City Hall in the hands of a successor who will actively thwart his efforts to uphold and enforce the law and protect and defend the city.

As one prominent example of the indictment's impact, Mayor Adams's security clearance was revoked following his indictment, and he can no longer be briefed on critical matters of national security. That means there is and will continue to be an absence of local leadership in circumstances where it is needed the most, and in a city where national-security issues arise constantly. This roadblock naturally extends to immigration enforcement, and it will become increasingly problematic as the Trump administration seeks to aggressively enforce immigration laws and remove undocumented immigrants who pose a threat to Americans' safety. The Mayor needs to be in lockstep with federal law enforcement, federal agency heads, and federal prosecutors to carry out this critical shared mission. That is evident from Mayor Adams's close coordination with the Department of Homeland Security and DHS Secretary Noem in connection with the recent immigration raids involving criminal suspects. While those raids were successful, the federal government cannot possibly rely on Mayor Adams to be a fully effective partner in all situations in ongoing public-safety missions while he is under federal indictment and stripped of access to the most important information.

This problem is not limited to classified issues of national security; it also extends to everyday matters of public safety. For instance, Mayor Adams has previously worked closely with a joint taskforce on firearms that involved federal and local law enforcement and the U.S. Attorneys' offices for the Southern and Eastern Districts of New York. This task force helps ensure that weapons are removed from the streets and weapons traffickers are identified, arrested, and prosecuted. The fact that these same federal agencies are now involved in prosecuting Mayor Adams makes it more challenging for him to fully participate in and execute on the task force's mission. Beyond obvious examples such as these, it simply is not possible to quantify nor predict all of the ways in which the Southern District's misguided pursuit of Mayor Adams will continue to complicate his work with the federal government.

Mayor Adams's independent abilities to exercise his powers have also been complicated by his indictment. The Mayor derives his power from the New York City Charter and the inherent nature of his political position. His powers allow him to take actions such as preventing the Office of the Corporation Counsel from litigating challenges to immigration enforcement, preventing appointed city employees from taking public stances against enforcement efforts, re-opening the ICE office on Rikers Island, and directing the NYPD to supply manpower to assist federal immigration agents. Indeed, just last week, Mayor Adams stepped in to clear up miscommunication between DHS and the NYPD, and he helped ensure that additional NYPD manpower was allocated to keep federal agents safe during dangerous criminal immigration raids.

2

While the indictment does not automatically strip Mayor Adams of any powers, it has opened the door to his potential removal from office. At the local level, the Charter establishes a Committee on Mayoral Inability that consists of the speaker of the City Council and other city officials, and the committee can vote to remove Mayor Adams from office, either temporarily or permanently. NYC Charter § 10(d)(2)-(5). Upon Mayor Adams's challenge to any such vote, the full City Council has the power to finally resolve the matter. The Governor also has the ability to remove Mayor Adams from office now that he is under indictment. NYC Charter § 9. Both scenarios are real threats that grow by the day. As Mayor Adams continues to help with DHS' ramping enforcement operations, the risk that his political opponents—and in particular, the City Council—will try to remove him from power will only increase. Governor Hochul also could conclude that, at a certain point, the Mayor can no longer devote the attention that his position requires and accordingly take steps to remove him.[1]

With respect to day-to-day leadership, Mayor Adams's political muscle is weakened by an indictment. Leaders of various city agencies such as the NYPD and the Office of the Corporation Counsel serve at the Mayor's pleasure and are subject to removal by him. Yet, to the extent that city officials perceive the Mayor to be politically weakened, on the ropes, or not long for the office, he loses some ability to make sure officials and their agencies are complying with his directives. These officials may become emboldened to seek alliances with the City Council or the Public Advocate, both of whom are staunchly opposed to Mayor Adams's longtime desire to roll back certain pieces of New York's sanctuary city policies.

Mayor Adams has seen the significant impact of this indictment across all facets of his job. His traditional political partners—both locally and in Albany—are hesitant to continue working with him. It has become increasingly difficult to retain talented staff, and the committed staff who have stayed by the Mayor's side have been distracted from his mission by the crush of overbroad federal subpoenas seeking all manner of documents and records. Local business and community leaders are reluctant to engage with City Hall, and there is an overall atmosphere of waiting out a Mayor whose days are numbered. The list goes on and on.

Now is a watershed moment for New York City and the rest of the United States. For the first time in Mayor Adams's administration, the federal government shares his commitment to public safety and longtime desire to confront the migrant crisis head-on. But at the same time the federal government is seeking to accelerate long-overdue immigration enforcement efforts, Mayor Adams is being increasingly pulled away from the streets of his city by the necessity of preparing his defense against criminal charges—as unfounded as they are. As his trial grows near, it will be untenable for the Mayor to be the ever-present partner that DHS needs to make New York City as safe as possible. It will be untenable for him to stay on top of city agencies and officials to ensure that his agenda on issues like immigration is being respected. And it will be untenable for him to unify the city around a much-needed rollback of certain sanctuary city policies. To be clear, Mayor Adams has always been laser-focused on addressing the migrant crisis, and that will not change

---

[1] If Mayor Adams is removed from office, he would be replaced at least temporarily by Public Advocate Jumaane Williams, a frequent outspoken critic of Mayor Adams's desire to protect New Yorkers by combating the migrant crisis.

3

no matter what happens with this case. But the simple reality is that there is only so much one man can hope to do while also fighting for his liberty and to restore his good name.

* * *

Through this prosecution, Damian Williams and his Southern District prosecutors sought to expand federal bribery laws past the breaking point to criminalize something that happens in politics every day: politicians being treated differently than the average citizen through things like flight or hotel upgrades, free meals, or nice seats at sporting events. These prosecutors have sought to turn federal bribery law into a blanket prohibition on the receipt of anything that could be characterized as a "perk," in exchange for nothing other than a vague understanding that the politician will help with some non-specific future issue. That is in direct contrast to decisions by the conservative majority of the Supreme Court in *McDonnell* and *Snyder* to reign in federal bribery law and prevent the over-criminalization of everyday political activity. And, given the real risk that its so-called "bribery" theory would not stick, the Southern District tacked on charges related to alleged straw donor schemes, without any credible evidence that Mayor Adams had knowledge of improper donations.

The legal and factual weaknesses in this case must be weighed against the cost on New York City, which has already been immense following more than a year of leaks regarding the "investigation" and other government-fueled innuendos about Mayor Adams's character. There is a reason that the Justice Department does not prosecute sitting presidents, and while a mayor is not a president, Mayor Adams is nonetheless the leader of this country's largest city and needs to be an important partner to the President and his administration. An honest balancing of these concerns against the unsupported prosecution theories in this case militates strongly in favor of dismissal. A Justice Department driven purely by the rule of law never would have authorized this prosecution in the first place. But as it happened, there was essentially zero engagement by the former Attorney General or Deputy Attorney General, despite Mayor Adams's repeated requests that the Department take a long, hard look at this house of cards. Instead, the Justice Department rubber-stamped an incredibly weak case against a politician who had fallen far out of favor with the former President and other prominent Democrats.

Given the exigency of this matter, we would appreciate the opportunity to speak further with you, and we are available for a call or meeting at your convenience. Thank you very much for your attention to this matter.

Sincerely,

*/s/ Alex Spiro*

Alex Spiro
William A. Burck