# EXHIBIT 1

## UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| UNITED STATES OF AMERICA, | Case No. 24 Cr. 556 (DEH) |
| Plaintiff, | |
| v. | |
| ERIC ADAMS, | |
| Defendant. | |

## <u>AMICUS BRIEF OF FORMER FEDERAL JURISTS</u>

2881524

## <u>TABLE OF CONTENTS</u>

<u>**Page**</u>

I.     IDENTITY AND INTEREST OF AMICI ........................................................................1

II.    INTRODUCTION ...................................................................................................................1

III.   BACKGROUND ....................................................................................................................2

      A.     The United States filed an indictment against Adams and vigorously pursued those charges. ............................................................................................2

      B.     Outside of his criminal proceedings, Adams appealed to the new presidential administration. .................................................................................4

      C.     The Department of Justice intervened after United States Attorneys refused its directive to seek dismissal. ...................................................................5

IV.   ARGUMENT ...........................................................................................................................8

      A.     If the Court finds an improper *quid pro quo*, it should exercise its authority under Rule 48(a) to deny the DOJ's request for dismissal. ...................................8

      B.     The Court can and should conduct further inquiry and take additional procedural steps as necessary. ..............................................................................11

V.    CONCLUSION .....................................................................................................................13

2881524

# TABLE OF AUTHORITIES

**Page(s)**

**Federal Cases**

*Brit. Int'l Ins. Co. v. Seguros La Republica, S.A.*,
 2002 WL 987199 (S.D.N.Y. May 14, 2002) ........................................................................12

*Commodity Futures Trading Comm'n v. Schor*,
 478 U.S. 833 (1986).............................................................................................................1

*In re Estelle*,
 516 F.2d 480 (5th Cir. 1975) ..............................................................................................11

*Florida v. Georgia*,
 585 U.S. 803 (2018) ............................................................................................................12

*Hoptowit v. Ray*,
 682 F.2d 1237 (9th Cir. 1982) ............................................................................................11

*Levine v. United States*,
 362 U.S. 610 (1960).............................................................................................................13

*Morrison v. Olson*,
 487 U.S. 654 (1988).............................................................................................................12

*Rice v. Rivera*,
 617 F.3d 802 (4th Cir. 2010) ................................................................................................9

*In re Richards*,
 213 F.3d 773 (3d Cir. 2000)..................................................................................................9

*Rinaldi v. United States*,
 434 U.S. 22 (1977)............................................................................................................8, 9

*Rispler v. Sol Spitz Co. Ret. Tr.*,
 2011 WL 43239 (E.D.N.Y. Jan. 6, 2011) ...........................................................................12

*In re United States*,
 345 F.3d 450 (7th Cir. 2003) ..............................................................................................13

*United States v. Ammidown*,
 497 F.2d 615 (D.C. Cir. 1973)...........................................................................................8, 9

*United States v. Arpaio*,
 887 F.3d 979 (9th Cir. 2018) ..............................................................................................13

2881524

*United States v. Bettinger Corp.*,
   54 F.R.D. 40 (D. Mass. 1971) ...................................................................................9

*United States v. Cockrell*,
   353 F. Supp. 2d 762 (N.D. Tex. 2005) .....................................................................9

*United States v. Cowan*,
   524 F.2d 504 (5th Cir. 1975) ...................................................................................9

*United States v. Derr*,
   726 F.2d 617 (10th Cir. 1984) .................................................................................8

*United States v. Donziger*,
   38 F.4th 290 (2d Cir. 2022) ...................................................................................12

*United States v. Freedberg*,
   724 F. Supp. 851 (D. Utah 1989) ...........................................................................10

*United States v. Greater Blouse, Skirt & Neckwear Contractors Ass'n, Inc.*,
   228 F. Supp. 483 (S.D.N.Y. 1964) ..........................................................................8

*United States v. Hamm*,
   659 F.2d 624 (5th Cir. 1981) ...................................................................................2

*United States v. HSBC Bank USA, N.A.*,
   863 F.3d 125 (2d Cir. 2017) ................................................................................8, 9

*United States v. N.V. Nederlandsche Combinatie Voor Chemische Industrie*,
   428 F. Supp. 114 (S.D.N.Y. 1977) ................................................................9, 10, 11

