UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA

- against -

ERIC ADAMS,

Defendant.

No. 24-CR-556 (DEH)

**MAYOR ERIC ADAMS'S MEMORANDUM OF LAW IN SUPPORT OF THE
GOVERNMENT'S RULE 48(a) MOTION TO DISMISS**

**TABLE OF CONTENTS**

**Page**

BACKGROUND ....................................................................................................................1

ARGUMENT .........................................................................................................................7

I.      UNDER RULE 48(A), A COURT'S DISCRETION IS LIMITED TO
        DISMISSING A PROSECUTION WITH PREJUDICE TO PREVENT
        PROSECUTORIAL HARASSMENT.................................................................7

II.     EVEN UNDER A PUBLIC-INTEREST STANDARD, THE COURT SHOULD
        DISMISS THE INDICTMENT .........................................................................17

III.    NO BASIS EXISTS FOR FURTHER PROCEDURAL STEPS OR FACTUAL
        INQUIRY.........................................................................................................23

CONCLUSION.....................................................................................................................25

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*In re Appointment of Indep. Couns.*,
    766 F.2d 70 (2d Cir. 1985)..................................................................................7

*Bank of Nova Scotia v. United States*,
    487 U.S. 250 (1988)..................................................................................10

*Barker v. Wingo*,
    407 U.S. 514 (1972)..................................................................................17

*Briseno v. ConAgra Foods, Inc.*,
    844 F.3d 1121 (9th Cir. 2017) ..................................................................10

*Commonwealth v. Davis*,
    184 S.W. 1121 (Ky. 1916)..................................................................................14

*The Confiscation Cases*,
    74 U.S. (7 Wall.) 454 (1868) ..................................................................13

*Dombrowski v. Pfister*,
    380 U.S. 479 (1965)..................................................................................12

*Donziger v. United States*,
    143 S. Ct. 868 (2023) ..................................................................24

*In re Esteva*,
    60 F.4th 664 (11th Cir. 2023) ..................................................................10

*FCC v. Fox Television Stations, Inc.*,
    556 U.S. 502 (2009)..................................................................................16

*In re Flynn*,
    973 F.3d 74 (D.C. Cir. 2020) (en banc) ..................................................9

*Greater Blouse, Skirt & Neckwear Contractors Ass'n*,
    228 F. Supp. 483 (S.D.N.Y. 1964)..................................................................11, 18

*Guinther v. City of Milwaukee*,
    258 N.W. 865 (Wis. 1935)..................................................................................14

*People ex rel. Hoyne v. Newcomer*,
    120 N.E. 244 (Ill. 1918)..................................................................................14

*Ortiz v. Fibreboard Corp.*,
   527 U.S. 815 (1999)......................................................................................................16

*People v. Disperati*,
   105 P. 617 (Cal. Dist. Ct. App. 1909) ......................................................................14

*People v. Kurminsky*,
   52 N.Y.S. 609 (N.Y. Sup. Ct. 1898) ........................................................................14

*People v. Schmidt*,
   30 P. 814 (Cal. 1883) ................................................................................................14

*People v. Williams*,
   249 N.Y.S. 425 (N.Y. Co. Ct. 1931) ........................................................................14

*Rice v. Rivera*,
   No. 08 C/A 1390, 2008 WL 4414721 (D.S.C. Sept. 24, 2008) ...............................9

*Rice v. Rivera*,
   617 F.3d 802 (4th Cir. 2010) .....................................................................................9

*In re Richards*,
   213 F.3d 773 (3d Cir. 2000).........................................................................10, 11, 19

*Rinaldi v. United States*,
   434 U.S. 22 (1977) (per curiam) ...............................................8, 9, 12, 13, 14, 18

*Rippo v. Baker*,
   580 U.S. 285 (2017) (per curiam) ............................................................................17

*Snyder v. United States*,
   603 U.S. 1 (2024)........................................................................................................3

*Southwest Airlines Co. v. Saxon*,
   596 U.S. 450 (2022)..................................................................................................10

*State v. Kiewel*,
   207 N.W. 646 (Minn. 1926)......................................................................................14

*State v. Ward*,
   165 S.E. 803 (W. Va. 1932).......................................................................................14

*Tapia v. United States*,
   564 U.S. 319 (2011)..................................................................................................17

*Trump v. Mazars USA, LLP*,
   591 U.S. 848 (2020)..................................................................................................20

*Trump v. United States,*
    603 U.S. 593 (2024)..................................................................7, 16, 19

*In re United States,*
    345 F.3d 450 (7th Cir. 2003) ...............................7, 9, 13, 17, 19, 24

*United States v. Ammidown,*
    497 F.2d 615 (D.C. Cir. 1973) .................................................................8

*United States v. Armstrong,*
    517 U.S. 456 (1996)..................................................................................7

*United States v. Bernard,*
    567 F. Supp. 3d 1125 (D.S.D. 2021) .......................................................9

*United States v. Bernard,*
    42 F.4th 905 (8th Cir. 2022) ..............................................................9, 18

*United States v. Blaszczak,*
    56 F.4th 230 (2d Cir. 2022) ............................................................8, 9, 21

*United States v. Butler,*
    486 F. Supp. 1285 (E.D. Tex. 1980) .......................................................9

*United States v. Cowan,*
    524 F.2d 504 (5th Cir. 1975) ...................................................................8

*United States v. Derr,*
    726 F.2d 617 (10th Cir. 1984) .................................................................9

*United States v. Doe,*
    101 F. Supp. 609 (D. Conn. 1951).........................................................23

*United States v. Doody,*
    No. 01 Cr. 1059 (S.D.N.Y.) ...................................................................23

*United States v. Fausto,*
    484 U.S. 439 (1988)...............................................................................13

*United States v. Fokker Servs. BV,*
    818 F.3d 733 (D.C. Cir. 2016) .................................................................7

*United States v. Freeman,*
    No. 87 Cr. 293 (S.D.N.Y.) .....................................................................23

*United States v. Gray,*
    448 F.2d 164 (9th Cir. 1971) .................................................................10

*United States v. Hamm*,
  659 F.2d 624 (5th Cir. 1981) (en banc) ...................................................................9

*United States v. Hoyland*,
  914 F.2d 1125 (9th Cir. 1990) ...........................................................................12

*United States v. HSBC Bank USA,*
  863 F.3d 125 (2d Cir. 2017)...........................................................................8, 18

*United States v. KPMG LLP*,
  No. 05 Cr. 903, 2007 WL 541956 (S.D.N.Y. Feb. 15, 2007)...................11, 18, 19

*United States v. KPMG LLP*,
  No. 05 Cr. 903 (S.D.N.Y.) ................................................................................23

*United States v. Madzarac*,
  678 F. Supp. 3d 42 (D.D.C. 2023) .....................................................................10

*United States v. Marra*,
  228 F. Supp. 2d 280 (W.D.N.Y. 2002) ...............................................................11

*United States v. Melendez*,
  No. 03 Mj. 201 (N.D.N.Y.)................................................................................23

*United States v. N. V. Nederlandsche Combinatie Voor Chemische Industrie*,
  453 F. Supp. 462 (S.D.N.Y. 1978)......................................................................12

*United States v. Nix*,
  No. 15 Cr. 6126 (W.D.N.Y.)..............................................................................23

*United States v. Nixon*,
  418 U.S. 683 (1974)...........................................................................................7

*United States v. Omni Consortium, Inc.*,
  525 F. Supp. 2d 808 (W.D. Tex. 2007)..................................................................9

*United States v. Ortega-Alvarez*,
  506 F.2d 455 (2d Cir. 1974)..............................................................................22

