UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA,

v.

ERIC ADAMS,

Defendant.

24-CR-556 (DEH)

OPINION AND ORDER

DALE E. HO, United States District Judge:

On February 14, 2025, the Department of Justice ("DOJ") filed a motion seeking to dismiss without prejudice the Indictment against New York City Mayor Eric Adams, pursuant to Federal Rule of Criminal Procedure 48(a).[1]  ECF No. 122 (the "Rule 48(a) Motion").  DOJ's Motion states that dismissal of this case is justified for several reasons, including because "continuing these proceedings would interfere with" the Mayor's ability to govern, thereby threatening "federal immigration initiatives and policies."  *Id.* ¶ 6.  A critical feature of DOJ's Motion is that it seeks dismissal *without prejudice*—that is, DOJ seeks to abandon its prosecution of Mayor Adams at this time, while reserving the right to reinitiate the case in the future.  DOJ does not seek to end this case once and for all.  Rather, its request, if granted, would leave Mayor Adams under the specter of reindictment at essentially any time, and for essentially any reason.

The Court declines, in its limited discretion under Rule 48(a), to endorse that outcome.  Instead, it dismisses this case *with prejudice*—meaning that the Government may not bring the charges in the Indictment against Mayor Adams in the future.  In light of DOJ's rationales, dismissing the case without prejudice would create the unavoidable perception that the Mayor's

---

[1] All subsequent references to Rules are to the Federal Rules of Criminal Procedure.  In all quotations from cases, the Court omits citations, alterations, emphases, internal quotation marks, and ellipses, unless otherwise indicated.

freedom depends on his ability to carry out the immigration enforcement priorities of the administration, and that he might be more beholden to the demands of the federal government than to the wishes of his own constituents. That appearance is inevitable, and it counsels in favor of dismissal with prejudice. Notably, Mayor Adams has filed his own motion seeking dismissal with prejudice on other grounds, and DOJ has not opposed his motion, effectively waiving any objection to permanent dismissal of this case. The parties offer the Court no basis to dismiss this case in a manner that would allow DOJ to reinitiate it in the future, and the Court declines to do so.

Various groups that have submitted friend-of-the-court briefs urge this Court to go further and deny DOJ's Motion altogether, arguing that the reasons DOJ has given to justify dismissing this case are unsubstantiated or contrary to the public interest. The Court ultimately declines their invitation to deny the Motion. But it concludes that many of their arguments have merit. DOJ's first asserted rationale for dismissing this case—that it has been tainted by "appearances of impropriety," Rule 48(a) Mot. ¶ 5—is unsupported by any objective evidence. Rather, the record before the Court indicates that the U.S. Attorney's Office for the Southern District of New York prosecutors who worked on this case followed all appropriate Justice Department guidelines. There is no evidence—zero—that they had any improper motives. Indeed, DOJ's memorandum directing dismissal of this case took care to note that it did not "call[] into question the integrity and efforts of the line prosecutors responsible for the case," or the efforts of the U.S. Attorney leading the office at the time of the memorandum.[2] And DOJ's assertion that this case—which was brought nine months before the 2025 New York City mayoral primary election—somehow amounts to election interference lacks any support in Justice Department guidelines or past

---

[2] Letter from Emil Bove, Acting Deputy Att'y Gen., to Danielle Sassoon, U.S. Att'y, S.D.N.Y. (Feb. 10, 2025) (the "February 10 Decisional Memo") at 1, ECF No. 150-7.

practice.  In fact, the timing of this case is entirely consistent with prior public corruption prosecutions.  All of this suggests that the "appearances of impropriety" rationale is not just thin, but pretextual.

As for the immigration enforcement rationale, to the extent that DOJ suggests that Mayor Adams is unable to assist with immigration enforcement while this case is ongoing, such an assertion is similarly unsubstantiated.  Indeed, shortly after DOJ made the decision to seek dismissal of the case—and while the Indictment was still pending—the Mayor announced that he would permit Immigration and Customs Enforcement (ICE) to operate at the Rikers Island Jail Complex, an act that appears to be contrary to New York City law.  In other words, the record does not show that this case has impaired Mayor Adams in his immigration enforcement efforts. Instead, it shows that after DOJ decided to seek dismissal of his case, the Mayor took at least one *new* immigration-related action consistent with the preferences of the new administration. Everything here smacks of a bargain: dismissal of the Indictment in exchange for immigration policy concessions.

Taking a step back from the particulars of this case, DOJ's immigration enforcement rationale is both unprecedented and breathtaking in its sweep.  DOJ cites no examples, and the Court is unable to find any, of the government dismissing charges against an elected official because doing so would enable the official to facilitate federal policy goals.  And DOJ's assertion that it has "virtually unreviewable" license to dismiss charges on this basis is disturbing in its breadth, implying that public officials may receive special dispensation if they are compliant with the incumbent administration's policy priorities.  That suggestion is fundamentally incompatible with the basic promise of equal justice under law.

Ultimately, however, there are two reasons why these points do not support outright denial of DOJ's Motion to Dismiss Mayor Adams's case.  The first is that a court's principal role in

deciding a motion of this nature is to protect the rights of the defendant—and denying dismissal of the case would not do so here.  In fact, to the extent that the Government may be seeking to extract policy concessions from the Mayor, dismissal with prejudice rather than continuation of the prosecution best addresses that concern.  It ensures that, going forward, the charges in the Indictment cannot be used as leverage over Mayor Adams or the City of New York.

The second and perhaps more fundamental reason is that a court, if it were so inclined, would have no way to compel the government to prosecute a case in circumstances like those presented here.  If an individual prosecutor seeks to dismiss a case for improper reasons, a court can deny the motion and send the matter back to the government, which can then reassign the case to another prosecutor.  But where, as here, a court has substantive concerns about the reasons for dismissal offered by the Justice Department itself, the court does not have the same option.  A court cannot force the Department of Justice to prosecute a defendant.  That is by design.  In our constitutional system of separation of powers, a court's role in a criminal case is to preside over the matter—not to decide whether the defendant should be prosecuted.  The Court is not aware of any authority that would empower it to appoint an independent prosecutor outside of the limited context of criminal contempt.  Consistent with that understanding, and in light of the particular facts of this case, the Court finds no basis to deny DOJ's Motion altogether.

Finally, it is important to clarify that the Court's decision today is not about whether Mayor Adams is innocent or guilty.  Mayor Adams, like any person accused of a crime, is presumed innocent until proven guilty.  If this case were to proceed to trial, it would be the Government's burden to prove, beyond a reasonable doubt, each element of the offenses with which he is charged. Because of DOJ's decision to abandon this case, that trial will not occur.  But unlike many (if not most) motions under Rule 48(a), the Government's Motion to Dismiss this case is expressly *not* based on the strength of the case against Mayor Adams.  Neither the dismissal of the Indictment,

nor the length of this Opinion, should be understood as any kind of statement about the merits of the allegations against the Mayor in the Indictment.

The Court's decision is also not about, and the Court expresses no opinion on, whether the case against Mayor Adams "should" continue based on the kinds of factors that a prosecutor might typically consider in bringing a case—including "the strength of the case, the prosecution's general deterrence value, the Government's enforcement priorities, and the case's relationship to the Government's overall enforcement plan." *Wayte v. United States*, 470 U.S. 598, 607 (1985). Courts are "particularly ill-suited" to weigh such factors, *id.*, and this Court declines to wander into that thicket. In our constitutional system, that decision is left to a political branch of our government, which is ultimately accountable for its actions to the people. Part of this Court's limited role under Rule 48(a) is to shine a light on the reasons that DOJ has decided to dismiss this case, leaving the most important judgment to the public.

Accordingly, and for the reasons set forth in more detail below, the Government's motion is **GRANTED IN PART AND DENIED IN PART**. The Indictment in this case is **DISMISSED WITH PREJUDICE**.

## BACKGROUND

Unless otherwise noted, the facts described below are taken from the parties' filings, transcripts of proceedings held before the Court, and the Court's prior decisions in this case.

### A. The Investigation and Indictment

The investigation of then–Brooklyn Borough President Eric Adams began in the summer of 2021. Oct. 2 Hr'g Tr. at 15:2-3, ECF No. 31; *see also* Gov't Opp'n Def.'s Mot. Sanctions ("Gov't First Sanctions Opp'n") at 1, ECF No. 38. It concerned travel benefits and campaign contributions that he allegedly received from Turkish nationals. *See* Indictment ("Ind.") ¶¶ 1-6,

ECF No. 2.  Approximately three years later, on September 24, 2024, a grand jury returned a five-

count indictment, charging him with:

- One count of conspiracy to commit wire fraud and federal program bribery, and to receive campaign contributions by foreign nationals, in violation of 18 U.S.C. § 371;

- One count of wire fraud in violation of 18 U.S.C. §§ 1343 and 2;

- Two counts of solicitation of a contribution by a foreign national in violation of 52 U.S.C. §§ 30121 and 30109(d)(1)(A), and 18 U.S.C. § 2; and

- One count of bribery in violation of 18 U.S.C. § 666(a)(1)(B)(2).

Ind. ¶¶ 50-63.  DOJ officials were aware of the investigation and of the timing of the Indictment;

consistent with DOJ policy, attorneys at the U.S. Attorney's Office for the Southern District of

New York ("USAO-SDNY") informed DOJ leadership that if the grand jury voted to indict Mayor

Adams on September 24, they intended to, among other things, unseal the indictment and hold a

press conference announcing the charges.  *See* Gov't First Sanctions Opp'n at 7.[3]

**B. Initial Proceedings and Motions Practice**

    1. <u>Initial Conference and Trial Date</u>

On October 2, 2024, Mayor Adams appeared before this Court for an initial conference.

During the conference, the Government stated it was "quite likely" that it would file a superseding

indictment, later clarifying that that it was "possible" that additional charges would be added and

"likely" that "additional defendants w[ould] be charged in connection with this scheme."  Oct. 2

Hr'g Tr. at 4:2-12.  The Court acknowledged that "the public and Mayor Adams have an interest

---

[3] This case was filed and initially prosecuted by USAO-SDNY.  On February 14, 2024, attorneys from DOJ "replaced AUSAs from the U.S. Attorney's Office for the Southern District of New York as counsel of record in this case" and stated that they would "handle this matter and any related decision-making" going forward.  Rule 48(a) Mot. at 1 n.1.  Where helpful to the reader, this Opinion distinguishes between the USAO-SDNY and DOJ by referring to them specifically; otherwise, references to the "Government" for actions taken prior to February 14 are to USAO-SDNY, and references to actions after February 14 are to Main Justice.

in a speedy trial," which was "heightened in the context of the elections calendar."  *Id.* at 38:17-19.  The Court also noted that this "is obviously a case of significant public interest," *id.* at 48:20-21, and consequently directed the parties to, whenever possible, file documents on the public docket.

At a subsequent conference on November 1, 2024, the Court again noted the public's and Mayor Adams's interests in a speedy trial, particularly "given the election cycle."  Nov. 1 Hr'g Tr. at 55:19-23, ECF No. 57.  The Court ultimately set trial for April 21, 2025, explaining that it took into account a variety of factors, including: the likely need for proceedings with respect to classified information, the time it would take Mayor Adams's counsel to review the "significant" volume of discovery, the trial schedules of other cases involving public officials tried in this District,[4] and the parties' competing proposals.  *Id.* at 60:19-61:21; 62:16-20.

2. Early Motions Practice: Mayor Adams's First Motion to Dismiss and First Rule 6 Motion

*First Motion to Dismiss.*  On September 30, 2024, Mayor Adams filed a motion to dismiss the bribery count of the Indictment.  *See* Def.'s Mem. Supp. Mot. Dismiss Count V ("Mayor Adams's First Mot. to Dismiss"), ECF No. 14.  His principal argument was that the Government's theory that he accepted travel benefits in exchange for assistance with the "regulation" of a Turkish consular building (the "Turkish House") was insufficient to state a charge of bribery under the relevant statute, 18 U.S.C. § 666 ("Section 666").  *See* Mayor Adams's First Mot. to Dismiss at 7-8.  In essence, Mayor Adams argued that a charge of bribery requires that the defendant agree to accept something of value in exchange for a discrete exercise of governmental power, and that assistance with the "regulation" of the Turkish House was "too vague and broad."  *Id.* at 11.  The

---

[4] *See, e.g.*, *United States v. Menendez*, No. 23 Crim. 490 (S.D.N.Y.); *United States v. Silver*, No. 15 Crim. 93 (S.D.N.Y.); *United States v. Benjamin*, No. 21 Crim. 706 (S.D.N.Y.).

Court rejected that argument, concluding that under binding Second Circuit precedent the Indictment's allegations were sufficiently specific to constitute bribery under Section 666. *See* Op. & Order ("First MTD Opinion") at 16-22 (citing *United States v. Ng Lap Seng*, 934 F.3d 110, 133 (2d Cir. 2019), and *United States v. Dawkins*, 999 F.3d 767 (2d Cir. 2021)), ECF No. 68.

*First Rule 6 Motion*.  On October 1, 2024, Mayor Adams filed a motion seeking an evidentiary hearing and sanctions, under Rule 6(e), based on alleged unlawful disclosures of matters occurring before a grand jury.  *See* Def.'s Mem. Supp. Mot. Evid. Hr'g & Sanctions ("Mayor Adams's First Rule 6 Mot."), ECF No. 19.  After full briefing from the parties, the Court denied the motion.  Am. Op. and Order ("First Rule 6 Order") at 1, ECF No. 49.

3. <u>Additional Motions Practice: Mayor Adams's Motion for a Bill of Particulars, The Government's Rule 23.1 Motion, and Mayor Adams's Second Rule 6 Motion</u>

*Motion for a Bill of Particulars*.  On December 18, 2024, Mayor Adams filed a Motion for Leave to File a Bill of Particulars.  ECF No. 72.  He argued that the Indictment "omits critical information about the bribery and campaign finance charges against him."  Def.'s Mem. Supp. Mot. for Bill of Particulars at 1-2, ECF No. 73.  In its opposition, the Government argued, among other things, that disclosing additional details at that time would be prejudicial to its ongoing investigation and noted that "law enforcement has continued to identify additional individuals involved in Adams's conduct, and to uncover additional criminal conduct by Adams."  Gov't Opp'n Mot. Bill of Particulars at 22, ECF No. 89.  The Court ultimately denied Mayor Adams's request.  *See* Op. & Order, ECF No. 113.

*Local Rule 23 Motion.*  On December 19, 2024, the Government filed a letter motion "request[ing] that the Court direct counsel for the parties to comply with" Local Criminal Rule 23.1 ("Local Rule 23.1"), which, among other things, prohibits lawyers from making extrajudicial statements concerning "[a]ny opinion as to the accused's guilt or innocence or as to the merits of

the case or the evidence in the case." *See* Gov't Rule 23.1 Letter Mot. at 1, ECF No. 76 (citing

S.D.N.Y. & E.D.N.Y. L. Crim. R. 23.1(d)(7)). The Court issued an Order on January 23, 2025

that memorialized the parties' respective obligations under the Local Rule. Order at 2, ECF No.

93.

*Second Rule 6 Motion.* On December 24, 2024, Mayor Adams filed a second Rule 6

Motion, making allegations similar to those in his First Rule 6 Motion. *See* Mem. Supp. Renewed

Mot. Evid. Hr'g & Sanctions ("Mayor Adams's Second Rule 6 Mot.") at 1, ECF No. 83. After the

motion was fully briefed, Mayor Adams filed a letter identifying a new issue: former U.S. Attorney

Damian Williams had recently published an op-ed containing statements—most relevantly, that

"America's most vital city is being led with a broken ethical compass"—which Mayor Adams

argued were "especially prejudicial," had "irrevocabl[y]" tainted the jury pool, and violated Local

Rule 23.1. Def.'s Jan. 18, 2025 Letter, ECF No. 99. The Government argued in response that,

among other things, "Williams did not cause Adams to be investigated. The evidence of Adams's

crimes was uncovered by career law enforcement officers performing their duties, in an

investigation that began before Williams took office and [that] continued after he left." Gov't Jan.

22, 2025 Letter, ECF No. 102.

In a Memorandum Order dated January 22, 2025, the Court denied Mayor Adams's Second

Rule 6 Motion. *See* Mem. Order ("Second Rule 6 Order"), ECF No. 103. In so ruling, the Court

held that there was no violation of Rule 6, because "[n]either Mr. Williams's op-ed itself nor the

media it incorporates by reference so much as allude[d] to the grand jury proceedings that led to

Mayor Adams's indictment, let alone disclose[d] protected information from those proceedings."

Second Rule 6 Order at 5-6. And regarding Local Rule 23.1, the Court held that Williams's op-ed

did not contain prohibited statements because it primarily referred to New York *State*, rather than

New York *City*, politics, and because the one statement that plausibly referred to City politics did

not "constitute opinions as to the Defendant's guilt, and [wa]s not otherwise the type of statement proscribed by the rule." *Id.* at 6 n.5. The Court, however, reiterated prosecutors' duties to "respect both the power of their words and their office, and ensure that their public comments are carefully tailored solely to further valid law enforcement interests and to steer far clear of violating a defendant's fundamental right to a fair trial." *Id.* (quoting *United States v. Smith*, 985 F. Supp. 2d 506, 541 (S.D.N.Y. 2013) (citing Local Rule 23.1(b)).

### C. The Government's Pending Motion to Dismiss

#### 1. Factual Background

##### a. *January 31 Meeting at the Justice Department and Follow-Up Letters*

On January 31, 2025, members of Mayor Adams's legal team, including Alex Spiro; staff at DOJ, including then-Acting Deputy Attorney General (DAG) Emil Bove; and staff from the USAO-SDNY, including then-U.S. Attorney Danielle Sassoon attended a meeting together. *See* Def.'s Feb. 18, 2025 Letter at 1-2, ECF No. 130. According to a letter filed on the docket by defense counsel, the meeting was at Acting DAG Bove's "invitation" to discuss, among other things, "how the case might be affecting Mayor Adams's ability to do his job and whether there was evidence of politicization." *Id.* at 1.[5] Defense counsel's letter to the Court states that, at the end of the meeting, Acting DAG Bove "asked [Mayor Adams's lawyers] and the S.D.N.Y. lawyers to memorialize [their] respective positions in writing." *Id.* at 2.

---

[5] An article attached as an exhibit to an *amicus* brief submitted by former federal judges states that other attorneys in attendance at this meeting included William Burck, one of Mayor Adams's other attorneys; Assistant U.S. Attorney Hagan Scotten, one of the prosecutors formerly assigned to this matter; and two unnamed USAO-SDNY attorneys. *See* Former Federal Jurists' Mot. Leave to File Amicus Brief, ECF No. 150 (appending, as exhibit, a CNN article describing the January 31 meeting between Acting DAG Bove, USAO-SDNY prosecutors, and Mayor Adams's counsel, ECF No. 150-2).

The follow-up letter from Mayor Adams's counsel to Acting DAG Bove, dated February 3, 2025, was also filed on the docket by counsel. *See* Letter from Alex Spiro & William A. Burck, Counsel for Mayor Adams, to Emil Bove, Acting Deputy Att'y Gen. ("Letter from Adams's Counsel to DOJ") (Feb. 3, 2025), ECF No. 130-1. The letter stated that the criminal case against Mayor Adams had prevented him from being "in lockstep with federal law enforcement, federal agency heads, and federal prosecutors" with respect to immigration enforcement, particularly the administration's efforts to "aggressively enforce immigration laws and remove undocumented immigrants who pose a threat to Americans' safety." *Id.* at 2. The letter identified, "[a]s one prominent example of the indictment's impact," the fact that "Mayor Adams's security clearance was revoked following his indictment." *Id.* The letter went on to state that "Mayor Adams's independent abilities to exercise his powers ha[d] also been complicated by his indictment," referencing his authority to "prevent[] the Office of the Corporation Counsel from litigating challenges to immigration enforcement, prevent[] appointed city employees from taking public stances against enforcement efforts, re-open[] the ICE office on Rikers Island, and direct[] the NYPD to supply manpower to assist federal immigration agents." *Id.* at 2.

