UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

# 23 MAG 5464

In the Matter of a Warrant for All
Content and Other Information
Associated with the iCloud Account
██████████@gmail.com Maintained at
Premises Controlled by Apple Inc.,
USAO Reference No. 2021R00778

**TO BE FILED UNDER SEAL**

**AGENT AFFIDAVIT**

**Agent Affidavit in Support of Application for a Search Warrant
for Stored Electronic Communications**

STATE OF NEW YORK          )
                                               ) ss.
COUNTY OF NEW YORK   )

██████████, being duly sworn, deposes and states:

## I. Introduction

### A. Affiant

1.  I have been a Special Agent with the Federal Bureau of Investigation ("FBI") for over three years.  I am assigned to a public corruption squad in the FBI's New York office and have participated in investigations involving campaign finance offenses and public corruption.  As part of those investigations, I have participated in the execution of search warrants involving electronic evidence.

### B. The Provider, the Subject Account, and the Subject Offenses

2.  I make this affidavit in support of an application for a search warrant pursuant to 18 U.S.C. § 2703 for all content and other information associated with the iCloud account ██████████@gmail.com (the "Subject Account"), maintained and controlled by Apple Inc. (the "Provider"), headquartered at 1 Infinite Loop, Cupertino, California 95014. The information to be searched is described in the following paragraphs and in Attachment A to the proposed warrant.

09.20.2021

2

SDNY_01_000004493
SUBJECT TO PROTECTIVE ORDER.

3.    As detailed below, there is probable cause to believe that the Subject Account contains evidence, fruits, and instrumentalities of theft of federal funds, wire fraud, making and soliciting a contribution by a foreign national, and conspiracy to commit the same, in violation of 18 U.S.C. §§ 371, 666, 1343, and 1349, and 52 U.S.C. § 30121 (the "Subject Offenses"). This affidavit is based upon my personal knowledge, my review of documents and other evidence, and my conversations with other law enforcement officers, as well as my training and experience concerning the use of email in criminal activity. Because this affidavit is being submitted for the limited purpose of establishing probable cause, it does not include all the facts I have learned during my investigation. Where the contents of documents and the actions, statements, and conversations of others are reported herein, they are reported in substance and in part, except where otherwise indicated.

### C.  Services and Records of the Provider

4.  I have learned the following about the Provider:

a.  Apple is a United States company that produces the iPhone, iPad, and iPod Touch, all of which use the iOS operating system, and desktop and laptop computers based on the Mac OS operating system.

b.  Apple provides a variety of services that can be accessed from Apple devices or, in some cases, other devices via web browsers or mobile and desktop applications ("apps"). As described in further detail below, the services include email, instant messaging, and file storage:

i.  Apple provides email service to its users through email addresses at the domain names mac.com, me.com, and icloud.com.

ii.  iMessage and FaceTime allow users of Apple devices to communicate in real-time.  iMessage enables users of Apple devices to exchange instant messages ("iMessages")

09.20.2021

SDNY_01_000004494
SUBJECT TO PROTECTIVE ORDER.

containing text, photos, videos, locations, and contacts, while FaceTime enables those users to conduct audio and video calls.

        iii.  iCloud is a cloud storage and cloud computing service from Apple that allows its users to interact with Apple's servers to utilize iCloud-connected services to create, store, access, share, and synchronize data on Apple devices or via icloud.com on any Internet-connected device.  For example, iCloud Mail enables a user to access Apple-provided email accounts on multiple Apple devices and on iCloud.com.  iCloud Photo Library and My Photo Stream can be used to store and manage images and videos taken from Apple devices, and iCloud Photo Sharing allows the user to share those images and videos with other Apple subscribers. iCloud Drive can be used to store presentations, spreadsheets, and other documents.  iCloud Tabs and bookmarks enable iCloud to be used to synchronize bookmarks and webpages opened in the Safari web browsers on all of the user's Apple devices.  iCloud Backup allows users to create a backup of their device data.  iWork Apps, a suite of productivity apps (Pages, Numbers, Keynote, and Notes), enables iCloud to be used to create, store, and share documents, spreadsheets, and presentations.  iCloud Keychain enables a user to keep website username and passwords, credit card information, and Wi-Fi network information synchronized across multiple Apple devices.

        iv. Game Center, Apple's social gaming network, allows users of Apple devices to play and share games with each other.

        v. Find My iPhone allows owners of Apple devices to remotely identify and track the location of, display a message on, and wipe the contents of those devices.  Find My Friends allows owners of Apple devices to share locations.

4

09.20.2021

SDNY_01_000004495
SUBJECT TO PROTECTIVE ORDER.

vi. Location Services allows apps and websites to use information from cellular, Wi-Fi, Global Positioning System ("GPS") networks, and Bluetooth, to determine a user's approximate location.

vii. App Store and iTunes Store are used to purchase and download digital content. iOS apps can be purchased and downloaded through App Store on iOS devices, or through iTunes Store on desktop and laptop computers running either Microsoft Windows or Mac OS. Additional digital content, including music, movies, and television shows, can be purchased through iTunes Store on iOS devices and on desktop and laptop computers running either Microsoft Windows or Mac OS.

c. Apple services are accessed through the use of an "Apple ID," an account created during the setup of an Apple device or through the iTunes or iCloud services. The account identifier for an Apple ID is an email address, provided by the user. Users can submit an Apple-provided email address (often ending in @icloud.com, @me.com, or @mac.com) or an email address associated with a third-party email provider (such as Gmail, Yahoo, or Hotmail). The Apple ID can be used to access most Apple services (including iCloud, iMessage, and FaceTime) only after the user accesses and responds to a "verification email" sent by Apple to that "primary" email address. Additional email addresses ("alternate," "rescue," and "notification" email addresses) can also be associated with an Apple ID by the user. A single Apple ID can be linked to multiple Apple services and devices, serving as a central authentication and syncing mechanism.

d. Apple captures information associated with the creation and use of an Apple ID. During the creation of an Apple ID, the user must provide basic personal information including the user's full name, physical address, and telephone numbers. The user may also provide means of payment for products offered by Apple. The subscriber information and password associated

5

SDNY_01_000004496
SUBJECT TO PROTECTIVE ORDER.