*United States v. N. V. Nederlandsche Combinatie Voor Chemische Industrie*,
   75 F.R.D. 473 (S.D.N.Y. 1977) ...........................................................................8, 9

*United States v. Rosenberg*,
   108 F. Supp. 2d 191 (S.D.N.Y. 2000) ......................................................................9

*Wharton v. Vaughn*,
   2020 WL 733107 (E.D. Pa. Feb. 12, 2020) ............................................................12

*Young v. U.S. ex rel. Vuitton et Fils S.A.*,
   481 U.S. 787 (1987) ...............................................................................................12

**Rules**

Federal Rule of Criminal Procedure 48(a)............................................................ *passim*

**Other Authorities**

Thomas Ward Frampton, *Why Do Rule 48(a) Dismissals Require "Leave of Court"?*, 73 Stan. L. Rev. Online 28 (2020) ..........................................................................8

iv

## I.     IDENTITY AND INTEREST OF AMICI

*Amici curiae* are former federal district court judges from across the nation. Specifically, *amici* are: Hon. Andre Davis (Ret.); Hon. Jeremy Fogel (Ret.); Hon. Nancy Gertner (Ret.); Andrew Guilford (Ret.); Hon. Thelton E. Henderson (Ret.); Hon. Richard J. Holwell (Ret.); Hon. D. Lowell Jensen (Ret.); Hon. George H. King (Ret.); Hon. A. Howard Matz (Ret.); Hon. Stephen M. Orlofsky (Ret.); Hon. Shira A. Scheindlin (Ret.); Hon. Fern Smith (Ret.); Hon. Thomas I. Vanaskie (Ret.); and Hon. T. John Ward (Ret.).

The common interest of *amici* here arises from their service on district courts, and their abiding dedication to the integrity and independence of those courts. Because the prosecution and defense in this case have effectively joined sides, the judiciary has "institutional interests that the parties cannot be expected to protect." *Commodity Futures Trading Comm'n v. Schor*, 478 U.S. 833, 851 (1986). *Amici*, therefore, submit this brief in support of their interest in the "institutional integrity of the Judicial Branch." *Id.*[1]

## II.     INTRODUCTION

Based on their years of experience and service, *amici* know the importance of maintaining the integrity of the judicial process. That integrity is imperiled if the Executive Branch seeks, and the Court allows, the dismissal of criminal charges for improper reasons. In requiring leave of court to dismiss an indictment, Federal Rule of Criminal Procedure 48(a) recognizes that judges may constitutionally guard against such impropriety in their own courts.

This Court has appointed an *amicus*, Paul Clement, to answer certain questions posed by the Court, which is entirely appropriate in *amici*'s experience and under the law. This brief offers *amici*'s support and endeavors to provide answers to some of the Court's questions from *amici*'s perspective. *Amici* believe that it is entirely appropriate—indeed, necessary—for the Court to

---

[1] *Amici* confirm that no counsel for a party authored this brief in whole or in part and that no person other than *amici* or their counsel made any contribution intended to fund the preparation or submission of this brief.

conduct further inquiry and ultimately to deny the Rule 48(a) motion if the Court finds that the appearance of impropriety here reflects actual impropriety.

As things currently stand, public confidence in the criminal justice system will be diminished if the Court grants leave to dismiss the indictment against New York City Mayor Eric Adams. The circumstances indicate that the dismissal is one half of an improper *quid pro quo*— the other half being Mayor Adams's agreement to further the administration's immigration policy objectives, which have nothing to do with the charges against Mayor Adams. This *quid pro quo* has nothing to do with the administration of justice; its goal is to advance the administration's political priorities.

Worse, by seeking to dismiss without prejudice, the administration apparently seeks to hold renewed prosecution over Adams's head to ensure his continued compliance with the administration's policies. The Justice Department seeks to use this Court as the fulcrum for its leverage against Mayor Adams. If so, the Court should not allow it.

Finally, under the present extreme circumstances, the Court may appoint a special prosecutor to advance the public interest in justice if the Justice Department refuses to do so.