*United States v. Pimentel*,
  932 F.2d 1029 (2d Cir. 1991)...............................................................................8

*United States v. Pitts*,
  569 F.2d 343 (5th Cir. 1978) .............................................................................12

*United States v. Rosenberg*,
  108 F. Supp. 2d 191 (S.D.N.Y. 2000)...............................................................9, 18

*United States v. Ruedlinger*,
  No. 97 Cr. 40012, 1997 WL 807925 (D. Kan. Dec. 17, 1997)................................12

*United States v. Salinas*,
  693 F.2d 348 (5th Cir. 1982) ..................................................................................9

*United States v. Smith*,
  853 F. Supp. 179 (M.D.N.C. 1994) ........................................................................9

*United States v. Smith*,
  55 F.3d 157 (4th Cir. 1995) ...............................................................................9, 18

*United States v. Sullivan*,
  652 F. Supp. 2d 136 (D. Mass. 2009) ...................................................................11

*United States v. Tam*,
  No. 94 Cr. 896 (S.D.N.Y.) ......................................................................................23

*United States v. Towill*,
  548 F.2d 1363 (9th Cir. 1977) ................................................................................9

*United States v. Toyota Motor Corp.*,
  278 F. Supp. 3d 811 (S.D.N.Y. 2017)......................................................................9

*United States v. Toyota Motor Corp.*,
  No. 14 Cr. 186 (S.D.N.Y.) ......................................................................................23

*United States v. Trump*,
  No. 23 Cr. 257 (D.D.C.)..........................................................................................23

*United States v. Windsor*,
  570 U.S. 744 (2013) ................................................................................................16

*Whole Woman's Health v. Jackson*,
  595 U.S. 30 (2021)...................................................................................................16

*Young v. U.S. ex rel. Vuitton et Fils SA*,
  481 U.S. 787 (1987).................................................................................................24

## Constitutions, Statutes, and Rules

18 U.S.C. § 666.............................................................................................................21

28 U.S.C. § 2072(b)......................................................................................................10

Fed. R. Crim. P. 2 ........................................................................................................12

Fed. R. Crim. P. 5.1(d).................................................................................................10

Fed. R. Crim. P. 6(a)(1) ...............................................................................................10

Fed. R. Crim. P. 11(a)(3) .............................................................................................10

Fed. R. Crim. P. 42(a)(2) .............................................................................................24

Fed. R. Crim. P. 48(a) ............................................................................................7, 13

Fed. R. Crim. P. 48(b)(3) .............................................................................................11

U.S. Const. art. II, §§ 1, 3 ..............................................................................................7

## **Other Authorities**

Advisory Committee on Rules of Criminal Procedure,
   *Minutes of Meetings* (Feb. 23, 1943) ...................................................................15

Advisory Committee on Rules of Criminal Procedure,
   *Minutes of Meetings* (Jan. 13, 1942) ....................................................................15

Advisory Committee on Rules of Criminal Procedure,
   *Minutes of Meetings* (May 19, 1942) ...................................................................15

American Law Institute, *Code of Criminal Procedure: Official Draft* (1930).............14

Damian Williams, *An Indictment of the Sad State of New York Government*,
   City & State NY (Jan. 16, 2025),
   https://tinyurl.com/24eujd9 ......................................................................................4

Devlin Barrett, *The U.S. Attorney General Derides the Merits of the Adams Case
   in New York*, N.Y Times (Feb. 20, 2025),
   https://tinyurl.com/NY72iuo .....................................................................................6

Erica Orden, *A Mayor, A Rapper, A Senator, A Billionaire: Meet the Man Who
   Has Prosecuted Them All,* Politico (Oct. 19, 2024),
   https://tinyurl.com/j90dr3l .......................................................................................3

George H. Dession, *The New Federal Rules of Criminal Procedure: I*,
   55 Yale L.J. 694 (1946) ..........................................................................................13

Leon R. Yankwich, *Increasing Judicial Discretion in Criminal Proceedings*,
   1 F.R.D. 746 (1941) ................................................................................................15

Madeleine J. Wilken & Nicholas Triffin, *Drafting History of the Federal Rules of
   Criminal Procedure* (1991)....................................................................................15

Nicholas McEntyre, *Mayor Adams Warns Migrant Crisis Will 'Destroy' NYC,
   Rips Biden for Failing to Help*, N.Y Post (Sep. 7, 2023),
   https://tinyurl.com/3n7ks03 .....................................................................................1

Note, *Trial by Persistence*,
    4 Stan. L. Rev. 537 (1952) ......................................................................................14

*Southern District of New York Announces Federal Indictment of NYC*
    *Mayor Eric Adams*, CSPAN (Sep. 26, 2024),
    https://tinyurl.com/j25dg13 .....................................................................................2

Thomas Ward Frampton, *Why Do Rule 48(a) Dismissals Require "Leave of*
    *Court"?*,
    73 Stan. L. Rev. Online 28 (2020). .....................................................................14, 15

Zachary Schermele, *White House 'Has Failed' New York City Over Migrant*
    *Crisis, Mayor Says*, Politico (Apr. 19, 2023),
    https://tinyurl.com/dshf73j .......................................................................................1

Mayor Eric Adams respectfully submits this memorandum of law in response to the Court's February 21, 2025 order, ECF No. 136, and in support of the government's motion to dismiss pursuant to Federal Rule of Criminal Procedure 48(a), ECF No. 122.

## BACKGROUND

In April 2023, Mayor Adams publicly broke with the Biden Administration on the contentious issue of immigration enforcement, stating that "[t]he president and the White House have failed this city." Zachary Schermele, *White House 'Has Failed' New York City Over Migrant Crisis, Mayor Says*, Politico (Apr. 19, 2023).[1]  In September of that year, Mayor Adams held a town hall in Manhattan in which he forcefully criticized the Biden Administration's handling of migrants illegally entering the country.  Nicholas McEntyre, *Mayor Adams Warns Migrant Crisis Will 'Destroy' NYC, Rips Biden for Failing to Help*, N.Y. Post (Sep. 7, 2023).[2]

Two months later, the *New York Times* and other media outlets began publishing a steady stream of articles reporting details about a grand jury investigation of Mayor Adams.  ECF No. 19, at 3-6 (collecting sources).  Those leaks continued unabated through September 2024, when the U.S. Attorney appointed by President Biden, Damian Williams, told Mayor Adams's attorneys that the Mayor was a "subject"—not a "target"—of an investigation and invited him to provide a voluntary proffer.  *See* ECF No. 128-4, at 8.  A mere two weeks after Mayor Adams declined that request as a "subject," Mr. Williams secured an indictment charging him with (i) accepting bribes in the form of travel benefits like airline seat upgrades in exchange for helping a Turkish consulate building to obtain an FDNY permit; and (ii) knowingly soliciting illegal campaign contributions from "straw donors" and improperly seeking matching funds for those illegal contributions from

---

[1]  https://tinyurl.com/dshf73j.

[2]  https://tinyurl.com/3n7ks03.

the City.  ECF No. 2, at 1-3.  The U.S. Attorney's Office has never explained when the charges were proposed or approved, whether Mayor Adams was in fact merely a "subject" at the time of the interview request, and, if so, what changed in the two-week interim.