The USAO-SDNY follow-up letter was not filed on the docket by any parties or *amici*, and it does not appear to be publicly available otherwise.

     *b.  February 10, 2025 Decisional Memorandum*

On February 10, 2025, Acting DAG Bove sent a memorandum (the "February 10 Decisional Memo") to U.S. Attorney Sassoon directing her to dismiss this case "as soon as is practicable." Letter from Emil Bove, Acting Deputy Att'y Gen., to Danielle Sassoon, U.S. Att'y,

S.D.N.Y. (Feb. 10, 2025), ECF No. 150-7.[6]  It started by noting that dismissal would be subject to certain conditions, including that Mayor Adams "agree in writing to dismissal without prejudice." *Id.* at 1.  It then explained that DOJ "reached this conclusion without assessing the strength of the evidence or the legal theories on which [the case] is based, which are issues on which [it] defer[ed] to the U.S. Attorney's Office at this time."  *Id.*  It also noted that "this directive in no way call[ed] into question the integrity and efforts of the line prosecutors responsible for the case, or [U.S. Attorney Sassoon's] efforts in leading those prosecutors in connection with a matter [she] inherited."  *Id.*

The February 10 Decisional Memo then stated that the Justice Department "determined that dismissal . . . is necessary for two independent reasons."  *Id.* at 1.  First, it said the "timing of the charges and more recent public actions by the former U.S. Attorney" had "threatened the integrity of the proceedings, including by increasing prejudicial pretrial publicity that risks impacting potential witnesses and the jury pool."  *Id.*  The Memo also stated that "Mayor Adams criticized the prior Administration's immigration policies before the charges were filed," and it asserted that former U.S. Attorney Williams's "public actions created appearances of impropriety that implicate the concerns raised in the Attorney General's February 5, 2025 memorandum regarding *Restoring the Integrity and Credibility of the Department of Justice*[7] as well as in

---

[6] The February 10 Decisional Memo is attached as an exhibit to multiple *amicus* briefs that have been filed in this case, including the *amicus* brief filed by former federal judges. *See* Former Jurists' Amicus Br. (appending Memo as an exhibit, ECF No. 150-7); *see also* Common Cause, State Democracy Defenders Brs. (appending the same, ECF No. 125-1).  At a conference before the Court, Acting DAG Bove confirmed that he wrote the memo, that he sent it to U.S. Attorney Sassoon, and that copies of it on the docket at that point were "authentic."  Feb. 19 Conf. Tr. at 41:4-42:6, ECF No. 145.

[7] Memorandum from the U.S. Attorney General on Restoring the Integrity and Credibility of the Department of Justice (Feb. 5, 2025), https://www.justice.gov/ag/media/1388506/dl?inline [https://perma.cc/QN7T-NE8Q].

Executive Order 14147, entitled *Ending the Weaponization of the Federal Government*."[8]  *Id.* at 1-2.  It further stated that "[t]hese actions and the underlying case have also improperly interfered with Mayor Adams' campaign in the 2025 mayoral election."  *Id.* at 2 (citing U.S. Dep't of Just., Just. Manual § 9-85.500 (2022)).

Second, the February 10 Decisional Memo stated that the "pending prosecution has unduly restricted Mayor Adams' ability to devote full attention and resources to the illegal immigration and violent crime that escalated under the policies of the prior Administration."  *Id.*  The Memo noted "the impact of the prosecution on Mayor Adams' ability to support critical, ongoing federal efforts 'to protect the American people from the disastrous effects of unlawful mass migration and resettlement,' as described in Executive Order 14165," entitled *Securing Our Borders*.[9]  *Id.*  It also drew a comparison between DOJ's decision to dismiss the Adams case and the prior administration's decision to "release[] violent criminals such as Viktor Bout, the 'Merchant of Death,'" in pursuit of its foreign policy goals.  *Id.*  In a footnote, the Memo referred to a follow-up letter submitted by U.S. Attorney Sassoon after the January 31 meeting, purporting to quote it as acknowledging that "the Government is not offering to exchange dismissal of a criminal case for Adams's assistance on immigration enforcement."  *Id.* at 2 n.1.  As noted above, this letter has not been filed on ECF and is not otherwise publicly available.  The February 10 Decisional Memo

---

[8]    Exec. Order No. 14147, 90 Fed. Reg. 8235 (Jan. 28, 2025), https://www.govinfo.gov/content/pkg/FR-2025-01-28/pdf/2025-01900.pdf [https://perma.cc/JM7B-GN32] (declaring that "[i]t is the policy of the United States . . . to correct past misconduct by the Federal Government related to the weaponization of law enforcement and the weaponization of the Intelligence Community").

[9]    Exec. Order No. 14165, 90 Fed. Reg. 8467 (Jan. 20, 2025), https://www.govinfo.gov/content/pkg/FR-2025-01-30/pdf/2025-02015.pdf [https://perma.cc/6DCV-XU7U] (describing federal efforts "to protect the American people from the disastrous effects of unlawful mass migration and resettlement").

also stated that Mayor Adams's case would "be reviewed by the confirmed U.S. Attorney in the Southern District of New York following the November 2025 mayoral election." *Id.* at 1.

### c.  *Subsequent Letters*

The February 10 Decisional Memo triggered a remarkable exchange of letters between USAO-SDNY and DOJ, followed by a sequence of unusual events at DOJ that were reported in news articles that have been submitted as exhibits to various *amicus* briefs, including one filed by former federal judges.  *See* Amicus Br. of Former Federal Jurists ("Former Federal Jurists Br.") at 1, ECF No. 150-1.

On February 12, 2025, U.S. Attorney Sassoon sent a nine-page letter to the Attorney General stating that Acting DAG "Bove's memo . . . raises serious concerns that render the contemplated dismissal inconsistent with [her] ability and duty to prosecute federal crimes without fear or favor and to advance good-faith arguments before the courts."  Letter from Danielle Sassoon, U.S. Att'y, S.D.N.Y., to Pamela Jo Bondi, Att'y Gen. (Feb. 12, 2025) (the "Sassoon Letter") at 1, ECF No. 150-3.[10]  U.S. Attorney Sassoon further stated, "I cannot fulfill my obligations, effectively lead my office in carrying out the Department's priorities, or credibly represent the Government before the courts, if I seek to dismiss the Adams case on this record." *Id.* at 1-2.

The Sassoon Letter then proceeded to address the rationales for dismissal set forth in the February 10 Decisional Memo.  First, with respect to recent conduct by former U.S. Attorney Williams, the Sassoon Letter explained:

> The investigation began before Mr. Williams took office, he did not manage the day-to-day investigation, and the charges in this case were recommended or approved by four experienced career prosecutors, the Chiefs of the SDNY Public

---

[10] The February 12 Sassoon Letter is referenced in the February 18, 2025 letter filed on the docket by Mayor Adams's counsel at ECF No. 130.  It is also attached as an exhibit to various *amicus* briefs, including the brief filed by former federal judges.  *See* ECF No. 150-3.

Corruption Unit, and career prosecutors at the Public Integrity Section of the Justice Department. Mr. Williams's decision to ratify their recommendations does not taint the charging decision. And notably, Adams has not brought a vindictive or selective prosecution motion, nor would one be successful.

*Id.* at 4. Without attempting "to defend Mr. Williams's motives or conduct," the Sassoon Letter concluded that "the appropriate chronology of this investigation and the strength of the case [showed that] Mr. Williams's conduct since leaving government service cannot justify dismissal here." *Id.* at 5.

Next, regarding the timing of the Indictment in relation to the 2025 New York City mayoral elections, the Sassoon Letter stated that

the decision to charge [Mayor Adams] in September 2024—nine months before the June 2025 Democratic Mayoral Primary and more than a year before the November 2025 Mayoral Election—complied in every respect with longstanding [Justice] Department policy regarding election year sensitivities and the applicable Justice Manual provisions.

*Id.* at 4. The Letter noted that "[t]he timing of the charges in this case is . . . consistent with charging timelines of other cases involving elected officials, both in this District and elsewhere." *Id.* (citing *United States v. Menendez*, No. 23 Crim. 490 (S.D.N.Y.) (indictment in September 2023, primary in June 2024) and *United States v. Hunter*, No. 18 Crim. 3677 (S.D. Cal.) (indictment in August 2018, general election in November)). It further stated: "I am not aware of any instance in which the Department has concluded that an indictment brought this far in advance of an election is improper because it may be pending during an electoral cycle, let alone that a validly returned and factually supported indictment should be dismissed on this basis." *Id.* The Letter further noted that "the Justice Manual requires that when investigative steps and charges involving a public official could be seen as affecting an election[,] the prosecuting office must consult with the Public Integrity Section, and, if directed to do so, the Office of the Deputy Attorney General or Attorney General," and that the USAO-SDNY "followed this requirement."

*Id.* (citing U.S. Dep't of Just., Just. Manual §§ 9-85.210 (2022) & 9-85.500 (2022)).    It also expressed the concern that "dismissing the case will amplify, rather than abate, concerns about weaponization of the Department," and it noted that the USAO-SDNY was "prepared to seek a superseding indictment from a new grand jury . . . that would add an obstruction conspiracy count based on evidence that Adams destroyed and instructed others to destroy evidence and provide false information to the FBI, and that would add further factual allegations regarding his participation in a fraudulent straw donor scheme." *Id.* at 5.

The Sassoon Letter further stated that Mayor Adams's "advocacy" to the DOJ regarding immigration enforcement "should be called out for what it is: an improper offer of immigration enforcement assistance in exchange for dismissal of his case." *Id.* at 3.    It asserted that, in the January 31 meeting, "Adams's attorneys repeatedly urged what amounted to a *quid pro quo*, indicating that Adams would be in a position to assist with the Department's enforcement priorities only if the indictment were dismissed." *Id.* at 3 n.1.    It further stated that it would be "a breathtaking and dangerous precedent to reward Adams's opportunistic and shifting commitments on immigration and other policy matters with dismissal of a criminal indictment." *Id.* at 3.

The Sassoon Letter also noted that "a member of [the USAO-SDNY] team who took notes during th[e] meeting" was "admonished" by Acting DAG Bove, who then "directed the collection of those notes at the meeting's conclusion." *Id.* at 3 n.1.    The Letter also noted that Sassoon was "baffled by the rushed and superficial process by which this decision was reached, in seeming collaboration with Adams's counsel and without [her] direct input on the ultimate stated rationales for dismissal." *Id.* at 8.    It ended with a statement that Sassoon was "prepared to offer [her] resignation" should the Attorney General be "unwilling to meet or to reconsider the directive" to dismiss the case. *Id.*

On February 13, 2025, Acting Deputy AG Bove sent an eight-page letter response to Sassoon. Letter from Emil Bove, Acting Deputy Att'y Gen. (Feb. 13, 2025) (the "Feb. 13 Bove Letter"), ECF No. 150-10. First, Acting DAG Bove accepted Sassoon's resignation and stated: "You lost sight of the oath that you took when you started at the Department of Justice by suggesting that you retain discretion to interpret the Constitution in a manner inconsistent with the policies of a democratically elected President and a Senate-confirmed Attorney General." *Id.* at 1. He then stated that DOJ would be placing two of the Assistant U.S. Attorneys ("AUSAs") "principally responsible for [the Adams] case" on "off-duty, administrative leave," and that "the prosecution of Mayor Adams [was being] transferred to the Justice Department, which w[ould] file a motion to dismiss the charges pursuant to Rule 48 of the Federal Rules of Criminal Procedure." *Id.* at 1-2. He then reiterated DOJ's reasons for its decision to dismiss the Adams case, and he added additional points not raised in the February 10 Decisional Memo. *Id.* at 3-5. For instance, he alluded to "many other concerns about [the Adams] case," noting that "[t]he case turns on factual and legal theories that are, at best, extremely aggressive." *Id.* at 7. The letter also raised a concern about "questionable behavior reflected in certain of the prosecution team's decisions," including how certain witnesses and Mayor Adams had been treated. *Id.* at 7-8.

On or around February 14, 2025, SDNY AUSA Hagan Scotten—a member of the prosecution team—sent an email to Acting DAG Bove tendering his resignation. In the email, AUSA Scotten stated that DOJ's first justification for seeking dismissal—regarding purported appearances of impropriety—was "so weak as to be transparently pretextual." Email from Hagan Scotten, Assistant U.S. Att'y, S.D.N.Y., to Emil Bove, Acting Deputy Att'y Gen. (Feb. 14, 2025), ECF No. 150-8. He then described the second justification—regarding immigration enforcement and national security—as being "worse" because "[n]o system of ordered liberty can allow the Government to use the carrot of dismissing charges, or the stick of threatening to bring them again,

to induce an elected official to support its policy objectives." *Id.* Later that day, the Government filed a motion requesting that the Court notice the withdrawal of AUSA Scotten, as well as the other AUSAs assigned to the case—Celia V. Cohen, Andrew Rohrbach, and Derek Wikstrom— as counsel for the United States. Gov't Withdrawal Request, ECF No. 123.

### d. Other Events

News articles attached to an *amicus* brief submitted by former federal judges report various related events concerning Mayor Adams and DOJ at around the same time.

On February 13, three days after the date of DOJ's Decisional Memo instructing USAO-SDNY to dismiss this case, Mayor Adams announced that he would be "implementing an executive order" that would allow federal immigration officials to operate at Rikers Island, a decision in apparent tension with a 2014 New York City law that "removed ICE from the jail complex." ECF No. 150-4 at 1-2.[11] That day, Mayor Adams met with the administration's "border czar"; the following day, the two made a joint television appearance, during which the latter stated, "I came to New York City and I wasn't going to leave with nothing," adding, "[i]f [Adams] doesn't come through, I'll be back in New York City . . . . I'll be in his office, up his butt saying, 'Where the hell is the agreement we came to?'" ECF No. 150-5 at 2, 4.[12] The Mayor later released a statement after his television appearance, stating, "I want to be crystal clear with New Yorkers: I

---

[11] Eric Levenson et al., NYC Mayor and Trump Border Czar Meet as Feds Turn Eyes Toward Sanctuary Cities Like New York, CNN (Feb. 14, 2025), https://www.cnn.com/2025/02/13/us/nyc-adams-border-czar-immigration/index.html [https://perma.cc/9HM6-XCXX].

[12] Rich Schapiro & Tom Winter, *Trump's Border Czar Tells NYC Mayor He'll Be "Up His Butt" If He Breaks Vow to Help ICE*, NBC (Feb. 14, 2025), https://www.nbcnews.com/politics/justice-department/trumps-border-czar-tells-eric-adams-butt-nyc-mayor-breaks-vow-help-ice-rcna192201 [https://perma.cc/W525-TASP].

never offered—nor did anyone offer on my behalf—any trade of my authority as your mayor for an end to my case. Never." ECF No. 150-6 at 2.[13]

Meanwhile at DOJ, on February 13, five attorneys—including the Deputy Assistant Attorney General who oversaw the Public Integrity Section, the acting head of the Public Integrity Section, and three other Public Integrity Section attorneys—resigned. ECF No. 150-2 at 5-6.[14] The next day, on February 14, Acting DAG Bove "told the [remaining DOJ] career public integrity prosecutors in a meeting . . . that they had an hour to decide among themselves who would file the motion." ECF No. 150-9 at 2.[15] Ultimately, an attorney in the Public Integrity Section agreed to file the motion. *Id.*

### 2. The Government's Rule 48(a) Motion to Dismiss

On the evening of February 14, 2025, the Government filed a Motion "seeking dismissal without prejudice of the charges in this case, with leave of the Court, pursuant to Rule 48(a) of the Federal Rules of Criminal Procedure." Rule 48(a) Motion ¶ 1. The Motion was signed by Acting DAG Bove, Antoinette T. Bacon (Supervisory Official in DOJ's Criminal Division), and Edward Sullivan (Senior Litigation Counsel in DOJ's Public Integrity Section), who "replaced AUSAs . . . as counsel of record in this case." *Id.* at 3 n.1.

---

[13] Cedar Attanasio, *Trump Border Czar and NYC Mayor Interview with "Fox & Friends" on Immigration Commitments*, AP (Feb. 14, 2025), https://apnews.com/article/adams-resignation-sassoon-letter-rikers 2fb5bf918b40fca294daed75e7676098 [https://perma.cc/99CV-Z8Y3].

[14] Kara Scannell et al., *"It Was Never Going to Be Me": How Trump's DOJ Sparked a Crisis and Mass Resignations Over the Eric Adams Case*, CNN (Feb. 15, 2025), https://www.cnn.com/2025/02/14/politics/eric-adams-justice-department-tick-tock/index.html [https://perma.cc/PK4Q-NB4M].

[15] Sarah N. Lynch, *US Prosecutor Agrees to Seek Dismissal of Adams Charges Under Pressure, Sources Say*, Reuters (Feb. 14, 2025), https://www.reuters.com/world/us/federal-prosecutor-will-sign-motion-dismiss-adams-charges-bid-save-colleagues-2025-02-14/ [https://perma.cc/9YLA-B842].

The Motion indicates that, "[t]hrough counsel," Mayor Adams "consented in writing to th[e] motion." *Id.* ¶ 2. The Motion further states that Acting DAG Bove "determined . . . that dismissal is necessary and appropriate . . . based on the unique facts and circumstances of this case." *Id.* ¶ 4. Specifically, the Motion provides two bases for seeking dismissal of the Indictment. *See id.* ¶¶ 5-6. First, the motion states that "dismissal is necessary because of appearances of impropriety and risks of interference with the 2025 [mayoral] election in New York City, which implicate Executive Order 14147."[16] *Id.* ¶ 5. Acting DAG Bove "reached that conclusion," the Motion explains, "based on, among other things, review of a website maintained by a former U.S. Attorney for the Southern District of New York"—*i.e.*, Damian Williams—and "an op-ed" published by the same. *Id.*

Second, the Motion states that Acting DAG Bove "concluded that continuing these proceedings would interfere with the defendant's ability to govern in New York City, which poses unacceptable threats to public safety, national security, and related federal immigration initiatives and policies," implicating Executive Orders 14159[17] and 14165.[18] *Id.* ¶ 6. Acting DAG Bove "reached that conclusion after learning, among other things, that as a result of these proceedings, Adams has been denied access to sensitive information that [Bove] believes is necessary for

---

[16]    Exec. Order No. 1417414147, 90 Fed. Reg. 8235 (Jan. 20, 2025), https://www.govinfo.gov/content/pkg/FR-2025-01-28/pdf/2025-01900.pdf [https://perma.cc/D2W4-A77V] (declaring it "the policy of the United States to identify and take appropriate action to correct past misconduct by the Federal Government related to the weaponization of law enforcement and the weaponization of the Intelligence Community").

[17]    Exec. Order No. 14159, 90 Fed. Reg. 8443 (Jan. 20, 2025), https://www.govinfo.gov/content/pkg/FR-2025-01-29/pdf/2025-02006.pdf [https://perma.cc/EG8A-TVQQ] (describing the current presidential administration's intention to "faithfully execute the immigration laws against all inadmissible and removable aliens, particularly those aliens who threaten the safety or security of the American people").

[18]    Exec. Order No. 14165, 90 Fed. Reg. 8467 (Jan. 20, 2025), https://www.govinfo.gov/content/pkg/FR-2025-01-30/pdf/2025-02015.pdf [https://perma.cc/DK27-W49Y] (outlining efforts to "secure the borders of our Nation").