with an Apple ID can be changed by the user through the "My Apple ID" and "iForgot" pages on Apple's website. In addition, Apple captures the date on which the account was created, the length of service, records of log-in times and durations, the types of service utilized, the status of the account (including whether the account is inactive or closed), the methods used to connect to and utilize the account, the Internet Protocol address ("IP address") used to register and access the account, and other log files that reflect usage of the account.

   e. Additional information is captured by Apple in connection with the use of an Apple ID to access certain services. For example, Apple maintains connection logs with IP addresses that reflect a user's sign-on activity for Apple services such as iTunes Store and App Store, iCloud, Game Center, and the My Apple ID and iForgot pages on Apple's website. Apple also maintains records reflecting a user's app purchases from App Store and iTunes Store, "call invitation logs" for FaceTime calls, "query logs" for iMessage, and "mail logs" for activity over an Apple-provided email account. Records relating to the use of the Find My iPhone service, including connection logs and requests to remotely lock or erase a device, are also maintained by Apple.

   f. Apple also maintains information about the devices associated with an Apple ID. When a user activates or upgrades an iOS device, Apple captures and retains the user's IP address and identifiers such as the Integrated Circuit Card ID number ("ICCID"), which is the serial number of the device's SIM card. Similarly, the telephone number of a user's iPhone is linked to an Apple ID when the user signs into FaceTime or iMessage. Apple also may maintain records of other device identifiers, including the Media Access Control address ("MAC address"), the unique device identifier ("UDID"), and the serial number. In addition, information about a user's computer is captured when iTunes is used on that computer to play content associated with

09.20.2021

SDNY_01_000004497
SUBJECT TO PROTECTIVE ORDER.

an Apple ID, and information about a user's web browser may be captured when used to access services through icloud.com and apple.com. Apple also retains records related to communications between users and Apple customer service, including communications regarding a particular Apple device or service, and the repair history for a device.

g. Apple provides users with five gigabytes of free electronic space on iCloud, and users can purchase additional storage space. That storage space, located on servers controlled by Apple, may contain data associated with the use of iCloud-connected services, including: email (iCloud Mail); images and videos (iCloud Photo Library, My Photo Stream, and iCloud Photo Sharing); documents, spreadsheets, presentations, and other files (iWork and iCloud Drive); and web browser settings and Wi-Fi network information (iCloud Tabs and iCloud Keychain). iCloud can also be used to store iOS device backups, which can contain a user's photos and videos, iMessages, Short Message Service ("SMS") and Multimedia Messaging Service ("MMS") messages, voicemail messages, call history, contacts, calendar events, reminders, notes, app data and settings, Apple Watch backups, and other data. Records and data associated with third-party apps may also be stored on iCloud; for example, the iOS app for WhatsApp, an instant messaging service, can be configured to regularly back up a user's instant messages on iCloud Drive. Some of this data is stored on Apple's servers in an encrypted form but can nonetheless be decrypted by Apple.

**D. Jurisdiction and Authority to Issue Warrant**

5. Pursuant to 18 U.S.C. §§ 2703(a), (b)(1)(A) & (c)(1)(A), the Government may require a provider of an electronic communications service or a remote computing service, such as the Provider, to disclose all stored content and all non-content records or other information pertaining to a subscriber, by obtaining a warrant issued using the procedures described in the Federal Rules of Criminal Procedure.

7

09.20.2021

SDNY_01_000004498
SUBJECT TO PROTECTIVE ORDER.

6. A search warrant under § 2703 may be issued by "any district court of the United States (including a magistrate judge of such a court)" that "has jurisdiction over the offense being investigated." 18 U.S.C. § 2711(3)(A)(i).

7. When the Government obtains records under § 2703 pursuant to a search warrant, the Government is not required to notify the subscriber of the existence of the warrant. 18 U.S.C. § 2703(a), (b)(1)(A), (c)(2) & (3). Additionally, the Government may obtain an order precluding the Provider from notifying the subscriber or any other person of the warrant, for such period as the Court deems appropriate, where there is reason to believe that such notification will seriously jeopardize an investigation. 18 U.S.C. § 2705(b).

## II. Probable Cause

### A. Probable Cause Regarding the Subject Offenses

8. Since in or about August 2021, the FBI and the Office of the United States Attorney for the Southern District of New York have been investigating the possible receipt of so-called "straw" donations by the 2021 New York City mayoral campaign of Eric Adams (the "Adams Campaign") from employees of ███████████████████████, a construction company that operates in New York City.[1] Based on my review of publicly available information, among other sources, I know that ███ is affiliated with a larger Turkish company and many of its employees are Turkish nationals. As detailed more fully below, Turkey's Consul General in New York was involved in the arrangement of a ███ fundraiser where straw donations were made to the Adams Campaign, the Consul General has communicated about this matter with ███████, a member of Adams' staff, and Adams has communicated with ███████ about

---

[1] A straw, or "conduit," donation occurs when a donation to a political campaign is made in the name of one donor, but the funds in question in fact belong to a different person.

8

09.20.2021

SDNY_01_000004499
SUBJECT TO PROTECTIVE ORDER.

fundraising in the Turkish community and the potential provision of benefits to the Consul General. Adams and members of his staff have intervened in at least one matter within the purview of the New York City government to obtain favorable action for the Consul General. This warrant seeks permission to search an iCloud account (the "Subject Account") used by ███████, a Turkish national who has communicated with ██████ about donating funds from Turkish nationals to the Adams Campaign under false identities.

### *The Adams Campaign and New York City's Matching Funds Program*

9.  I understand, based on my review of publicly available information, that:

a.  The Adams Campaign accepted matching funds from the New York City Campaign Finance Board throughout a significant part of its campaign ("Matching Funds"), meaning that the Adams Campaign received funds from the New York City government as a result of donations the Adams Campaign received from private donors that were eligible for matching funds.[2]

b.  Under New York City law, the Adams Campaign was eligible to receive $2,000 in Matching Funds, and no more than $2,000 in Matching Funds, for each donation of $250 from an individual donor who resides within New York City, subject to certain exceptions not relevant here. If an individual donated more than $250, any amount in excess of $250 would not be eligible for matching funds.[3]

---

[2]  *See, e.g.*, https://www.ny1.com/nyc/all-boroughs/news/2021/10/08/eric-adams-is-taking-a-rare-step--turning-down-campaign-cash (reporting on the Adams Campaign's prior acceptance of matching funds and decision to turn down some matching funds as of October 7, 2021); https://www.nyccfb.info/VSApps/CandidateSummary.aspx?as_cand_id=1545&as_election_cycl e=2021&cand_name=Adams%2C+Eric+L&office=Mayor&report=summ (New York City Campaign Finance Board's report detailing total public funds disbursed to Adams Campaign).