## III.    BACKGROUND

### A.    The United States filed an indictment against Adams and vigorously pursued those charges.

In 2021, the United States began investigating Adams "based on concrete evidence that [his] campaign sought and received illegal campaign contributions." Dkt. No. 76 at 3.[2]

---

[2] The Court has asked "[w]hether, and to what extent, a court may consider materials other than the Rule 48(a) motion itself." Dkt. No. 136 at 3. Under Rule 48(a), the Court has the authority— and indeed the duty—to determine if dismissal serves the public interest or, instead, is sought for improper reasons. Where, as here, there are serious questions regarding abuse of prosecutorial discretion, the Court's responsibility to safeguard the public interest is heightened. *See United States v. Hamm*, 659 F.2d 624, 629 (5th Cir. 1981) (in analyzing a Rule 48(a) motion, courts have a duty to "look to the motivation of the prosecutor at the time of the decision to dismiss"). Because of the unique procedural posture of the present case, the Court can, and should, consider information (including public statements), outside of the four corners of the Rule 48(a) motion to determine whether granting the motion would be contrary to the public interest.

Following that investigation, the United States indicted Adams for accepting illegal campaign contributions and improper personal benefits in exchange for favorable treatment for nearly a decade while holding political office. Dkt. No. 1 ¶ 1. The indictment stated, for example, that Adams accepted campaign contributions and other benefits from a Turkish official and, in exchange, facilitated the opening of a new skyscraper without a fire inspection at the official's direction. *Id.* ¶¶ 5–6. The Grand Jury charged Adams with (1) conspiracy to commit wire fraud, federal program bribery, and to receive campaign contributions by foreign nationals (Count I); (2) wire fraud (Count II); (3) solicitation of a contribution by a foreign national (Count III); (4) solicitation of a contribution by a foreign national (Count IV); and (5) bribery (Count V). *Id.* ¶¶ 50–63.

Over the next four months, the United States advanced its case against Adams. In October, it opposed Adams's motion to dismiss Count V of the indictment, explaining that Adams engaged in "a *quid pro quo* in which [he] sought and took luxury travel from a foreign official in exchange for influencing New York City's regulation of a Manhattan skyscraper– including by pressuring the FDNY to allow the building to open without an inspection." Dkt. No. 37 at 1. The United States reiterated that "[t]he charges in the Indictment stem from a long-running conspiracy in which the defendant accepted illegal campaign contributions and bribes consisting of various forms of luxury travel." *Id.* In November, the United States opposed Adams's numerous filings. Dkt. Nos. 51, 59, 64. In December, the United States sought sanctions based on Adams's counsel's statements that the "prosecution's case was 'contrived'" and counsel's "long-running and fallacious accusation that the Government obtained the Indictment because of improper and malicious motives." Dkt. No. 76 at 2. The Government stressed that "there are multiple witnesses who will expressly implicate the defendant in criminal

3

conduct, each of whom is corroborated by electronic communications and other data obtained from over 50 cellphones and other electronic devices and accounts." *Id.* And it reiterated that the investigation began in 2021 "based on concrete evidence that the defendant's campaign sought and received illegal campaign contributions." *Id.* at 3; *see also* Dkt. Nos. 86, 92.

In January and February, the United States continued to oppose Adams's attempts to dismiss the charges. In late January, the United States denounced Adams's "shifting attempts to suggest that he was indicted for any reason other than his crimes"; noted Adams's prior, debunked claim that "his indictment resulted from a policy disagreement with the prior presidential administration arising in October 2022"; and criticized Adams for "attempt[ing] to shift the focus away from the evidence of his guilt." Dkt. No. 102 at 2. The Government reiterated that "[t]he evidence of Adams's crimes was uncovered by career law enforcement officers performing their duties[] in an investigation . . . ." *Id.* On February 7, the United States informed the Court of its intent to charge Adams's employee for conspiring in conduct underlying Adams's indictment. Dkt. No. 116 at 2. That employee had indicated his intention to plead guilty. *Id.*

    **B.**     **Outside of his criminal proceedings, Adams appealed to the new presidential administration.**

While his attempts at dismissal failed in court, Adams separately appealed to the new presidential administration. Three days before President Trump was sworn in, Adams traveled to Mar-a-Lago to meet with him. Ex. 2. Following President Trump's inauguration, Adams's attorneys approached the White House counsel's office to ask about a pardon for Adams. *Id.* A week later, the Acting Deputy Attorney General, Emil Bove, contacted Adams's attorney to set up a meeting because the DOJ was considering dismissing the charges against him. *Id.* A meeting occurred on January 31, and Adams's attorneys "repeatedly urged what amounted to a *quid pro quo*" of Adams's assistance in exchange for dismissal. Ex. 3 at 3 n.1.