The timing of the indictment, years after the investigation began, *see* ECF No. 89, at 2, meant that the trial would likely fall during or very near the June 2025 Democratic primary for the mayoral election.  For reasons only he knows, Mr. Williams held a press conference announcing the indictment in which he made prejudicial statements that could clearly influence the electorate and the jury pool, going far beyond ordinary DOJ practice of reciting the allegations and affirming the presumption of innocence.  He stated, for example, that Mayor Adams had violated laws that are "designed to ensure that officials like him serve the people, not the highest bidder" and that "[t]hese are bright red lines, and we allege that the mayor crossed them again and again for years." *Southern District of New York Announces Federal Indictment of NYC Mayor Eric Adams*, CSPAN, at 10:50-11:12 (Sep. 26, 2024).[3]

That hyperbole was out of all proportion to what the indictment actually alleges.  The sole bribery count, for example, alleges a single, deeply implausible *quid pro quo*: that before he was elected Mayor, Adams accepted travel benefits in exchange for assisting a Turkish consulate building to obtain a fire permit in time for a visit from the president of that country—an urgent matter that many City officials were trying to address at the time.  That allegation makes no sense on its face, because the travel benefits were allegedly provided before the permit issue arose.  And the indictment claims that three anodyne text messages flagging the permit matter for the FDNY Commissioner amounted to "pressure," even though the messages assured the Commissioner that

---

[3]  https://tinyurl.com/j25dg13.

if the request was not achievable, Adams would explain that to Turkish diplomatic officials.  ECF No. 2, at 3, 35.

Mayor Adams moved to dismiss the bribery count as facially implausible and foreclosed by the Supreme Court's recent decision in *Snyder v. United States*, 603 U.S. 1 (2024).  ECF No. 14.  This Court denied the motion on the ground that it lacked power to rule that *Snyder* had superseded preexisting Second Circuit precedent and that, while the indictment's timeline was "not a model of clarity," that was an issue for the jury.  ECF No. 68, at 29 (quotation omitted).

Mayor Adams sought a February 2025 trial date to try to minimize impact on the June election.  Prosecutors, however, insisted on a trial date in May 2025, at the height of the campaign season, ostensibly to address classified evidence.  (Ultimately, prosecutors identified about 150 classified documents for defense counsel's review, none of them remotely relevant.)  This Court set a trial date in April 2025.  Prosecutors proceeded to provide defense counsel with 1,748 gigabytes of discovery documents.  But those voluminous materials contain no evidence that Mayor Adams agreed to provide assistance to Turkish officials in exchange for benefits or that Mayor Adams was aware that a small number of the more than 19,000 donations to his 2021 campaign were unlawful.  To the contrary, every piece of evidence established that Mayor Adams repeatedly instructed his subordinates to follow campaign-finance rules and established protocols for fundraising.

After the November presidential election, Mr. Williams resigned.  He immediately set up a campaign-style website boasting about his tenure as U.S. Attorney and linking to a fawning *Politico* profile touting his indictment of Mayor Adams.  *See* Erica Orden, *A Mayor, A Rapper, A Senator, A Billionaire: Meet the Man Who Has Prosecuted Them All*, Politico (Oct. 19, 2024).[4]

---

[4]  https://tinyurl.com/j90dr3l.

He then published an op-ed in which he claimed that the City was in a "deep crisis" and was "being led with a broken ethical compass"—an obvious reference to this case.  Damian Williams, *An Indictment of the Sad State of New York Government*, City & State NY (Jan. 16, 2025).[5]  In other words, Mr. Williams used the indictment that he had procured to argue that the city needed a new mayor, presumably himself or a political ally.  All the while, leaks about the government's investigation continued to flow to the media.  *See* ECF No. 83, at 2-3.

Once the leadership of the Department of Justice turned over in January 2025, the government was willing to take a fresh look at this extraordinary case.  The then-Acting Deputy Attorney General arranged a meeting on January 31, 2025 in Washington with defense counsel, interim U.S. Attorney Danielle Sassoon, and the line prosecutors assigned to the case.  During that meeting, the Acting Deputy Attorney General asked whether the pending charges were impacting Mayor Adams's ability to assist federal law enforcement.  Defense counsel replied that they were, in part because as a result of the charges Mayor Adams was denied access to sensitive information. Ms. Sassoon and the line prosecutors agreed that the charges impacted Mayor Adams's ability to assist federal law enforcement to some degree.  The meeting was cordial, and at no point did any prosecutor object that the discussion was improper.  Near the end, the Acting Deputy Attorney General asked the government and defense counsel to submit letters on how the ongoing prosecution affected immigration enforcement.

Mayor Adams's ensuing letter further explained why the pending charges inhibited him from assisting federal law enforcement as a practical matter—including through the revocation of his security clearance, greater difficulty in recruiting talented staff members, and the reluctance of other City officials to work with the Mayor's office.  ECF No. 130-1.  The letter made clear,

---

[5]  https://tinyurl.com/24eujd9.

however, that "Mayor Adams has always been laser-focused on addressing the migrant crisis, and that will not change no matter what happens in this case." *Id.* at 3-4.

Through a memorandum leaked to the media and submitted as an exhibit by a putative *amicus* in this Court, the Acting Deputy Attorney General then instructed Ms. Sassoon on February 10 to dismiss the charges against Mayor Adams without prejudice. ECF No. 125-1.[6] This leak could only have come from the government. Citing recent executive orders, the memorandum gave two reasons for dismissal: (i) "the timing of the charges and more recent public actions by the former U.S. Attorney responsible for initiating the case have threatened the integrity of the proceedings" and "improperly interfered with Mayor Adams' campaign in the 2025 mayoral election"; and (ii) "the pending prosecution has unduly restricted Mayor Adams' ability to devote full attention and resources to the illegal immigration and violent crime that escalated under the policies of the prior Administration." *Id.* at 1-2 (citing Exec. Orders Nos. 14147 and 14165).

Ms. Sassoon, however, refused to seek dismissal, instead sending a letter to the Department's leadership asserting that the charges were warranted and that the taint from Mr. Williams's actions could be cured by securing a new indictment. ECF No. 124-1. In a footnote, she stated that at the January 31 meeting "Adams's attorneys repeatedly urged what amounted to a *quid pro quo*, indicating that Adams would be in a position to assist with the Department's enforcement priorities only if the indictment were dismissed." *Id.* at 3 n.1. Ms. Sassoon's letter, which alleged that Mayor Adams had committed uncharged crimes, also was leaked to the press.

On February 13, the Acting Deputy Attorney General sent Ms. Sassoon a letter containing a more detailed discussion of his two reasons for directing the dismissal of the case. ECF No. 125-

---

[6] While Mayor Adams does not believe that this Court should consider internal DOJ memoranda in ruling on the motion to dismiss, *see* p. 23, *infra*, he includes this discussion in case this Court reaches a different conclusion.

2, at 3-7.  He further stated that he had "many other concerns about this case," explaining that "[t]he case turns on factual and legal theories that are, at best extremely aggressive," and that "[t]here is questionable behavior reflected in certain of the prosecution team's decisions," including the false representations to defense counsel about Mayor Adams's status in the investigation before the indictment issued.  *Id.* at 7-8.

On February 14, the Acting Deputy Attorney General moved to dismiss the charges without prejudice (with Mayor Adams's consent).  ECF No. 122.  The motion set out the same reasons for the dismissal as the leaked internal memoranda: (i) "appearances of impropriety and risks of interference with the 2025 elections in New York City" and (ii) "interfere[nce] with the defendant's ability to govern in New York City, which poses unacceptable threats to public safety, national security, and related federal immigration initiatives and policies."  *Id.* at 2.  This Court held a hearing on February 19 in which it confirmed Mayor Adams's consent.  ECF No. 138, at 6:1-11:19, 16:4-21:16.  At that hearing, Mayor Adams's lead counsel, who attended the January 2025 meeting with the Acting Deputy Attorney General, offered to testify under oath that no *quid pro quo* had been offered or accepted at any time.  *Id.* at 44:17-45:15.