Adams to govern and to help protect the City." *Id.* In conclusion, the Motion requests that "th[is] Court enter an order of *nolle prosequi* pursuant to Rule 48(a), without prejudice, with respect to all of the charges in [the] Indictment." *Id.* ¶ 7.

On the next business day, February 18, 2025, this Court issued an Order instructing the parties to appear for a conference on February 19, 2025. Order at 2, ECF No. 129. The Court informed the parties that they should be "prepared to address, *inter alia*, the reasons for the Government's motion, the scope and effect of Mayor Adams's 'consent[] in writing,' . . . and the procedure for resolution of the motion." *Id.* The Court further instructed Mayor Adams to "file his 'consent[] in writing' on the docket" by 5:00 pm that day. *Id.* Mayor Adams complied with the Court's request and filed his written consent, a two-sentence letter signed by his counsel, Mr. Spiro. *See* Letter from Alex Spiro, Counsel for Mayor Adams, to Emil Bove, Acting Deputy Att'y Gen. (Feb. 14, 2025), ECF No. 131-1.

At around the same time on February 18, Mayor Adams's counsel filed a letter on ECF, described above, responding to several motions for leave to file *amicus* briefs. *See* Def.'s Feb. 18, 2025 Letter, ECF No. 130. In the letter, Mayor Adams's counsel denied having engaged in a *quid pro quo* concerning immigration enforcement, stating, "we never said or suggested to anyone . . . that Mayor Adams would do X in exchange for Y, and no one said or suggested to us that they would do Y in exchange for X." *Id.* at 2. The Letter concluded by offering "sworn declarations" to "confirm these points." *Id.*[19]

---

[19] As noted, Mayor Adams's counsel also attached and filed a copy of the letter that they had sent to DOJ on February 3 as a follow-up to the January 31 meeting. *See* Letter from Alex Spiro & William A. Burck, Counsel for Mayor Adams, to Emil Bove, Acting Deputy Att'y Gen. (Feb. 3, 2025), ECF No. 130-1.

The Court held a conference on February 19, 2025.  Acting DAG Bove appeared for the Government;[20] Mr. Spiro and Mr. Burck appeared for Mayor Adams.  *See* Feb. 19 Conf. Tr. at 2:5-9.  During the conference, Mayor Adams swore under oath that nothing had been left out of the written, two-sentence consent to dismissal signed by his attorney, Mr. Spiro; that he had not entered into any other agreements, written or otherwise, with the Government; that nothing else had been promised to him to induce his consent to DOJ's Rule 48(a) Motion; and that no one had threatened him in any way to consent to it.  *Id.* at 20:17-21:8.  Mr. Spiro also reiterated his offer to swear under oath as to the absence of an "X in exchange for Y" arrangement.  *Id.* at 44:17-45:18.

With respect to the rationales for the Rule 48(a) Motion, DOJ confirmed that the Motion contains no statement about the strength of the case in terms of the facts or the legal theory, and that "[t]here are two" bases for the Motion, which were "laid out and . . . articulated at paragraphs five and six of the motion."  *Id.* at 22:18-23:2.  While Acting DAG Bove added that he "do[es] have other concerns" about the case, he expressly disclaimed reliance on them for purposes of the Rule 48(a) Motion, explaining that DOJ is "not asking the court to rely on any" reasons for dismissal beyond what is stated in the Rule 48(a) Motion itself.  *Id.* at 22:5-17.  As to whether there was any sort of agreement between DOJ and Mayor Adams with respect to immigration enforcement, Acting DAG Bove stated, "you have a record undisputed that there is no quid pro quo," but added, "I don't think it's correct, that even if there was a quid pro quo, there would be any issue with this motion."  *Id.* at 49:3-7.

---

[20] Despite appearing on the Rule 48(a) Motion and entering appearances on the docket, Ms. Bacon and Mr. Sullivan did not appear at the conference and have not signed subsequent filings in the case.

The Court noted the parties' alignment on DOJ's Rule 48(a) Motion and that, in such situations, it is "sometimes helpful" to have "adversarial testing" to "assist in the Court's decision making process." *Id.* at 48:3-12.  Acting DAG Bove acknowledged that "the Court has broad discretion about if, how, and when to invite amicus participation," but objected to a motion for leave to file an *amicus* brief by former U.S. Attorneys based on their counsel.  *Id.* at 50:4-15. Counsel for Mayor Adams registered the same objection. Neither party objected to an *amicus* motion filed by the organization Common Cause.  *Id.* at 49:18-20 (DOJ "has no objection" to Common Cause motion); 54:15-55:9 (Mayor Adams objecting to Former U.S. Attorneys motion and taking no position on Common Cause motion).

### 3.  Subsequent Orders and Mayor Adams's Second Motion to Dismiss

After the conference, on February 21, 2025, the Court issued an Order that directed next steps for resolution of the Rule 48(a) Motion.  "In light of the Government's motion and the representations of the parties during the conference," the Court adjourned *sine dine* Mayor Adams's trial and all other deadlines set forth in the previous Order setting a pretrial schedule. Feb. 21 Order at 1, ECF No. 136.  "[T]o assist with its decision-making via an adversarial process," the Court also "exercise[d] its inherent authority to appoint Paul Clement of Clement & Murphy PLLC as *amicus curiae* to present arguments on the Government's Motion to Dismiss."  *Id.* at 3.[21] Specifically, the Court ordered *amicus* and the parties to address:

1)  The legal standard for leave to dismiss an indictment under Rule 48(a);

2)  Whether, and to what extent, a court may consider materials other than the Rule 48(a) motion itself;

3)  Under what circumstances, if any, additional procedural steps and/or further inquiry would be appropriate before resolving a Rule 48(a) motion;

---

[21] The Court extends its gratitude to Mr. Clement for his service, and for his thorough, careful, and thoughtful analysis.  He has ably discharged his responsibilities.

4) Under what circumstances, if leave is granted, dismissal should be with or without prejudice;

5) If leave were denied under Rule 48(a), what practical consequences would follow . . . ; and

6) Any other issues the parties or *amicus* consider relevant to the Court's resolution of the Government's motion.

*Id.* at 3-4.  Given "concerns raised by the parties regarding the Mayor's responsibilities and the burden of continued court appearances," the Court informed Mayor Adams that, while he "has a right to appear at any future proceedings, he need not do so given the current procedural posture" of his case.  *Id.* at 4 (citing Rule 43(b)(3)).

Later that day, Mayor Adams filed a letter describing "recent out-of-court statements" by the Attorney General and DOJ Chief of Staff Chad Mizelle that Adams says "constitute admissions of a party opponent under the Federal Rules of Evidence."  Def.'s Feb. 21, 2025 Letter at 1, ECF No. 137 (citing Fed. R. Evid. 801(d)(2)).  According to the letter, the Attorney General "described the indictment in this case as 'incredibly weak,' and said that the charges against the Mayor were so weak she doubted prosecutors could secure a guilty verdict."  *Id.*  Mr. Mizelle likewise stated in a post on social media that "[t]he case against Mayor Adams was just one in a long history of past DOJ actions that represent grave errors of judgement" and that "[d]ismissing the prosecution was absolutely the right call."  *Id.*

On February 26, 2025, Mayor Adams filed a motion seeking an "order dismissing the indictment with prejudice."  ECF No. 140 at 1.  In support of his motion, Mayor Adams argues that the publication of the Sassoon Letter caused him "extreme prejudice" because, among other things, it "disclosed that Southern District prosecutors were seeking to reindict" him.  Def.'s Mem. Supp. Mot. to Dismiss for Prosecutorial Misconduct ("Adams's Second Mot. to Dismiss") at 1, 4-5, ECF No. 141.  Adams described publication of the Sassoon Letter as "constitut[ing] grave prosecutorial misconduct" warranting dismissal with prejudice.  *Id.* at 1, 8, 15.  In response, this

24

Court issued an Order on February 27, 2025 instructing DOJ to file any opposition to Mayor Adams's motion by March 7, 2025.  Order, ECF No. 144.  No such opposition was filed.

On March 7, 2025, DOJ, Mayor Adams, and Court-appointed *amicus* Mr. Clement submitted their respective briefs.  *See* ECF Nos. 159, 160, and 162.  DOJ also submitted a motion seeking to seal various exhibits appended to its brief.  *See* Letter Mot. to Seal, ECF No. 161.  DOJ represented that the exhibits, which consist of communications involving former members of the USAO-SDNY prosecution team, show "troubling conduct at the U.S. Attorney's Office for the Southern District of New York."  DOJ's Response in Further Supp. of Mot. to Dismiss Pursuant to Rule 48(a) ("DOJ Br.") at 1, ECF No. 160.[22]

On March 11, 2025, the Court issued an Order granting leave to file *amicus* briefs by various represented individuals and entities[23] and denying such motions submitted by *pro se* individuals.  *See* Order, ECF No. 166.  A Scheduling Order issued the same day adjourned oral argument as unnecessary.  *See* Scheduling Order, ECF No. 167.

On March 18, the Court issued an Order granting in part and denying in part DOJ's Motion to Seal and directing DOJ to file the exhibits to its brief on the public docket with only phone numbers and email addresses redacted.  *See* Order, ECF No. 174.  On March 25, DOJ did so.  *See* ECF No. 175.

---

[22] A letter filed on the docket by Common Cause indicates that, on the same day that Acting DAG Bove filed this brief, the New York Times reported that the remaining AUSAs on the case, Celia Cohen and Andrew Rohrbach, "were put on administrative leave by the Justice Department." ECF No. 164 at 2.

[23] These motions were filed by: Common Cause (ECF Nos. 124, 125, 127); Former United States Attorneys (ECF No. 128); the Separation of Powers Clinic at The Catholic University of America's Columbus School of Law (ECF No. 143); Lt. General Michael Flynn (ret.), *et al*. (ECF No. 147); Former Federal Court Jurists (ECF No. 150); and State Democracy Defenders Fund, *et al*. (ECF No. 152).  The parties did not object to these motions, with the exception of the motion filed by Former United States Attorneys.  Order at 1, ECF No. 166.  The Court appreciates the perspectives expressed by all *amici.*

## LEGAL STANDARD

"Few subjects are less adapted to judicial review than the exercise by the Executive of his discretion in deciding when and whether to institute criminal proceedings, or what precise charge shall be made, or whether to dismiss a proceeding once brought." *Newman v. United States*, 382 F.2d 479, 480 (D.C. Cir. 1967) (Burger, J.). "Subject to constitutional constraints, such as prohibitions against invidious discrimination or vindictive prosecution," the decision to bring a prosecution generally rests entirely within the executive's discretion. *United States v. Blaszczak*, 56 F.4th 230, 237 (2d Cir. 2022). But "once the [executive] has involved the judiciary by obtaining an indictment or a conviction, its discretion is tempered by the courts' independent obligations." *Id.* at 259 (Sullivan, J., dissenting).

By requiring "leave of court" for dismissals by the government, the Federal Rules of Criminal Procedure deliberately altered the common-law rule, under which a prosecutor could "enter a *nolle prosequi* in his discretion, without any action by the court." Fed. R. Crim. P. 48(a) advisory committee's note to 1944 adoption 1.[24] "Rule 48(a)'s requirement of judicial leave,

---

[24] The Advisory Committee tasked with drafting the Rules initially proposed a minor variation on the common-law rule, adding only that the government must state its reasons for dismissal. *See United States v. Ammidown*, 497 F.2d 615, 620 (D.C. Cir. 1973). But the Justices ultimately "substituted the requirement that dismissal be obtained only by leave of court." *Id.* The Court did not publicly explain its rationale for adding the "leave of court" requirement, *see Rinaldi v. United States*, 434 U.S. 22, 29 n.15 (1977), but internal memoranda offer some insight into its thinking. In a memorandum in response to the preliminary draft of the Rules, the Justices noted that the draft rule "apparently gives the Attorney General or the United States Attorney unqualified authority to *nolle pros* a case without consent of the court," and asked: "Is this now the law, and in any event should it be the law, any more than that the Government can confess error in a criminal case without the consent of the court?" *Memorandum from the Sup. Ct. to the Advisory Comm. on the Fed. Rules of Crim. Proc.* 7 (June 10, 1942) (citing *Young v. United States*, 315 U.S. 257 (1942)), *in* 1 *Drafting History of the Federal Rules of Criminal Procedure* at 13, 19 (Madeleine J. Wilken & Nicholas Triffin eds., 1991). A later memorandum, in response to the second preliminary draft, noted that "[t]wo members of the Court think that the United States Attorney should not be permitted to dismiss an indictment without the consent of the court." *Memorandum with Suggestions with Reference to the Proposed Rules of Criminal Procedure* 5 (Apr. 11, 1944), *in* 7 *Drafting History of the Federal Rules of Criminal Procedure*, *supra*, at 5, 9.

theretofore known in state practice, gives the court a role in dismissals following indictment." *United States v. Ammidown*, 497 F.2d 615, 620 (D.C. Cir. 1973). As explained below, the Rule has both procedural and substantive dimensions, both of which inform a court's decision to grant or deny dismissal and, if dismissal is granted, whether it should be with or without prejudice.

## A.    Background on Rule 48(a)

The Supreme Court has addressed the contours of Rule 48(a) on only one occasion: in a summary disposition in *Rinaldi v. United States*, 434 U.S. 22 (1977).[25] There, in a footnote, the Court explained that the words "leave of court" "obviously vest some discretion in the court," but noted that the precise scope of that discretion had "not been delineated." *Id.* at 29 n.15. The Court observed that "[t]he principal object of the 'leave of court' requirement is apparently to protect a defendant against prosecutorial harassment, *e.g.*, charging, dismissing, and recharging, when the Government moves to dismiss an indictment over the defendant's objection." *Id.* (first citing *United States v. Cox*, 342 F.2d 167, 171 (5th Cir. 1965), and then citing *Woodring v. United States*, 311 F.2d 417, 424 (8th Cir. 1963)). But the Court also noted that some lower courts had held Rule 48(a) "to permit the court to deny a Government dismissal motion to which the defendant has consented if the motion is prompted by considerations clearly contrary to the public interest." *Id.* (first citing *United States v. Cowan*, 524 F.2d 504, 512 (5th Cir. 1975); and then citing *Ammidown*,

---

[25] In *Rinaldi*, the government moved to dismiss the petitioner's indictment after conviction, arguing that the prosecution had been initiated in violation of the longstanding federal policy against duplicative state and federal prosecutions. 434 U.S. at 24-25 (citing *Petite v. United States*, 361 U.S. 529 (1960), after which the government maintained its policy against duplicative prosecutions). The district court denied the motion to dismiss, and the court of appeals affirmed, reasoning that the prosecutor's misrepresentations regarding his authorization to pursue the case were incompatible with the public interest. *Id.* at 25-27, 30. The Supreme Court disagreed and reversed, explaining that "[t]he salient issue . . . is not whether the decision to maintain the federal prosecution was made in bad faith but rather whether the Government's later efforts to terminate the prosecution were similarly tainted with impropriety." *Id.* at 30.

497 F.2d at 620).  The Court ultimately found it "unnecessary to decide whether the court has

discretion under these circumstances," as it would not have affected the outcome in the case.  *Id.*[26]

     Lower courts before and after *Rinaldi* have taken care to acknowledge the narrow scope of

their discretion under Rule 48(a), stressing that a court is "not free to substitute its judgment for

that of the prosecutor," *United States v. Poindexter*, 719 F. Supp. 6, 10 (D.D.C. 1989), who is

entitled to a "presumption that he is acting in good faith and in the proper discharge of his duties,"

*United States v. Greater Blouse, Skirt & Neckwear Contractors Ass'n*, 228 F. Supp. 483, 486

(S.D.N.Y. 1964).  But that presumption "is not conclusive upon the Court; otherwise there would

be no purpose to Rule 48(a)."  *Id.*  Courts—including the Second Circuit—have therefore agreed

that Rule 48(a) requires more of a court than to "serve merely as a rubber stamp for the prosecutor's

decision."  *Ammidown*, 497 F.2d at 622; *see also United States v. HSBC Bank USA, N.A.*, 863 F.3d

125, 141 (2d Cir. 2017) (quoting *Ammidown*, 497 F.2d at 622).  Rule 48(a) asks courts to strike a

delicate balance—deferring to executive discretion where appropriate but protecting against

executive overreach in limited circumstances.  As the Fifth Circuit explained in its influential

decision in *Cowan*, later quoted by the Fourth and Second Circuits:

> Rule [48(a)] was not promulgated to shift absolute power from the Executive to the
> Judicial Branch. Rather, it was intended as a power to check power. The Executive
> remains the absolute judge of whether a prosecution should be initiated and the first
> and presumptively the best judge of whether a pending prosecution should be
> terminated. The exercise of its discretion with respect to the termination of pending
> prosecutions should not be judicially disturbed unless clearly contrary to manifest
> public interest. In this way, the essential function of each branch is synchronized to
> achieve a balance that serves both practical and constitutional values.

*Blaszczak*, 56 F.4th at 240 (quoting *United States v. Smith*, 55 F.3d 157, 158-59 (4th Cir. 1995) (in

turn quoting *Cowan*, 524 F.2d at 513)).  Rule 48(a) thus contemplates a division of labor consistent

---

[26] In dissent, Justice Rehnquist, joined by Justice White, expressed his view that the "leave of court" proviso "would seem clearly directed toward an independent judicial assessment of the public interest in dismissing the indictment."  *Id.* at 34 (Rehnquist, J., dissenting).

with the constitutional design, which "enjoins upon its branches separateness but interdependence, autonomy but reciprocity," *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 635 (1952) (Jackson, J., concurring).

## B.    Rule 48(a)'s Requirements

"Because the Second Circuit has had no opportunity to analyze the scope and discretion afforded by Rule 48(a), courts in this district have relied heavily on the holdings of other Circuits." *United States v. Doody*, No. 01 Crim. 1059, 2002 WL 562644, at *2 (S.D.N.Y. Apr. 16, 2002). The D.C. Circuit in *Ammidown*, synthesizing much of the early caselaw on Rule 48(a), explained that the Rule contains both procedural and substantive components. As a matter of procedure, "the court will not be content with a mere conclusory statement by the prosecutor that dismissal is in the public interest, but will require a statement of reasons and underlying factual basis." 497 F.2d at 620. And as a matter of substance, "the court does not have primary responsibility, but rather the role of guarding against abuse of prosecutorial discretion." *Id.*

Ultimately, a court's inquiry is narrow. Only "[r]arely will the judiciary overrule the Executive Branch's exercise" of its discretion "to eschew or discontinue prosecutions." *Blaszczak*, 56 F.4th at 238. But critically, courts have noted that whether a defendant consents to dismissal is not dispositive. *See, e.g.*, *United States v. Hamm*, 659 F.2d 624, 629 (5th Cir. 1981) (holding that a court may deny dismissal "even when the defendant consents to the motion to dismiss").[27]

### 1.    Procedural Requirements

Rule 48(a) requires that the government set forth the basis for its motion to dismiss. As Judge Weinfeld explained,

---

[27] *But see In re United States*, 345 F.3d 450, 453 (7th Cir. 2003) ("[I]t is hard to see . . . how [a court] could properly refuse to dismiss a prosecution merely because [it] was convinced that the prosecutor was acting in bad faith or contrary to the public interest.").

> the Rule contemplates public exposure of the reasons for the abandonment of an indictment, information or complaint in order to prevent abuse of the uncontrolled power of dismissal previously enjoyed by prosecutors. Accordingly, to gain the Court's favorable discretion, it should be satisfied that the reasons advanced for the proposed dismissal are substantial and the real grounds upon which the application is based.