[3]  *See* https://www.nyccfb.info/program/how-it-works.

09.20.2021

SDNY_01_000004500
SUBJECT TO PROTECTIVE ORDER.

c.  New York City receives in excess of $10,000 per year in federal funding.[4]

### *The Suspected Straw Donations*

10. I understand, based on information provided by the New York City Campaign Finance Board, that the Adams Campaign received the following donations, among others, on May 7, 2021:

| AMOUNT | NAME | CITY | STATE | OCCUPATION | EMPLOYER NAME |
|--------|------|------|-------|------------|---------------|
| $1,500 | Arkan, Erden | New York | NY | Owner | ███████ |
| $1,200 | ██████ | Flushing | NY | Sr.     Prod. Manager | ███████ |
| $1,250 | ██████ | Brooklyn | NY | Account Manager | ███████ |
| $1,250 | ██████ | Flushing | NY | Construction | ███████ |
| $1,250 | ██████ | Cliffside Park | NJ | Business Logistics | ███████ |
| $1,250 | ██████ | Brooklyn | NY | PM | ███████ |
| $1,250 | ██████ | Brooklyn | NY | Engineer/ Lawyer | ███████[5] |
| $1,250 | ██████ | Brooklyn | NY | Project manager | ███████ |
| $1,250 | ██████ | Ridgewood | NJ | Finance Director | ███████ |
| $1,250 | ██████ | Flushing | NY | Partner | ███████ |

---

[4]  *See* https://comptroller.nyc.gov/wp-content /uploads/2016/11/Federal_Budget_ Vulnerabilities_Memo.pdf

[5]  The description of ████ as an "Engineer/lawyer" at ████ is taken from the donation form submitted to the New York City Campaign Finance Board as part of her donation, but it appears from publicly available information that ████ may not in fact be employed at ████, although as explained in ¶ 12, her husband does appear to be employed at ████.

09.20.2021

SDNY_01_000004501
SUBJECT TO PROTECTIVE ORDER.

| $1,250 | ███████ | New York | NY | Accountant | ███ |
|--------|---------|----------|----|-----------|-----|

The individuals listed in this table are hereinafter referred to as the "Donors."

11. I have further confirmed that, with the exception of the donations by ████████ and ████████, Matching Funds were issued in connection with each of the donations identified above.[6]

12. Bank records for ████ indicate that on April 28, 2021, ████ issued checks in the amount of $1,250 to each of the Donors with the exception of Arkan and ████ and also issued a $1,250 check to ████████. I know from law enforcement databases that ████ is ████ spouse. I know from my review of emails sent to and from each of the Donors except for ████ and also including emails sent to and from ████ (collectively, the "████ Emails"), obtained pursuant to a search warrant, that ████ is also employed by ████. As noted above, Arkan's donation to the Adams Campaign identifies Arkan as an or the owner of ████. Thus, on April 28, 2021, ████ paid each of the Donors the amount of their May 7, 2021 donation, with the exceptions of ████ whose husband instead received a check for that amount; Arkan, whose donation form describes him as the owner of ████; and ████ who donated $50 less to the Adams Campaign than ████ received from ████.

***The ████ Emails***

13. I know from my review of the ████ emails, in substance and in part, that:

    a. On April 10, 2021, Arkan sent an email (the "April 10 Email") in Turkish[7] to seven individuals, five of whom have corporate email addresses indicating involvement in the

---

[6]    I understand that Matching Funds are only available for donations made by persons who reside in New York City, and both ████ and ████ reside in New Jersey.

[7]    Many of the ████ emails, as well as other communications below, are written wholly or partly in Turkish. I have reviewed draft summaries of those emails prepared by a Turkish linguist

09.20.2021

SDNY_01_000004502
SUBJECT TO PROTECTIVE ORDER.

construction industry.  Arkan also copied seven ███ employees, of whom four are Donors and

one of whom, ███ is the husband of a Donor.  Arkan wrote, in substance and in part, that: In

the previous week he had met with (then) Brooklyn Borough President Eric Adams, and the New

York General Consul (who I understand, based on information discussed below, to be Turkey's

New York Consul General) also joined them; Adams is running for New York City Mayor and has

warm feelings for Turkish business people; Arkan knows that the recipients of the email have been

supporting Adams so far, but "they" (from context, ███) are organizing a very special event in

Arkan's office on May 5th, between 5 and 6:30 pm; the recipients of the email should participate

in the event and contribute; this may "feel like swimming against the current" but unfortunately,

this is how things are done in this country; and this will hopefully be a successful fundraising

event.

      b.   On April 21, 2021, Arkan sent an email to four individuals to thank them all for

participating in an unspecified event.  Arkan further wrote that in the morning, he had spoken with

"Consul General ███████," who was very happy and thought that mid-May would be an

appropriate target date.  I know from publicly available materials that ███████ is the consul

general of Turkey's New York consulate.

      c.   On April 26, 2021, ███████ ███████ (a Donor and ███ employee) asked

Arkan: "Do you want me to email all the people on our list that are capable of making contributions

to find out if they are willing to do it? Also Food and beverages, who would you like me to get to

cater it?"  Arkan responded by forwarding ███ the April 10 Email.

_____

employed by the FBI, which are reflected in this Affidavit.  Quotations to these emails are to the
summaries prepared by the linguist.