On February 3, Adams followed up with a letter to Mr. Bove explaining how his criminal proceedings were interfering with the administration's immigration objectives. Dkt. No. 130-1. He said that although he coordinated with the Department of Homeland Security in connection with recent immigration raids, "the federal government cannot possibly rely on Mayor Adams to be a fully effective partner in all situations in ongoing public-safety missions while he is under federal indictment and stripped of access to the most important information." *Id.* at 2. Adams explained that as trial approaches, "it will be untenable for the Mayor to be the ever-present partner that DHS needs to make New York City as safe as possible." *Id.* at 3; *see id.* ("As Mayor Adams continues to help with DHS' ramping enforcement operations, the risk that his political opponents . . . will try to remove him from power will only increase."); *id.* at 2 ("[H]e helped ensure that additional NYPD manpower was allocated to keep federal agents safe during dangerous criminal immigration raids."). Adams indicated dismissal was warranted in part because he is "the leader of this country's largest city and needs to be an important partner to the President and his administration." *Id.* at 4.

On February 13, Adams and the Trump administration's border czar, Tom Homan, announced following a meeting that Adams had agreed to sign an executive order reestablishing an office for U.S. Immigration and Customs Enforcement at Rikers Island jail, a reversal of a decade-long policy. Ex. 4. The next day, Homan said "I came to New York City and I wasn't going to leave with nothing," Ex. 5 and that this "was just one piece of a bigger collaboration" between Adams and the administration, Ex. 6. Homan then warned: "If [Adams] doesn't come through, I'll be back in New York City . . . . I'll be in his office, up his butt, saying, 'Where the hell is the agreement we came to?'" Ex. 5. Adams said: "Let's be clear – I'm not standing in the way. I'm collaborating against so many others who don't want to collaborate." Ex. 4.

### C.    The Department of Justice intervened after United States Attorneys refused its directive to seek dismissal.

On February 10, Mr. Bove directed the then-Acting U.S. Attorney for the Southern District of New York, Danielle Sassoon, to dismiss the charges against Adams, subject to the

following three conditions: (1) Adams's agreement in writing to dismissal without prejudice,

(2) Adams's agreement in writing that he was not a prevailing party under the Hyde Amendment,

and (3) that following the November 2025 mayoral election, the confirmed U.S. Attorney for the

Southern District would review the matter. Ex. 7 at 1. The Department of Justice emphasized that

it reached "this conclusion without assessing the strength of the evidence or the legal theories on

which the case is based." *Id.* Nonetheless, the DOJ said dismissal subject to the conditions

identified was appropriate because (1) the former U.S. attorney's actions created an appearance

of impropriety and the proceedings interfered with Adams's mayoral campaign and (2) the

proceedings interfered with Adams's ability "to devote full attention and resources" to illegal

immigration. *Id.* at 1–2.

   Ms. Sassoon promptly replied and stated there was no valid basis to seek dismissal. Ex. 3

at 1. She described the proposal to dismiss "the charges against Adams in return for his

assistance in enforcing the federal immigration laws" as violating rules regarding the equal

administration of justice. *Id.* at 2. Ms. Sassoon also detailed a January 31 meeting with Adams's

counsel, the Acting Deputy Attorney General, and members of her office wherein "Adams's

attorneys repeatedly urged what amounted to a *quid pro quo*, indicating that Adams would be in

a position to assist with the Department's enforcement priorities only if the indictment were

dismissed." *Id.* at 3 n.1. During that meeting, Mr. Bove admonished a member of her office for

taking notes and directed the collection of those notes. *Id.* Ms. Sassoon also challenged Mr.