Since the hearing, the Attorney General has also made clear that, in addition to the problems identified by the Acting Deputy Attorney General, the charges against Mayor Adams are themselves "incredibly weak."  Devlin Barrett, *The U.S. Attorney General Derides the Merits of the Adams Case in New York*, N.Y. Times (Feb. 20, 2025).[7]

---

[7]  https://tinyurl.com/NY72iuo.

## ARGUMENT

**I.    UNDER RULE 48(a), A COURT'S DISCRETION IS LIMITED TO DISMISSING A PROSECUTION WITH PREJUDICE TO PREVENT PROSECUTORIAL HARASSMENT**

Article II vests the "executive Power" in the President and requires the President to "take Care that the Laws be faithfully executed."  U.S. Const. art. II, §§ 1, 3.  As the Supreme Court reaffirmed just last year, "[i]nvestigation and prosecution of crimes is a quintessentially executive function," *Trump v. United States*, 603 U.S. 593, 620 (2024) (quoting Brief for the United States at 19), and "the Executive Branch has 'exclusive authority and absolute discretion' to decide which crimes to investigate and prosecute," *id.* (quoting *United States v. Nixon*, 418 U.S. 683, 693 (1974)); *see also United States v. Armstrong*, 517 U.S. 456, 467 (1996).  Federal courts have thus long recognized the plenary constitutional discretion of the Executive Branch over criminal prosecutions before the entry of judgment.  *See, e.g.*, *In re Appointment of Indep. Couns.*, 766 F.2d 70, 76 (2d Cir. 1985); *United States v. Fokker Servs. BV*, 818 F.3d 733, 741 (D.C. Cir. 2016).

In this case, the government has moved before trial to dismiss the indictment against Mayor Adams under Rule 48(a).  Rule 48(a) provides in relevant part that the "government may, with leave of court, dismiss an indictment, information, or complaint."  Fed. R. Crim. P. 48(a).  Properly construed in light of the Constitution's allocation of prosecutorial power to the Executive Branch, that rule permits a district court to evaluate whether a pretrial motion to dismiss is part of a campaign to harass the defendant "by repeatedly filing charges and then dismissing them before they are adjudicated" and, if so, to "condition dismissal on its being with prejudice."  *In re United States*, 345 F.3d 450, 453 (7th Cir. 2003) (Posner, J., joined by Easterbrook and Wood, JJ.).  But the rule does not permit a district court to keep a prosecution alive indefinitely against the wishes of both the government and the defendant.

1.    Neither the Supreme Court nor the Second Circuit has fully delineated the scope of a

district court's authority under Rule 48(a). In *Rinaldi v. United States*, 434 U.S. 22 (1977) (per curiam), the Supreme Court held that a district court had abused its discretion in declining to grant the government's post-conviction motion to dismiss under Rule 48(a) in light of an intervening state conviction. *Id.* at 23-25, 32. The Court explained that while "the words 'leave of court'" in Rule 48(a) "obviously vest some discretion in the court," the "principal object of the 'leave of court' requirement is apparently to protect a defendant against prosecutorial harassment, *e.g.*, charging, dismissing, and recharging, when the Government moves to dismiss an indictment over the defendant's objection." *Id.* at 29 n.15. The Court declined to decide whether some lower courts had been correct in permitting a "court to deny a Government dismissal motion to which the defendant has consented if the motion is prompted by considerations clearly contrary to the public interest," because it concluded that the government's proffered reason would satisfy that standard. *Id.* at 29 n.15, 32 (citing *United States v. Cowan*, 524 F.2d 504 (5th Cir. 1975); *United States v. Ammidown*, 497 F.2d 615 (D.C. Cir. 1973)).

The Supreme Court has not revisited the question of the scope of Rule 48(a)'s leave-of-court requirement since *Rinaldi*. For its part, the Second Circuit has also left open whether a general assessment of the public interest is a sufficient basis to deny a Rule 48(a) motion despite the defendant's consent. In *United States v. HSBC Bank USA*, 863 F.3d 125 (2d Cir. 2017) (*HSBC Bank*), the Second Circuit explained that its decisions have only "suggested (in dictum) that any authority a court might have to deny a Rule 48(a) motion would be limited to cases in which dismissal is 'clearly contrary to manifest public interest.'" *Id.* at 141 (quoting *United States v. Pimentel*, 932 F.2d 1029, 1033 n.5 (2d Cir. 1991)).[8] And in the rare instances in which courts have

---

[8] In its order setting the February 19 hearing, the Court quoted from a portion of *United States v. Blaszczak*, 56 F.4th 230 (2d Cir. 2022), that refers to the "clearly contrary to manifest

denied motions to dismiss, they have often cited concerns about prosecutorial harassment.  *See, e.g.*, *United States v. Salinas*, 693 F.2d 348, 352-53 (5th Cir. 1982); *United States v. Omni Consortium, Inc.*, 525 F. Supp. 2d 808, 818 (W.D. Tex. 2007); *see also id.* at 811 n.2 (collecting cases).

In fact, while appellate courts have frequently reversed the denial of an unopposed Rule 48(a) motion on grounds other than prosecutorial harassment,[9] it appears that no appellate court has ever *upheld* such a denial, *see In re United States*, 345 F.3d at 453; *In re Flynn*, 973 F.3d 74, 97 (D.C. Cir. 2020) (en banc) (Rao, J., dissenting).  Nevertheless, a handful of decisions in this district have indicated that a court may deny an unopposed Rule 48(a) motion if dismissal is "clearly contrary to manifest public interest," echoing other circuits.  *See, e.g.*, *United States v. Toyota Motor Corp.*, 278 F. Supp. 3d 811, 813 (S.D.N.Y. 2017); *United States v. Rosenberg*, 108 F. Supp. 2d 191, 202-06 (S.D.N.Y. 2000).

This Court should reject that view and hold instead that a court's discretion under Rule 48(a) is limited to evaluating whether dismissal is part of a campaign of prosecutorial harassment of the sort that the Supreme Court identified in *Rinaldi* and, if it is, "condition[ing] dismissal on its being with prejudice."  *In re United States*, 345 F.3d at 453; *see United States v. Derr*, 726 F.2d 617, 619 (10th Cir. 1984); *United States v. Towill*, 548 F.2d 1363, 1369-70 (9th

---

public interest" approach.  *See* ECF No. 129 at 1 (quoting *Blaszczak*, 56 F.4th at 240).  But that portion of *Blaszczak* quotes from a Fourth Circuit decision, *see United States v. Smith*, 55 F.3d 157, 158-59 (4th Cir. 1995), without taking a position on the scope of Rule 48(a), and no other passage in *Blaszczak* addresses the scope question.

[9]  *See, e.g.*, *United States v. Bernard*, 567 F. Supp. 3d 1125 (D.S.D. 2021), *rev'd and remanded*, 42 F.4th 905 (8th Cir. 2022); *Rice v. Rivera*, No. 08 C/A 1390, 2008 WL 4414721, at *7 (D.S.C. Sept. 24, 2008), *rev'd and remanded*, 617 F.3d 802 (4th Cir. 2010); *United States v. Smith*, 853 F. Supp. 179 (M.D.N.C. 1994), *rev'd and remanded*, 55 F.3d 157 (4th Cir. 1995); *United States v. Butler*, 486 F. Supp. 1285 (E.D. Tex. 1980), *rev'd sub nom. United States v. Hamm*, 659 F.2d 624 (5th Cir. 1981) (en banc).