*Greater Blouse*, 228 F. Supp. at 486; *see also United States v. Rosenberg*, 108 F. Supp. 2d 191, 204-05 (S.D.N.Y. 2000) (same). Numerous courts of appeals have adopted similar reasoning. *See In re Richards*, 213 F.3d 773, 788 (3d Cir. 2000) (acknowledging that "a judge's discretion under Rule 48(a) is severely cabined," but describing "Rule 48(a) as a 'sunshine' provision that exposes the reasons for prosecutorial decisions"); *United States v. Salinas*, 693 F.2d 348, 352 (5th Cir. 1982) ("Although the burden of proof is not on the prosecutor to prove that dismissal is in the public interest, the prosecutor is under an obligation to supply sufficient reasons—reasons that constitute more than a mere conclusory interest [supporting dismissal]."); *United States v. Derr*, 726 F.2d 617, 619 (10th Cir. 1984) ("[T]o honor the purpose of the rule, the trial court at the very least must know the prosecutor's reasons for seeking to dismiss the indictment and the facts underlying the prosecutor's decision."); *Ammidown*, 497 F.2d at 620 ("Rule 48(a)'s requirement of judicial leave . . . contemplates exposure of the reasons for dismissal.").

The reason for requiring the government to state its actual reasons for seeking dismissal is simple: "Since the court must exercise sound judicial discretion in considering a request for dismissal, it must have sufficient factual information supporting the recommendation." 3B Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 802 (4th ed. June 2024 update). Put another way, a district court abuses its discretion if it does not articulate its reasons for granting or denying leave, and it cannot discharge its duties properly unless the underlying motion accurately states the government's reasons for dismissal. *See Derr*, 726 F.2d at 619 ("If the record contains no reasons or facts explaining the trial court's decision, the trial court's decision

30

is effectively unreviewable."). Thus, although the court must presume good faith on the part of the prosecutor, it need not accept an "an unsupported conclusory reason" for seeking dismissal. *Salinas*, 693 F.2d at 352. Courts may deny Rule 48(a) motions on that basis, or if the proffered reason is not the real reason for dismissal. *See, e.g.*, *United States v. Olmos-Gonzales*, 993 F. Supp. 2d 1234, 1236 (S.D. Cal. 2014) (denying Rule 48(a) motion without prejudice to refiling where government had provided only conclusory reasons for dismissal); *Rosenberg*, 108 F. Supp. 2d at 208 (inquiring into whether proffered reasons for dismissal were the real reasons).

Consistent with the procedural requirements of Rule 48(a), courts have looked beyond the four corners of the motion to consider the entire record before the court—occasionally even conducting hearings—to determine if dismissal is warranted. *See, e.g.*, *Rinaldi*, 434 U.S. at 30 (finding no bad faith on the part of the government after conducting an "examination of the record"[28]); *see also id.* at 23 (concluding that summary disposition was appropriate based on

---

[28] The proceedings below in *Rinaldi* included various hearings at which the district court questioned the government on its reasons for bringing the prosecution and later requesting dismissal. *See, e.g.*, 434 U.S. at 24 (noting that "the District Court questioned Government counsel regarding the need for another trial in view of petitioner's state convictions" and "Government counsel responded that he had been instructed by his superiors at the Department of Justice to pursue the federal prosecution vigorously because of their concern that the state convictions might be reversed on appeal"). As the district court described the record:

> At the hearing on the motion to dismiss the indictments, the government reported that the policy statement is not contained in either the United States Code or in the Federal Register, but rather is found in the United States Attorney's Manual. The Manual is only available to government attorneys, and the court and defense counsel do not have access to its contents. The government also stated at the hearing that at no time during the first trial, which ended in a mistrial, or during the second trial, which resulted in the conviction of these defendants, was the policy, or its violation, ever brought to the court's attention. In fact, the court specifically inquired of the special trial attorney sent to Miami from Washington by the Department of Justice to try this case, why the government was insisting on a federal trial of these defendants. Government's trial counsel advised the court that the Department of Justice was adamant in their decision that the federal trial proceed because there was grave concern that the state convictions would be reversed on appeal. The Department of Justice trial attorney, at a special conference

"independent evaluation of the unusual circumstances disclosed by this record"); *HSBC*, 863 F.3d at 141 (noting that a monitor's report could "indeed be relevant in determining whether to grant an eventual Rule 48(a) motion," for example if there were "circumstances that suggest that the motion is being made in bad faith, thereby raising a question as to whether dismiss[al] . . . would be 'clearly contrary to manifest public interest'" (quoting *United States v. Pimentel*, 932 F.2d 1029, 1033 n.5 (2d Cir. 1991))); *Salinas*, 693 F.2d at 352 ("We turn to the record for evidence of the prosecutor's motivation."); *In re Richards*, 213 F.3d at 787-88 (holding that territorial court considering Rule 48(a) motion "had discretion to hold a hearing on the parties' claims, especially in light of the checkered course of the case up to that point").

### 2.    Substantive Requirements

With respect to Rule 48(a)'s substantive requirements, courts have cited the protection of a defendant's rights, a prosecutor's bad faith, and the public interest as relevant concerns. Courts have "agreed that the primary purpose of the rule is protection of a defendant's rights." *Salinas*, 693 F.2d at 351.[29] The Second Circuit, for example, has twice quoted *Rinaldi*'s language that the

---

called for the purpose of discussing the offer of at least one defendant to plead guilty, stated that the Department's position was that it could not agree to any plea involving concurrent confinement, and he had been instructed to proceed with the trial. Under those circumstances, it is clear the Department of Justice was completely aware of the proceedings in the Southern District of Florida.

*United States v. Washington*, 390 F. Supp. 842, 843 (S.D. Fla. 1975), *aff'd sub nom. In re Washington*, 531 F.2d 1297 (5th Cir. 1976), *aff'd on reh'g*, 544 F.2d 203 (5th Cir. 1976), *cert. granted, judgment vacated sub nom. Rinaldi*, 434 U.S. 22 (1977).

[29] Some have disputed that protection against harassment was the principal purpose of the "leave of court" requirement. *See* Thomas Ward Frampton, *Why Do Rule 48(a) Dismissals Require "Leave of Court"?*, 73 Stan. L. Rev. Online 28, 29 (2020) ("In fact, the 'principal object' of Rule 48(a)'s 'leave of court' requirement was not to protect the interests of individual defendants, but rather to guard against dubious dismissals of criminal cases that would benefit powerful and well-connected defendants." (footnote omitted)). The precise origin of the now-prevalent idea that the principal purpose is "to protect a defendant against prosecutorial harassment" is unclear: The footnote in *Rinaldi* cited two courts of appeals opinions that had

"principal object" of the Rule is "apparently to protect a defendant against prosecutorial harassment." *See HSBC*, 863 F.3d at 141; *Blaszczak*, 56 F.4th at 238.

But lower courts have disagreed about the extent to which considerations of "bad faith" or the "public interest" can also inform the decision whether to grant leave under Rule 48(a). Courts addressing these factors generally fall into two camps:

- The Fourth, Fifth, and the Eighth Circuits have treated prosecutorial bad faith and the public interest as two sides of the same coin. *See, e.g.*, *Smith*, 55 F.3d at 159 (stating that "[a] motion that is not motivated by bad faith is not clearly contrary to manifest public interest, and it must be granted," and that "[t]he disservice to the public interest must be found, if at all, in the motive of the prosecutor"); *United States v. Bernard*, 42 F.4th 905, 909 (8th Cir. 2022) ("For a dismissal to be 'clearly contrary to manifest public interest,' the prosecutor must have had an illegitimate motive rising to the level of bad faith."); *Hamm*, 659 F.2d at 629-631 (explaining that "the trial judge must look to the motivation of the prosecutor at the time of the decision to dismiss" and that "[a]s long as it is not apparent that the prosecutor was motivated by considerations clearly contrary to the public interest, his motion must be granted").

- The Tenth Circuit and some district courts, including in this District, have spoken of the public interest in terms that go beyond the motive of the prosecutor. *See, e.g.*, *United States v. Carrigan*, 778 F.2d 1454, 1463 (10th Cir. 1985) ("Rule 48(a) . . . permits courts faced with dismissal motions to consider the public interest in the fair administration of criminal justice and the need to preserve the integrity of the courts."); *Rosenberg*, 108 F. Supp. 2d at 206 (considering "the motivations of the prosecutor, the effects of dismissal, including whether the dismissal is with or without prejudice, on the defendant, and the public interest, more generally, when evaluating the nolle"); *United States v. Flynn*, 507 F. Supp. 3d 116, 129-30 (D.D.C. 2020) (holding that, "consistent with our system of checks and balances, courts are tasked with making their own determination on whether dismissal would be in the 'public interest'" (quoting *Rinaldi*, 434 U.S. at 29 n.15)).

---

reached that conclusion via minimal analysis. *See* 434 U.S. at 29 n.15. *Rinaldi*'s first citation, *United States v. Cox*, declared that "[t]he purpose of the Rule is to prevent harassment of a defendant by charging, dismissing and re-charging without placing a defendant in jeopardy," citing only *Woodring v. United States*—the other case cited by *Rinaldi*—as authority for that proposition. 342 F.2d at 171. *Woodring*, in turn, made that same pronouncement without citing to any authority. *See* 311 F.2d at 424. By contrast, *United States v. Cowan* conducted a far more in-depth analysis of Rule 48(a)'s drafting, concluding that "the history of the Rule belies the notion that its only scope and purpose is the protection of the defendant." 524 F.2d at 512, 515 (reversing district court's decision to deny motion to dismiss).

While DOJ argues that the Second Circuit is in the first camp (*i.e.*, that the public interest and good faith prongs are identical), *see* DOJ Br. at 5-6, the Circuit has not definitively ruled out either of the above approaches.  In *Pimentel*, the Second Circuit "suggested (in dictum) that any authority a court might have to deny a Rule 48(a) motion would be limited to cases in which dismissal is 'clearly contrary to manifest public interest.'"  *HSBC*, 863 F.3d at 141 (quoting *Pimentel*, 932 F.2d at 1033 n.5).  In a subsequent case, *HSBC*, the Circuit noted that *other* courts had "'equat[ed] a dismissal that is clearly contrary to the public interest with one in which the prosecutor appears motivated by bribery, animus towards the victim, or a desire to attend a social event rather than trial'—in other words, bad faith."  *Id.* (quoting *In re Richards*, 213 F.3d at 787-88); s*ee also Blaszczak*, 56 F.4th at 240-41 (quoting *Smith*, 55 F.3d at 159, for the proposition that "[t]he disservice to the public interest must be found, if at all, in the motive of the prosecutor").  But *HSBC* made clear that it ultimately declined to define "the precise contours of a district court's authority in resolving a Rule 48(a) motion."  863 F.3d at 141; *see also Blaszczak*, 56 F.4th at 258 (Sullivan, J., dissenting) (describing the majority's lengthy discussion of prosecutorial discretion (including, presumably, its discussion of Rule 48(a)) as "dicta")

For his part, Mayor Adams argues that courts are not authorized to consider the public interest in adjudicating a Rule 48(a) motion because "[n]othing in the language of the rule states that a district court is empowered to undertake a general inquiry into the public interest."  Mayor Adams's Mem. Supp. Gov't Mot. Dismiss ("Adams Br.") at 10, ECF No. 162.  That argument goes too far.  The text of the Rule does not specify *any* factors to guide the Court's decision whether to grant or deny leave—even the rights of the defendant, which all agree is a relevant consideration under Rule 48(a).  In any event, Mayor Adams's argument finds no support in caselaw, and it runs counter to judicial interpretations of the Rule, including the Supreme Court's decision in *Rinaldi*,

referencing the public interest as a factor that courts have considered in ruling on Rule 48(a) motions. 434 U.S. at 29 n.15.

Whatever the precise relevance of the "public interest" to a court's inquiry under Rule 48(a), there is broad agreement that any judicial authority here is exceedingly narrow, and the requirement of leave of court is not a license for free-wheeling oversight of prosecutorial discretion. Few courts have denied a Rule 48(a) motion based on the court's independent assessment of the public interest—indeed, there appears to be only one decision in this District doing so. *See United States v. N.V. Nederlandsche Combinatie Voor Chemische Industrie*, 75 F.R.D. 473, 474-75 (S.D.N.Y. 1977) (denying Rule 48(a) motion on basis that "to allow the government unilaterally to terminate a nine-year[-]old indictment of the greatest public significance would be 'clearly contrary to manifest public interest'" (quoting *Cowan*, 524 F.2d at 513)); *see also United States v. Freedberg*, 724 F. Supp. 851, 854 (D. Utah 1989) (declining to grant leave under Rule 48(a) where "dismissal of the charges against the individual defendant would be contrary to the manifest public interest").

Ultimately, the Court does not in this Opinion attempt to define the boundaries of permissible inquiry into the public interest, which, as explained below, is unnecessary to the Court's decision given the unique facts of this case.

### D.    Remedies for a Substantively Deficient Motion under Rule 48

We now come to the question of what remedies a court has at its disposal if the government's motion to dismiss is found wanting. Where a substantively deficient Rule 48(a) motion is brought by an individual prosecutor, a court's denial of the motion could presumably cause the government to make a new determination as to whether the prosecution should continue. For example, if a line prosecutor were "motivated by bribery, animus towards the victim, or a desire to attend a social event rather than trial," *HSBC*, 863 F.3d at 141 (quoting *In re Richards*,

213 F.3d at 787-88), judicial exposure of such substantively invalid reasons might prompt reassignment of the matter to another attorney or division.  *See In re United States*, 345 F.3d 450, 454 (7th Cir. 2003).  After a reassessment of the case, the prosecution might then continue; or, if a fresh look reveals legitimate reasons for dismissal, it might not.  But in denying the motion, the court would play a fundamentally judicial role, reviewing "the reasons advanced for the proposed dismissal" and determining whether they are "substantial."  *Greater Blouse*, 228 F. Supp. at 486-87.  The executive, in turn, would decide, based on the record exposed by the court, whether to continue the prosecution.  Such a division of responsibilities respects the role of each branch in our constitutional system.

But it is a different story when the executive branch has decided, at the highest levels of DOJ, to abandon a prosecution.  Although courts have discretion to deny dismissal altogether, they are "nevertheless constitutionally powerless to compel the government to proceed."  *Cowan*, 524 F.2d at 511.  "If a Rule 48(a) motion is denied, the government can refuse to bring the case to trial within the time limits of the Speedy Trial Act, in which case the court has no choice except to dismiss."  3B Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 802 n.5 (4th ed. June 2024 update) (citing *United States v. N.V. Nederlandsche Combinatie Voor Chemische Industrie*, 453 F. Supp. 462, 462-63 (S.D.N.Y. 1978)).  As Judge Weinfeld explained:

> Should the motion be denied, what next? The Attorney General is the head of the Department of Justice, a part of the Executive branch of the Government. Even were leave of Court to the dismissal of the indictment denied, the Attorney General would still have the right to adhere to the Department's view that the indictment cannot be supported by proof upon a trial of the merits, and accordingly, in the exercise of his discretion, decline to move the case for trial. The Court in that circumstance would be without power to issue a mandamus or other order to compel prosecution of the indictment, since such a direction would invade the traditional separation of powers doctrine. And if the indictment continues to remain in status quo, each defendant would be in a position to move for dismissal of the indictment under Rule 48(b).

36

*Greater Blouse*, 228 F. Supp. at 489-90.  Where an unequivocal decision to dismiss has been made at the highest institutional levels, "a judge could not possibly win a confrontation with the executive branch over its refusal to prosecute."  *In re United States*, 345 F.3d at 454.

That precise scenario played out in *Nederlandsche*, the one case in this District in which a court denied a Rule 48(a) motion on public interest grounds.  There, the government—after denial of its motion to dismiss—simply chose not to further prosecute the defendant.  *Nederlandsche*, 453 F. Supp. at 462-63.  Around one year later, the defendant moved to dismiss the indictment on, essentially, speedy trial grounds.  *Id.* at 462.  The court reluctantly granted the defendant's motion to dismiss, stating that it did so "despite its continuing conviction that the interests of justice ha[d] been here ill-served."  *Id.* at 463.

The possibility of such an impasse is a product of design.  In our system of separation of powers, the role of the judiciary is to "say what the law is," *Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 178 (1803), not to "take Care that the Laws be faithfully executed," U.S. Const. art. II, § 3.  More specifically, courts are "particularly ill-suited" to weigh the factors typically relevant in determining whether to pursue prosecution, such as "as the strength of the case, the prosecution's general deterrence value, the Government's enforcement priorities, and the case's relationship to the Government's overall enforcement plan."  *Wayte*, 470 U.S. at 607.  The judicial role is to preside over a case; it is not to decide whether the case "should" continue.  This is not simply a matter of comparative institutional competence.  It also reflects "[t]he structural principles secured by the separation of powers," which "protect the individual as well."  *Bond v. United States*, 564 U.S. 211, 222 (2011).

This is why, "[e]ven if a federal judge could properly deny . . . a motion to dismiss a criminal charge, it would not follow that he could appoint a prosecutor."  *In re United States*, 345 F.3d at 454.  Although various *amici* argue that a court can appoint a special prosecutor upon

denial of a Rule 48(a) motion, *see* Br. of *Amici* Former United States Att'ys at 14, ECF No. 128-1; Former Federal Jurists Br. at 12-13, they generally rely on authority in the contempt-of-court context, which presents markedly different considerations. The Supreme Court has explained that "courts possess *inherent authority* to initiate contempt proceedings for disobedience to their orders, authority which necessarily encompasses the ability to appoint a private attorney to prosecute the contempt." *Young v. United States ex rel. Vuitton et Fils S.A.*, 481 U.S. 787, 793 (1987) (emphasis added).[30]  *Amici* cite no authority for, or examples of, a district court appointing a private prosecutor in a criminal case outside the contempt context.[31]

Thus, while a court could, in theory, deny a Rule 48(a) motion even when made at the direction of DOJ leadership, such a denial would almost certainly be an exercise in futility. The court cannot appoint its own prosecutor; absent a sudden change of heart at DOJ, such a denial would produce only a staring contest, followed by an inevitable dismissal on speedy trial grounds after seventy days. *See* 18 U.S.C. § 3161(c)(1) ("In any case in which a plea of not guilty is entered, the trial of a defendant charged in an information or indictment with the commission of an offense shall commence within seventy days.").

---

[30] *Accord United States v. Donziger*, 38 F.4th 290, 304 (2d Cir. 2022) (upholding appointment of a special prosecutor in contempt proceeding); Fed. R. Crim. P. 42(a)(2) ("The court must request that the contempt be prosecuted by an attorney for the government, unless the interest of justice requires the appointment of another attorney. If the government declines the request, the court must appoint another attorney to prosecute the contempt.").

[31] In *Morrison v. Olson*, the Supreme Court held that it was not "impermissible for Congress to vest the power to appoint independent counsel in a specially created federal court" through the short-lived Independent Counsel Act, and specifically rejected the contention that "there is an inherent incongruity about a court having the power to appoint prosecutorial officers." 487 U.S. 654, 676 (1988); *see also* Former Federal Jurists Br. at 12.  But it does not follow that a court has *inherent* power to appoint a special prosecutor in a criminal case absent such a congressional grant of authority.