09.20.2021

SDNY_01_000004503
SUBJECT TO PROTECTIVE ORDER.

d.  From on or about April 27, 2021 through on or about May 7, 2021, ████ sent a series of emails inviting persons and businesses associated with ████, including the recipients of the April 10 Email, to attend a fundraiser for the Adams Campaign, which Adams personally was scheduled to attend, hosted by ████ on May 7, 2021. Arkan and ████ were consistently copied on these emails.

e.  On April 27 and 28, 2021, Arkan exchanged three emails with ████, who is not a Donor but, based on his email address and the statements in his email, is a ████ employee. In the first email, ████ responds to one of the emails sent by ████ described above in paragraph 13(d), asking whether he should set up a " 'go fund me' kind of thing and share the link with everyone" so that the group could raise funds for Adams toward a target amount using a website. Arkan replied in Turkish and only to ████ stating that it would "cramp their style" to use the method proposed by ████ Arkan further explained that "the goal is to host the man there and to hand the checks to his secretary," that ████ method "is too professional" and that ████ "need[s] to be hands on." ████ replied that he would "polish his checkbook" and attend. According to other ████ Emails I have reviewed, ████ donated $200 to the Adams Campaign.

f.  On May 5, 2021, Arkan emailed ████ and ██ (another Donor and ████ employee): "Don't forget to remind our guest for fundraising event!" Subsequently on May 5, 2021, ████ sent a "friendly reminder regarding our fundraiser with 'Eric Adams for Mayor'" to the parties described above in paragraphs 13(a) and 13(d).

g.  On May 7, 2021, shortly after the scheduled time for the fundraiser, Arkan thanked ████ ██ and ████ (another Donor and ████ employee) for their hard work in making "this event" successful. Arkan copied ████ on this email. As noted above, also on

13

09.20.2021

SDNY_01_000004504
SUBJECT TO PROTECTIVE ORDER.

May 7, 2021, the Donors made donations to the Adams Campaign that largely matched the amount of money ▮▮▮ had paid them on April 28, 2021.

14. On May 10, 2021, ▮▮▮ sent ▮ an email with no subject heading or body, attaching a photograph of a handwritten list (the "List"). The List is entitled "Eric Adams 2021 Donation," and consists of a column of names with corresponding dollar amounts. The List includes all of the Donors and accurately reflects the amount of their donations, except that ▮▮▮ is listed as a donor of $1,250, when according to records maintained by the New York City Board of Elections, it was ▮▮▮ wife, ▮▮▮ ▮▮▮ [8] who donated that amount. The List also reflects smaller donations by ten other individuals or corporations, most of whom appear to have received the emails from ▮▮▮ and Arkan urging contribution that are described above in paragraphs 13(a) and 13(d). In total, the list records $20,000 in donations, of which nearly 70% came from the Donors.

**The ▮▮▮ Messages**

15. I know from my review of media reports, among other sources, that ▮▮▮ is a longtime advisor of Eric Adams who worked in the Special Counsel's office of the Brooklyn Borough President when Adams was Brooklyn Borough President, was involved with the Adams Campaign, and now works in the Mayor's Office for International Affairs. As detailed below, during the course of the Adams Campaign, ▮▮▮ had contact both with Turkish consular officials and with ▮▮▮, and was personally involved with the May 7, 2021 Adams fundraiser held by ▮▮▮, pursuant to which the Donors made their straw donations.

16. Phone records indicate that from between February 8, 2021 and January 14, 2022, a phone number subscribed in ▮▮▮ name (the "▮▮▮ Number") exchanged 22 calls with

---

[8]     On the records provided by the New York City Campaign Finance Board, ▮▮▮ first name is spelled "▮▮▮. On ▮▮▮ bank records as well as the underlying donation slip, however, she uses the common spelling "▮▮▮.

14

SDNY_01_000004505
SUBJECT TO PROTECTIVE ORDER

a phone number subscribed to the Turkish Consulate General (the "Consulate Number").[9]  This includes a call on April 2, 2021.  As explained above, in the April 10 Email, Arkan stated that he had met with the Consul General and Adams in the prior week, and planned to hold a fundraiser for Adams.

17. I have reviewed photographs posted to the Internet on November 18, 2021 by the Turkish General Consulate in New York City showing persons I believe to be ███████ ████ (the Consul General), and Eric Adams together.

18. Toll records indicate that on May 19, 2021, a phone number subscribed to by ████ and a phone number subscribed to by Arkan exchanged two calls, one of which resulted in a call of one minute and 11 seconds duration and the other of which did not result in a listed duration (possibly indicating that the call was not answered).

19. From my review of the contents of an iCloud account and Apple iPhone used by ██████ obtained pursuant to search warrants, I know that ██████ exchanged messages, including over encrypted messaging applications WhatsApp and Signal, with ████ (Turkey's Consul General in New York), Adams, and ██████ ████ a fundraiser for the Adams Campaign, among others, including the following, in substance and in part:

    a.  On June 14, 2018, ██████ and ████ exchanged messages concerning the legal limits for corporate donations in elections.

    b.  On June 28, 2018, ██████ texted ████ "The list for 6/22/18," which appears to be a list of names and dollar amounts.  I know from my review of records maintained by the

---

[9]    These records are not complete, but rather do not include April 2022 and parts of March and May 2022.

09.20.2021

SDNY_01_000004506
SUBJECT TO PROTECTIVE ORDER.

New York City Campaign Finance Board that this list reflects, in part, donations to the Adams Campaign, which had already begun fundraising at that time.

      c.  In October and November 2018, ██████ and Adams exchanged text messages that appear to involve one or more meetings with individuals associated with Turkey, because, among other reasons, the messages referred to the "Group from Turkey (from yesterday meeting)," "my guy from ████████," and several names that I recognize from my experience in this case as commonly used by people of Turkish heritage. On November 6, 2018, after an event that Adams described as "Went well," Adams told ████████ "They showed me a lot of love. Lol. Let's move to the next level."

      d.  On January 13, 2021, ████ and ██████ exchanged messages in which ████ sought a meeting with Adams. ██████ asked ████ "what will the topic be?" ██████ replied, in a series of messages, "The election," "that's what," "Turkish community support to him," and "What can we do, let's talk."

      e.  Between January 20 and February 13, 2021, ████████ communicated with ████ to set up a meeting which eventually occurred on February 14, 2021, and which ████ and Adams attended.

      f.  On April 1, 2021, ██████ sent ████ a "List of people who will attend the meeting," which included Arkan and ██████ As discussed above, the ████ Emails, among other evidence, reflect Arkan stating that he met Adams and ██████ in early April 2021, after which the events leading to the straw donations occurred.

      g.  Between April 11, 2021, and April 21, 2021, ██████ and ████████ exchanged messages that I believe to concern the ██████ fundraiser held for the Adams Campaign on May 7, 2021, discussed above. For example, on April 15, 2021, ████████ and ████ exchanged a series