Bove's claim that dismissal was warranted due to the conduct of the former U.S. Attorney,

explaining those "generalized concerns" provided no basis to dismiss an indictment returned by a

grand jury. *Id.* at 4. Ms. Sassoon said she would resign if forced to carry out the dismissal

directive. *Id.* at 8. Other career prosecutors also resigned, and one wrote that the Justice

Department's "impropriety" suggestion was "so weak as to be transparently pretextual" and that "[n]o system of ordered liberty can allow the Government to use the carrot of dismissing charges, or the stick of threating to bring them again, to induce an elected official to support its policy objectives." Ex. 8; *see also* Ex. 9.

The next day, Mr. Bove transferred the case to the DOJ to file a motion to dismiss the charges. Ex. 10. But the DOJ's public integrity officials also refused to dismiss the case, prompting Mr. Bove to hold a meeting where he told career public integrity prosecutors that they had an hour to decide who would file the motion. Ex. 9. After those prosecutors contemplated resigning en masse, one prosecutor volunteered to alleviate pressure on his colleagues. *Id.*

Next, "attorneys from the DOJ replaced AUSAs from the U.S. Attorney's Office for the Southern District of New York as counsel of record in the case" and said they "will handle this matter and any related decision-making in the future." Dkt. No. 122 ¶ 1 n.1. They then sought to dismiss the charges against Adams without prejudice "based on the unique facts and circumstances of this case" and provided two bases for dismissal. *Id.* ¶¶ 1, 4. ***First***, citing an executive order titled "Ending the Weaponization of the Federal Government," they said dismissal was "necessary because of appearances of impropriety and risks of interference with the 2025 elections in New York City . . . ." *Id.* ¶ 5. ***Second***, citing executive orders regarding illegal immigration, the DOJ attorneys said the proceedings "would interfere with [Adams's] ability to govern in New York City, which poses unacceptable threats to public safety, national security, and ***related federal immigration initiatives and policies***." *Id.* ¶ 6 (emphasis added). They noted that Adams had been "denied access to sensitive information" because of the ongoing criminal proceedings. *Id.* Adams agreed to dismissal without prejudice. Dkt. No. 131-1.

## IV.    ARGUMENT

### A.    If the Court finds an improper *quid pro quo*, it should exercise its authority under Rule 48(a) to deny the DOJ's request for dismissal.

Federal Rule of Criminal Procedure 48(a) provides that "[t]he government may, with leave of court, dismiss an indictment, information, or complaint." "The words 'leave of court' were inserted in Rule 48(a)" and "obviously vest some discretion in the court." *Rinaldi v. United States*, 434 U.S. 22, 29 n.15 (1977); *see also United States v. N. V. Nederlandsche Combinatie Voor Chemische Industrie*, 75 F.R.D. 473, 475 (S.D.N.Y. 1977) ("*Nederlandsche II*") ("The effect of Rule 48(a) necessarily turns what was once solely the prerogative of the executive into a shared responsibility between the executive and judicial branches of government."). Rule 48(a) does not permit "the trial court to merely serve as a rubber stamp for the prosecutor's decision." *United States v. Ammidown*, 497 F.2d 615, 622 (D.C. Cir. 1973). Indeed, Rule 48(a) was amended to require leave of court precisely in order to prevent prosecutorial abuse. *See, e.g.*, Thomas Ward Frampton, *Why Do Rule 48(a) Dismissals Require "Leave of Court"?*, 73 Stan. L. Rev. Online 28 (2020).

In *Rinaldi*, the Supreme Court indicated that courts may deny leave under Rule 48(a) (1) "to protect a defendant against prosecutorial harassment" or (2) "if the motion is prompted by considerations clearly contrary to the public interest." *Rinaldi*, 434 U.S. at 29 n.15. The Second Circuit has likewise suggested that courts may deny Rule 48(a) motions where "dismissal is 'clearly contrary to manifest public interest.'" *United States v. HSBC Bank USA, N.A.*, 863 F.3d 125, 141 (2d Cir. 2017). Courts have primarily analyzed two factors to determine whether dismissal is contrary to public interest.