Cir. 1977); *United States v. Madzarac*, 678 F. Supp. 3d 42, 49-52 (D.D.C. 2023). That conclusion follows from the rule's text and history and from the canon of constitutional avoidance.

2. Since the federal rules have the force and effect of federal statutes, *see Bank of Nova Scotia v. United States*, 487 U.S. 250, 255 (1988), the construction of Rule 48(a) must begin with its plain text, *see Southwest Airlines Co. v. Saxon*, 596 U.S. 450, 457 (2022). Here is the full text of Rule 48(a):

> (a) By the Government. The government may, with leave of court, dismiss an indictment, information, or complaint. The government may not dismiss the prosecution during trial without the defendant's consent.

Nothing in the language of the rule states that a district court is empowered to undertake a general inquiry into the public interest in deciding whether to grant the government's motion. In contrast, other provisions of the Federal Rules of Criminal Procedure *do* require the court to weigh the "public interest" in deciding whether to grant particular forms of relief. *See* Fed. R. Crim. P. 5.1(d) (postponing a preliminary hearing); Fed. R. Crim. P. 6(a)(1) (summoning a grand jury); Fed. R. Crim. P. 11(a)(3) (accepting a *nolo contendere* plea). That is a powerful indication that no such inquiry is contemplated under Rule 48(a). Courts ordinarily strive to give meaning to the choice to include a requirement in one rule (or provision thereof) and not another. *See, e.g.*, *In re Esteva*, 60 F.4th 664, 675-76 (11th Cir. 2023); *Briseno v. ConAgra Foods, Inc.*, 844 F.3d 1121, 1125-26 (9th Cir. 2017); *United States v. Gray*, 448 F.2d 164, 168 (9th Cir. 1971).

Further, under the Rules Enabling Act, a federal rule may not "abridge, enlarge or modify any substantive right." 28 U.S.C. § 2072(b). But if Rule 48(a) were construed to "interpos[e] a discretionary act by a court between a prosecutor's decision to drop a case and ultimate dismissal," it would have "unmistakable substantive trappings." *In re Richards*, 213 F.3d 773, 786 (3d Cir. 2000).

That construction would also pose an insurmountable practical problem. No other

provision of the federal rules empowers a district court to direct the government to prosecute a defendant or to appoint a special prosecutor to do so. *See* p. 24, *infra*. For that reason, construing Rule 48(a) to permit a court to deny the prosecution leave to dismiss a case would result in an impracticable (and likely unconstitutional) scheme in which the case is held in indefinite limbo. There would be "no way to compel the prosecutor to proceed," *United States v. KPMG LLP*, No. 05 Cr. 903, 2007 WL 541956, at *7 (S.D.N.Y. Feb. 15, 2007) (quoting *Richards*, 213 F.3d at 786), and the court would eventually be forced to dismiss the case on speedy-trial grounds. That makes little sense.

Indeed, another subsection of Rule 48 authorizes a court to dismiss an indictment for "unnecessary delay" in "bringing a defendant to trial," Fed. R. Crim. P. 48(b)(3), so it would be incongruous to interpret Rule 48(a) to authorize the court itself to generate an indefinite delay. As Judge Weinfeld explained many decades ago:

> Even were leave of Court to the dismissal of the indictment denied, the Attorney General would still have the right to adhere to the Department's view that the indictment cannot be supported by proof upon a trial of the merits, and accordingly, in the exercise of his discretion, decline to move the case for trial. The Court in that circumstance would be without power to issue a mandamus or other order to compel prosecution of the indictment, since such a direction would invade the traditional separation of powers doctrine. And if the indictment continues to remain in status quo, each defendant would be in a position to move for dismissal of the indictment under Rule 48(b).

*Greater Blouse, Skirt & Neckwear Contractors Ass'n*, 228 F. Supp. 483, 489-90 (S.D.N.Y. 1964). Other courts have made the same point.[10] And even in *United States v. N. V. Nederlandsche*

---

[10]    *See, e.g.*, *Richards*, 213 F.3d at 785 ("[The] court would seem to have few options if the day of trial came, and the prosecution refused to call witnesses or otherwise go forward with its case."); *United States v. Sullivan*, 652 F. Supp. 136, 140 n.10 (D. Mass. 2009) ("If the Court were to refuse to dismiss the charge, the United States Attorney could merely decide not to present any evidence at the trial which would require the Court to enter a judgment of acquittal."); *United States v. Marra*, 228 F. Supp. 2d 280, 283 (W.D.N.Y. 2002) ("[C]ounsel for the government has

*Combinatie Voor Chemische Industrie*, 453 F. Supp. 462 (S.D.N.Y. 1978)—by far this district's most aggressive application of Rule 48(a) to deny a motion to dismiss an indictment—the court ultimately dismissed the case on speedy-trial grounds. *Id.* at 463.

Given that serious practical problem and the lack of any textual support for a public-interest standard, the most natural understanding of the function of the leave-of-court requirement in Rule 48(a) is to enable a court to inquire into whether the dismissal should be with prejudice. That function is clearest in the circumstance described in Rule 48(a)'s second sentence: a mid-trial motion to dismiss, where the defendant's consent is required. The purpose of that mandatory-consent requirement is presumably "to protect the government, since dismissal without the defendant's consent would invoke double jeopardy protection, barring further proceedings against the defendant on the same charge." *United States v. Ruedlinger*, No. 97 Cr. 40012, 1997 WL 807925, at *1 (D. Kan. Dec. 17, 1997) (citing *United States v. Hoyland*, 914 F.2d 1125, 1128 (9th Cir. 1990); *United States v. Pitts*, 569 F.2d 343, 346-47 (5th Cir. 1978)). The leave-of-court requirement of the first sentence in turn gives the court the power to determine whether the defendant has in fact knowingly consented to a without-prejudice mid-trial dismissal or whether instead the defendant consents only to a dismissal with prejudice.

Even outside the context of mid-trial dismissals, moreover, it is reasonable to construe the leave-of-court requirement to enable the Court to inquire into whether the defendant consents to a without-prejudice dismissal and whether the dismissal should be with prejudice to prevent the sort of "prosecutorial harassment" that the Supreme Court identified in *Rinaldi*, 434 U.S. at 29 n.15, which implicates the defendant's constitutional rights, *see Dombrowski v. Pfister*, 380 U.S. 479,

---

communicated to this Court that, if the Court were to deny the motion and require the government to proceed to trial, the government would refuse to offer any evidence, thereby leaving this Court with no choice but to enter judgment of acquittal in favor of the defendants.").

490 (1965).  That understanding is consistent with the interpretative canon set forth in Federal Rule of Criminal Procedure 2, which requires courts to construe the rules to ensure "fairness in administration" and "to eliminate unjustifiable expense and delay."  A campaign of prosecutorial harassment in which the government "charg[es], dismiss[es], and recharg[es]," *Rinaldi*, 434 U.S. at 29 n.15, would frustrate those foundational values.  And such a circumscribed role for the leave-of-court requirement would not generate the practical problems discussed above, because the court could prevent prosecutorial harassment simply by "condition[ing] dismissal on its being with prejudice," not compelling prosecution or keeping a case open indefinitely.  *In re United States*, 345 F.3d at 453.