### F.    Dismissal With or Without Prejudice

Notwithstanding the significant limitations on a court's authority to deny a Rule 48(a) motion to dismiss altogether, a court retains discretion to determine whether a dismissal should be with or without prejudice.  Typically, a dismissal under Rule 48(a) "is without prejudice to the government's right to reindict for the same offense, unless the contrary is expressly stated." *United States v. Ortega-Alvarez*, 506 F.2d 455, 458 (2d Cir. 1974).  But if appropriate in light of the purposes of Rule 48(a), a court can grant the motion on the condition that dismissal be *with prejudice*—ensuring that the charges, once dropped, cannot be resurrected.  The First, Seventh, and Tenth Circuits have either affirmed such dismissals or otherwise endorsed the practice.  *See In re United States*, 345 F.3d at 453 (observing that in a case of prosecutorial harassment under Rule 48(a), "the judge might rightly condition dismissal on its being with prejudice"); *United States v. Raineri*, 42 F.3d 36, 43 (1st Cir. 1994) (given concerns that a future reindictment would constitute harassment, considering "itself order[ing] that the dismissal be modified to reflect that it is a dismissal with prejudice," and citing another court's explanation "that a court may dismiss under Rule 48(a) with prejudice if retrial would be fundamentally unfair"); *Derr*, 726 F.2d at 619 (affirming district court's decision to dismiss a successive indictment following earlier dismissal without prejudice under Rule 48(a), "in effect altering the first dismissal to one with prejudice").[32] Numerous district courts have dismissed prosecutions with prejudice, even when the government seeks dismissal without it, to protect defendants from the unwarranted or inappropriate threat of re-indictment.[33]  *See* Adams Br. at 12 (arguing that "the most natural understanding of the function

___

[32] The Eleventh Circuit has disapproved this practice.  *See United States v. B.G.G.*, 53 F.4th 1353, 1367-69 (11th Cir. 2022).

[33] *See, e.g.*, *United States v. Erickson*, No. 19 Crim. 53-3, 2024 WL 81290, at *5, 10 (D.V.I. Jan. 8, 2024); *United States v. Madzarac*, 678 F. Supp. 3d 42, 44 (D.D.C. 2023); *United States v. Pitts*, 331 F.R.D. 199, 202, 206 (D.D.C. 2019); *United States v. Borges*, 153 F. Supp. 3d 216, 218-

of the leave-of-court requirement in Rule 48(a) is to enable a court to inquire into whether the dismissal should be with prejudice").

The Second Circuit has thus far declined to "rule out discretionary dismissals with prejudice" in similar contexts. *Hilbert v. Dooling*, 476 F.2d 355, 361 (2d Cir. 1973); *see also id.* at 363 (Friendly, C.J., dissenting) (stressing "the district judge's discretion" under Rule 48(b) "to dismiss either with or without prejudice as he deemed appropriate"). But the "Circuit has not specifically addressed" under what circumstances, if any, a court may dismiss an indictment with prejudice notwithstanding the government's request that dismissal be without prejudice. *United States v. Hernandez-Hernandez*, No. 18 Crim. 30, 2018 WL 4765129, at *2 (W.D.N.Y. Sept. 13, 2018), *report and recommendation adopted*, 2018 WL 4762255 (W.D.N.Y. Oct. 2, 2018).

In exercising their discretion to dismiss with prejudice under Rule 48(a), courts have generally looked to the same principles that motivate the "leave of court" requirement. In district courts for the District of Columbia, where Rule 48(a) is "routinely applied . . . to consider dismissal with prejudice," courts "take into account (1) the purpose of the government's dismissal, (2) the presence or absence of good faith, and (3) the objective effect that dismissal without prejudice would have on the defendant." *United States v. Madzarac*, 678 F. Supp. 3d 42, 48 (D.D.C. 2023). Courts in this District have had less occasion to consider the question, but they have tended to look to whether there is a risk of prosecutorial harassment from re-charging of the offense(s) or whether there is evidence of bad faith on the part of the prosecution. *See, e.g.*, *Doody*, 2002 WL 562644, at *2 (explaining that "[c]ourts dismiss cases under Rule 48(a) with prejudice or deny such motions

---

19 (D.D.C. 2015); *Poindexter*, 719 F. Supp. at 10-12; *United States v. Angilau*, No. 08 Crim. 431, 2012 WL 346446, at *14 (D. Utah Feb. 1, 2012), *aff'd in part, appeal dismissed in part*, 717 F.3d 781 (10th Cir. 2013); *United States v. Wecht*, No. 06 Crim. 26, 2008 WL 65605, at *5-6 (W.D. Pa. Jan. 4, 2008); *Government of Virgin Islands ex rel. Robinson v. Schneider*, 893 F. Supp. 490, 498 (D.V.I. 1995); *United States v. Rossoff*, 806 F. Supp. 200, 202-03 (C.D. Ill. 1992); *United States v. Fields*, 475 F. Supp. 903, 904, 908 (D.D.C. 1979).

only where the prosecutor acted in 'bad faith,' or where dismissal followed by recharge would amount to 'prosecutorial harassment'"); *see also* Adams Br. at 12 ("[I]t is reasonable to construe the leave-of-court requirement to enable the Court to inquire into . . . whether the dismissal should be with prejudice to prevent the sort of 'prosecutorial harassment' that the Supreme Court identified in *Rinaldi*.").

Thus, while bad faith is a relevant consideration, most courts do not require a finding of bad faith to grant dismissal with prejudice. *See, e.g.*, *Rosenberg*, 108 F. Supp. 2d at 206 (reviewing Rule 48(a) caselaw and concluding that "a finding of bad faith is not required, the defendant's objection to dismissal notwithstanding, but is a relevant, and sometimes determinative, factor in a court's evaluation of a motion to dismiss an indictment"); *Poindexter*, 719 F. Supp. at 11 (dismissing with prejudice and clarifying that "the subjective good faith of" the prosecutor was "not at issue"; rather, "the question is the effect on the defendant of a dismissal of charges followed by their reinstitution at a later date"); *cf. United States v. Goodson*, 204 F.3d 508, 516 (4th Cir. 2000) (holding that, on Rule 48(a) motion seeking dismissal without prejudice, a court can dismiss with prejudice on a finding of "demonstrable prejudice or [the] threat of prejudice" to the defendant, but reversing because the district court made no such finding).[34]

Converting a dismissal without prejudice to one with prejudice does not raise the same separation-of-powers concerns as outright denial of a Rule 48(a) motion. Where a court grants the government's motion to dismiss a case, it respects the executive branch's primacy in matters of prosecutorial discretion. The determination of whether a dismissal should be with or without

---

[34] The Court is aware of decisions in the Ninth Circuit and the Western District of New York suggesting that a request for dismissal without prejudice under Rule 48(a) should only be converted to a dismissal with prejudice on a showing of bad faith. *See United States v. Hayden*, 860 F.2d 1483, 1488 (9th Cir. 1988); *United States v. Mujahid*, 491 Fed. App'x 859, 860 (9th Cir. 2012); *United States v. Nix*, No. 15 Crim. 6126, 2017 WL 4641257, at *4 (W.D.N.Y. Oct. 13, 2017).

prejudice does not entail the kind of incursion on the executive branch that an order to pursue an unwanted prosecution would. *See* Adams Br. at 17 (arguing that a dismissal with prejudice "does not raise constitutional problems because it neither compels prosecution nor keeps a criminal case open indefinitely"). And deciding whether a dismissal should be with or without prejudice involves weighing considerations that, unlike the factors that are relevant to an exercise of prosecutorial discretion, are well within the judicial wheelhouse as a matter of institutional competence. *Cf. United States v. Giambrone*, 920 F.2d 176, 180 (2d Cir. 1990) (under Speedy Trial Act, "the matter of whether to dismiss with or without prejudice was a matter left to the district court's discretion"). Accordingly, dismissal with prejudice can be an appropriate judicial remedy to vindicate Rule 48(a)'s purposes, including protecting the rights of the defendant.

## DISCUSSION

DOJ seeks "dismissal *without prejudice* of the charges in this case." Rule 48(a) Mot. ¶ 1 (emphasis added). The effect of such a dismissal would not be akin to that of a presidential pardon, which, once accepted, "releases the wrongdoer from punishment and restores the offender's civil rights without qualification." *Flynn*, 507 F. Supp. 3d at 136. Instead, DOJ seeks to terminate the prosecution at this time, but it has confirmed that if its Motion were granted, Mayor Adams could be reindicted on the same charges in the future, with no clear limits on the grounds or timeline for reindictment. *See* Feb 19. Conf. Tr. at 12:14-23 (confirming that the only substantive limits would be "impermissible considerations, protect[ed] classes, things like that," and the only time limits would relate to "statute of limitations" and "speedy trial obligations" without specifying those limits). And the Government has not committed to halting any additional investigative steps with respect to Mayor Adams. *See id.* at 14:8-11. Instead, DOJ has represented that it, "in its discretion,

may or may not at some point revisit whether these charges are appropriate." *Id.* at 14:5-6.[35]  The prospect of reindictment therefore "hangs like the proverbial Sword of Damocles over the accused."  Am. Br. of Ct.-Appointed *Amicus Curiae* Paul D. Clement ("Clement Br.") at 1, ECF No. 159.

The Court begins its discussion with the Government's Motion itself, and concludes that the reasons articulated in it, when assessed in light of the purposes of Rule 48(a), counsel in favor of dismissal *with prejudice* rather than without it.  The Court then turns to the criticisms of DOJ's reasons for dismissal raised by various *amici* and concludes that while they have merit, they ultimately point in favor of the same result: not denial of the Motion, but dismissal with prejudice.

## I.    The Government's Request for Dismissal *Without Prejudice*

The Court has considered the parties' submissions in light of the purposes of Rule 48(a), and ultimately concludes that the form of relief DOJ seeks is inappropriate.  In reaching this determination, the Court focuses its analysis on the submissions of the parties—written and verbal—and does not consider additional factual materials submitted by *amici*.[36]  That is, leaving

---

[35] During the February 19 Conference, DOJ acknowledged that in its February 10 Decisional Memo, its stated intention at that time was to revisit the matter upon the confirmation of a new U.S. Attorney for SDNY, but it also represented that this was not a condition of the Rule 48(a) Motion and that it does not "have any plans for that at this time."  Feb. 19 Conf. Tr. at 13:19-14:7.

[36] DOJ's position appears to be that the Court's review of this request should be confined to the four corners of the Motion and "the sworn testimony and representations at the February 19 [conference]."  DOJ Br. at 13.  As discussed below, the Court is not convinced that judicial review under Rule 48(a) should necessarily be so constrained in every case.  Nevertheless, mindful of the presumption of good faith afforded to the Government and the Court's narrow discretion under Rule 48(a), the Court confines its analysis in this section of its Opinion along the lines suggested by DOJ, focusing on the papers filed by the parties—including not only DOJ's Rule 48(a) Motion, but also Mayor Adams's separate motion seeking dismissal of this case *with prejudice*, *see* Adams's Second Mot. to Dismiss—and the parties' representations at the February 19 conference before the Court.

aside factual submissions from various *amici*, the Court concludes that, under a proper application of Rule 48(a), dismissal of this case should be granted only if it is *with prejudice*.

Courts have generally agreed "that the primary purpose of [Rule 48(a)] is protection of a defendant's rights," including the right to be free from prosecutorial harassment. *Salinas*, 693 F.2d at 351. A court's discretion to condition its granting of a Rule 48(a) motion on dismissal being with prejudice is a critical means of fulfilling that purpose. "A court can determine whether the potential for harassment renders a dismissal with prejudice in the public interest by looking at the *purpose* of the government's dismissal and the *effect* it has on the defendant." *Madzarac*, 678 F. Supp. 3d at 46 (emphases added). Here, DOJ's Motion advances two grounds for dismissal: (1) "appearances of impropriety and risks of interference with the 2025 elections in New York City," and (2) "interfere[nce] with the defendant's ability to govern in New York City, which poses unacceptable threats to public safety, national security, and related federal immigration initiatives and policies." Rule 48(a) Mot. ¶¶ 5-6. Both rationales, if taken at face value, counsel in favor of dismissal with prejudice.

As articulated in the Rule 48(a) Motion, the "appearances of impropriety" rationale rests, in part, on allegedly improper statements by former U.S. Attorney Williams on his personal website and in an op-ed. *Id.* ¶ 5. To the extent that DOJ believes that the purported appearance of impropriety here is so severe that it warrants dismissal, then such concerns would be conclusively resolved only by dismissing the case permanently—that is, *with prejudice*. *See* Clement Br. at 22 ("[I]f political considerations improperly influenced the initial decision to seek the defendant's indictment, then dismissal with prejudice would definitively eliminate that taint."); *cf. United States v. Mancuso*, 302 F. Supp. 2d 23, 31 (E.D.N.Y. 2004) (dismissing case with prejudice in light of "significant governmental impropriety").

44

If, as DOJ asserts, this prosecution has been tainted with appearances of impropriety, it is unclear why the Government should be permitted to reinitiate the case in the future. To the extent DOJ might argue that any whiff of impropriety could fade over time, such that it could bring a new (and untainted) prosecution based on the charges in the Indictment, that would entail precisely the kind of prosecutorial harassment that Rule 48(a) is meant to guard against. "[T]he question is not whether the government was acting in bad faith, but rather whether the actions of the government objectively amounted to harassment." *Madzarac*, 678 F. Supp. 3d at 46 (quoting *United States v. Pitts*, 331 F.R.D. 199, 203 (D.D.C. 2019)). And it would "objectively amount to harassment . . . to allow the prosecutor to dismiss charges but nevertheless keep them in abeyance for an indefinite period of time in the hope or expectation that something will turn up to remove the complications" of the initial prosecution. *Poindexter*, 719 F. Supp. at 11; *see also Madzarac*, 678 F. Supp. 3d at 51 (explaining that "the operative question is whether dismissal without prejudice would lead to the government 'commencing another prosecution at a different time or place deemed more favorable to the prosecution'" (quoting *Ammidown*, 497 F.2d at 620)). Here, although DOJ disclaims any concrete plan to reassess the case, its proposal—which would allow it to hold out the possibility of reindictment in the hopes that the purported taint of impropriety might eventually fade, thereby putting the government in a more favorable position to try a second time— "objectively amount[s] to harassment" under Rule 48(a). *Poindexter*, 719 F. Supp. at 11.

DOJ's second rationale for dismissal—that the prosecution, by interfering with the Mayor's ability to govern the City, threatens various federal priorities, including "federal immigration initiatives and policies," Rule 48(a) Mot. ¶ 6—similarly points in favor of dismissal with prejudice. Dismissal without prejudice based on this rationale inevitably creates the appearance that the Mayor may be beholden to the federal government, which holds the prospect of reindictment over him should he fail to adequately effectuate the administration's goals. Thus,

although dismissal without prejudice always comes with some inchoate risk of reindictment, Mayor Adams's status as a public official raises special concerns. As Court-appointed *amicus* explains, "[c]oncerns with the appearance that the executive branch was either targeting political opponents or seeking to exert undue influence over other officeholders prompted the creation of the public integrity unit within the Justice Department." Clement Br. at 10 (citing Press Release, U.S. Dep't of Just., Off. of Pub. Affs. (Jan. 14, 1976), https://perma.cc/ZY5Y-YLJ2). "Moreover, perhaps as a consequence of the distinct problems posed by even the appearance that the executive branch was exercising leverage over an elected official via the threat of re-indictment," deferred prosecution agreements in the context of prosecutions of public officials are exceedingly rare. *Id.*

To be clear, "the question is not whether the government was acting in bad faith." *Madzarac*, 678 F. Supp. 3d at 46. It is the "*effect* [that dismissal without prejudice] has on the defendant." *Id.* (emphasis added). And here, the effect of dismissal without prejudice is unavoidable: "the prospect of re-indictment could create the appearance, if not the reality, that the actions of a public official are being driven by concerns about staying in the good graces of the federal executive, rather than the best interests of his constituents." Clement Br. at 2. The lack of clarity around any timeline or criteria for reassessment only heightens this concern, leaving Mayor Adams and the broader public in the dark as to what conditions might trigger renewal of the investigation or indictment. Under these circumstances, "[i]f the government's motion were granted," the Mayor would be prejudiced by having "to wait in a state of uncertainty and under public obloquy for an indefinite period of time," *Poindexter*, 719 F. Supp. at 12. While that is in some sense true for any defendant whose indictment is dismissed without prejudice, the unique combination of factors here—including this Defendant's status as a local elected official and DOJ's asserted rationale for seeking dismissal on federal public policy grounds—raises unique concerns. "In the view of this Court, such a process would not be fair to the defendant. The Court

has an obligation to protect him from the uncertainty it entails, and from what, objectively, would be harassment." *Id.* By contrast, dismissal *with prejudice* would put any such fears to rest, at least with respect to the pending charges.

For their part, the parties offer no good reason why dismissal should be without prejudice. To be sure, Mayor Adams consents to it, *see* Adams Br. at 22, and as *Rinaldi* notes, concerns about prosecutorial harassment typically arise "when the Government moves to dismiss an indictment over the defendant's objection," 434 U.S. at 29 n.15. But even where a defendant consents to dismissal under Rule 48(a), courts have an independent obligation to ensure the defendant's rights are protected.[37] "[G]iven the delicate position of a defendant facing criminal indictment, it will often be the case that the defendant gladly acquiesces in a dismissal without prejudice, even though it will always be in the defendant's best interests to push for a dismissal with prejudice to guard against re-indictment." Clement Br. at 20. Here, for the reasons stated above, the Court determines that, in light of DOJ's asserted reasons for dismissal, dismissal with prejudice is the most appropriate result and best aligns with the purposes of Rule 48(a), notwithstanding Mayor Adams's professed consent.

Moreover, although Mayor Adams consents to DOJ's Motion, he has separately moved for dismissal with prejudice on other grounds. *See* Adams's Second Mot. to Dismiss at 1. And throughout his brief, he argues that the Court has the power to grant dismissal with prejudice. *See, e.g.*, Adams Br. at 22 (stating that "Mayor Adams has knowingly agreed to a voluntary dismissal without prejudice . . . subject to the Court's power to condition dismissal on its being with

---

[37] When the government seeks to dismiss an indictment during trial, the defendant's consent is required. Fed. R. Crim. P. 48(a) ("The government may not dismiss the prosecution during trial without the defendant's consent."). The lack of such a requirement when the government moves to dismiss before trial indicates that the defendant's consent is not *necessary* for a pretrial Rule 48(a) motion, but that does not suggest that it is *dispositive*.

prejudice"). Mayor Adams's consent to dismissal without prejudice appears to be equivocal at best. Even if DOJ's Motion were granted and the Indictment dismissed without prejudice, he would still have a request for additional relief—*i.e.*, dismissal with prejudice—pending before the Court.

Nor does DOJ meaningfully oppose such a resolution. In response to the Court's direction to address "[u]nder what circumstances, if leave is granted, dismissal should be with or without prejudice," Feb. 21 Order at 1, DOJ offered no reason for dismissal without prejudice other than that it is the "default." DOJ Br. at 17. The Court has been offered no reason to think that the rationales offered by the Motion, or the purposes of Rule 48(a), would be better served by dismissal without prejudice. The parties have offered essentially no basis to conclude that dismissal, if granted, should be without prejudice. And because DOJ has not opposed Mayor Adams's separate motion to dismiss the indictment with prejudice on other grounds, *see* ECF Nos. 140, 144, it has waived opposition to this form of relief.

In sum, the Court concludes that if dismissal is to be granted, dismissal *with prejudice* best comports with DOJ's asserted rationales for dismissal and is necessary to vindicate Rule 48(a)'s principal object of protecting the defendant. In reaching that conclusion, the Court need not find any bad faith on the part of DOJ or question the validity of its reasons for dismissal. Rather, DOJ's own proffered justifications weigh in favor of dismissal with prejudice.