16

09.20.2021

SDNY_01_000004507
SUBJECT TO PROTECTIVE ORDER.

of proposed dates for "the event," and settled on May 7, 2021. In response to a question from

█████████ about "the location," █████ replied "██████████████ – Headquarters," and

supplied the phone number and a link to the address of █████.

    h. On or about April 21, 2021, █████████ sent █████ the following message: "Also

I gave your number to one of the gentleman [*sic*] from last time dinner[.] He has questions

regarding campaigns[.] His name is Erden Arkan[.]"

    i. On May 7, 2021, █████████ asked █████ for "forms," stating: "They already

collect the checks." Based on █████████ status as a fundraiser for the Adams Campaign and this

message being sent on the day of the █████ fundraiser at which checks for the straw donations were

given to the Adams Campaign, I believe that in this message █████████ requested contribution

forms for the already-made █████ donations.

    j. Between September 6 and 10, 2021, █████████ and █████ exchanged a series

of messages, the substance of which █████████ then relayed to Adams, concerning, in substance

and in part, obtaining a Temporary Certificate of Occupancy ("TCO") for the official opening of

a building associated with the Turkish Consulate in New York in time for a visit by Turkey's

president. In these messages, █████ repeatedly asked █████████ to have "Eric," who I understand

to be Eric Adams, assist in obtaining a TCO from the Fire Department of New York. When

█████████ relayed these requests to Adams, Adams told her that he was speaking with an

unspecified person, who from context appears to be an FDNY official, and was working to "resolve

this." Adams also stated that he had spoken directly "to the council [*sic*] general," who I

understand to be █████ on this subject. On September 10, 2021, █████████ wrote Adams "Problem

was resolved[.] Thank you very much," and Adams replied, "Anything for you █████████

09.20.2021

SDNY_01_000004508
SUBJECT TO PROTECTIVE ORDER.

k.  On April 21, 2022, ████ and ██████ exchanged a series of messages in which ████ asked ██████ in substance, to confirm that Adams would not make "A statement about the Armenia Genocide" on "24th of April," and ██████ replied, "No" "He wont."  I am aware, based on my review of publicly available information, that April 24 is Armenian Genocide Remembrance Day and that the Turkish Government denies that the Armenian Genocide (which was committed by Turkey's government between 1915 and the early 1920s) occurred.  ████ made further requests related to "the Armenians," and ██████ replied, "We try to stop the official requests as much as we can," and "We do not let him get into these kinds of conflicts."

l.  On July 11, 2022, ██████ encouraged ████ to "Ask her all your pending problems regarding this building … Like FDNY approvals."  Based on the messages detailed *supra* ¶ 19(k), I believe ██████ is referencing a building associated with the Turkish Consulate in New York.

### The FDNY and the TCO

20. I have reviewed emails sent by FDNY employees from their official FDNY email accounts, which were obtained by the New York City Department of Investigations ("DOI").  Those emails revealed, in substance and in part, that shortly before Adams' involvement in the Turkish Consulate General's receipt of the TCO discussed above,[10] the Consulate General was requesting the TCO on an urgent basis, without success, because the FDNY would not concur due to concerns about the building's fire safety systems.  Once Adams' involvement began (as reflected

---

[10]  In prior affidavits, I have described this occurrence as the receipt of a TCO "from FDNY," which is consistent with how ██████ appeared to understand the process in her communications with ████ and Adams.  I now understand, based in part on the interview of the Fire Prevention Chief discussed below, that TCOs are in fact issued by the New York City Department of Buildings ("DOB"), although FDNY's concurrence that the building is fit for occupancy is part of the DOB process.

SDNY_01_000004509
SUBJECT TO PROTECTIVE ORDER.

in his messages with ██████████ however, the TCO was issued, without FDNY actually inspecting the location and despite concerns that this omission was unsafe.

21. I have spoken with an FBI agent who interviewed an FDNY Assistant Chief who was the FDNY Chief of Fire Prevention at the time the above TCO was issued (the "Fire Prevention Chief"), and reviewed a report of that interview.  In substance and in part, the Fire Prevention Chief stated that he received requests from multiple New York City officials to concur in the issuance of a TCO for the Turkish Consulate building for over one week prior to September 10, 2021.  The Fire Prevention Chief had been unwilling to agree to issuance of the TCO because, in substance, he was not satisfied with the adequacy of the fire prevention systems in the building. On the afternoon of September 10, 2021, however, FDNY's Chief of Department (the senior uniformed member of the FDNY) told the Fire Prevention Chief that it was important for the TCO to issue, and that he and the Fire Prevention Chief would lose their jobs if it did not.  The Chief of Fire Prevention understood the pressure to facilitate the TCO to be coming from the Adams Campaign.  The Fire Prevention Chief issued a letter which did not conform to FDNY standards but was sufficient for DOB to issue the TCO.  As discussed above, on the afternoon of September 10, 2021, ██████████ relayed to Adams ██████████ request that Adams intervene in this matter and Adams appeared to inform ██████████ that he was speaking with  FDNY personnel to "resolve" the matter.

22. I have spoken with the Chief of Department, whose recollection of the events on September 10, 2021 was less detailed than, but not inconsistent with, the account of the Fire Prevention Chief.

**B.  Probable Cause Regarding the Subject Account**

23. I have reviewed records provided by the Provider showing that the Subject Account is registered in ██████████ name, in addition to using his name as part of the account name.  I know

09.20.2021

19

SUBJECT TO PROTECTIVE ORDER.

from my review of publicly available material, including the publicly accessible parts of █████ social media accounts, that █████ has worked in media, with a focus on lifestyle and technology topics, and has resided in Turkey and the United Kingdom, among other places.  I have viewed pictures of █████ and Adams together on █████ social media.

24. I know from my review of the █████ Messages, that █████ has corresponded with █████ about possible donations to the Adams Campaign originating with Turkish individuals or corporations.  For example:

a.   On June 22, 2018, █████ and █████ discussed a possible trip by Adams to Turkey.  In addition, █████ stated "Fund Raising in Turkey is not legal, but I think I can raise some money for your campaign off the record."  █████ inquired, "How can he declare that money here?"  █████ responded "He won't declare it . . . Or . . . We'll make the donation through a U.S. citizen in the U.S. . . . A Turk . . . I'll give him cash in Turkey . . . Or I'll send it to an American . . . He can make the donation to you."  █████ replied "I don't think he'll get involved in such games, which might transpire into something else later on" but "I'll ask him anyways." Less than two minutes later,[11] the following exchange occurred:

█████        Dearest █████ how much do you think you can come up with? $?