*First*, the Court should evaluate whether the government has advanced a non-conclusory "statement of reasons and underlying factual basis" as to why dismissal is in the public interest. *Ammidown*, 497 F.2d at 620; *see also United States v. Derr*, 726 F.2d 617, 619 (10th Cir. 1984). The court must be "satisfied that the reasons advanced for the proposed dismissal are substantial and the real grounds upon which the application is based." *United States v. Greater Blouse, Skirt*

& *Neckwear Contractors Ass'n, Inc.*, 228 F. Supp. 483, 486 (S.D.N.Y. 1964); *see also United States v. Rosenberg*, 108 F. Supp. 2d 191, 206 (S.D.N.Y. 2000); *Ammidown*, 497 F.2d at 620–21 (same). The Court thus acts as a check on the government's purported basis for dismissal "to prevent abuse of the uncontrolled power of dismissal previously enjoyed by prosecutors." *Ammidown*, 497 F.2d at 620. This is consistent with Rule 48(a)'s requirement that leave of court is necessary for dismissal and ensures that the court does not "serve merely as a rubber stamp for the prosecutor's decision." *Id.* at 622; *see also United States v. Cowan*, 524 F.2d 504, 513 (5th Cir. 1975); *United States v. N.V. Nederlandsche Combinatie Voor Chemische Industrie*, 428 F. Supp. 114, 116 (S.D.N.Y. 1977) ("*Nederlandsche I*") ("Any suggestion that the district court simply 'rubber stamp' a Rule 48(a) motion ignores the Supreme Court's inclusion in the Rule of the requirement that indictments be dismissed 'by leave of court.'"); *United States v. Cockrell*, 353 F. Supp. 2d 762, 769, 776 (N.D. Tex. 2005) (denying Rule 48(a) motion because the government did not advance substantial reasons for dismissal and dismissal was in bad faith in part because prosecutor did not accurately represent the record); *United States v. Bettinger Corp.*, 54 F.R.D. 40, 41 (D. Mass. 1971) (denying Rule 48(a) motion and noting "a District Court in passing on a motion by the Government to dismiss is not a mere rubber stamp").

   ***Second***, the Court should evaluate whether the DOJ's motives in requesting dismissal are improper such that granting its motion would be contrary to the public interest. *See Rinaldi*, 434 U.S. at 30 (issue is "whether the Government's later efforts to terminate the prosecution were [] tainted with impropriety"). Examples of such taint include where "the prosecutor appears motivated by bribery, animus towards the victim, or a desire to attend a social event rather than trial." *In re Richards*, 213 F.3d 773, 787 (3d Cir. 2000); *Rice v. Rivera*, 617 F.3d 802, 811 (4th Cir. 2010); *Cowan*, 524 F.2d at 514 ("[W]e can hardly say that the motion was a sham or a deception."); *see also HSBC*, 863 F.3d 141 (discussing cases). Additionally, courts have observed that concerns about a prosecutor's improper motives in dismissing a Rule 48(a) motion are heightened when a grand jury has issued an indictment. *See, e.g.*, *Nederlandsche II*, 75 F.R.D. at 475; *Cockrell*, 353 F. Supp. 2d at 769; *Bettinger Corp.*, 54 F.R.D. at 41.

9

As another court in this district explained in denying a Rule 48(a) motion to dismiss, "the court is vested with the responsibility of protecting the interests of the public on whose behalf the criminal action is brought," especially when there is an indictment. *Nederlandsche I*, 428 F. Supp. at 116. There, the government did not claim there was insufficient evidence to convict and noted a private agreement in which one defendant would plead guilty to three counts and the government would move to dismiss as to another defendant. *Id.* at 117. The court concluded that dismissal was not in the public interest because it would implicate the Court in an agreement where some defendants enter guilty pleas in return for dismissals as to others. *Id.*

Other courts have also denied Rule 48(a) motions when it would implicate the Court in an improper agreement. For example, in *United States v. Freedberg*, the court denied a Rule 48(a) motion because it would involve the court in enforcing an improper plea bargain. 724 F. Supp. 851, 853 (D. Utah 1989). The court rejected the government's argument that refusal to dismiss would usurp the Executive power and said that granting dismissal "would constitute violation of principles of separation of powers because of interference with *judicial* discretion." *Id.* at 856 (emphasis in original).