3.  The historical provenance of Rule 48(a) also does not favor construing the rule to permit a court to deny a motion to dismiss based on its own sense of the public interest.  Until the Rules of Criminal Procedure came into effect in 1946, criminal procedure in federal court was governed by a mixture of federal, state, and common law.  George H. Dession, *The New Federal Rules of Criminal Procedure: I*, 55 Yale L.J. 694, 700 (1946).  And as the advisory committee note to Rule 48 explains, "[t]he common-law rule that the public prosecutor may enter a *nolle prosequi* in his discretion, without any action by the court, prevail[ed] in the Federal courts" at that time.  Advisory Committee's Notes to Fed. R. Crim. P. 48(a) (1944) (citing, *inter alia*, *The Confiscation Cases*, 74 U.S. (7 Wall.) 454, 457 (1868)).  While Rule 48(a) undoubtedly modified the common-law rule by "vest[ing] some discretion in the court," *Rinaldi*, 434 U.S. at 29 n.15, it is not likely that merely by requiring "leave of court" the Supreme Court intended to radically alter the standards governing voluntary dismissal and the relationship between prosecutors and courts, especially given the canon that "statutes in derogation of the common law will be strictly construed," *United States v. Fausto*, 484 U.S. 439, 454 (1988).

13

Rule 48(a)'s history does not suggest a broader compass. According to the advisory committee, the leave-of-court requirement was "similar to the rule now prevailing in many States."[11] Most state courts applying leave-of-court requirements, however, freely granted prosecutors' motions to dismiss for a variety of proffered reasons without closely analyzing whether dismissal conflicted with the courts' particular view of the public interest.[12] Although there were some outlier courts that appeared to approve a more searching inquiry,[13] the weight of pre-1946 precedent does not support an expansive public-interest standard. Thus, a Stanford Law Review note written shortly after the criminal rules' promulgation concluded that Rule 48(a) was analogous to state rules that "prevent prosecutors from continually harassing a defendant whose resources are not nearly equal to the state's." *Trial by Persistence*, 4 Stan. L. Rev. 537, 538 (1952).

One online article has argued that the Supreme Court in *Rinaldi* misunderstood the purpose of the rule that it promulgated. Thomas Ward Frampton, *Why Do Rule 48(a) Dismissals Require "Leave of Court"?*, 73 Stan. L. Rev. Online 28, 32 (2020). Based on a review of discussions among members of the advisory committee and the broader legal community, the article concludes that *Rinaldi*'s understanding of Rule 48(a) was incorrect because "Rule 48(a)'s 'principal object' was never 'to protect a defendant against prosecutorial harassment.'" *Id.* at 37 (quoting *Rinaldi*, 434 U.S. at 30 n.15).

---

[11]    Advisory Committee's Notes to Fed. R. Crim. P. 48(a) (1944); *see* American Law Institute, *Code of Criminal Procedure: Official Draft* 895-97 (1930) (collecting authorities).

[12]    *See, e.g.*, *State v. Ward,* 165 S.E. 803, 804-05 (W. Va. 1932); *State v. Kiewel*, 207 N.W. 646, 647 (Minn. 1926); *Commonwealth v. Davis*, 184 S.W. 1121, 1121-23 (Ky. 1916); *People v. Disperati*, 105 P. 617, 618 (Cal. Dist. Ct. App. 1909); *People v. Kurminsky*, 52 N.Y.S. 609, 609-11 (N.Y. Sup. Ct. 1898); *People v. Schmidt*, 30 P. 814, 815 (Cal. 1883); *see also People v. Williams*, 249 N.Y.S. 425, 428-29 (N.Y. Co. Ct. 1931) (granting the private complainants' motion to dismiss because the defendant was a man of "high character" who just made a "costly mistake").

[13]    *See Guinther v. City of Milwaukee*, 258 N.W. 865, 867 (Wis. 1935); *People ex rel. Hoyne v. Newcomer*, 120 N.E. 244, 247-48 (Ill. 1918).

Even if that view had merit, it would not be the place of lower courts to conclude that the Supreme Court erred in its construction of Rule 48(a).  But at any rate, the article's historical analysis is not compelling.  Most notably, the article asserts that when it promulgated the federal rules, the Supreme Court "signal[led] approval" for the position that Rule 48(a) "armed the district judge with a powerful tool to halt corrupt or politically motivated dismissals of cases."  Frampton, *supra*, at 37; *see* ECF No. 128-1, at 7 (*amici* quoting same).  Putting aside the fact that the descriptor does not apply to this case, that contention is based solely on a few comments by individual Justices generally supporting a role for courts in the dismissal process, without any discussion of the scope or purpose of that role.  *See* 7 Madeleine J. Wilken & Nicholas Triffin, *Drafting History of the Federal Rules of Criminal Procedure* 9 (1991) ("Two members of the Court think that the United States Attorney should not be permitted to dismiss an indictment without the consent of the court."); *see also* 1 Wilken & Triffin, *supra*, at 19.  The article's analysis assumes that the full Supreme Court accepted the view advanced by a handful of advisory committee members and legal commentators that Rule 48 should authorize courts to closely scrutinize the government's reasons for seeking dismissal, but it cites no evidence that any member of the Supreme Court actually shared that understanding.[14]

    4.  To the extent the text and history of Rule 48(a) leave ambiguity about the scope of a

---

[14]    Moreover, even putting aside that problem, the article's sources for its claim are by turns untimely, irrelevant, or unhelpful.  They include a federal judge's speech that was not widely circulated, *see* Leon R. Yankwich, *Increasing Judicial Discretion in Criminal Proceedings*, 1 F.R.D. 746 (1941); comments by advisory committee members that were opposed and repeatedly failed to change the committee's recommendation, *see* Advisory Committee on Rules of Criminal Procedure, *Minutes of Meetings* 297-316 (Jan. 13, 1942); Advisory Committee on Rules of Criminal Procedure, *Minutes of Meetings* 438-48 (May 19, 1942); Advisory Committee on Rules of Criminal Procedure, *Minutes of Meetings* 1110-22 (Feb. 23, 1943) (all available at https://tinyurl.com/o3ndjs2); and mixed feedback from members of bar, *see* 2 Wilken & Triffin, *supra*, at 267-69; 5 Wilken & Triffin, *supra*, at 190-92; 6 Wilken & Triffin, *supra*, at 92-94.

court's discretion, the canon of constitutional avoidance, which instructs courts to construe "ambiguous statutory language . . . to avoid serious constitutional doubts," would compel the narrower interpretation. *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 516 (2009); *see Ortiz v. Fibreboard Corp.*, 527 U.S. 815, 845 (1999) (applying constitutional avoidance to construe civil Rule 23). Here, construing Rule 48(a) to permit the court to maintain a prosecution that the government does not wish to pursue would not only raise serious constitutional doubts; it would violate multiple provisions of the Constitution.

*First*, that interpretation would encroach on the Executive Branch's authority to decide which prosecutions to pursue. As discussed, p. 7, *supra*, the Supreme Court has now made abundantly clear that Article II vests the Executive Branch with near-absolute discretion over criminal prosecutions, *Trump*, 603 U.S. at 619-21, overruling any contrary authority in lower courts. Construing Rule 48(a) to permit a court to supervise the "[i]nvestigative and prosecutorial decisionmaking" that lies within "the special province of the Executive Branch" would thus violate Article II. *Id.* at 620-21.

*Second*, continuing to exercise the judicial power over a case in which both the government and the defendant agree that no prosecution should go forward would exceed the scope of the judicial power under Article III of the Constitution, which "affords federal courts the power to resolve only actual controversies arising between *adverse litigants*." *Whole Woman's Health v. Jackson*, 595 U.S. 30, 39 (2021) (internal quotation marks omitted; emphasis added). The situation here is unlike the circumstances in which the government professes to agree with the opposing party on the law but persists in the injury-causing conduct, *see United States v. Windsor*, 570 U.S. 744, 756 (2013); where the government is subject to a binding judgment that requires it to pay money or take other action, *id.* at 757-58; or where a criminal defendant is subject to a conviction

or sentence that the government agrees post-judgment was the product of legal error, *e.g.*, *Tapia v. United States*, 564 U.S. 319, 322-23 (2011). Simply put, if the government does not believe that a criminal prosecution should be pursued before the entry of judgment, there is no concrete controversy between the parties amenable to judicial resolution.