## II.    Whether the Motion Should Be Denied Altogether

Having determined, based on the parties' own submissions, that dismissal of this case should only be with prejudice, the Court now turns to the arguments raised by various *amici* that dismissal should be denied altogether. Several *amici* argue that, notwithstanding the presumption of good faith and the courts' narrow discretion in reviewing a Rule 48(a) motion, even a cursory review of the record here compels the conclusion that DOJ's rationales are inadequate and that the

Motion should be denied.  *See, e.g.*, Letter Mot. to Appear as *Amicus Curiae* ("Common Cause Br.") at 5, ECF No. 125; Former Federal Jurists Br. at 8-11.  The Court is largely persuaded by the merits of *amici*'s various criticisms of DOJ's rationales.  But for the reasons explained below, the Court concludes that they do not counsel in favor of denial of DOJ's Rule 48(a) Motion under the circumstances presented here.  Instead, they support the same conclusion that the Court has reached taking the Rule 48(a) Motion at face value—that dismissal *with prejudice* is the most appropriate result.

One preliminary matter: It is unclear precisely what materials the Court may consider in resolving a Rule 48(a) motion, particularly in light of the presumption of good faith applicable here.  The parties themselves are not entirely consistent on this point.  At times, they appear to suggest that the Court may not look beyond the four corners of the Rule 48(a) Motion itself.[38]  At other times, they point to their own additional submissions on the docket, including their prior filings, letters submitted in connection with this Motion, and exhibits to their briefs.[39]  During the February 19 Conference, this Court asked Mayor Adams a limited number of questions under oath to ensure his consent was knowing and voluntary, *see* Feb. 19 Conf. Tr. at 5:7-11, 16:17-19; the parties did not object to that questioning and, in fact, rely on Mayor Adams's responses in their respective briefs, *see* Adams Br. at 23; DOJ Br. at 10.  For their part, Mayor Adams's counsel have

---

[38] *See, e.g.*, Feb. 19 Conf. Tr. at 44:7-10 (DOJ stating that "[c]onsidering documents outside the record" is not part of a court's discretion under Rule 48(a)).

[39] *See, e.g.*, Adams Br. at 18 ("[C]ourts have typically examined the motion to dismiss, as well as the government's previous conduct in the case and other materials on the docket"); *id.* at 23 (stating that "the Court can review a wealth of materials" beyond the Rule 48(a) Motion itself, including "hundreds of documents filed on the court's docket"); DOJ Br. at 1-2, 13-16 (referencing numerous external exhibits, consisting of drafts and communications involving USAO-SDNY staff, but noting that it asks the Court to consider these materials only if it looks beyond the Rule 48(a) Motion itself).

acknowledged that the Court may consider *amicus* briefs,[40] many of which here include various documents attached as exhibits.  And they have, on several occasions, even offered to supplement the record with their own sworn testimony.[41]

It is inconsistent for the parties to ask this Court to consider materials they have submitted that are extraneous to the Rule 48(a) Motion while ignoring other materials on the docket—especially memoranda and letters between USAO-SDNY and DOJ—the authenticity of which has not been disputed and which are broadly available to the public.  In particular, DOJ authenticated the February 10 Decisional Memo directing dismissal of the case and stating DOJ's reasons for that decision.  *See* Feb. 19 Conf. Tr. at 41:4-42:6.  It is difficult to see how the Court can discharge its duty to ensure "that the reasons advanced for the proposed dismissal are substantial and the real grounds upon which the application is based," *Greater Blouse*, 228 F. Supp. at 486, while ignoring this critical document.  And the parties ultimately cite no authority for the notion that a Court may look only within the four corners of a Rule 48(a) motion when adjudicating it—no cases, for example, holding that a district court erred by considering materials on the docket beyond a Rule 48(a) motion itself.  Rather, there are numerous cases indicating that courts have looked to the entire "record" in a case, and not just the motion papers, in adjudicating a Rule 48(a) motion.  *See, e.g.*, *Rinaldi*, 434 U.S. at 30.  And courts have sometimes held evidentiary hearings to assess the validity of a Rule 48(a) motion.  *See United States v. Ocasio*, 623 F. Supp. 2d 139, 139 (D. Mass. 2009) (holding hearing featuring live testimony on Rule 48(a) motion).  All of this is consistent

---

[40] *See* Adams Br. at 18.

[41] *See, e.g.*, ECF No. 130 (offering, in a Feb. 17 Letter from counsel for Mayor Adams to the Court, to provide additional sworn testimony); Feb. 19 Conf. Tr. at 45:9-15 (offering again, as counsel for Mayor Adams, to provide sworn testimony).

with Rule 48(a)'s procedural requirement that the government's reasons for seeking dismissal be publicly exposed.  *See Greater Blouse*, 228 F. Supp. at 486-87.

It is therefore clear that a court need not confine its review under Rule 48(a) to the motion itself.  But the Court concludes that, in this case, it need not determine the outer boundaries of the range of materials that may be considered.  That is because the Court, even if it were to consider the various factual materials (government letters, memoranda, and the like) that have been put before it by *amici*, arrives at the same conclusion: that dismissal with prejudice is the appropriate outcome here.  Accordingly, for purposes of the discussion below, the Court assumes, without deciding, that it can consider such materials in adjudicating the Rule 48(a) Motion.

The Court now proceeds to an analysis of each rationale put forth by DOJ in support of dismissal.  First, applying a presumption of good faith, the Court addresses Rule 48(a)'s procedural requirements and considers whether each rationale is "substantial" and a "real ground[] upon which the application is based."  *Id.* at 486.  Then, mindful of the limited discretion enjoyed by courts under Rule 48(a), the Court considers whether DOJ's rationales pass muster under the Rule's substantive prongs.  As explained below, the Court ultimately concludes that the appropriate outcome in this case remains dismissal with prejudice.

### A.      The Appearances of Impropriety Rationale

As noted, DOJ's first rationale in its Rule 48(a) Motion concerns "appearances of impropriety and risks of interference with the 2025 elections in New York City."  Rule 48(a) Mot. ¶ 5.  As explained below, DOJ does not point to any objective indicia that could support a conclusion that this case has been tainted with an appearance of impropriety by the prosecutors who worked on it.

At the outset, the Court notes that this rationale, as articulated in the Rule 48(a) Motion, concerns the *appearances* of impropriety, not the *actual purposes* of the prosecutors in this case,

which are not referenced in the Motion.  As the February 10 Decisional Memo states, DOJ's determination "in no way call[ed] into question the integrity and efforts of the line prosecutors responsible for this case, or [U.S. Attorney Sassoon's] efforts in leading those prosecutors in connection with a matter [she] inherited."  February 10 Decisional Memo at 1.  And at the February 19 conference before the Court, DOJ made clear that it was not relying on any assertions about the motives behind the prosecution for purposes of its Rule 48(a) Motion.[42]  Accordingly, except where otherwise stated, the Court confines its discussion to purported "appearances" of impropriety, as opposed to the actual intentions of the prosecutors in this case.

The appearance of impropriety—even absent any evidence of improper motives—can be a valid concern.  "[J]ustice must satisfy the appearance of justice, and a prosecutor with conflicting loyalties presents the appearance of precisely the opposite."  *Young*, 481 U.S. at 811-12.  But while a prosecutor should be disinterested, "prosecutors may not necessarily be held to as stringent a standard of disinterest as judges."  *Id*. at 807.  To that end, the Supreme Court has observed that courts "may require a stronger showing for a prosecutor than a judge in order to conclude that a conflict of interest exists," *id.* at 810-11, and the Second Circuit has noted that "[t]rue disinterest on the issue of . . . a defendant's guilt is the domain of the judge and the jury—not the prosecutor," *Wright v. United States*, 732 F.2d 1048, 1056 (2d Cir. 1984) (Friendly, J.).

---

[42] In response to the Court asking whether the Government was arguing "that the prosecution was actually motivated by improper reasons, has the appearance of being motivated by improper reasons, or both," Acting DAG Bove stated that "what [he] relied on in [the motion] is the appearances" of impropriety.  Feb. 19 Conf. Tr. at 24:22-26:8. Although he referenced the existence other "concerns," he made clear that DOJ is "not asking the court to rely on any" reasons for dismissal beyond what is stated in the Rule 48(a) Motion itself.  *Id.* at 22:5-13.  And while Acting DAG Bove stated that he "believe[s the Adams prosecution] actually goes further than [appearances of impropriety] and it is an abuse of the criminal justice process," *id.* at 23:12-14, he did not represent that DOJ had reached any conclusions in that regard, stating only that "the actual purpose in the prosecution is the subject of a couple ongoing investigations at the Department," *id.* at 25:15-17.

Courts considering allegations that a prosecutor's actions have created an "appearance of impropriety" generally look to whether the prosecutor has a potential conflict of interest that could impede the impartial administration of justice. For example, a financial stake in the outcome of the case, a past representation of an involved party, or a relationship with the adversary or the victim could all constitute such a potential conflict of interest. *See Wright*, 732 F.2d at 1056 (citing cases). A conflict of interest could also arise if the prosecutor, as a result of a longstanding acrimonious relationship, "has, or is under the influence of others who have, an axe to grind against the defendant, as distinguished from the appropriate interest that members of society have in bringing a defendant to justice with respect to the crime with which he is charged." *Id.*; *see also id.* at 1055 (finding appearance of impropriety where the prosecutor's wife was "not merely a political opponent" of the defendant but had "allegedly been assaulted by [his] minions," had "actively petitioned various federal, state and local agencies to investigate [him]," and "almost certainly harbored personal animosity against [him]").

Here, to substantiate its assertion of "appearances of impropriety," DOJ's Rule 48(a) Motion cites former U.S. Attorney Williams's website and op-ed and references the proximity of the 2025 New York City mayoral election. *See* Rule 48(a) Mot. ¶ 5 & nn.2-3. The Court considers each in turn.

First, Williams's op-ed and website do not establish the kind of conflict of interest that courts have held could give rise to an appearance of impropriety by a prosecutor, such as a financial stake in the case, a prior representation, or a past acrimonious relationship with the defendant. *See Wright*, 732 F.2d at 1055-56; *cf. Azzone v. United States*, 341 F.2d 417 (8th Cir. 1965), *cert. denied*, 381 U.S. 943 (1965) (application for writ of error coram nobis denied where defendant alleged, among other things, that his indictment had been motivated by U.S. Attorney's political ambitions). And as the Government noted in a letter to the Court, "Williams did not cause Adams

to be investigated"; rather, "[t]he evidence of Adams's crimes was uncovered by career law enforcement officers performing their duties, in an investigation that began before Williams took office and . . . continued after he left."  Gov't Jan. 22, 2025 Letter at 2; *see also* Sassoon Letter at 4 ("The investigation began before Mr. Williams took office . . . .").[43]

The Court previously credited the Government's arguments in this regard.  *See* Second Rule 6 Order.  It reviewed the Williams materials carefully, and it concluded that "the majority of statements in the op-ed that Mayor Adams claims are problematic concern New York *State* rather than New York *City* politics"—meaning that they had nothing to do whatsoever with the Mayor. *Id.* at 6 n.5.  The Court noted that one sentence in Williams's op-ed could plausibly be read to refer to Mayor Adams—that "America's most vital city is being led with a broken ethical compass"— but determined that it did not run afoul of Rule 6(e) or Local Rule 23.1.  *Id.*  It therefore concluded that Williams did not violate any duty to ensure "a defendant's fundamental right to a fair trial." *Id.*[44]  While the Government, with the intervening change in administrations and the transfer of the case from UASO-SDNY to DOJ, has changed its views regarding these materials, it offers this

---

[43] The investigation began in summer of 2021.  *See* Gov't Opp'n to Mayor Adams's First Rule 6 Motion at 1, ECF No. 38; Oct. 2 Hr'g Tr. at 15:2-3.  Williams became U.S. Attorney in October of that year.  *See* Press Release, SDNY, U.S. Att'y Damian Williams Appointed to Chair Att'y Gen. Merrick B. Garland's Advisory Comm. (Mar. 30, 2022), https://www.justice.gov/usao-sdny/pr/us-attorney-damian-williams-appointed-chair-attorney-general-merrick-b-garland-s [https://perma.cc/BE7M-RT5L] ("The Senate confirmed Damian Williams' appointment as U.S. Attorney for the Southern District of New York in October 2021.").

[44] To be sure, it is fair to question the prudence of Williams's decision to publish such statements before Mayor Adams's case had been adjudicated.  This is particularly true given how much attention Williams's words have commanded in this litigation.  But a statement may be ill-advised without rising to the level of being "improper."  In any event, the Court reiterates that it sees nothing suggesting a violation by Williams of the Federal Rules, the Local Rules, or an attorney's ethical duties more broadly.

Court no reason to reconsider its earlier conclusion that Williams's statements were not improper.[45]

Second, there is no support for the notion that timing of the Indictment—approximately nine months before the 2025 New York City mayoral primary election—creates a risk of election interference.  A section of the DOJ's Justice Manual provides that "[f]ederal prosecutors and agents may never select the timing of any action . . . for the *purpose* of affecting any election, or for the *purpose* of giving an advantage or disadvantage to any candidate or political party."  U.S. Dep't of Just., Just. Manual § 9-85.500 (Actions that May Have an Impact on an Election) (2022) (emphases added).[46]  That prohibition on improper purposes is inapposite here: As noted, neither the Rule 48(a) Motion itself nor the February 10 Decisional Memo calls into question the integrity or the motives of the prosecutors who worked on this case.  The Justice Manual also specifies certain procedural requirements in this context, stating that "[a]ny action likely to raise an issue or the perception of an issue under this provision requires consultation with the Public Integrity

---

[45] To the extent that Mayor Adams argues that he has been prejudiced from extrajudicial statements about the case, *see* Adams Br. at 19-20, the Court has rejected two prior motions under Rule 6 raising these issues.  *See* First Rule 6 Order; Second Rule 6 Order.  Moreover, the Government itself has, until the filing of the Rule 48(a) Motion, denied that Mayor Adams has suffered any prejudice from any pretrial publicity throughout this litigation.  For example, in response to Mayor Adams's First Rule 6 Motion, the Government observed that there was no evidence that news articles about the investigation into his alleged illegal activity "put pressure on senior Justice Department officials to approve the indictment," induced any grand jury witness to testify, or affected the grand jury's decision to indict the Mayor.  Gov't First Sanctions Opp'n at 21-23.  The Government also argued that Mayor Adams "ha[d] rejected reason to believe that a future trial jury w[ould] be prejudiced by the news coverage of this case."  *Id.* at 23.  The existence of such prejudice is typically uncovered through voir dire, which obviously has not happened here (nor will it).  *See United States v. Zichettello*, 208 F.3d 72, 106 (2d Cir. 2000) ("When a trial court determines that media coverage has the potential for unfair prejudice, it is obligated to canvass the jury to find out if they have learned of the potentially prejudicial publicity and, if necessary, voir dire the jury to ascertain how much they know of the distracting publicity and what effect, if any, it has had on that juror's ability to decide the case fairly.").

[46] This provision is cited in the February 10 Decisional Memo, but not in DOJ's Rule 48(a) Motion itself.

Section, and such action shall not be taken if the Public Integrity Section advises that further consultation is required with the Deputy Attorney General or Attorney General." *Id.* The Sassoon Letter states that USAO-SDNY "followed this requirement," and there is nothing in the record to suggest otherwise. Sassoon Letter at 4.

While some other Justice Department sources have described an unwritten norm that, regardless of purpose, prosecutions should not be brought against candidates for office within sixty days of an election due to the risk of affecting the election,[47] this case was brought in September 2024, approximately *nine months* before the June 2025 New York City mayoral primary. In their briefs, neither DOJ nor the Mayor cites any authority—no guideline, rule, or case—suggesting that it is improper to indict a candidate for office nine months before an election. It is also difficult to imagine how such a rule could work in practice without effectively gutting public corruption laws. For example, congressional elections occur every two years in November, and primary elections are typically held at least six months beforehand. In New York, state assemblymembers are similarly elected every two years, *see* N.Y. Const., art. III, § 2, with primaries typically held in June, *see* N.Y. Elec. § 8-100(1)(a) (2024). That leaves about nineteen months between when New York's state assemblymembers and congressional representatives are elected and when they must to stand for re-election in a primary. DOJ's proposed rule prohibiting prosecutions from being initiated within nine months of an election would leave a ten-month window every two years in which a case could be brought (and perhaps completed) against an assemblymember or

---

[47] *See, e.g.*, U.S. Dep't of Just., Office of the Inspector General, A Review of Various Actions by the Federal Bureau of Investigation and Department of Justice in Advance of the 2016 Election at 17 (June 2018) (describing "'60-Day Rule,' under which prosecutors avoid public disclosure of investigative steps related to electoral matters or the return of indictments against a candidate for office within 60 days of a primary or general election"). This is sometimes characterized as a ninety, not sixty, day rule, where the same prohibitions apply three months before an election.

congressperson in New York.[48]  Such a rule would effectively immunize many elected officials from public corruption laws.

In fact, the timing of this case in relation to the 2025 New York City mayoral election appears unexceptional.  Other prosecutions of elected officials have taken place on similar or even shorter timeframes.  For example, New Jersey Senator Robert Menendez was indicted in this District in September 2023, approximately nine months before the June 2024 New Jersey primary elections.  *See United States v. Menendez*, No. 23 Crim. 490 (S.D.N.Y.); *see also United States v. Hunter*, No. 18 Crim. 3677 (S.D. Cal.) (indictment of Representative Duncan Hunter in August 2018, approximately three months before November general election).  The Court has been unable to locate any cases where a prosecution was deemed inappropriate because it was brought approximately nine months before an election.  And here, mindful of the election calendar, the parties and the Court attempted to select a trial schedule that would balance the need for time for the parties to prepare while also ensuring resolution of this matter before the June 2025 primary. The Court ultimately adopted a compromise, in which trial would have commenced on April 21. *See* Nov. 1 Hr'g Tr. at 62:16-20.

Finally, the parties raise related issues in their briefs that do not appear in DOJ's Rule 48(a) Motion.  For reasons explained below, a court cannot properly grant a Rule 48(a) motion on the basis of rationales that were not raised in the motion.  But even considering these additional points on the merits, the Court finds them either inapposite or unsupported by the record.  For example, DOJ attaches various exhibits to its brief consisting of communications involving the former

---

[48]  That window would be even shorter in a state that holds its primary elections earlier than New York.  For example, in Alabama, where primary elections are held as early as March, DOJ's proposed rule would leave only a seven-month window every two years for prosecutions. *See* Ala. Code § 17-13-3(b) (2022) ("In years in which a presidential primary is conducted, the primary election shall be the first Tuesday in March.").

prosecution team and asserts that they show "troubling conduct" at USAO-SDNY.  DOJ Br. at 1.

But these communications were not public until DOJ sought to rely on them; as a matter of logic,

they could not have affected "appearances" in this case.  Moreover, the notion that DOJ sought

dismissal because of improper conduct by the USAO-SDNY prosecution team is belied by the

February 10 Decisional Memo itself, which makes clear that DOJ, in reaching its decision, "in no

way call[ed] into question the integrity and efforts of the line prosecutors responsible for the case."