█████        Max $100K

█████        100K?  Can you bring it here? . . . We can't do it while Eric is in TR.

█████        Let's think about this.

---

[11]      In the intervening portion of the conversation, █████ stated that "He," from context, Adams, "actually asked for Ms. █████ assistance" and briefly discussed that topic.  Based on my review of publicly available information, █████ █████ appears to be a prominent Turkish businesswoman who has operated in the New York City area.  It is at present unclear whether this exchange related to the possible contribution, or a separate subject.

20

09.20.2021

SDNY_01_000004511
SUBJECT TO PROTECTIVE ORDER.

b.  On February 11, 2019, ▇▇▇ inquired with ▇▇▇ about a "fundraising event" that "the Turks" would conduct "for Eric." ▇▇▇ informed him that the event would occur on February 22 and invited him to attend.

c.  On July 11, 2021, ▇▇▇ and ▇▇▇ discussed dates for an unnamed event. ▇▇▇ also asked ▇▇▇ "how much did you decide to raise/donate?" ▇▇▇ replied "We should raise/donate 40-50" and "We won't go below 50."  Shortly thereafter, the following exchange occurred:



▇▇▇    He had mention 200K. . . . Didn't happen?

▇▇▇    We can't work out the number of people . . . Otherwise it's easy

▇▇▇    I can work out the number of people

▇▇▇    Hmmm then great!

▇▇▇    From what I gathered you'll distribute the money

▇▇▇    Yes

▇▇▇    Not everyone has to attend the event.

d.  Between October 10 and 12, 2021, ▇▇▇ asked ▇▇▇ "Did you get the money from ▇▇▇?" ▇▇▇ stated "Only 4000." ▇▇▇ replied "Interesting . . . The rest should come."  Based on my review of publicly available information, ▇▇▇ appears to refer to ▇▇▇▇▇▇, a Washington, D.C., based university which is partners with a Turkish university named ▇▇▇▇▇▇.  Records maintained by the New York City Campaign Finance Board indicate that on September 27, 2021, five employees of ▇▇▇ donated $2,000 each to the Adams Campaign.  The Adams Campaign returned all five donations the same day they were received.

e.  On April 30, 2022, ▇▇▇ and ▇▇▇ exchanged the following messages:

21

09.20.2021

SDNY_01_000004512
SUBJECT TO PROTECTIVE ORDER.

██████    Are the accounts open for Eric's election campaign?

██████    Hello dear . . . Of course they're open

██████    What's the maximum amount per person? Isn't there another way to make larger donations?

███████   We talked about this recently. 2500 per person.

██████    I understand

██████    Yes

██████    Can someone make a donation to NYC?  200-300K etc.

██████    It happens . . . But it has to be companies here

██████    There are some

███████   They can't accept it from outside

██████    A U.S. company need to make the donation . . . Can we talk some time?

25. I have also obtained records pursuant to a search warrant for an iCloud account used by ██████.[12] I know based on my investigation of this case that ████ was an employee of ████████████ stationed in New York City who was involved in assisting Adams with travel to Turkey in coordination with ████████ and ██████ the Consul General discussed above. Communications between ████ ████████ ████████ and ██████ indicate, in substance and in part, that ████ was also involved in the meeting to plan the ██████ fundraiser discussed above.  On April 13, 2019, ████████ wrote ████ in an effort to arrange a meeting, stating in part "We've been in contact with regard to Eric Adams before."  On January 11, 2022, ████████ again attempted to arrange a meeting with ████, and wrote in part "We talked to each other during Eric Adams' visits to Turkey, if you recall."

---

[12]    The material portions of these records appear to be largely or entirely in Turkish, and their review is not yet complete.

09.20.2021

SDNY_01_000004513
SUBJECT TO PROTECTIVE ORDER.

26. I understand based on my previous experience with the searches of iCloud accounts that based on the settings on the Subject Account, it is likely to contain copies of messages sent to or by ▮▮▮▮ using certain applications such as iMessage (which is often used to exchange text messages on the Provider's devices) and various email programs, to the extent ▮▮▮▮ used those methods of communication, as well as photographs and calendar, contact, and location information reflecting meetings and other associations. I also know from my experience in this case searching other iCloud accounts like the Subject Account that they may contain communications exchanged on applications such as WhatsApp and Signal, even if that cannot be discerned from the records I currently possess.

27. For the reasons detailed above, I submit that there is probable cause to believe that evidence of communications concerning the contribution of funds from foreign nationals and under the names of donors other than the true donor, some of which may have obtained matching funds for which they were not eligible, in the exchange of benefits between Adams and entities acting at the behest of Turkey's Consul General, and other evidence of the Subject Offenses described in Section II of Attachment A to the proposed warrant are likely to be found in the Subject Account.

28. <u>Temporal Limitation</u>. This application is limited to all content created, sent, or received on or after January 1, 2018, which is the year in which the current records reflect Adams, ▮▮▮▮ and ▮▮▮▮ beginning to communicate about the Consul General's assistance to the Adams Campaign, and ▮▮▮▮ and ▮▮▮▮ discussing possible Turkish contributions to that campaign.

**C. Evidence, Fruits and Instrumentalities**

29. Based upon the foregoing, I respectfully submit there is probable cause to believe that information stored on the Provider's servers associated with the Subject Account will contain

23

09.20.2021

SDNY_01_000004514
SUBJECT TO PROTECTIVE ORDER.

evidence, fruits, and instrumentalities of the Subject Offenses, as more fully described in Section II of Attachment A to the proposed warrant.

### III. Review of the Information Obtained Pursuant to the Warrant

30. Pursuant to 18 U.S.C. § 2703(g), the presence of a law enforcement officer is not required for service of a search warrant issued under § 2703, or for the collection or production of responsive records. Accordingly, the warrant requested herein will be transmitted to the Provider, which shall be directed to produce a digital copy of any responsive records to law enforcement personnel within 30 days from the date of service. Law enforcement personnel (who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, agency personnel assisting the government in this investigation, and outside technical experts under government control) will retain the records and review them for evidence, fruits, and instrumentalities of the Subject Offenses as specified in Section III of Attachment A to the proposed warrant.