Here, this Court should not be part of an agreement that conditions dismissal on Adams's agreement to advance the administration's unrelated policy objectives. Rule 48(a) requires leave of court for dismissal so that courts may independently evaluate the prosecutor's basis and motivation for dismissal. The DOJ's unprecedented intervention in this case to replace prosecutors that refused to carry out its dismissal directive, and its request for dismissal so that Adams can carry out the administration's immigration efforts, reflect a *quid pro quo*. If this Court finds such a *quid pro quo*, it should deny leave to dismiss.

Furthermore, it not only appears that the DOJ seeks to dismiss the case as part of an improper *quid pro quo*, it also apparently seeks to dismiss without prejudice to hold the risk of future prosecution over Adams if he does not continue to comply with the administration's directives. The DOJ has maintained that dismissal is necessary so Adams can assist with the administration's immigration objectives. Dkt. 122 ¶ 6; Ex. 7 at 1, 2; Ex. 10 at 6. It also has

10

suggested its prosecution of Adams depends on whether he continues to hold political power. Ex. 7 at 1 (dismissal must be subject to a review of Adams's case following the November 2025 mayoral election). And President Trump's border czar indicated that the administration will hold Adams accountable if he does not assist with immigration efforts. Ex. 5. Although the DOJ cites Adams's assistance with its immigration efforts today, dismissal without prejudice would allow the DOJ to hold the threat of future prosecution over Adams in exchange for compliance with any future directives. If the Court finds that this is the case, it should not dismiss without prejudice. But neither should the Court dismiss with prejudice because that would involve the Court in the improper *quid pro quo*, if that is what the Court finds. *See Nederlandsche I*, 428 F. Supp. at 117 (refusing to be an indirect party to a *quid pro quo* agreement between the government and defendant).

      **B.**    **The Court can and should conduct further inquiry and take additional procedural steps as necessary.**

The Court can and should conduct further inquiry into the DOJ's motion by developing a factual record. *Amici* suggest that the Court consider conducting a thorough evidentiary hearing that may include (1) productions of documents from the parties and other entities and (2) sworn testimony by witnesses to material events in the matter. That will assist the Court in making findings of fact and conclusions of law in connection with resolving the DOJ's motion. The Court may consider appointing a special master or directing the Court's amicus, Mr. Clement, to assist in the fact-finding process. *See, e.g.*, *In re Estelle*, 516 F.2d 480, 482-83 (5th Cir. 1975) (affirming the district court's appointment of an amicus curiae "[i]n order to investigate fully the facts alleged in the prisoners' complaints, to participate in such civil action with the full rights of a party thereto, and to advise [the] court at all stages of the proceedings as to any action deemed appropriate by it."); *Hoptowit v. Ray*, 682 F.2d 1237, 1260 (9th Cir. 1982), *overruled on other grounds by Sandin v. Conner*, 515 U.S. 472 (1995) (affirming district court's appointment of an amicus curiae to "investigate fully the facts alleged in the complaint, . . . participate in the case with the full rights of parties, and . . . advise the Court on the public interest(s) at issue.");

2881524

*Wharton v. Vaughn*, 2020 WL 733107, at *5–6 (E.D. Pa. Feb. 12, 2020) (appointing an amicus curiae to appear at hearings and to present evidence); *see also Florida v. Georgia*, 585 U.S. 803, 806, 819 (2018) (special master appointed to make factual findings in part due to the complexity of the case and "the need to secure equitable solutions"); *Rispler v. Sol Spitz Co. Ret. Tr.*, 2011 WL 43239, at *2 (E.D.N.Y. Jan. 6, 2011) (appointing special master to investigate matter); *Brit. Int'l Ins. Co. v. Seguros La Republica, S.A.*, 2002 WL 987199, at *1 (S.D.N.Y. May 14, 2002) (noting authority to appoint special master to ascertain facts on conflict of interest).

Further, if the Court denies the Rule 48(a) motion, there are various potential avenues for proceeding with the matter. The Court may leave the grand jury's indictment pending to allow the DOJ to proceed now or following the election. Or, understanding that the Court must proceed with caution, it could appoint a special prosecutor given the extreme facts of this case.