*Third*, construing Rule 48(a)—which was promulgated three decades before the Speedy Trial Act—to permit a court to indefinitely keep alive a case that the government does not intend to pursue would invite egregious violations of the Speedy Trial Clause. *See Barker v. Wingo*, 407 U.S. 514, 530-31 (1972).

*Finally*, allowing a judge to preside over a prosecution that he or she effectively ordered would violate the Due Process Clause's guarantee of an impartial adjudicator. *See Rippo v. Baker*, 580 U.S. 285, 287 (2017) (per curiam).

*    *    *

In sum, a broad interpretation of Rule 48(a) finds no support in either text or history and would raise serious—indeed, fatal—constitutional problems. Rule 48(a) is best construed narrowly as cabining the Court's discretion to preventing prosecutorial harassment. In that circumstance, "the judge might rightly condition dismissal on its being with prejudice." *In re United States*, 345 F.3d at 453. Such a dismissal does not raise constitutional problems because it neither compels prosecution nor keeps a criminal case open indefinitely.

## II. EVEN UNDER A PUBLIC-INTEREST STANDARD, THE COURT SHOULD DISMISS THE INDICTMENT

Under the properly circumscribed interpretation of Rule 48(a) set forth above, there is no question that the Court should dismiss this case. But even if the Court applies the broader public-interest standard that some courts have recognized, it should reach the same result. The government has set out more than sufficient grounds to demonstrate that the dismissal is not

"clearly contrary to manifest public interest," and the record contains no basis to overcome the "presumption of regularity that federal courts are obliged to ascribe to prosecutorial conduct and decisionmaking," *HSBC Bank*, 863 F.3d at 136.

1.  The courts that have applied the public-interest standard have recognized certain principles to guide a court's review of a Rule 48(a) motion to dismiss.

*First*, "the prosecution does not have the burden of proof to show that dismissal is in the public interest" and need only "provide sufficient reasons to the court that amount to more than a mere conclusory interest." *KPMG*, 2007 WL 541956, at *5; *see Rosenberg*, 108 F. Supp. 2d at 204-05; *Greater Blouse*, 228 F. Supp. at 486.

*Second*, a number of courts have held that "[f]or a dismissal to be 'clearly contrary to manifest public interest,' the prosecutor must have had an illegitimate motive rising to the level of bad faith," such as the "'acceptance of a bribe, personal dislike of the victim, [or] dissatisfaction with the jury impaneled.'" *United States v. Bernard*, 42 F.4th 905, 909 (8th Cir. 2022) (quoting *United States v. Smith*, 55 F.3d 157, 159 (4th Cir. 1995)).  On that view, "the judicial inquiry turns on 'whether the prosecutor acted in good faith at the time he moved for dismissal,'" and "[i]n making this determination, the presumption is that the Government is acting in good faith." *KPMG*, 2007 WL 541956, at *5 (quoting *Smith*, 55 F.3d at 159).

*Third*, in determining whether the government's reasons are sufficient and not pretextual, courts have typically examined the motion to dismiss, as well as the government's previous conduct in the case and other materials on the docket (like the indictment).  *See, e.g.*, *Rinaldi*, 434 U.S. at 30; *Rosenberg*, 108 F. Supp. 2d at 208-10; *Greater Blouse*, 228 F. Supp. at 487-89.

2.  Under those principles, no justifiable basis exists to deny dismissal here.

As an initial matter, this case involves none of the grounds that some courts have identified

for concluding that the government is acting in bad faith, such as animus towards a victim. *See,*
*e.g.*, *Richards*, 213 F.3d at 787; *KPMG*, 2007 WL 541956, at *5. Moreover, the examples of
impermissible justifications that courts have identified differ materially from the circumstances of
this case. Each of those examples relates either to particular improper conduct by the line
prosecutor working the case (*e.g.*, taking a bribe, attending a social event, animus) or a case-
specific strategic consideration (*e.g.*, dissatisfaction with the jury). In those situations, a judge's
refusal to dismiss the prosecution may spur the prosecutor's superiors to reassign the case or direct
the prosecutor to proceed. *See In re United States*, 345 F.3d at 454. But in this case, the Acting
Deputy Attorney General determined that the prosecution should not proceed, and the Attorney
General has announced that the charges are "incredibly weak." Should the Court deny the motion
to dismiss, there is zero chance that the current leadership of the Department of Justice would
instruct another prosecutor to continue the prosecution.

More generally, refusing to grant a motion to dismiss authorized (indeed, filed) by the
leadership of the Department of Justice rather than a line prosecutor would represent a particularly
serious incursion on the prerogatives of the Executive Branch. *See* p. 7, *supra*. That is especially
true here, where the Acting Deputy Attorney General relied in part on the President's executive
orders in determining that dismissal was appropriate. ECF No. 122, at 2 (citing Exec. Orders Nos.
14147, 14159, and 14165); *see Trump*, 603 U.S. at 619-21.

3. At any rate, the dismissal of the charges here would not be "clearly contrary to manifest
public interest," whether or not bad faith is required. The government's two proffered
justifications, *see* pp. 5-6, *supra*, are facially legitimate and are not pretextual.

*First*, the appearance of impropriety is substantial. After Mayor Adams broke publicly
with the Biden Administration, details of the grand jury investigation started appearing in the

media.  Prosecutors then misrepresented Mayor Adams's status in the investigation to defense counsel to induce him to make a proffer and timed the indictment so that trial would fall right in the middle of the primary election.  Mr. Williams announced the charges in a press conference using highly inappropriate rhetoric.  The leaks continued after the indictment, and Mr. Williams then resigned, touted his prosecution of Mayor Adams on his website, and alluded to it in a nakedly political op-ed.  That extraordinary sequence of events more than justifies the Acting Deputy Attorney's General conclusion that the appearance of impropriety warrants dismissal.  Indeed, the risk of jury taint has only increased since the Acting Deputy Attorney General made the decision to seek dismissal, because someone at the Department leaked Ms. Sassoon's memorandum, which accused Mayor Adams of uncharged criminal conduct and commented on the supposed strength of the evidence.  *See* ECF No. 128-3, at 1, 5, 7-8.

*Second*, the pendency of this criminal case undoubtedly impedes Mayor Adams's ability to help carry out federal law designed to stop violent crime and protect the Nation's borders.  As Mayor Adams explained in an earlier letter to the Acting Deputy Attorney General, preparation for trial will occupy most of his attention from now until late May or early June.  ECF 130-1 at 2; *cf. Trump v. Mazars USA, LLP*, 591 U.S. 848, 871 (2020) ("carefully scrutiniz[ing]" the burdens of legal process on the Executive's time and attention).  Beyond that, this case has resulted in the revocation of Mayor Adams's security clearance, impeded his ability to serve on a joint taskforce on firearms alongside agents from the Southern District of New York, and threatened the exercise of his inherent powers to provide support to immigration enforcement.  *Id.* at 2-3.

Thus, unlike cases in which the government has given little or no justification for a dismissal, the motion here contains two substantial reasons why the case should be dismissed.

Counsel is aware of no ruling that has ever held that these sorts of justifications for dismissing a prosecution are illegitimate.