February 10 Decisional Memo at 1.  At any rate, the Court has reviewed these communications

carefully and finds that they do not show any improper motives or violations of ethics canons or

the Justice Manual by the USAO-SDNY prosecution team or by former U.S. Attorney Sassoon.[49]

For his part, Mayor Adams returns to the assertion that he was indicted in retaliation for

"publicly br[eaking] with the Biden Administration on the contentious issue of immigration

enforcement" in "April 2023."  Adams Br. at 1.[50]  But he cites no evidence supporting this

---

[49] The Justice Department's Principles of Federal Prosecution state, in relevant part, that "the attorney for the government should commence or recommend federal prosecution if he/she believes that the person's conduct constitutes a federal offense, and that the admissible evidence will probably be sufficient to obtain and sustain a conviction, unless (1) the prosecution would serve no substantial federal interest; (2) the person is subject to effective prosecution in another jurisdiction; or (3) there exists an adequate non-criminal alternative to prosecution."  U.S. Dep't of Just., Just. Manual § 9-27.220 (2023).  There is nothing in the USAO-SDNY communications indicating a violation of these principles.  For example, one communication indicates that a friend of AUSA Scotten believed that he would make a good federal judge.  *See* ECF No. 175-4.  The Court has reviewed this communication and finds that it shows nothing noteworthy, only that AUSA Scotten was focused on his current job "first," rather than on any possible future opportunities.  *Id.*  Another communication—an email circulating a draft letter to the Court—refers to the Williams op-ed as a "scandal," ECF No. 175-3, but the use of that informal shorthand in an email does not suggest that any of the individual AUSAs on the case, or the U.S. Attorney at the time, had any inappropriate motives or otherwise violated Justice Department policy or guidelines.

[50] DOJ's Rule 48(a) Motion gestures at this notion without articulating it.  *See* Rule 48(a) Mot. ¶ 5 (citing Executive Order 14147, "Ending the Weaponization of the Federal Government," which in turn describes a purported "systematic campaign" by the previous administration "against its perceived political opponents").  DOJ's brief also references purported "improper weaponization of the criminal justice system."  DOJ Br. at 6.  As noted *supra*, however, DOJ has,

contention.  Despite repeating this claim throughout this litigation, he has not filed a motion for selective or vindictive prosecution.[51]  *Cf. United States v. Stewart*, 590 F.3d 93, 121-23 (2d Cir. 2009) (describing elements of a vindictive prosecution claim); *United States v. Avenatti*, 433 F. Supp. 3d 552, 562-63 (S.D.N.Y. 2020) (same).  And, as noted, the investigation into Adams began during the summer of 2021, almost two years before his criticism of the prior administration.  *See* Gov't First Sanctions Opp'n at 1.

Ultimately, DOJ does not point to any objective criteria that would suggest an appearance of impropriety here.  To be sure, "appearances," in their colloquial sense, are often in the eye of the beholder.  But the phrase "appearance of impropriety" is generally understood as a term of art with an objective standard.  *See People v. Adams*, 987 N.E.2d 272, 275 (N.Y. 2013) ("[A]n appearance of impropriety may arise when the record provides an objective basis to question whether the prosecutor is exercising pretrial prosecutorial discretion in an evenhanded manner, based on the merits of the case or other legitimate prosecutorial concerns."); *cf. United States v. Bayless*, 201 F.3d 116, 126-27 (2d Cir. 2000) (explaining, in the context of a judicial recusal motion, that "the existence of the appearance of impropriety" is determined "not by considering what a straw poll of the only partly informed man-in-the-street would show[,] but by examining the record facts and the law, and then deciding whether a reasonable person knowing and

---

for purposes of its Rule 48(a) Motion, disclaimed any reliance on the suggestion of improper purposes in *this* prosecution.

[51] Mayor Adams has, as noted, filed a motion to dismiss based on alleged prosecutorial misconduct.  *See* Adams's Second Mot. to Dismiss.  But the Mayor's allegations in that motion center on "[t]he leak of the February 12 letter" written by Sassoon, which he says violates internal Justice Department regulations, Local Rule 23.1, and Federal Rule of Criminal Procedure 6(e).  *See id.* at 8-11.  Mayor Adams makes no legal argument in his latest motion, and has not made any motion throughout this litigation, seeking dismissal under either a vindictive or selection prosecution theory.

understanding all the relevant facts would recuse the judge"), *cert. denied*, 529 U.S. 1061 (2000). Here, DOJ cites no rule broken and no guidance or principle ignored.

The absence of any substantiation for this rationale matters, because the justifications for dismissal put forth by the government must be "substantial." *Greater Blouse*, 228 F. Supp. at 486. While the government's decision to dismiss a prosecution is entitled to a presumption of good faith under Rule 48(a), a presumption is just that; it is not an inexorable command. If the presumption were conclusive, "there would be no purpose to Rule 48(a)." *Id.* And while a court's review of that decision is exceedingly deferential, a court is "not required to exhibit a naivete from which ordinary citizens are free." *United States v. Stanchich*, 550 F.2d 1294, 1300 (2d Cir. 1977) (Friendly, J.). Here, the incongruity between the Government's proffered "appearances of impropriety" rationale and the record suggests that "[w]hat was provided here was more of a distraction" than a legitimate explanation. *Dep't of Com. v. New York*, 588 U.S. 752, 785 (2019).

### B.    The Immigration Enforcement Rationale

The second rationale in DOJ's Rule 48(a) Motion concerns "federal immigration initiatives and policies." Rule 48(a) Mot. ¶ 6. As explained below, neither DOJ nor Mayor Adams substantiates the assertion that the Mayor's immigration enforcement efforts have been hampered by this case. The record does show, however, that shortly after DOJ decided to seek dismissal, the Mayor made at least one policy choice in alignment with the administration's immigration enforcement goals—to permit ICE to operate at the Rikers Island jail complex. Thus, while DOJ's immigration enforcement rationale is supported to some extent by the record, it points towards an uncomfortable conclusion: that the decision to dismiss this case was apparently premised on the Mayor taking subsequent immigration-related actions in conformity with the administration's policy preferences.

As an initial matter, it is indisputable that the President has broad authority over foreign affairs. *See, e.g.*, *United States v. Curtiss-Wright Export Corp.*, 299 U.S. 304 (1936). Here, however, DOJ's decision to seek dismissal of the indictment is not a *direct* exercise of the President's authority in matters of either national security or immigration. Rather, DOJ's argument—that this case is hindering Mayor Adams's "ability to govern in New York City," which, in turn, "poses unacceptable threats to public safety, national security, and related federal immigration initiatives and policies," Rule 48(a) Mot. ¶ 6—concerns *Mayor Adams's* authority as a local official. Whether or how the Indictment is dismissed will have no bearing on the President's ability to exercise his own national security or immigration authority.

Turning to the immigration enforcement rationale itself, certain *amici* argue that this rationale is unsubstantiated, noting that Mayor Adams himself has "publicly argued that the indictment has not interfered with his official mayoral duties." Common Cause Br. at 4. That said, the Motion does point to one specific way in which Mayor Adams has purportedly been hampered, noting that "as a result of these proceedings, Adams has been denied access to sensitive information that the Acting [DAG] believes is necessary for Adams to govern and to help protect the City." Rule 48(a) Mot. ¶ 6. This is apparently a reference to Mayor Adams's loss of a security clearance following his indictment. *See* Feb. 19 Conf. Tr. at 27:3-7. But DOJ's own representations at the February 19 conference contradict its proffered example. When asked about the security clearance, Acting DAG Bove stated that restoring Mayor Adams's security clearance does not, in fact, "hinge[] on the resolution of this motion [to dismiss]" because the President has "separate authority to grant a security clearance" at any time, solely as a matter of "executive power." *Id.* at 29:16-30:1. Thus, to the extent the executive branch has determined that Mayor Adams needs a security clearance, whether he remains under indictment appears to be wholly irrelevant.

The same appears to be true with respect to other examples offered by the parties of purported impediments to the Mayor's ability to govern, such as "his [in]ability to serve on a joint taskforce on firearms alongside agents from the Southern District of New York."  Adams Br. at 20.  To the extent these issues concern cooperation or coordination with federal authorities, the parties offer no explanation as to how they are any different from the issuance of a security clearance.  That is, if the executive branch can simply restore Mayor Adams's security clearance, it is unclear why it cannot also enable him to participate in a "joint taskforce on firearms," or otherwise facilitate his coordination with federal officials about matters of public safety, national security, and immigration.

Given the absence of evidence that the Indictment has impeded the Mayor's past or current efforts related to immigration, various *amici*, citing the Sassoon Letter, describe the immigration enforcement rationale not as an effort to remove barriers to the Mayor's existing work but instead as a bargain to extract future policy concessions.  *See* Former Federal Jurists Br. at 10 (arguing that DOJ's "request for dismissal so that Adams can carry out the administration's immigration efforts[] reflect[s] a *quid pro quo*"); Common Cause Br. at 2 (stating "there is overwhelming evidence from DOJ's own internal documents showing that the dismissal of the Adams indictment is not in the public interest and is part of a corrupt *quid pro quo*").

For their part, DOJ and Mayor Adams vehemently deny any *quid pro quo*.  *See* Adams Br. at 22; DOJ Br. at 10.  During a conference before the Court, Mayor Adams was unequivocal that the two-sentence written consent to dismissal without prejudice signed by his counsel was the sum total of his agreement with DOJ, that no one made any other promise to him, and that no one threatened him to induce his consent to dismissal without prejudice.  *See* Feb. 19 Conf. Tr. at 20:17-21:8.  Mayor Adams's counsel explain it this way: "Ms. Sassoon . . . appears to have simply mischaracterized defense counsel's explanation that the charges were *in fact* impeding Mayor

Adams's ability to help carry out federal law as 'amount[ing] to a *quid pro quo*.'"  Adams Br. at 22.

The dispute here, however, seems to be more about how to interpret the facts than what the facts are.  In a February 3, 2025 letter to DOJ (which they filed on the docket without prompting from the Court), Mayor Adams's counsel asserted that the Mayor's "independent abilities to exercise his powers have also been complicated by his indictment."  *See* Letter from Adams's Counsel to DOJ.  Specifically, they noted that

> [the Mayor's] powers allow him to take actions such as preventing the Office of the Corporation Counsel from litigating challenges to immigration enforcement, preventing appointed city employees from taking public stances against enforcement efforts, re-opening the ICE office on Rikers Island, and directing the NYPD to supply manpower to assist federal immigration agents.

*Id.*  Mayor Adams's counsel did not explain how the Mayor's exercise of these powers had been "complicated" by this case.  Instead, they provided a list of discrete policy options that the Mayor could choose to exercise.  And then, three days after DOJ issued the February 10 Decisional Memo directing SDNY to move to dismiss the Indictment (and one day before the Rule 48(a) Motion was ultimately filed), Mayor Adams decided to take one of these official acts, announcing that "he would issue an executive order allowing federal immigration authorities into the Rikers Island jail complex."  Br. of *Amicus Curiae* State Democracy Defenders Fund et al. at 5, ECF No. 152-2; *see also* ECF No. 150-4 at 1[52] (news article stating that "New York City Mayor Eric Adams said Thursday he will use his executive powers to allow federal immigration authorities back into the city's sprawling Rikers Island jail complex, marking a substantial shift in the city's sanctuary

---

[52] Eric Levenson et al., NYC Mayor and Trump Border Czar Meet as Feds Turn Eyes Toward Sanctuary Cities Like New York, CNN (Feb. 14, 2025), https://www.cnn.com/2025/02/13/us/nyc-adams-border-czar-immigration/index.html [https://perma.cc/9HM6-XCXX].

policies that prevent it from enforcing immigration law"). It seems that the Indictment was not, in fact, a barrier to that particular policy decision.

The parties deny that Mayor Adams's Rikers Island decision—which appears to be contrary to New York City Code[53]—reflects a *quid pro quo*. The record contains no contemporaneous notes of what was actually said during the January 31 meeting at DOJ,[54] but counsel for Mayor Adams have represented in a letter to the Court that "we never said or suggested to anyone . . . that Mayor Adams would do X in exchange for Y, and no one said or suggested to us that they would do Y in exchange for X," adding: "We are prepared to confirm these points under oath in sworn declarations." *See* Def.'s Feb. 18, 2025 Letter at 2. The Court appreciates counsel's willingness to supplement the record and facilitate further inquiry by the Court beyond the materials that they have affirmatively submitted without solicitation. *E.g.*, Letter from Adams's Counsel to DOJ.

But the Court finds that additional factual investigation—even if permissible—is unnecessary at this time. Whether anyone expressly incanted the precise words that they "would do X in exchange for Y" is not dispositive. As the Second Circuit has explained, "[a]n explicit quid pro quo . . . need not be expressly stated but may be inferred from the official's and the payor's words and actions." *United States v. Benjamin*, 95 F.4th 60, 67 (2d Cir. 2024), *cert. denied*,

---

[53] N.Y.C. Admin. Code § 9-131(h)(2) ("Federal immigration authorities shall not be permitted to maintain an office or quarters on land over which the department exercises jurisdiction, for the purpose of investigating possible violations of civil immigration law; provided, however, that the mayor may, by executive order, authorize federal immigration authorities to maintain an office or quarters on such land for purposes unrelated to the enforcement of civil immigration laws.").

[54] As noted above, the Sassoon Letter states one of her colleagues took contemporaneous notes but that those notes were confiscated at the end of the meeting. Sassoon Letter at 3 n.1. The February 13 Bove Letter in response references these events as well. *See* Feb. 13 Bove Letter at 3 n.3.

No. 24-142, 2024 WL 5112284 (Dec. 16, 2024); *see also Benjamin*, 95 F.4th at 68 (noting that while a "quid pro quo must be clear and unambiguous, there is no reason why it cannot be implied from the official's and the payor's words and actions."); *cf. Evans v. United States*, 504 U.S. 255, 274 (1992) (Kennedy, J., concurring in part and concurring in the judgment) ("The official and the payor need not state the *quid pro quo* in express terms, for otherwise the law's effect could be frustrated by knowing winks and nods.").

The Court need not and does not make any conclusive findings as to whether there was an explicit bargain here.[55]  It is sufficient to note that the facts, as put into the record by Mayor Adams's legal team, do not support the notion that continuing this case will impede the Mayor's *ongoing* immigration enforcement efforts—they instead suggest that dismissal of the case will facilitate *future* efforts by the Mayor, in alignment with the administration's policy preferences.

### C.    The Strength of the Case

In its brief, DOJ raises "another reason that the Motion is in the public interest"—one that was not raised in the Rule 48(a) Motion itself: "the apparent weakness of SDNY's overly aggressive charging theory."  DOJ Br. at 18.  The Court is mindful of the Supreme Court's admonition that "factors [such] as the strength of the case . . . are not readily susceptible to the kind of analysis the courts are competent to undertake."  *Wayte*, 470 U.S. at 607.[56]  The Court

---

[55] If such factual findings were necessary to the Court's decision, additional evidentiary proceedings could then be appropriate.

[56] As a general matter, courts are not well placed to second-guess the judgment of the government with respect to the strength of the prosecution's case.  However, to the extent that DOJ relies on quotations from this Court's decision on Mayor Adams's First Motion to Dismiss to cast doubt on the viability of the prosecution's legal theory, such reliance is misplaced.  For one thing, Mayor Adams moved to dismiss only one of five counts in the Indictment (bribery under 18 U.S.C. § 666); nothing in his motion, or in the Court's decision on it, relates to the four other counts.  And with respect to the bribery count, the Government alleged two theories of a *quid pro quo*—one concerning the regulation of the Turkish consulate building generally, and one regarding the issuance of a temporary certificate of occupancy ("TCO") specifically.  First MTD Order at 19.

therefore expresses no views as to the merits of the Government's case against Mayor Adams. But the Court nevertheless cannot base its decision here on DOJ's purported concerns in this regard, because they were not an asserted basis for its Rule 48(a) Motion.

The Rule 48(a) Motion does not allude to the possibility of other reasons for dismissal beyond the two set forth on its face. *See* Rule 48(a) Mot. ¶¶ 5-6. To the contrary, the Motion suggests that there are none. *See id.* at 3 (seeking dismissal "[b]ased on the foregoing" reasons). At the February 19 conference, DOJ confirmed that there were no other bases asserted in the Motion. *See* Feb. 19 Conf. Tr. at 22:18-22 (confirming that the Court's "understanding that the motion contains no statement about the government's views regarding the strength of the case in terms of the facts or the legal theory" is "correct"); *id.* at 22:18-25 (stating that "[t]here are two" bases for the Motion, neither of which concerned the merits). While counsel for DOJ stated "I do have other concerns" about the case, he disclaimed reliance on them for purposes of the Rule 48(a) Motion, explaining that the Government is "not asking the court to rely on any" reasons for dismissal beyond what is stated in the Motion itself. *Id.* at 22:5-13. And DOJ's February 10 Decisional Memo is unequivocal in this regard, stating that "[t]he Justice Department has reached this conclusion *without assessing the strength of the evidence or the legal theories on which the case is based*, which are issues on which we defer to the U.S. Attorney's Office at this time." Feb. 10 Decisional Memo at 1 (emphasis added). It was only in response to this Court's Order

---

The Court held that the Government's first theory was permissible under Second Circuit precedent, though it acknowledged that it was "not inconceivable" that the controlling law might change at some point. *Id.* at 19; *see also id.* at 20-22. But that is always in some sense true, and "district courts are obliged to follow Circuit precedent, even if that precedent *might* be overturned in the near future." *Id.* at 19 (citing *Packer ex rel. 1-800-Flowers.Com, Inc. v. Raging Cap. Mgmt., LLC*, 105 F.4th 46, 54 (2d Cir. 2024)). As for the second theory, the Court explained that "there is no real dispute that the issuance of a TCO is a specific and formal exercise of governmental power" sufficient to form the basis of a bribery charge under any legal theory. *Id.* at 21.

requesting further briefing on several questions, none of which concerned the reasons for the

Motion, that DOJ raised this additional ground for dismissal.[57]

As a threshold procedural matter, a *post hoc* rationale not stated in the motion itself cannot

be a basis for granting it. *See Greater Blouse*, 228 F. Supp. at 486-87; *cf. Dep't of Homeland Sec.*

*v. Regents of the Univ. of Cal.*, 140 S. Ct. 1891, 1909 (2020) (holding that, under arbitrary and

capricious review in the administrative law context, "[t]he basic rule here is clear: An agency must

defend its actions based on the reasons it gave when it acted," not on "impermissible post hoc

rationalizations . . . not properly before [the court]"); *Sec. & Exch. Comm'n v. Chenery Corp.*, 318

U.S. 80, 93-94 (1943) (noting that the government's "action must be measured by what [it] did,

not by what it might have done"). As noted, the requirement that the government state its reasons

for dismissal is necessary for the Court to exercise its discretion under Rule 48(a). It also promotes

public transparency and accountability. As the Third Circuit has explained:

> Even though a judge's discretion under Rule 48(a) is severely cabined, the rule may serve
> an important interest as an information- and accountability-producing vehicle. A judge who
> hears a Rule 48(a) motion has independent responsibilities that may bear on his or her
> decision on the requested dismissal. In other words, there are independent rights, interests,

---

[57] To be sure, in his February 13 letter to U.S. Attorney Sassoon, Acting DAG Bove stated that he has "many other concerns about this case," which he described as turning on "factual and legal theories that are, at best, extremely aggressive." Feb. 13 Letter at 7. Mayor Adams also points to a statement by the Attorney General that the case was "incredibly weak," and has previously referenced similar statements to the same effect by the DOJ Chief of Staff. *See* Adams Br. at 6; Def.'s Feb. 21, 2025 Letter at 1. Assuming these concerns were well founded, they still do not contradict the February 10 Decisional Memo's statement that DOJ reached its determination regarding dismissal without assessing the strength of the case.

Separately, the Court notes that the statements referenced by Mayor Adams appear to violate Local Criminal Rule 23.1, which prohibits extrajudicial statements regarding an "opinion . . . in connection with pending or imminent criminal litigation . . . if there is a substantial likelihood that the dissemination will interfere with a fair trial or otherwise prejudice the due administration of justice." S.D.N.Y. & E.D.N.Y. L. Crim. R. 23.1(a). The Rule provides that "[a]ny opinion as to . . . the merits of the case" "presumptively involve[s] a substantial likelihood that their public dissemination will interfere with a fair trial or otherwise prejudice the due administration of justice within the meaning of this rule." *Id.* at 23.1(d)(7).

and duties that a court may protect . . . through using Rule 48(a) as a "sunshine" provision that exposes the reasons for prosecutorial decisions.