31. In conducting this review, law enforcement personnel may use various methods to locate evidence, fruits, and instrumentalities of the Subject Offenses, including but not limited to undertaking a cursory inspection of all emails within the Subject Account. This method is analogous to cursorily inspecting all the files in a file cabinet in an office to determine which paper evidence is subject to seizure. Although law enforcement personnel may use other methods as well, particularly including keyword searches, I know that keyword searches and similar methods are typically inadequate to detect all information subject to seizure. As an initial matter, keyword searches work only for text data, yet many types of files commonly associated with emails, including attachments such as scanned documents, pictures, and videos, do not store data as searchable text. Moreover, even as to text data, keyword searches cannot be relied upon to capture all relevant communications in an account, as it is impossible to know in advance all of the unique

09.20.2021

SDNY_01_000004515
SUBJECT TO PROTECTIVE ORDER.

words or phrases that investigative subjects will use in their communications, and consequently there are often many communications in an account that are relevant to an investigation but that do not contain any keywords that an agent is likely to search for.

**IV. Request for Non-Disclosure and Sealing Order**

32. The existence and scope of this ongoing criminal investigation is not publicly known. As a result, premature public disclosure of this affidavit or the requested warrant could alert potential criminal targets that they are under investigation, causing them to destroy evidence, flee from prosecution, or otherwise seriously jeopardize the investigation. As is set forth above, subjects of this investigation are known to use computers and electronic communications, including encrypted messaging applications, in furtherance of their activity and thus could easily delete, encrypt, or otherwise conceal such digital evidence from law enforcement were they to learn of the Government's investigation. *See* 18 U.S.C. § 2705(b)(3).

33. Accordingly, there is reason to believe that, were the Provider to notify the subscribers or others of the existence of the warrant, the investigation would be seriously jeopardized. Pursuant to 18 U.S.C. § 2705(b), I therefore respectfully request that the Court direct the Provider not to notify any person of the existence of the warrant for a period of one year from issuance, subject to extension upon application to the Court, if necessary.

34. For similar reasons, I respectfully request that this affidavit and all papers submitted herewith be maintained under seal until the Court orders otherwise, except that the Government be permitted without further order of this Court to provide copies of the warrant and affidavit as need be to personnel assisting it in the investigation and prosecution of this matter, and to disclose those materials as necessary to comply with discovery and disclosure obligations in any prosecutions related to this matter.

25

09.20.2021

SDNY_01_000004516
SUBJECT TO PROTECTIVE ORDER.

**V.Conclusion**

35. Based on the foregoing, I respectfully request that the Court issue the warrant sought herein pursuant to the applicable provisions of the Stored Communications Act, 18 U.S.C. § 2703(b)(1)(A) (for contents) and § 2703(c)(1)(A) (for records and other information), and the relevant provisions of Federal Rule of Criminal Procedure 41.

S/ by the Court with permission

_____

Special Agent
Federal Bureau of Investigation

Special Agent ▮▮ attested to this Affidavit by telephone pursuant
to F.R.C.P. 4.1(b)(1)(A) on July 12, 2023

_____
Honorable Robert W. Lehrburger
United States Magistrate Judge
Southern District of New York

26

09.20.2021

SDNY_01_000004517
SUBJECT TO PROTECTIVE ORDER.

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

In the Matter of a Warrant for All
Content and Other Information
Associated with iCloud Account
████████@gmail.com, Maintained at
Premises Controlled by Apple Inc.,
USAO Reference No. 2021R00778

# 23 MAG 5464

## SEARCH WARRANT AND NON-DISCLOSURE ORDER

TO:    Apple Inc. ("Provider")

Federal Bureau of Investigation ("Investigative Agency")

**1. Warrant.** Upon an affidavit of Special Agent ████ ████ of the Federal Bureau of Investigation, and pursuant to the provisions of the Stored Communications Act, 18 U.S.C. § 2703(b)(1)(A) and § 2703(c)(1)(A), and the relevant provisions of Federal Rule of Criminal Procedure 41, the Court hereby finds there is probable cause to believe the iCloud account ████████@gmail.com, maintained at premises controlled by the Provider, contains evidence, fruits, and instrumentalities of crime, all as specified in Attachment A hereto.  Accordingly, the Provider is hereby directed to provide to the Investigative Agency, within 30 days of the date of service of this Warrant and Order, the records specified in Section II of Attachment A hereto, for subsequent review by law enforcement personnel as authorized in Section III of Attachment A. The Government is required to serve a copy of this Warrant and Order on the Provider within 14 days of the date of issuance.  The Warrant and Order may be served via electronic transmission or any other means through which the Provider is capable of accepting service.

**2. Non-Disclosure Order.** Pursuant to 18 U.S.C. § 2705(b), the Court finds that there is reason to believe that notification of the existence of this warrant will result in destruction of or tampering with evidence, or otherwise will seriously jeopardize an ongoing investigation.

SUBJECT TO PROTECTIVE ORDER.

Accordingly, it is hereby ordered that the Provider shall not disclose the existence of this Warrant and Order to the listed subscriber or to any other person for a period of one year from the date of this Order, subject to extension upon application to the Court if necessary, except that Provider may disclose this Warrant and Order to an attorney for Provider for the purpose of receiving legal advice.

**3. Sealing.** It is further ordered that this Warrant and Order, and the Affidavit upon which it was issued, be filed under seal, except that the Government may without further order of this Court serve the Warrant and Order on the Provider; provide copies of the Affidavit or Warrant and Order as need be to personnel assisting the Government in the investigation and prosecution of this matter; and disclose these materials as necessary to comply with discovery and disclosure obligations in any prosecutions related to this matter.

Dated: New York, New York

July 12, 2023
_____
Date Issued

10:10 am
_____
Time Issued

_____
UNITED STATES MAGISTRATE JUDGE
Southern District of New York

2

09.20.2021

SDNY_01_000004519
SUBJECT TO PROTECTIVE ORDER.

## iCloud Search Attachment A

**I.Subject Account and Execution of Warrant**

This warrant is directed to Apple Inc. (the "Provider"), headquartered at 1 Infinite Loop, Cupertino, California 95014, and applies to all content and other information within the Provider's possession, custody, or control associated with the iCloud Account ████████@gmail.com (the "Subject Account").