In *Morrison v. Olson*, 487 U.S. 654 (1988), the Supreme Court "disagree[d] with the Court of Appeals' conclusion that there is an inherent incongruity about a court having the power to appoint prosecutorial officers." *Id.* at 676. "Indeed, in light of judicial experience with prosecutors in criminal cases, it could be said that courts are especially well qualified to appoint prosecutors." *Id.* at 676 n.13. The Court noted that "courts may appoint private attorneys to act as prosecutor for judicial contempt judgments"; that courts may appoint United States commissioners with prosecutorial powers; that courts may appoint federal marshals, who are executive officers; that courts may appoint interim United States Attorneys who, *inter alia*, prosecute criminal cases; and that "Congress itself has vested the power to make these interim appointments in the district courts," citing 28 U.S.C. § 546(d). 487 U.S. at 676–77.

Nor is the power of appointment dependent on statutory authority. In the context of contempt proceedings, the Supreme Court explained that "it is long settled that courts possess ***inherent authority*** to initiate contempt proceedings for disobedience to their orders, authority which necessarily encompasses the ability ***to appoint a private attorney to prosecute the contempt***." *Young v. U.S. ex rel. Vuitton et Fils S.A.*, 481 U.S. 787, 793 (1987) (emphasis added); *see also*, *e.g.*, *United States v. Donziger*, 38 F.4th 290, 304 (2d Cir. 2022) (upholding

12

appointment of a special prosecutor). The courts also "have inherent authority to appoint a special counsel to represent a position abandoned by the United States on appeal," *United States v. Arpaio*, 887 F.3d 979, 982 (9th Cir. 2018), much as the United States has abandoned the prosecution in this case. The Court should similarly have inherent authority to protect the work of the grand jury that returned the indictment the DOJ now seeks to dismiss, especially because the "grand jury is an arm of the court." *Levine v. United States*, 362 U.S. 610, 617 (1960).

*Amici* are not aware of any binding authority for the proposition that the Court's inherent authority to appoint a special prosecutor is limited to the contempt context. Although the Seventh Circuit reversed a district court's appointment of a special prosecutor in *In re United States*, 345 F.3d 450 (7th Cir. 2003), that case is not binding and its reasoning does not apply here in any event. There, the court explained that "[p]resumably an assistant U.S. attorney who accepts a bribe, wants to go on vacation rather than conduct a trial, etc., is acting alone rather than at the direction or with the approval of the Justice Department, and a different U.S. attorney would continue with the prosecution." *Id.* at 454. This case presents the opposite situation: the DOJ intervened to dismiss the charges against Adams after prosecutors maintained the strength of the case. There is no one to "continue with the prosecution" unless the Court appoints someone. The situation in *In re United States* was nothing like the unprecedented situation this Court now faces. Thus, appointment of a special prosecutor would be appropriate here.

## V.    CONCLUSION

For the foregoing reasons, *amici* urge the Court to conduct further factual inquiry, ultimately denying the motion for leave and appointing a special prosecutor if the Court finds that an improper *quid pro quo* underlies the motion to dismiss the indictment against Mayor Adams.

13

Respectfully submitted,

KEKER, VAN NEST & PETERS LLP

Dated:  February 28, 2025

By:    */s/ Robert A. Van Nest*
      ROBERT A. VAN NEST (pro hac vice
      pending)
      DAN JACKSON (pro hac vice pending)
      KELLY S. KAUFMAN (pro hac vice
      pending)
      ELIZABETH A. HECKMANN (pro hac
      vice pending)
      633 Battery Street
      San Francisco, CA 94111-1809
      Telephone:  415 391 5400
      Facsimile:  415 397 7188

      *Counsel for Amici Curiae Former Federal
      Court Jurists*

14

**CERTIFICATE OF COMPLIANCE WITH LOCAL CIVIL RULE 7.1(C)**

The undersigned hereby certifies that the foregoing brief complies with the word-count limitations because the brief contains 4,724 words according to the word count of the word-processing system used to prepare the brief, excluding the parts of the brief exempted by Local Civil Rule 7.1(c).

Dated: February 28, 2025                          _/s/ Robert A. Van Nest_____
                                                  Robert A. Van Nest

2881524

## CERTIFICATE OF SERVICE

I hereby certify that on February 28, 2025, I electronically filed the foregoing with the

clerk of the court using the CM/ECF system, which will send notification of this filing to counsel

of record.

*/s/ Robert A. Van Nest*
Robert A. Van Nest

2881524