Moreover, the two justifications should be considered in light of the further determination by Department of Justice leadership that the charges in this case are "incredibly weak" and rest on aggressive legal theories. This Court is well aware that there are substantial grounds to challenge the legal validity of the bribery charge, including the Supreme Court's 2024 decision in *Snyder*, which arguably overruled Second Circuit precedent holding that the federal-program bribery statute, 18 U.S.C. § 666, does not contain an "official act" requirement. Given the infirmities in the case, the Department could reasonably conclude that the appearance of past impropriety and the harm to other federal law-enforcement interests warrant immediate dismissal. *See Blaszczak*, 56 F.4th at 234-36, 246 (dismissing criminal charges after the government confessed error in light of a recent Supreme Court decision). And the immense public interest in a speedy resolution of this matter only fortifies that conclusion. *Cf.* ECF No. 136, at 4 (the Court recognizing the "importance of prompt resolution" in adjudicating the government's motion to dismiss).

4. There is no reason to believe that the Acting Deputy Attorney General's proffered reasons are pretextual. *Amici* have drawn attention to Ms. Sassoon's accusation that Mayor Adams's counsel offered what "amounted to a *quid pro quo*." *See, e.g.*, ECF No. 152-1, at 16. But no *quid pro quo* was offered or accepted, *see* ECF No. 138, at 20:15-21:1 (Mayor Adams swearing that he has no other agreements with the government, written or otherwise), and Mayor Adams's counsel made clear in writing immediately after the meeting (and before the Acting Deputy Attorney General directed Ms. Sassoon to seek dismissal) that the Mayor's commitment to immigration enforcement would not waver no matter what happened with the case, ECF No. 130-1, at 3-4.

It appears that Ms. Sassoon's vaguely worded accusation refers to defense counsel's explanation—in response to a question from the Acting Deputy Attorney General—that the pending charges would as a practical matter impede Mayor Adams's ability to assist in the enforcement of federal law:  What she claims "amounted to a *quid pro quo*" was (in her words) counsel's representation that Mayor Adams "*would be in a position to assist* with the Department's enforcement priorities only if the indictment were dismissed."[15]  ECF 124-1, at 3 n.1 (emphasis added).  Ms. Sassoon thus appears to have simply mischaracterized defense counsel's explanation that the charges were *in fact* impeding Mayor Adams's ability to help carry out federal law as "amount[ing] to a *quid pro quo*."  But that was just a statement of reality, not an offer to trade action for dismissal.  And critically for present purposes, it is precisely the same justification that the government has presented to this Court, so it would not support a finding of pretext.

In short, under any standard, Rule 48(a) requires the Court to dismiss this case.  The government has provided sufficient justifications in good faith that dismissing this case would not clearly violate manifest public interest.

5.  The government has moved to dismiss the indictment against Mayor Adams without prejudice.  For reasons set out in a separate motion relating to the government's incessant and unlawful leaks, ECF No. 141, Mayor Adams has requested that the indictment be dismissed with prejudice.  But setting that motion aside, Mayor Adams has knowingly agreed to a voluntary dismissal without prejudice, both in writing and on the record, which is the default pretrial disposition under Rule 48(a), subject to the Court's power to condition dismissal on its being with prejudice. *United States v. Ortega-Alvarez*, 506 F.2d 455, 458 (2d Cir. 1974).

---

[15]    It is also worth noting that neither Ms. Sassoon nor any of the line prosecutors said anything about a *quid pro quo* in the January 31 meeting or in the several days afterward.

## III.    NO BASIS EXISTS FOR FURTHER PROCEDURAL STEPS OR FACTUAL INQUIRY

No basis exists for further procedural steps or factual inquiry in this case.  This is not the rare case in which the government has failed to provide any "disclosure of the facts upon which [the Rule 48(a) motion] is based."  *United States v. Doe*, 101 F. Supp. 609, 611 (D. Conn. 1951).  And as of today, the Court can review a wealth of materials, including: (1) the government's motion to dismiss, (2) the transcript of the February 19 hearing on the motion to dismiss, which includes an extended colloquy with the Acting Deputy Attorney General; (3) briefing on the motion to dismiss submitted by the government, Mayor Adams, and the court-appointed *amicus*, (4) additional briefing submitted by other putative *amici*, and (5) hundreds of documents filed on the court's docket prior to February 14.  Numerous courts have relied solely on briefing and argument to resolve Rule 48(a) motions.[16]

Mayor Adams does not believe that it is appropriate for the Court to consider extra-record internal DOJ memoranda that have been leaked to the press, particularly given the lack of any basis to overcome the government's strong presumption of regularity.  Counsel is aware of no precedent in which a court ruling on a Rule 48(a) motion has considered DOJ deliberative materials. But at any rate, for the reasons stated above, those materials demonstrate that the government's justifications for dismissal in this Court are precisely the same justifications that it cited internally.

The Court, moreover, is well aware of the facts that Mayor Adams and the government

---

[16]    *See, e.g.*, *United States v. Toyota Motor Corp.*, No. 14 Cr. 186 (S.D.N.Y.) (briefing and oral argument); *United States v. Doody*, No. 01 Cr. 1059 (S.D.N.Y.) (briefing and oral argument); *United States v. Tam*, No. 94 Cr. 896 (S.D.N.Y.) (briefing and oral argument); *United States v. Freeman*, No. 87 Cr. 293 (S.D.N.Y.) (briefing and oral argument); *United States v. KPMG LLP*, No. 05 Cr. 903 (S.D.N.Y.) (briefing); *United States v. Nix*, No. 15 Cr. 6126 (W.D.N.Y.) (briefing); *United States v. Melendez*, No. 03 Mj. 201 (N.D.N.Y.) (government's motion); *see also United States v. Trump*, No. 23 Cr. 257 (D.D.C.) (government's motion).

contend create the appearance of impropriety.  Although the Court has previously declined to grant relief on account of those facts, it was applying a different legal standard than asking whether that justification for dismissal is "clearly contrary to manifest public interest."  Likewise, the Court has questioned the parties about the government's other justification (the effect of the charges on Mayor Adams's ability to assist federal law enforcement) and can determine without further factual inquiry whether that justification is sufficient.

Certain *amici* have proposed that the Court should appoint a special prosecutor to pursue the charges returned by the grand jury.  *See* ECF No. 124, at 6; ECF No. 128-1, at 14; ECF No. 150-1, at 12-13.  The Court lacks authority to do so.  *Amici*'s legal authorities all involve the unique context of criminal contempt, where Congress has explicitly authorized the appointment of special private prosecutors.  *See* Fed. R. Crim. P. 42(a)(2); *In re United States*, 345 F.3d at 452.  The Supreme Court has indicated that courts have "inherent authority to initiate contempt proceedings for disobedience to their orders," *Young v. U.S. ex rel. Vuitton et Fils SA*, 481 U.S. 787, 793 (1987), although two Justices have recently called that principle into question, *see Donziger v. United States*, 143 S. Ct. 868, 868-70 (2023) (Gorsuch, J., dissenting from the denial of certiorari, joined by Kavanaugh, J.).  Since this case does not involve criminal contempt, any contempt "exception" does not apply, *In re United States*, 345 F.3d at 452; *see* pp. 1-2, *supra*.

## CONCLUSION

For the foregoing reasons, the Court should grant the government's motion and dismiss the indictment.

Date: March 7, 2025

Respectfully submitted,

QUINN EMANUEL URQUHART
& SULLIVAN, LLP

By: */s/ Alex Spiro*

Alex Spiro
295 Fifth Ave.
New York, NY 10016
(212) 849-7000

William A. Burck
John F. Bash (*admitted pro hac vice*)
Avi Perry
1300 I Street NW, 9th Floor
Washington, D.C. 20005
(202) 538-8000

*Attorneys for Mayor Eric Adams*