*In re Richards*, 213 F.3d 773, 788 (3d Cir. 2000).

None of this is meant to suggest that it would be wholly impermissible for the government to have, in addition to valid reasons that are expressly stated, other unstated reasons for dropping a prosecution. But if the reasons actually articulated in a Rule 48(a) motion itself are insufficient, and dismissal can be justified only by resort to other grounds, then the omission of those other reasons misleads the court and the public, undermining political accountability. Under such circumstances, it would flout Rule 48(a)'s requirement of leave of court to grant a motion based on belatedly offered rationales. *See Ammidown*, 497 F.2d at 620 ("Rule 48(a)'s requirement of judicial leave . . . contemplates exposure of the reasons for dismissal."). Here, DOJ has affirmatively asked the Court to rely on the reasons in its Rule 48(a) Motion and has argued that these reasons are a sufficient basis for granting the Motion. *See* Feb. 19 Conf. Tr. at 22:5-17. The Court therefore cannot permit DOJ to rely on a *post hoc* rationale not stated in the Motion itself. "[W]hen so much is at stake, . . . the Government should turn square corners in dealing with the people." *Regents*, 140 S. Ct. at 1909. For these reasons, the Court cannot consider DOJ's belated merits-based arguments in adjudicating this motion.

### D.    Application of Rule 48(a) to the Full Record before the Court

In sum, the Court is left with one rationale that is unsubstantiated and appears pretextual (the "appearances of impropriety" rationale), and one that is unprecedented and possibly a *quid pro quo* arrangement (the immigration enforcement rationale). The Court now turns to whether these rationales form a sufficient basis to grant dismissal, starting with Rule 48(a)'s procedural requirements.

Plainly, a pretextual rationale cannot satisfy the Government's obligation to set forth the "real grounds upon which the application is based," *Greater Blouse*, 228 F. Supp. at 486. If it were faced with a motion based solely on a pretextual rationale, a court would be well within its discretion to deny the motion and require the government to come forward with its *actual* reasons for seeking dismissal. Indeed, it seems that a court—which must set forth the basis for a decision to grant leave—could not properly exercise its discretion otherwise. *See Derr*, 726 F.2d at 619 (concluding that "the trial court at the very least must know the prosecutor's reasons for seeking to dismiss the indictment").

Here, however, DOJ has put forward at least one rationale that seems to be a real purpose of the Rule 48(a) Motion: It believes dismissal will facilitate the administration's "immigration initiatives and policies." Rule 48(a) Mot. ¶ 6. There is nothing in the record to suggest that immigration enforcement is *not* a real reason for the Motion. Denial of the Motion on procedural grounds is unnecessary for the Court to uncover that purpose, and for the public to understand it.

The Court therefore turns next to Rule 48(a)'s substantive safeguards, starting with the Rule's apparent principal purpose—that is, to safeguard the rights of the defendant. Plainly, denial of the Motion would not protect Mayor Adams's rights. A dismissal *with prejudice* would better protect his right to be free from prosecutorial harassment, as previously discussed. To be sure, it is not a perfect solution, because such a ruling would apply only to the charges in the Indictment. *Cf.* Oct. 2 Hr'g Tr. at 4:2-12; Gov't Opp'n Mot. Bill of Particulars at 22; Sassoon Letter at 5. But the bottom line is that, if the request for dismissal without prejudice constitutes an effort to obtain policy concessions from the Mayor on immigration enforcement, that is all the more reason to dismiss this case permanently.

That leaves the "bad faith" and "public interest" prongs of Rule 48(a). As an initial matter, a request grounded in pretext cannot be made in good faith. *Cf. Ammidown*, 497 F.2d at 620-21

(contrasting "an application made in good faith" with one where "the assigned reason for dismissal has no basis in fact"); *United States v. Hayden*, 860 F.2d 1483, 1489 (9th Cir. 1988) (explaining that use of "the Rule 48(a) motion as a pretext to bypass [the court's] denial of [a] continuance" would be "a clear act of bad faith"). And some courts have found bad faith and the public interest to be two sides of the same coin. *See, e.g.*, *Smith*, 55 F.3d at 159.

But the disservice to the public interest in this case goes beyond DOJ's reliance on a pretextual rationale. If it is true that DOJ sought to extract a public official's cooperation with the administration's agenda in exchange for dropping a prosecution, that would be "clearly contrary to the public interest," *Cowan*, 524 F.2d at 513, and a grave betrayal of the public trust, because it would violate norms against using prosecutorial power for political ends. *See, e.g.*, Criminal Justice Standards for the Prosecution Function, Standard 3-1.6(a) (Am. Bar. Ass'n 2017) ("A prosecutor should not use other improper considerations, such as partisan or political or personal considerations, in exercising prosecutorial discretion.").

Threatening federal indictment to compel compliance with federal regulatory objectives by a state or local official also raises significant federalism concerns. It is well established that "the Federal Government may not compel the States to implement, by legislation or executive action, federal regulatory programs." *Printz v. United States*, 521 U.S. 898, 925 (1997). Although this prohibition has typically been applied to acts of Congress, the principles that underpin it—namely, federalism and political accountability—would similarly preclude an attempt by the federal executive branch to coerce a state or local official into implementing federal policy objectives.[58]

---

[58] That prohibition applies even where state or local officials consent to federal compulsion, because "[t]he interests of public officials . . . may not coincide with the Constitution's intergovernmental allocation of authority." *New York v. United States*, 505 U.S. 144, 183 (1992). "The Constitution does not protect the sovereignty of States for the benefit of the States . . . as abstract political entities, or even for the benefit of the public officials governing the States." *Id.*

*See* U.S. Dep't of Just., Just. Manual § 9-16.110 (2020) (cautioning that "[p]lea bargains with defendants who are elected public officers can present issues of federalism . . . when they require the public officer defendant to take action that affects his or her tenure in office").  Here, the fact that, after DOJ made the decision to seek dismissal of his case, Mayor Adams decided to issue an executive order in alignment with current "federal immigration initiatives and policies," Rule 48(a) Mot. ¶ 6, but in apparent conflict with New York City law, *see* N.Y.C. Admin. Code § 9-131(h)(2), is troubling to say the least.  It suggests that the federal government is using the pendency of a federal indictment to override the City's laws in favor of its own policy goals.

And even if there were no *quid pro quo*, the breadth of DOJ's immigration enforcement rationale here is stunning.  As DOJ acknowledges, the invocation of this rationale in the context of a public corruption prosecution is without precedent.  *See* Feb. 19 Conf. Tr. at 31:13-20 (responding, "I'm not aware of a case where it's a public official at issue," when asked whether "this rationale has been invoked in a decision to dismiss an indictment or to cease a prosecution in some way where the defendant is a public official with important responsibilities with respect to public safety, immigration, or national security, or the like").  The Court is similarly unaware of a single instance in which the Government dismissed a public official's indictment because his position implicated matters of public safety, national security, or immigration.

---

at 181.  "Rather, federalism secures to *citizens* the liberties that derive from the diffusion of sovereign power." *Id.* (emphasis added) (quoting *Coleman v. Thompson*, 501 U.S. 722, 759 (1991) (Blackmun, J., dissenting)).

In addition to securing liberty, the prohibition against federal commandeering of state and local officials has been held to promote political transparency and accountability.  "[W]here the Federal Government directs the States to regulate, it may be state officials who will bear the brunt of public disapproval, while the federal officials who devised the regulatory program may remain insulated from the electoral ramifications of their decision." *New York*, 505 U.S. at 169.  The anti-commandeering principle ensures that "state governments remain responsive to the local electorate's preferences; state officials remain accountable to the people." *Id.* at 168.

In arguing that executive policy priorities are sometimes cited in support of dismissal determinations, DOJ cites, as an example, the prior administration's release of Viktor Bout in exchange for Russia's release of a well-known American athlete.  *See* DOJ Br. at 7 (citing *United States v. Bout*, No. 08 Crim. 365 (S.D.N.Y. Nov. 29, 2022).  This comparison is confusing.  First, it is odd that DOJ would analogize its decision to dismiss Mayor Adams's indictment—which it vehemently denies is a *quid pro quo*—to a prisoner exchange that was explicitly a *quid pro quo*.  Moreover, it is inapt to compare an exchange negotiated between two sovereign nations, neither of which is beholden to the laws of the other, to the Government's decision to dismiss the indictment of an elected public official who is subject to local, state, and federal laws.

The unprecedented nature of DOJ's rationale is particularly concerning given its view that its decision is "virtually unreviewable" because it "invocates concerns about executive power that go right to the core of Article II of the Constitution."  Feb. 19 Conf. Tr. at 23:20-24.  If that is correct, DOJ's position has rather broad implications, to put it mildly.  For instance, DOJ endorsed the view that the government can apply this rationale to virtually any public official with immigration-related responsibilities—ranging from a local police commissioner to the governor of a border state—and determine that they are essentially immune from criminal liability.  *See id.* at 32:22-34:8.

And despite denying that this case involves a *quid pro quo* with Mayor Adams, DOJ argues that there would be nothing wrong with the executive branch explicitly conditioning dismissal of charges against a public official in exchange for his support of the administration's policy agenda.  *See id.* at 49:5-7 (arguing that, "even if there was a *quid pro quo*," it would not affect the validity of the Government's Rule 48(a) Motion).  DOJ goes so far as to contend that, as a matter of law, a promise to trade dismissal of the Indictment for the Mayor's efforts with respect to immigration enforcement cannot constitute a *quid pro quo*.  *See* DOJ Br. at 10 (quoting *United States v.*

*Blagojevich*, 794 F.3d 729, 734 (7th Cir. 2015), for the proposition that "a proposal to trade one public act for another, a form of logrolling, is fundamentally unlike the swap of an official act for a private payment"). DOJ's reliance on *Blagojevich* is misplaced. There, the Seventh Circuit cautioned against "a rule making everyday politics criminal." *Blagojevich*, 794 F.3d at 735. This Court is unaware of any case suggesting that the decision to *prosecute* a public official is the kind of public act that may be horse-traded away in the course of "everyday politics" as "a form of logrolling." To the contrary, ethics rules prohibit such political considerations in the exercise of prosecutorial discretion. *See* ABA Standard 3-1.6(a).

DOJ's arguments trigger concerns regarding political favoritism in prosecutorial decision-making, which Rule 48(a) was designed, in part, to address. *See* Wright & Miller, *supra*, §802 n.2.50 (explaining the adoption of Rule 48(a)'s requirement of leave of court was "motivated by a concern that prosecutors were seeking dismissals of politically well-connected defendants."). More broadly, "[t]he Constitution created a government dedicated to equal justice under law," *Cooper v. Aaron*, 358 U.S. 1, 19 (1958), not one in which criminal liability may depend on the defendant's alignment with the policy preferences of the incumbent administration. The breathtaking implications of DOJ's position—which were apparently well-understood by the numerous attorneys at USAO-SDNY and DOJ who resigned rather than sign this Rule 48(a) Motion—are difficult to square with the words engraved above the front entrance of the United States Supreme Court: "Equal Justice Under Law."

Ultimately, however, the Court would be overreaching if it attempted to force this prosecution to continue. As noted above, a court is not situated—either in terms of institutional competence, or as a matter of its proper role in our constitutional system—to make an assessment as to whether a prosecution "should" continue. A court's role is to preside over cases, not to determine if a case should be prosecuted. If an individual line prosecutor agreed to dismiss a case

pursuant to a corrupt bargain, a court could deny the motion as contrary to the public interest, "and a different assistant U.S. attorney [c]ould continue with the prosecution," *In re United States*, 345 F.3d at 454, or make a new determination based on legitimate criteria to dismiss the case.  But it is another matter where, as here, the problematic rationale is put forward by the Justice Department itself, which represents that it will not go forward with the case under any circumstances.  *See* DOJ Br. at 17 (explaining that "the Justice Department has assumed responsibility for this case and determined that it should not be prosecuted," and that if leave were denied the Department would not devote any resources to prosecuting the case); Adams Br. at 19 ("[T]here is zero chance that the current leadership of the Department of Justice would instruct another prosecutor to continue the prosecution.").[59]

Thus, whatever teeth the public interest inquiry might have under Rule 48(a), denying dismissal as contrary to the public interest would be futile as a practical matter where, as here, the Motion was filed by DOJ itself.  *See id.*; *Nederlandsche*, 453 F. Supp. at 463.  While the Court could deny the Motion, allow seventy days to pass, and then dismiss the case on Speedy Trial Act grounds, it is hard to see what good that would accomplish.  And, given that seventy days from the date of this Opinion would take us uncomfortably close to the June 24, 2025 New York City mayoral primary election,[60] the Court concludes that, if dismissal is inevitable, the public interest weighs in favor of its happening now rather than later.

---

[59] The situation would arguably be different after entry of a judgment of conviction (pursuant to either a plea or a trial verdict).  In such a scenario, the government's role in the case would be largely complete; all that would remain would be for the Court to sentence the defendant. At that point, a determination by the court that dismissing the case would be contrary to the public interest might not raise the same separation of powers concerns.  *Cf. Flynn*, 507 F. Supp. 3d 116.

[60] *See* Board of Elections in the City of New York, Primary Election 2025, https://vote.nyc/election/primary-election-2025 [https://perma.cc/S72Q-WQDM].  Seventy days from the date of this decision is June 11, 2025.  Early voting begins on June 14, 2025.  *See id.*

For similar reasons, the Court concludes that further inquiry is not necessary at this time. Various *amici* have urged this Court to hold an evidentiary hearing to unearth more details regarding the events leading up to DOJ's Motion to Dismiss this case. *See, e.g.*, Common Cause Letter at 4 n.3, ECF No. 164; Former Federal Jurists Br. at 11-12. Another *amicus* has counseled against that route, arguing that there is essentially no authority for "[a]ny judicial inquiry into criminal dismissal decisions" "beyond a narrow focus on the defendant's constitutional rights." Separation of Powers Clinic Br. at 2, 6, ECF No. 143-1. There is some precedent indicating that a court may, under some circumstances, hold an evidentiary hearing when considering a Rule 48(a) Motion. *See, e.g.*, *Ocasio*, 623 F. Supp. 2d at 139. As DOJ itself suggested at a conference, further inquiry may be appropriate where there are some indicia of bad faith. *See* Feb 19 Conf. Tr. at 42:23-24 (stating, in response to whether a court may look beyond the four corners of a Rule 48(a) Motion, that it "boils down to whether there's bad faith").

Here, however, the Court concludes that no such further inquiry is necessary. While some questions remain for those seeking a complete picture of how the decision to dismiss unfolded (e.g., what exactly was said at the January 31 meeting between SDNY, DOJ, and Adams's counsel, and what USAO-SDNY said in its follow-up letter to DOJ), the record already makes clear that a least one of the rationales the Department has advanced is in fact a "real" basis for the Motion: DOJ has determined that dismissing this case will advance "federal immigration initiatives and policies." Rule 48(a) Mot. ¶ 6. No further factual development is necessary to arrive at that conclusion. And delving deeper would not change the ultimate outcome here, because the Court—even if it were so inclined—could not force the Government to prosecute this case by denying the Motion.

The discussion above, however, illustrates yet another reason why dismissal *with prejudice* is the most appropriate outcome here. "Rule 48(a) . . . permits courts faced with dismissal motions

to consider the public interest in the fair administration of criminal justice and the need to preserve the integrity of the courts." *Carrigan*, 778 F.2d at 1463.  As the court-appointed *amicus* noted, "if improper considerations tainted the decision to seek dismissal, then there is *a fortiori* every reason to protect the defendant from the threat of re-indictment."  Clement Br. at 22.  If in fact DOJ's immigration enforcement rationale amounts to a *quid pro quo* to extract policy concessions from the Mayor, then it is difficult to imagine a more egregious example of the kind of prosecutorial harassment Rule 48(a) is intended to guard against.  Such an arrangement would be bad for Mayor Adams, and it would be bad for the people of New York City.  And the Court cannot be complicit in it.

## CONCLUSION

DOJ's position on this Motion is essentially as follows: the Court should dismiss this prosecution because (1) it is tainted with impropriety; (2) it is detrimental to national security and immigration enforcement; and (3) it was a weak case to begin with—but the Court should also allow DOJ to bring the prosecution back at any time, for essentially any reason.

For the reasons stated above, the Court cannot and will not authorize such a result.  There may or may not be good reasons to drop this prosecution.  But the reasons articulated by DOJ, if taken at face value, are inconsistent with a decision to leave the charges in the Indictment hanging like the proverbial Sword of Damocles over the Mayor.  If dismissal is to be granted, such dismissal should be *with prejudice* in order to vindicate the purposes of Rule 48(a)—most importantly the protection of a defendant's right to be free from prosecutorial harassment.  That is clear from the submissions of the parties alone, without resort to any other factual materials submitted by *amici*.  And there are many reasons to be troubled by DOJ's proffered rationales—further supporting dismissal with prejudice.

Some will undoubtedly find today's decision unsatisfying, wondering why, if DOJ's ostensible reasons for dropping this case are so troubling, the Court does not simply deny the Motion to Dismiss altogether. But, as explained above, the Court cannot order DOJ to continue the prosecution, and it is aware of no authority (outside of the criminal contempt context) that would empower it, as some have urged, to appoint an independent prosecutor. Therefore, any decision by this Court to deny the Government's Motion to Dismiss would be futile at best, because DOJ could—and, by all indications, unequivocally would—simply refuse to prosecute the case, inevitably resulting in a dismissal after seventy days for violating the Mayor's right to a speedy trial. That route would simply postpone finality in this case to a date uncomfortably close to the June 24 mayoral primary. The public interest would not be served by such an outcome.

To be clear, the Court again emphasizes that it does not express any opinion as to the merits of the case or whether the prosecution of Mayor Adams "should" move forward. The Court notes only that it has no authority to require that it continue, and that the remedy for what some *amici* characterize as an abuse of power cannot be for the Court to arrogate to itself more power than it may properly wield in our system of government. It is precisely in the most difficult cases that it is most critical to adhere to constitutional principles. That includes recognizing the limits of this Court's constitutional authority consistent with the separation of powers.

Ultimately, because the decision to discontinue a prosecution belongs primarily to a political branch of government, it is the public's judgment, and not this Court's, that truly matters. The Court can play only a limited role under Rule 48(a), including by providing a measure of transparency, which in turn may promote public accountability:

> [T]he public has a generalized interest in the processes through which prosecutors make decisions about whom to prosecute that a court can serve by inquiring into the reasons for a requested dismissal. While this interest cannot rise to the substantive ability to compel a prosecution to proceed, it does argue in favor of allowing a court to force prosecutors to publicly reveal their reasons for not proceeding before granting a requested dismissal.

Bringing these decisions into the open may, in turn, lead to attempts by the public to influence these decisions through democratic channels.

*In re Richards*, 213 F.3d at 789 (citation omitted).

In sum, for the reasons above, DOJ's Motion, ECF No. 122, is **GRANTED** to the extent that the Indictment is dismissed. But it is **DENIED** as to the request that dismissal be "without prejudice." Accordingly, it is hereby **ORDERED** that the Indictment against Eric Adams, ECF No. 2, is **DISMISSED WITH PREJUDICE**. The Clerk of Court is respectfully directed to terminate ECF No. 122 and to close this case.

SO ORDERED.

Dated: April 2, 2025

New York, New York

_____

DALE E. HO
United States District Judge