A law enforcement officer will serve this warrant by transmitting it via email or another appropriate manner to the Provider. The Provider is directed to produce to the law enforcement officer an electronic copy of the information specified in Section II below.  Upon receipt of the production, law enforcement personnel will review the information for items falling within the categories specified in Section III below.

**II.Information to be Produced by the Provider**

To the extent within the Provider's possession, custody, or control, the Provider is directed to produce the following information associated with the Subject Account:

a.  *Subscriber and payment information*.   All subscriber and payment information regarding the Subject Account, including but not limited to name, username, address, telephone number, alternate email addresses, registration IP address, account creation date, account status, length of service, types of services utilized, means and source of payment, and payment history.

b.  *Device information and settings*.  All information about the devices associated with the Subject Account, including but not limited to the Integrated Circuit Card ID ("ICCID") number, the Media Access Control address ("MAC address"), the unique device identifier ("UDID"), the serial number, customer device settings, and repair history.

c.  *Transactional records*.  All transactional records associated with the Subject Account, including any IP logs or other records of session times and durations.

SUBJECT TO PROTECTIVE ORDER.

d. *Address book information*.   All address book, contact list, or similar information associated with the Subject Account.

e. *Call history and voicemails*.   All call histories, logs for FaceTime calls, audio voicemails, and visual voicemails associated with the Subject Account.

f. *Text message content*.  All text messages (including iMessages, Short Message Service ("SMS") messages, and Multimedia Messaging Service ("MMS") messages) sent to or from, stored in draft form in, or otherwise associated with the Subject Account, including all message content, attachments, and header information (specifically including the source and destination addresses associated with each text message, and the date and time at which each text message was sent).

g. *Email content*.   All emails sent to or from, stored in draft form in, or otherwise associated with the Subject Account, including all message content, attachments, and header information (specifically including the source and destination addresses associated with each email, the date and time at which each email was sent, and the size and length of each email).

h. *Photos and video*s.  All photographs or videos associated with the Subject Account, including any photographs or videos found on any iCloud Photo Library, My Photo Stream, or iCloud Photo Sharing service linked to the Subject Account.  All associated metadata with any photograph or video including the time and date of creation, the author or creator, the means of its creation, and the GPS location information for where a photo or video was taken.

i. *Documents*.  All documents stored in or otherwise associated with the Subject Account, including all documents in iCloud Drive, and iWork Apps.

j. *Search and web histories*. All search history, web history, bookmarks, and iCloud Tabs.

09.20.2021

SDNY_01_000004521
SUBJECT TO PROTECTIVE ORDER.

    k.  *Third-party application data*.  All records, messages, and data relating to third-party applications, including WhatsApp and other third-party messaging applications, stored in or otherwise associated with the Subject Account.

    l.  *Location data*.  All location data associated with the Subject Account.

    m.  *iOS Device Backups*.  All device backups, and the contents of those backups, including but not limited to messages, web history, and preferences.

    <u>Temporal Limitation</u>. This application is limited to all content created, sent, or received on or after January 1, 2018.

## III. Review of Information by the Government

    Law enforcement personnel (who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, agency personnel assisting the government in this investigation, and outside technical experts under government control) are authorized to review the records produced by the Provider in order to locate any evidence, fruits, and instrumentalities of theft of federal funds, wire fraud, making and soliciting a contribution by a foreign national, and conspiracy to commit the same, in violation of 18 U.S.C. §§ 371, 666, 1343, and 1349, and 52 U.S.C. § 30121 (the "Subject Offenses"), including the following:

    a.  Evidence of knowledge or understanding of, or intent to violate, laws and regulations governing the conduct of the 2021 New York City Mayoral campaign on the part of ██████████████████ and its employees, officers, or associates (███████); the Turkish Government, including its Consulate General in New York and its employees, officers, or associates; or the 2021 New York City mayoral campaign of Eric Adams and its employees, officers, or associates (the "Adams Campaign").

    b.  Evidence relating to coordination between ████, Turkish nationals, or the Turkish Government and the Adams Campaign concerning political contributions to the Adams Campaign,

09.20.2021

SDNY_01_000004522
SUBJECT TO PROTECTIVE ORDER.

including, but not limited to, evidence of motive and intent for ███ Turkish nationals, or the Turkish Government to provide or facilitate campaign contributions to the Adams Campaign, and evidence of motive and intent by Adams, the Adams Campaign, or any employees or associates of Adams or the Adams Campaign to provide benefits, whether lawfully or unlawfully, to ███ Turkish nationals, or the Turkish Government in return for campaign contributions.

c.   Evidence relating to payments to employees, officers, and associates of ███ to facilitate those employees, officers, and associates making campaign contributions to the Adams Campaign.

d.   Evidence relating to the source of funds for payment or reimbursement of employees, officers, and associates of ███ or other persons serving as conduits for campaign contributions to the Adams Campaign originating from Turkish nationals.

e.   Evidence of individuals or entities who donated to the Adams Campaign before or after receiving transfers of funds similar to the amount of the donation.

f.   Identity of any persons or entities involved, wittingly or unwittingly, in straw donations to the Adams Campaign.

g.   Evidence of the relationship between ███ the Turkish Government, Turkish nationals covertly contributing to the Adams campaign, Adams, and/or the Adams Campaign, including all communications with or about, contact information for, and meetings and appointments with co-co-conspirators.

h.   Evidence of an intent to exchange benefits between Turkish Government or entities and persons acting at its behest, and Adams or the Adams' campaign, including but not limited to the straw donations discussed above and any actions taken by Adams or any persons connected to

4

09.20.2021

SDNY_01_000004523
SUBJECT TO PROTECTIVE ORDER.

Adams on behalf of the Turkish Government, ███ or entities and persons acting at the behest of the Turkish Government.

   i. Passwords or other information needed to access user's online accounts, including encrypted data stored in the Subject Account.

   j. Evidence sufficient to establish the owners and users of the Subject Account at times relevant to the Subject Offenses.

   k. Evidence of the geographic location of users, computers, or devices involved in the commission of the Subject Offenses at times relevant to the Subject Offenses.

09.20.2021

5

SDNY_01_000004524
SUBJECT TO PROTECTIVE ORDER.